**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RCS CAPITAL CORPORATION, <u>et al.</u>, | ) | Case No. 16-10223 (   ) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors.[1] | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS: (I) PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364 AND 507 AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH
COLLATERAL OF PREPETITION SECURED PARTIES, AND (D) GRANT
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: RCS Capital Corporation (4716); American National Stock Transfer, LLC (3206); Braves Acquisition, LLC (6437); DirectVest, LLC (9461); J.P. Turner & Company Capital Management, LLC (7535); RCS Advisory Services, LLC (4319); RCS Capital Holdings, LLC (9238); Realty Capital Securities, LLC (0821); SBSI Insurance Agency of Texas, Inc. (9203); SK Research LLC (4613); Trupoly, LLC (5836); and We R Crowdfunding, LLC (9785).  The Debtors' corporate headquarters and mailing address is located at 405 Park Avenue, 14th Floor, New York, NY 10022.

# TABLE OF CONTENTS

**Page**

JURISDICTION ........................................................................................................... 2

BACKGROUND .......................................................................................................... 3

A.    General Background ........................................................................................... 3

B.    The Debtors' Prepetition Funded Indebtedness .................................................. 4

C.    The Debtors' Liquidity Needs ............................................................................ 6

D.    The Debtors' Efforts to Obtain Postpetition Financing ...................................... 8

  i.    The Junior Capital Raise and the Shift to a Negotiation of a More
    Comprehensive Restructuring ................................................................... 8

  ii.    The DIP Facility ..................................................................................... 11

PRINCIPAL TERMS OF THE DIP FACILITY ....................................................... 13

REQUIREMENTS UNDER LOCAL RULE 4001-2 ................................................ 26

RELIEF REQUESTED ............................................................................................. 30

BASIS FOR RELIEF ................................................................................................ 31

A.    The Debtors Satisfy the Requirements for Obtaining  Credit Pursuant to Section
  364(c) of the Bankruptcy Code ......................................................................... 32

  i.    The Debtors Could Not Obtain Unsecured Financing ................................ 33

  ii.    The DIP Facility Is Necessary to Preserve Estate Assets and  Is an Exercise of
    the Debtor's Reasonable Business Judgment ............................................ 34

  iii.    The Terms of the DIP Facility Are Fair, Within the Range  of Reasonableness,
    and Appropriate Under the Circumstances ............................................... 36

B.    Financing Pursuant to Section 364(d) of the Bankruptcy Code is Appropriate ................ 38

  i.    The Debtors Are Unable to Obtain Financing From Any Other Source .................... 40

  ii.    The Prepetition Agents and Required Lenders, For Themselves and On Behalf
    of the Prepetition Secured Parties, Do Not Object to Being Primed .......................... 41

C.    The Debtors' Proposed Grant of Adequate  Protection to Use Cash Collateral Is
  Appropriate ...................................................................................................... 43

D.    The DIP Facility Was Negotiated in Good Faith and Should Be  Afforded the
  Protection of Section 364(e) of the Bankruptcy Code ....................................... 44

E.    Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy
  Code Is Appropriate Under the Circumstances .................................................. 44

F.    Liens on the Proceeds of Avoidance Actions Are Appropriate ........................... 45

G.    Funding to Non-Debtor Entities is Appropriate ................................................ 47

# TABLE OF CONTENTS
(continued)

**Page**

H.    Approval of the DIP Facility on an Interim Basis Is  Necessary to Prevent Immediate and Irreparable Harm..........................................................................48

REQUEST FOR A FINAL HEARING AND  ESTABLISHING RELATED NOTICE PROCEDURES..................................................................................................50

WAIVER OF BANKRUPTCY RULES 6004(H) AND LOCAL RULE 9013-1(M) .................50

NOTICE.........................................................................................................51

CONCLUSION.................................................................................................52

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their proposed undersigned attorneys, hereby file this motion (this "**Motion**") for the entry of an interim order, substantially in the form attached hereto as <u>**Exhibit A**</u> (the "**Interim Order**"),[2] and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"),[3] pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"): (A) authorizing the Debtors to (i) obtain financing under a senior secured super-priority debtor-in-possession term loan facility (the "**DIP Facility**"), (ii) grant liens (the "**DIP Liens**") and super-priority claims to the lenders providing the DIP Facility (the "**DIP Lenders**"), (iii) utilize Cash Collateral (as defined below) of the Prepetition Secured Parties (as defined below), and (iv) enter into certain fee and commitment letters[4] with, and pay related fees to, the DIP Agent (as defined below) and DIP Lenders in connection with the funding of the DIP Facility and (v) grant adequate protection to the Prepetition Secured Parties; (B) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**"); and (C) granting related relief to the Debtors.  Pending the Final Hearing and entry of the Final Order, the Debtors respectfully request that the DIP Facility be approved on an interim basis under the terms of that certain Superpriority Secured Debtor-in-Possession Term Loan Agreement entered into on or

---

[2]    Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Interim Order or the DIP Credit Agreement (as defined below), as applicable.

[3]    The Debtors will provide a proposed form of Final Order to this Court, the Office of the United States Trustee for the District of Delaware, and all parties-in-interest upon appropriate notice in advance of the Final Hearing.

[4]    Attached hereto in substantially final form are the fee letter executed by Barclays Bank PLC and RCS Capital Corporation in connection with the DIP Credit Agreement (the "**Fee Letter**") and the commitment letter executed by Barclays Bank PLC and RCS Capital Corporation in connection with the DIP Credit Agreement (the "**Commitment Letter**") as <u>Exhibit D</u> and <u>Exhibit E</u>, respectively.

about the date hereof attached to the Interim Order as **Exhibit 1** (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of the Interim Order, the Final Order and thereof, the "**DIP Credit Agreement**"), among RCS Capital Corporation (a debtor in possession), as borrower, the guarantors party thereto from time to time, Barclays Bank PLC, as administrative agent, collateral agent, sole lead arranger, sole bookrunner and sole syndication agent (the "**DIP Agent**"), and the DIP Lenders.

In support of this Motion, the Debtors rely upon and incorporate by reference the (i) *Declaration of Christian Tempke in Support of Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "**Tempke Declaration**"), a copy of which is attached hereto as **Exhibit B**, and (ii) the *Declaration of David Orlofsky Chief Restructuring Officer of RCS Capital Corporation In Support of Chapter 11 Petitions and Various First Day Applications and Motions* filed contemporaneously herewith (the "**First Day Declaration**"), and further respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Bankruptcy Cases, this Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Consideration of this Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court

would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

2.       Venue of these chapter 11 cases (the "**Bankruptcy Cases**") and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of title 11 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Bankruptcy Rules, and Local Rules 4001-2 and 9013-1(m).

## BACKGROUND

**A.       General Background**

4.       On the date hereof (the "**Petition Date**"), each Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Bankruptcy Cases and no request has been made for the appointment of a trustee or an examiner.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of the Bankruptcy Cases for procedural purposes only, pursuant to Rule 1015(b) of the Bankruptcy Rules.

5.       Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Bankruptcy Cases is set forth in the First Day Declaration.

**B.     The Debtors' Prepetition Funded Indebtedness[5]**

6.     As of the Petition Date, the Debtors have funded debt facilities in place with an aggregate face amount of approximately $873.6 million, of which approximately $709.2 million is secured debt and $164.4 million is unsecured debt.  The below chart summarizes the Debtors' prepetition indebtedness:

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| (i) $575.0 million Senior Secured First Lien Term Loan Facility (the "**First Lien Term Facility**") and (ii) $25.0 million Senior Secured First Lien Revolving Facility (the "**First Lien Revolver**," and together with the First Lien Term Facility, the "**First Lien Credit Facility**") | First Lien Credit Agreement (as amended, restated, modified, or supplemented, and in effect on the date hereof, the "**First Lien Credit Agreement**"), dated as of April 29, 2014, among RCS Capital Corporation, as Borrower, RCAP Holdings, LLC, RCS Capital Management, LLC, and the Subsidiary Guarantors, as Guarantors, the lenders and other parties from time to time party thereto, and Barclays Bank PLC, as Administrative Agent and Collateral Agent (in its capacity as the Administrative Agent thereunder, the "**First Lien Agent**") | $532.2 million under the First Lien Term Facility $23.8 million under the First Lien Revolving Facility | First Lien Term Facility: April 29, 2019 First Lien Revolver: Commitments Terminated Prepetition | First Lien Secured[6] |

---

[5]   A more detailed description of the Debtors' prepetition capital structure can be found in Part II of the First Day Declaration.  The descriptions in the First Day Declaration and herein of the Prepetition Secured Facilities are qualified in their entirety by the terms of the documentation governing the Prepetition Secured Facilities.  In the event of any conflict between the description herein and the terms of the documentation governing the Prepetition Secured Facilities, the terms of the Prepetition Secured Facilities shall control.

[6]   Although the First Lien Agent and the Second Lien Agent have identical collateral packages, the relative rights, remedies and lien priorities of the First Lien Lenders and Second Lien Lenders under the Prepetition Secured Facilities are governed by that certain Intercreditor Agreement (as amended, restated, modified, or supplemented, and together with any ancillary documents thereto), dated as of April 29, 2014, subject to that certain Amended and Restated Intercreditor Agreement, the form of which is attached to the Interim Order as Exhibit 2 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Intercreditor Agreement**").

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| $150.0 million Senior Secured Second Lien Term Loan Facility (the "**Second Lien Credit Facility**," and together with the First Lien Credit Facility, the "**Prepetition Secured Facilities**") | Second Lien Credit Agreement (as amended, restated, modified, or supplemented, and in effect on the date hereof, the "**Second Lien Credit Agreement**"), dated as of April 29, 2014, among RCS Capital Corporation, as Borrower, RCAP Holdings, LLC, RCS Capital Management, LLC, and the Subsidiary Guarantors, as Guarantors, the lenders and other parties from time to time party thereto, and Wilmington Trust, National Association, as successor Administrative Agent and Collateral Agent (in its capacity as the Administrative Agent thereunder, the "**Second Lien Agent**," and together with the First Lien Agent, the "**Prepetition Agents**") | $153.2 million | April 29, 2021 | Second Lien Secured |
| $120.0 million aggregate principal amount of 5.00% Convertible Senior Notes due 2021 (collectively, the "**Convertible Notes**") | Indenture (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of April 29, 2014, among RCS Capital Corporation and Wilmington Trust, National Association, as Indenture Trustee | $121 million | November 1, 2021 | Unsecured |
| $15.3 million Unsecured Promissory Note | Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of December 4, 2014, between RCS Capital Corporation and ARC Properties Operating Partnership, L.P. | $15.5 million | March 31, 2017 | Unsecured |

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| (i) $12,000,000 Senior Unsecured Promissory Note issued to RCAP Holdings, LLC, (ii) $6,080,000 Senior Unsecured Promissory Note issued to Luxor Capital Partners, LP, (iii) $1,447,000 Senior Unsecured Promissory Note issued to Luxor Wavefront, LP, (iv) $7,128,000 Senior Unsecured Promissory Note issued to Luxor Capital Partners Offshore Master Fund, LP, and (v) $315,000 Senior Unsecured Promissory Note issued to Thebes Offshore Master Fund, LP (collectively, the "**2015 Promissory Notes**") | Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and RCAP Holdings, LLC<br><br>Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Capital Partners, LP<br><br>Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Wavefront, LP<br><br>Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Capital Partners Offshore Master Fund, LP<br><br>Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Thebes Offshore Master Fund, LP | $27.9 million | November 11, 2021 | Unsecured |

## C.    The Debtors' Liquidity Needs

7.    As described more fully in the First Day Declaration, beginning in early 2014 and through early 2015, the Debtors and certain non-debtor affiliates made 11 significant acquisitions in an effort to build out the their businesses' retail presence.  In connection with these acquisitions, the Debtors and their affiliates incurred approximately $1.1 billion in debt and used in excess of $150 million in existing cash on hand, which led to significant declines in liquidity.  See First Day Declaration ¶¶ 76–78.  Further, a number of

factors and events contributed to a decline in the Debtors' operating and financial performance including, but not limited to:  (a) accounting irregularities at American Realty Capital Properties, Inc., a company associated with RCS Capital Corporation's controlling shareholder, adversely affected the Company's ability to raise equity capital and, as a result, generate wholesale revenues; (b) the failure to consummate an announced sale transaction with Apollo Management Holdings, L.P.; and (c) the filing of administrative complaint against Debtor Realty Capital Securities by the Massachusetts Securities Division.  See First Day Declaration ¶¶ 80–81.

8.     As a result of the foregoing, the Debtors had been operating under severe liquidity constraints prior to the Petition Date and did not have sufficient projected short-term liquidity to service its amortization and interest payment obligations under the Prepetition Secured Facilities.  On December 31, 2015, the Company failed to make a $14.4 million amortization payment and $5 million interest payment under the First Lien Credit Facility and $5.1 million in combined interest payments under the Prepetition Secured Facilities.  Given these liquidity constraints, the Debtors' existing capital structure is no longer sustainable based on $60 million of first-lien amortization and approximately $60 million of cash interest payments and the Debtors are, therefore, in immediate need of postpetition financing.  See First Day Declaration ¶ 82.  Absent access to the proposed DIP Facility, the Debtors' business operations will be severely constrained, which would have a detrimental effect on the continued viability and value of the Debtors' businesses as a whole.

9.     Prior to the Petition Date, the Debtors, with the assistance of their financial and operational advisors, Lazard Frères & Co. ("**Lazard**"), and Zolfo Cooper, LLC, respectively, analyzed their cash needs in an effort to determine the amounts necessary to fund their operations in chapter 11.  See First Day Declaration ¶ 83; Tempke Declaration ¶ 16.

10.     Based on the Debtors' financial analysis and projections, absent approval of the DIP Facility and the Debtors' access to Cash Collateral, to which the Prepetition Agents have consented, the Debtors will not have sufficient cash to, among other things, continue operating their businesses, maintain business relationships with their vendors and suppliers, pay employee wages in the ordinary course, make necessary capital expenditures and capital lease payments, or satisfy other working capital and operational needs, provide funding to each non-Debtor broker-dealer subsidiary of the Borrower as required to maintain sufficient capital and liquidity to permit continued operation of such broker-dealer subsidiary, including as may be required under applicable laws, regulations and supervisory requirements during the pendency of the Bankruptcy Cases.  Accordingly, the Debtors require immediate access to the DIP Facility and authority to use the Cash Collateral to ensure that sufficient working capital is available to further their operations and reorganization efforts.  See Tempke Declaration ¶¶ 7–10.

**D.     The Debtors' Efforts to Obtain Postpetition Financing**

11.     Prior to the Petition Date, and as set forth more fully in the Tempke Declaration and the First Day Declaration, the Debtors explored various strategic alternatives, including a junior capital raise, as more fully described below.

*i.     The Junior Capital Raise and the Shift to a Negotiation of a More Comprehensive Restructuring*

12.     On September 15, 2015, the Company engaged Lazard as investment banker, initially to assist the Company in exploring one or more potential transactions, including a significant junior capital raise.  See Tempke Declaration ¶ 16.  Immediately following its engagement, Lazard commenced diligence review of the Company's financial projections and assisted management in developing a Confidential Information Memorandum ("**CIM**") and constructing an electronic data room.  Id.  Lazard held discussions with over twenty potential

investors, ten of whom executed confidentiality agreements for the junior capital raise.  The CIM and other financial information were provided to, and management meetings were held with, ten interested parties.  Id.  Ultimately, only two parties submitted final bids which were in the form of offers to purchase the Debtors' and non-debtors affiliates' assets, neither of which was acceptable to the Debtors or the Participating Prepetition Lenders, as both were insufficient to pay off the debt outstanding under First Lien Credit Facility.  Id.  Subsequently, the Company received a non-binding proposal from Luxor setting forth a potential equity investment in RCS Capital Corporation, but Luxor subsequently abandoned that proposal.  Id.

13.    In early December 2015 in became clear that the Debtors' attempts to raise junior capital or to sell their businesses would not be fruitful, therefore the Debtors shifted their focus to a balance sheet restructuring.  See Tempke Declaration ¶ 17.  The Debtors expanded the scope of Lazard's engagement to include the negotiation and consummation of an out-of-court or in-court restructuring transaction and, with the assistance of Lazard, Zolfo Cooper, and Dechert LLP, as legal counsel, the Debtors began an extensive, good-faith negotiating process with the Participating Prepetition Lenders and Luxor.  Id.  The process included presentations to the Participating Prepetition Lenders regarding the Debtors' financial situation and estimates of the Debtors' anticipated cash needs during a chapter 11 filing and after emergence.  Id.

14.    Specifically, in the months leading up to the filing of these Bankruptcy Cases, the Debtors, with the assistance of their advisors, contacted, over twenty interested parties, including lenders under the First Lien Credit Facility (collectively, the "**First Lien Lenders**"), lenders under the Second Lien Term Facility (collectively, the "**Second Lien Lenders**" and together with the First Lien Lenders, the "**Participating Prepetition Lenders**"), and Luxor Capital Group, L.P., a holder or manager to one or more holders of the Convertible Notes, a

substantial amount of the 2015 Promissory Notes, and the Preferred Stock of RCS Capital Corporation (in such capacities, "**Luxor**"), regarding financing alternatives for the Debtors, including a significant junior capital raise, and, beginning in December 2015, the terms of a potential restructuring of the Debtors.  See Tempke Declaration ¶¶ 16–17.

15.     Negotiations with the Participating Prepetition Lenders with respect to the terms of a potential restructuring continued for approximately eight weeks.  See Tempke Declaration ¶ 18.  This effort involved protracted negotiations, responding to multiple rounds of diligence requests, in-depth discussions about the terms for DIP financing, the overall restructuring strategy, the advisor retention program and exit financing needs.  Id.  Due to the unique circumstances associated with the Debtors' businesses (*i.e.* that the core business is conducted at broker-dealer subsidiaries that are ineligible for chapter 11 relief and through independent financial advisors with transferrable businesses), the Debtors stressed the need to prioritize consensual and operational stability over any one creditor constituency's ability to maximize its own recoveries.  Id.  Through these negotiations, the Participating Prepetition Lenders worked collaboratively with the Debtors and made significant concessions to creditors more junior in the capital stack in negotiating a restructuring framework, including with respect to the DIP Facility to be provided by the Participating Prepetition Lenders.  Id.

16.     These discussions ultimately led to (a) an agreement between the Debtors, certain of the First Lien Lenders and Second Lien Lenders, and Luxor on the terms set forth in the Restructuring Support Agreement dated January 29, 2016 attached to the First Day Declaration (the "**RSA**") and the Debtors' proposed chapter 11 plan filed contemporaneously herewith (the "**Plan**"), (b) the documenting of the DIP Facility to be provided by certain of the First Lien Lenders and Second Lien Lenders and (c) the Prepetition Agents' and requisite First

Lien Lenders' and requisite Second Lien Lenders' consent to priming liens and the use of Cash Collateral.  See First Day Declaration ¶¶ 88–90; Tempke Declaration ¶ 14.

17.     Concurrently with these discussions, and although it appeared highly unlikely that a third-party financing source would be willing to provide post-petition financing on a junior or unsecured basis, Lazard nonetheless continued to solicit interest for such financing. See Tempke Declaration ¶ 25.  Lazard contacted three additional sophisticated third-party financing sources with respect to post-petition financing, each of which has extensive experience in extending and syndicating post-petition financing under similar circumstances.  Id.  However, none of the potential financing sources that were approached offered or agreed to provide post-petition financing on a junior or unsecured basis.  Id.

### ii.    *The DIP Facility*

18.     Once the importance of the DIP Facility to the overall restructuring became apparent, and for other reasons as described below, the Debtors, in consultation with Lazard, decided to concentrate their efforts on improving the terms of the DIP Facility proposed by the Participating Prepetition Lenders.  See Tempke Declaration ¶ 20.  Extensive good-faith negotiations between the Debtors and the Participating Prepetition Lenders occurred over the weeks leading up to the Petition Date, where the Debtors were successful in improving certain key terms of the DIP Facility.  Id.  Moreover, the Debtors determined, with the assistance of their advisors, that obtaining post-petition financing from third party financing sources appeared significantly less likely and not practicable for a number of reasons, in part due to the significant benefits offered by the DIP Facility:

- First, as noted above, the DIP Facility is an integral part of the Debtors' overall restructuring strategy and was offered by the Participating Prepetition Lenders in connection with entry into the RSA in order to provide the Debtors with the capital necessary to execute the

restructuring plan developed by the Debtors in concert with their key stakeholders;

- <u>Second</u>, the RSA contemplates that upon the effective date of the Plan and the satisfaction of certain other conditions, that the DIP Facility will be satisfied out of the proceeds of the Exit Facility, ensuring the Debtors' continued access to liquidity following consummation of the Plan;

- <u>Third</u>, given the Debtors' need for immediate liquidity and stabilization, it was critical to find lenders that were already familiar with the Debtors' business and willing to provide commitments and funding on an expedited timeline, along with an agreed resolution for the remainder of the capital structure, avoiding a long and drawn out diligence process with potential third party financing sources or investors;

- <u>Fourth</u>, it is highly likely that any third party lender would have required a priming security interest in the pre-petition lenders' collateral given the Debtors' "asset-lite" balance sheet and general lack of unencumbered assets that could be utilized in a financing. Without consensual priming of the Participating Prepetition Lenders' security interests, which consent did not appear to be forthcoming based on feedback from negotiations, a priming DIP facility could have given rise to a "priming fight", which could have had a significant negative impact on the Debtors' business, their the retention of their already fragile financial advisor base and the cost of these chapter 11 cases;

- <u>Fifth</u>, as noted above, the results of the prior junior capital raise process were not promising, and the additional outreach performed by Lazard to-date has been unsuccessful in producing any serious interest from third parties for providing postpetition financing; and

- <u>Finally</u>, the Debtors, after having insufficient liquidity to make interest and amortization payments that became due on the First Lien Credit Facility in December 2015 and interest that became due on the Second Lien Credit Facility in December 2015, were able to obtain short-term forbearances from the Prepetition Secured Parties (as defined below) in order to continue negotiations with respect to a consensual restructuring. The Debtors' focus given the existence of the default and limited forbearance, was ensuring that they reached a deal with the Prepetition Secured Parties to ensure a well funded, and soft landing, in these chapter 11 cases.

Based on the foregoing and the Debtors' existing capital structure and immediate liquidity needs, in the exercise of their reasonable business judgment, the Debtors concluded that the DIP Facility is the best financing option available to them at this time and is in the best interests of the Debtors' estates and stakeholders.  See Tempke Declaration ¶¶ 21–27.

## **PRINCIPAL TERMS OF THE DIP FACILITY**[7]

19.    As required by Bankruptcy Rules 4001(b) and 4001(c) and Local Rule 4001-2, the following is a summary of the material terms of the DIP Facility as set forth in the DIP Credit Agreement and the Interim Order:

| | |
|---|---|
| **Facility Structure**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | DIP Facility in the aggregate principal amount of $100 million net of the DIP Discount (as defined below), $25 million of which, net of the Interim Discount (as defined below) and the Administrative Agent Fees (as defined in the DIP Credit Agreement), shall be available following entry of the Interim Order, with the remainder of the DIP Facility loans, net of the Final Discount (as defined below) and any fronting or similar fees and administrative fees, to be made available upon entry of the Final Order.<br><br>See DIP Credit Agreement at p. 1; Interim Order at ¶¶ Preamble (v), 2. |
| **Borrower**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | RCS Capital Corporation, as a Debtor in the Bankruptcy Cases (the "**Borrower**")<br><br>See DIP Credit Agreement at p. 1; Interim Order at ¶¶ Preamble (i); 2. |
| **Guarantors**<br><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each subsidiary of the Borrower (other than (i) broker-dealer subsidiaries of the Borrower and (ii) for so long as it is not a wholly owned subsidiary of the Borrower, Docupace Technologies, LLC) shall act as a guarantors under the DIP Facility pursuant to the Guarantee Agreement (as defined in the DIP Credit Agreement) (the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**").<br><br>See DIP Credit Agreement at p. 1; Ex. G; Interim Order at ¶¶ Preamble (i); 2. |
| **Administrative and Collateral Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Barclays Bank PLC, as administrative agent, collateral agent, sole lead arranger, sole bookrunner and sole syndication agent (in such capacities, the "**DIP Agent**").<br><br>See DIP Credit Agreement at p. 1; Interim Order at ¶ Preamble (i). |

---

[7]    This summary is qualified in its entirety by the provisions of the DIP Loan Documents (as defined herein).

| | |
|---|---|
| **DIP Lenders**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Certain prepetition lenders under the Prepetition Secured Facilities will act as lenders under the DIP Facility.<br><br><u>See</u> DIP Credit Agreement at 1; Sched. 2.01; Interim Order at ¶ Preamble (i). |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The earliest of: (a) Effective Date (as defined in the DIP Credit Agreement), (b) the date that all loans shall become due and payable in full under the DIP Credit Agreement or other guarantee, security or other relevant documentation, including, but not limited to the Loan Documents (as defined in the DIP Credit Agreement) [8] (together with the DIP Orders, the "**DIP Loan Documents**"), whether by acceleration or otherwise, and (c) the date that is 6 months from the Closing Date (as defined below) (the "**Maturity Date**").<br><br><u>See</u> DIP Credit Agreement at pp. 8; 33; 79–84. |
| **Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | A per annum rate equal to 8.00%, payable monthly in cash.<br><br><u>See</u> DIP Credit Agreement at p. 16; Interim Order at ¶ 6. |
| **Default Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | A per annum rate equal to 10.00%, payable on demand.<br><br><u>See</u> DIP Credit Agreement at p. 32; Interim Order at ¶ 6. |
| **Discount and Fee**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Discount: Each DIP Lender shall be entitled to a discount (the "**DIP Discount**") equal to 1.0% of the DIP Facility, payable as 1.0% original issue discount on the Interim DIP Amount (the "**Interim Discount**") and 1.0% original issue discount on the Final DIP Amount. (the "**Final Discount**").<br><br><u>See</u> DIP Credit Agreement at p. 32; Interim Order at ¶¶ 2, 4.<br><br>Agency Fee: The DIP Agent shall be entitled to a fee of $75,000 per annum, payable in advance.<br><br><u>See</u> DIP Credit Agreement at p. 32; Interim Order at ¶¶ 4, 10.<br><br>Fronting Fee:  The DIP Agent shall be entitled to payment of ordinary and customary fronting fees as set forth in a fee letter between the DIP Agent and Borrower.<br><br><u>See</u> DIP Credit Agreement at p. 32; Interim Order at ¶¶ 4, 10. |

---

[8]   The term "**Loan Documents**" is defined in the DIP Credit Agreement to mean "th[e DIP Credit] Agreement, the Security Documents, the Guarantee Agreement, the Intercreditor Agreement, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e) and any other document executed by or on behalf of any of the Loan Parties that is delivered to any of the Secured Parties in connection with the foregoing and expressly designated as a 'Loan Document.'" <u>See</u> DIP Credit Agreement at p. 17.

| | |
|---|---|
| **Use of Proceeds** | The proceeds of the DIP Facility shall be used in accordance with the DIP Budget (as defined below and subject (except in the case of expenditures or contributions for employee or financial advisor retention, in respect of Broker-Dealer Capital Contributions (as defined below)) to Permitted Variances (as defined below); the DIP Budget shall include costs of the administration of the bankruptcy cases of the RCS Debtors and the Non-RCS Debtors (as defined below), following the filing by such Non-RCS Debtors of chapter 11 petitions with the Bankruptcy Court, and the consummation of the Restructuring to (i) provide working capital to the Debtors; (ii) fund interest, discount, fees and other payments contemplated in respect of the DIP Facility or as contemplated under the Section titled "Adequate Protection" below; (iii) fund advisor retention loans up to an aggregate amount of $50 million; (iv) provide funding to each non-debtor broker-dealer subsidiary (other than J.P. Turner & Company, LLC) as required to maintain sufficient capital and liquidity to permit continued operation of such broker-dealer subsidiary, including as may be required under applicable laws, regulations and supervisory requirements (the "**Broker-Dealer Capital Contributions**"); and (v) to provide funding to subsidiaries that are not debtors in the Bankruptcy Cases.  Proceeds of the DIP Facility shall not be used to fund the operations of, or the administration of any bankruptcy case of, any of RCAP Holdings, RCS Management, or any non-debtor subsidiary or affiliate, except as set forth in (iv) or (v) above.<br><br>See DIP Credit Agreement at p. 48; Interim Order at ¶ 3. |
| **Security and Priority** | The claims of the DIP Agent and DIP Lenders with respect to the obligations of each DIP Loan Party that is a Debtor, shall, subject to the Carve-Out (as defined below), at all times:<br><br>(i.)   pursuant to Section 364(c)(1) of the Bankruptcy Code, have super-priority claim status on a joint and several basis in the Bankruptcy Case of such DIP Loan Party;<br><br>(ii.)   pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on and security interest in all owned or hereafter acquired assets and property of the DIP Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, commercial tort claims, patents, copyrights, trademarks, tradenames and other intellectual property, and capital stock of subsidiaries), and the proceeds thereof, subject to customary exceptions set forth in Section 2.20 of the DIP Credit Agreement and excluding assets of deferred compensation plans for financial advisors of retail brokerage entities (the "**DIP Collateral**"), (A) to the extent such DIP Collateral is not subject to valid, perfected, and non-avoidable liens as of the Petition Date and (B) to the extent approved by the Court in the Final Order, proceeds of claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (however, upon entry of the Final DIP Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions, provided that, to the extent the Bankruptcy Court grants a lien on the proceeds of the Avoidance Actions, the DIP Agent and DIP Lenders shall use best efforts to first use other DIP Collateral or Prepetition Collateral other than the proceeds of Avoidance Actions to repay the DIP Obligations);<br><br>(iii.)   pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected security interest and lien on the DIP Collateral, to the extent |

that the DIP Collateral is subject to valid, perfected, and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the existing liens that secure obligations of such DIP Loan Party under the Prepetition Secured Facilities, which existing liens will be primed by the liens described in clause (iv.) below), subject as to priority to such liens in favor of such third parties; and

(iv.) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the DIP Collateral of each DIP Loan Party (the "**Priming Liens**"), to the extent the DIP Collateral is subject to existing liens that secure the obligations of such Loan Party under the Prepetition Secured Facilities (the "**Primed Liens**" and the collateral subject to such liens the "**Prepetition Collateral**"). The Priming Liens (x) shall be senior in all respects to the interests in such property of the First Lien Lenders and the Second Lien Lenders under the applicable Prepetition Secured Facilities (and of the other "secured parties" referenced therein) and the related security documents, and (y) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens. The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Bankruptcy Cases.

See DIP Credit Agreement at pp. 43-45; Interim Order at ¶¶ 7-9.

The claims of the DIP Agent and DIP Lenders with respect to the obligations of each Guarantor that is not a debtor in the Bankruptcy Cases shall be secured by a perfected first priority security interest in and lien on all DIP Collateral of such Guarantor, subject only to liens permitted under the DIP Loan Documents. All such liens shall be granted by customary security documents and shall be perfected upon the filing of customary security financing statements, intellectual property filings, mortgages, control agreements or other customary filing or notice with any governmental authority.

See DIP Credit Agreement at pp. 63–65; Interim Order at ¶ 8.

| | |
|---|---|
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Collateral, the DIP Liens, the DIP Superpriority Claims (as defined in the Interim Order), the Adequate Protection Claims, and the Adequate Protection Liens shall, solely in the event of the DIP Agent's issuance of a Carve-Out Notice (as defined in the Interim Order), be subject to the payment of the Carve-Out. For the avoidance of doubt, if at any time the Carve-Out is not adequately funded in accordance with the provisions of the Interim Order, upon a realization against the Carve-Out, the unpaid portion of the Carve-Out shall be funded out of the DIP Collateral having priority over the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens. The "**Carve-Out**" shall mean, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Carve |

| | |
|---|---|
| | Out Trigger Date (as defined in the Interim Order), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, in the Bankruptcy Cases, whose retention is approved by the Court pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (collectively, the "**Professionals**," and the fees, costs and expenses of Professionals, the "**Professional Fees**"), to the extent such Professional Fees are allowed by the Court at any time and (iv) all Professional Fees incurred on and after the Carve Out Trigger Date by Professionals and allowed by the Court at any time, whether before or after the Carve Out Trigger Date, whether by interim order, procedural order or otherwise; <u>provided</u> that, other than with respect to any success or transaction fees that may be come due and payable to Professionals, the payment of any Professional Fees (but excluding fees and expenses of third-party professionals employed by Creditors' Committee members) incurred on or after the Carve Out Trigger Date and allowed by the Court at any time, whether before or after the Carve Out Trigger Date, whether by interim order, procedure order or otherwise, shall not exceed $1,500,000 in the aggregate. <br><br> <u>See</u> Interim Order at ¶ 13. |
| **Covenants** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | Financial, negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings, including, without limitation, compliance with the DIP Budget and delivery of specified financial and regulatory reports. <br><br> Notice requirements will include, without limitation, delivery by Thursday of each week of reports, in form reasonably acceptable to Required DIP Lenders for all weeks since the Closing Date immediately preceding the date of each such delivery, setting forth operational statistics, including, without limitation, rates of independent financial advisor attrition and the associated gross dealer concession value. <br><br> The Borrower shall also (i) provide the DIP Agent and the DIP Lenders promptly with (A) all Financial and Operational Combined Uniform Single (FOCUS) Reports provided to FINRA in respect of the Borrower's broker-dealer subsidiaries; (B) all weekly reports of the 15c3-3 reserve calculations, including without limitation, the underlying calculation used to produce such reserve calculations, for the broker-dealer subsidiaries, as applicable; (C) all reports provided to FINRA under FINRA Rule 4530 other than Sections (a)(2), (d)(e), (f)(4), (g) and (h) on a bi-weekly basis; (D) all other material written presentations and reports with respect to such broker dealer subsidiaries provided to the SEC, FINRA, SIPC or other applicable regulatory and self regulatory organizations and the clearinghouses, clearing banks and clearing brokers through which the broker-dealer subsidiaries transact (such organizations each, a "**Relevant Organization**" and collectively, the "**Relevant Organizations**") with respect to the broker-dealers' net capital, liquidity and compliance with financial responsibility rules; (E) any "early warning" notification received by a broker-dealer subsidiary with respect to its net capital requirements, including those under Rule 17a-11 under the Securities Exchange Act of 1934 or FINRA Rule 4120 and any notice received by a broker dealer subsidiary under FINRA Rule 4110; and (F) any written communications received by the Borrower or any of its subsidiaries from a Relevant Organization with respect to any material investigation or inquiry that could reasonably be expected to lead to an enforcement action; and (ii) provide the DIP Agent and the DIP Lenders on a weekly or on a frequency as otherwise mutually agreed upon basis with an oral report with regard to all communications with the Relevant Organizations relating to the matters described in clause (i) above. |

| | |
|---|---|
| | See DIP Credit Agreement at pp. 57–78. |
| **Representations & Warranties** | Representations and warranties that are usual and customary for debtor-in-possession financing.<br><br>See DIP Credit Agreement at pp. 45–52 |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)* | The DIP Facility includes the following milestones (the "**DIP Milestones**"):<br><br>(i.) The Debtors shall have commenced the Bankruptcy Cases in the Court no later than January 31, 2016;<br><br>(ii.) on or prior to the Petition Date, the board of directors or other applicable governing body shall have authorized each DIP Loan Party that is not a Debtor or a registered investment advisor (a "**Non-RCS Debtor**") to file a chapter 11 petition with the Bankruptcy Court subject to completion of solicitation on any prepackaged plan applicable to such Non-RCS Debtor and receipt of sufficient votes accepting such prepackaged plan by the applicable classes of claims held by First Lien Lenders and Second Lien Lenders.<br><br>(iii.) the Debtors shall have filed a motion seeking approval of the DIP Facility on the Petition Date;<br><br>(iv.) the Interim Order shall be entered in the Bankruptcy Cases by no later than two (2) calendar days after the Petition Date;<br><br>(v.) an order in form and substance acceptable to the Borrower and the Prepetition Secured Parties (as defined below), approving the assumption of the RSA shall be entered in the Bankruptcy Cases by no later than thirty five (35) calendar days after the Petition Date;<br><br>(vi.) the Final Order, which shall be in form and substance acceptable to the DIP Agent, the Required DIP Lenders (as defined in the DIP Loan Documents) and the Borrower in their sole discretion, and the First Lien Agent and the Second Lien Agent in their reasonable discretion, shall be entered in the Bankruptcy Cases by no later than thirty five (35) calendar days after the Petition Date;<br><br>(vii.) the Non-RCS Debtors shall complete the solicitation of votes on the Prepackaged Plan on or before March 15, 2016, and shall receive votes from the First Lien Lenders and the Second Lien Lenders consistent with section 1126 of the Bankruptcy Code (which shall include a sufficient number of First Lien Credit Agreement Claim and Second Lien Credit Agreement Claims to satisfy the class voting requirement thresholds established by section 1126 of the Bankruptcy Code);<br><br>(viii.) each Non-RCS Debtor shall have commenced a Bankruptcy Case on or before March 25, 2016;<br><br>(ix.) each Non-RCS Debtor shall, on the date it files its Bankruptcy Case, file a motion seeking to assume its obligations under the DIP Credit Agreement (the "**DIP Assumption Motion**"), which shall be reasonably acceptable in form and substance to the DIP Agent, the Required Lenders (as defined in the DIP Credit Agreement), the First Lien Agent, the Second Lien Agent and the Borrower; |

| | |
|---|---|
| | (x.) an order approving the DIP Assumption Motion, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the First Lien Agent, the Second Lien Agent and the Borrower, shall be entered in the applicable Bankruptcy Case no later than two (2) business days after the date of filing of such motion; |
| | (xi.) each Non-RCS Debtor shall, on the date it files its Bankruptcy Case, file a motion seeking to assume its obligations under the RSA (the "**RSA Assumption Motion**"), which shall be reasonably acceptable in form and substance to the DIP Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent and the Borrower, |
| | (xii.) an order approving the RSA Assumption Motion, which shall be reasonably acceptable in form and substance to the Borrower and Prepetition Secured Parties, shall be entered in the applicable Bankruptcy Case no later than thirty-five (35) days after the date of filing of such motion; |
| | (xiii.) the Plan shall have been filed by the Debtors in the Bankruptcy Cases on the Petition Date and a related disclosure statement (the "**Disclosure Statement**") shall have been filed no later than February 5, 2016; |
| | (xiv.) an order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the DIP Agent, Required DIP Lenders, the Borrower, the Prepetition Agents, the Requisite Supporting Parties, and to the extent set forth in the RSA, Luxor, shall be entered in the Bankruptcy Cases by no later than forty (40) calendar days after the Petition Date; |
| | (xv.) each Non-RCS Debtor shall, on the date such Non-RCS Debtor files its Bankruptcy Case, file its proposed prepackaged chapter 11 plan of reorganization (the "**Prepackaged Plan**"); |
| | (xvi.) an order confirming the Plan, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Prepetition Agents, the Requisite Supporting Parties, the Borrower, and to the extent set forth in the RSA, Luxor, shall be entered in these Bankruptcy Cases by no later than May 1, 2016; |
| | (xvii.) an order confirming the Prepackaged Plan, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Prepetition Agents, Requisite Supporting Parties, the Borrower, and to the extent set forth in the RSA, Luxor, shall be entered in the applicable Bankruptcy Cases by no later than May 1, 2016; and |
| | (xviii.) the Plan and the Prepackaged Plan shall each become effective by no later than May 15, 2016. |
| | <u>See</u> DIP Credit Agreement at pp. 66–68. |
| **Conditions Precedent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-* | The obligations of the DIP Lenders to fund the DIP Facility is subject to the satisfaction on the date of effectiveness and funding thereof (the "**Closing Date**") of the following conditions precedent (unless waived in writing by the DIP Lenders): |

| 2(a)(ii) | (i.) | All DIP Loan Documents shall be in form and substance substantially consistent with the Plan and satisfactory to the DIP Agent and the DIP Lenders in their sole discretion; |
|---|---|---|
| | (ii.) | The representations and warranties of the DIP Loan Parties contained in the DIP Loan Documents shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "Material Adverse Effect" or otherwise as to "materiality", in all respects) as of the Closing Date (or as of such earlier date if the representation or warranty specifically relates to an earlier date); |
| | (iii.) | There shall have been no material adverse change in the business, condition (financial or otherwise) or results of operations of the Borrower and its subsidiaries, taken as a whole (a "**Material Adverse Effect**"), since January 4, 2016; |
| | (iv.) | With respect to the obligations of the DIP Lenders to make any DIP Loan upon or after entry of the Final DIP Order, there shall have been no attrition greater than 10% of the gross dealer concessions of all independent channel financial advisors (excluding Cetera Investment Services, Inc.) and the financial institution clients of Cetera Investment Services, Inc., measured as of January 4, 2016.  As used herein, the term "independent financial advisors" ("**Financial Advisor(s)**") means those representatives registered with the retail broker-dealer subsidiaries of the Borrower and its affiliates collectively operating under the marketing brand of "Cetera Financial Group", including Braves Acquisition, LLC, Cetera Financial Holdings, Inc., Chargers Acquisition, LLC, First Allied Holdings Inc., Investors Capital Holdings, LLC, Summit Financial Services Group, Inc. and VSR Group, LLC and, in each case, its direct and indirect subsidiaries (each, a "**Cetera Entity**"), and the term "financial institution clients" ("**Financial Institution(s)**") shall mean those financial institution clients who have entered into bank networking agreements with Cetera Investment Services, Inc.  As used herein, the term "attrition" with respect to a Financial Advisor shall mean that the Financial Advisor's securities registration with the Cetera Entity retail broker-dealer has been terminated, and the term "attrition" with respect to a Financial Institution shall mean that the client accounts associated with the bank networking agreement have been bulk transferred from Cetera Investment Services, Inc. to a third party broker-dealer.  As used herein, the term "gross dealer concessions" shall mean all compensable commissions, trailing commissions and advisory fee revenues received by the Cetera Entity retail broker-dealer measured at a Financial Advisor or Financial Institution level on a trailing twelve month basis; |
| | (v.) | The RSA shall have become effective in accordance with its terms and shall be in full force and effect; |
| | (vi.) | The amendments to the First Lien Credit Agreement, Second Lien Credit Agreement and related documents, including the Intercreditor Agreement governing rights and obligations between the First Lien Lenders and Second Lien Lenders, contemplated by the RSA shall have become effective and each non-debtor Guarantor shall have provided a properly perfected first priority security interest in substantially all of its property as described above in the Section titled |

|   | "Security and Priority"; |
|---|---|
|   | (vii.)  All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented out-of-pocket fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lenders shall have been paid (or will be paid with the proceeds of the DIP Loan); |
|   | (viii.)  The DIP Agent and the DIP Lenders shall have received, and the Required DIP Lenders shall be satisfied with, the DIP Budget; |
|   | (ix.)  The DIP Lenders shall have received, and the Required DIP Lenders shall be satisfied with, a communication plan and a financial advisor retention plan for the Debtors' broker-dealer subsidiaries; |
|   | (x.)  The DIP Agent and the DIP Lenders shall have received, by at least two (2) business days prior to the Closing Date, reasonably requested "know your customer" and similar information required by bank regulatory authorities to the extent requested at least five (5) business days prior to the Closing Date; |
|   | (xi.)  Upon the entry of the Interim Order, the DIP Agent shall, for the benefit of the DIP Lenders, have valid and perfected first priority liens on the DIP Collateral to the extent set forth in the Interim Order, subject only to liens permitted by the DIP Loan Documents, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid; and |
|   | (xii.)  The Borrower shall have used commercially reasonable efforts to obtain from a nationally recognized statistical rating agency reasonably satisfactory to the DIP Lenders (i) a corporate rating with respect to the Borrower and (ii) facility and recovery ratings with respect to the DIP Facility, and the Borrower shall have delivered notice thereof to the DIP Agent and the DIP Lenders. |
|   | See DIP Credit Agreement at pp. 52–56. |
| **DIP Budget**  *Fed. R. Bankr. P. 4001(b)(1) and (c)(1)*  *Del. Bankr. L.R. 4001-2(a)(ii)* | Prior to the Petition Date, the DIP Agent and DIP Lenders received a 13-week budget commencing with the week during which the Petition Date occurred, containing line items of sufficient detail to reflect the consolidated projected receipts and disbursements for such 13-week period, in form and substance satisfactory to the Required DIP Lenders (such budget, as supplemented in accordance with the DIP Loan Documents, the "**DIP Budget**," attached hereto as Exhibit C).  For the avoidance of doubt, the DIP Budget will not include operating cash flows in respect of non-Debtor subsidiaries.  The DIP Budget shall be updated by the Borrower every four weeks pursuant to amendments extending the term thereof on a 13-week basis and the Required DIP Lenders, in their reasonable discretion, shall have the right to dispute any such updates or amendments by providing the Borrower specific notice thereof within five (5) business days after the delivery by the Borrower of any such update or amendment; provided that, (i) to the extent the Required DIP Lenders do not provide such dispute notice within such five business day period, such update or amendment shall be deemed approved and consented to by the Required DIP Lenders and shall be deemed to constitute the DIP Budget upon the expiration of such five business day period and (ii) to the extent the Required DIP Lenders do provide such dispute notice within such five business day period, the then- |

existing DIP Budget shall continue to constitute the applicable DIP Budget until such time as such update or amendment is agreed to among the DIP Loan Parties and the Required DIP Lenders.

The Borrower shall, beginning on the second Thursday following the Petition Date, deliver on a weekly basis to the DIP Lenders a variance report for the Borrower for all weeks since the Closing Date immediately preceding the date of each such delivery comparing actual cumulative receipts and disbursements for such period to cumulative receipts and disbursements, respectively, for such period as set forth in the DIP Budget.

The actual cumulative total net operating cash flows of the Borrower may not vary from projected cumulative total net operating cash flows as reflected in the DIP Budget (each, a "**Variance**") by more than a Permitted Variance or by such greater amount as agreed upon by the "Required Lenders" under the DIP Credit Agreement.

A "**Permitted Variance**" shall mean a Variance from the DIP Budget on a cumulative basis tested on a weekly basis commencing with the Petition Date, which unfavorable Variance may not be more than the greater of (i) $1,500,000 or (ii) the dollar amount resulting from multiplying the total net operating cash flows by the percentage set forth below for the applicable week under the column "Cumulative Variance".

| Week | Cumulative |
|------|------------|
| 1 | 40% |
| 2 | 40% |
| 3 | 30% |
| 4 or after | 20% |

The Borrower shall test the total net operating cash flows against the initial DIP Budget or the updated DIP Budget when issued. For example, in week 5, the Borrower would report actual results against the updated projected cumulative total net operating cash flows and be measured for Variances with the maximum Permitted Variance being the greater of $1,500,000 or 40% of the first week of the updated budget.

See DIP Credit Agreement at pp. 4; 22; 58–62.

|  |  |
|---|---|
| **Voluntary Prepayment** | At any time prior to the Maturity Date, the Borrower may prepay all or any portion of the outstanding loans under the DIP Facility without premium or penalty. Amounts so prepaid may not be reborrowed.<br><br>See DIP Credit Agreement at pp. 33–34; Interim Order at ¶ 6. |
| **Mandatory Prepayment** | Loans under the DIP Facility shall be subject to mandatory prepayment in an amount equal to 100.0% of the net cash proceeds of any casualty and condemnation, asset disposition and incurrence of indebtedness (other than indebtedness under the Exit Facility), with exceptions satisfactory to the DIP Lenders in their sole discretion, provided that the net cash proceeds of the disposition of certain non-core businesses disclosed to, and agreed upon by, the DIP Lenders prior to the date of the RSA (which shall not include any Cetera Entity) shall only be required to be applied to repayment of the DIP Facility to the extent that such proceeds exceed $15,000,000 per individual disposition (or |

|  | series of related dispositions) and $30,000,000 in the aggregate, and only in each case to the extent of such excess. |
|  | <u>See</u> DIP Credit Agreement at pp. 34–35; Interim Order at ¶ 6. |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Events of Default shall include, without limitation:<br><br>(i.)    failure to pay principal on the DIP Facility when due;<br><br>(ii.)    failure to pay interest or fees on the DIP Facility when due, subject to a five (5) business day grace period;<br><br>(iii.)    failure of any representation or warranty to be true and correct in all material respects when made;<br><br>(iv.)    breach of any covenant, subject to a 30-day grace period (from the earlier of (i) an authorized officer of any DIP Loan Party obtaining knowledge of the default and (ii) any DIP Loan Party receiving written notice of such default from the DIP Agent or the Required DIP Lenders (any such notice to be identified as a "notice of default" and to refer specifically to the applicable Event of Default provision) for certain affirmative covenants;<br><br>(v.)    failure to comply with the DIP Budget, subject (except in the case of expenditures or contributions for employee or financial advisor retention or in respect of Broker-Dealer Capital Contributions) to Permitted Variances;<br><br>(vi.)    the DIP Agent shall cease to have a valid and perfected first-priority lien in any DIP Collateral (other than upon a release by reason of a transaction that is permitted under the DIP Credit Agreement);<br><br>(vii.)    any DIP Loan Party shall (A) contest the validity or enforceability of any DIP Loan Document in writing or deny in writing that it has any further liability thereunder or (B) contest the validity or perfection of the liens and security interests securing the DIP Loans;<br><br>(viii.)    any attempt by any DIP Loan Party to invalidate or otherwise impair the DIP Loans or the liens granted to the DIP Lenders with respect to the DIP Loans;<br><br>(ix.)    failure by any Debtor or Non-RCS Debtor to comply in any material respect with the Interim Order or Final Order, as applicable;<br><br>(x.)    the commencement of a liquidation under SIPA or Chapter 7 of the Bankruptcy Code in respect of any broker-dealer subsidiary of the Borrower;<br><br>(xi.)    the failure of any material broker-dealer subsidiary of the Borrower to maintain registrations and licenses necessary for its operations;<br><br>(xii.)    the suspension or expulsion of any material broker-dealer subsidiary of the Borrower from membership of, or participation in, a clearing organization or the termination or material interruption of any clearing contract with any clearing broker;<br><br>(xiii.)    the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim Order or Final Order, as applicable, without the express written consent of the |

| | |
|---|---|
| | Required DIP Lenders; |
| | (xiv.) any sale or other disposition of all or a material portion of the DIP Collateral securing the DIP Loans pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders or the Plan (or pursuant to a transaction that is permitted under the DIP Credit Agreement); |
| | (xv.) conversion of any of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code; |
| | (xvi.) dismissal of any of the Bankruptcy Cases; |
| | (xvii.) the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any DIP Loan Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; |
| | (xviii.) failure to meet any DIP Milestone (including, without limitation, failure of the Bankruptcy Court to enter, within thirty-five (35) calendar days following the Petition Date, a Final Order); |
| | (xix.) the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to the holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Loans to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed by the Required DIP Lenders; |
| | (xx.) the grant of any super-priority claim that is *pari passu* with or senior to those of the DIP Lenders; |
| | (xxi.) any default or termination event under the RSA; |
| | (xxii.) termination of the use of cash collateral; and |
| | (xxiii.) the filing of a plan of reorganization or liquidation by any DIP Loan Party that is the Plan or Prepackaged Plan. |
| | See DIP Credit Agreement at pp. 79–84; Interim Order at ¶ 23. |
| **Remedies** | Among other remedies to be specified, upon the occurrence of an Event of Default and subject to the giving of three (3) business days' prior written notice to the DIP Loan Parties (during which period the Event of Default is not cured) as set forth below, the Required DIP Lenders may direct the DIP Agent to seek relief from the automatic stay to foreclose on all or any portion of the security for the DIP Facility, collect accounts receivable and apply the proceeds thereof to the obligations arising under the DIP Facility or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.  During the three (3) business day notice period, the DIP Loan Parties may continue to use proceeds of the DIP Facility and/or Cash Collateral in accordance with the DIP Budget and the terms of the DIP Facility.  The DIP Agent, at the direction of the Required DIP Lenders, shall also have the authority to credit bid all or a portion of the outstanding DIP Facility obligations, whether pursuant to a sale under section 363 of the Bankruptcy Code, a plan pursuant to section 1129(b) of the Bankruptcy Code or otherwise. |

| | |
|---|---|
| | See DIP Credit Agreement at p. 106-107; Interim Order at ¶ 24. |
| **Expenses** | The DIP Loan Parties shall be jointly and severally liable to pay all of the DIP Agent's and DIP Lenders' reasonable, documented out-of-pocket costs and expenses incurred on account of the negotiation, preparation, execution and enforcement of rights and remedies with respect to the DIP Facility and the DIP Loan Documents, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith.<br><br>See DIP Credit Agreement at pp. 98-100; Interim Order at ¶ 4. |
| **Adequate Protection** | The Prepetition Agents, the First Lien Lenders, the Second Lien Lenders (collectively, the "**Prepetition Secured Parties**") shall receive (in the case of clauses (iii) and (iv) on a first lien/second lien basis and subject to the Carve-Out):<br><br>(i)    all accrued and unpaid fees and disbursements owed to the Prepetition Agents, the First Lien Lenders, and/or the Second Lien Lenders under the applicable Prepetition Secured Facility, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition Agents, First Lien Lenders, or Second Lien Lenders (including Shearman & Sterling LLP, Jones Day, and Davis Polk & Wardwell LLP, Covington & Burling LLP and Delaware local counsel retained by each of the First Lien Lenders, the Second Lien Lenders, the First Lien Agent and/or the Second Lien Agent ("**Delaware Counsel**") incurred prior to the Petition Date in accordance with the applicable Pre-Petition Secured Facility;<br><br>(ii)    when due, current payment of all fees and reasonable and documented out-of-pocket expenses payable to the Prepetition Agents, the First Lien Lenders or the Second Lien Lenders under the applicable Prepetition Secured Facility, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Pre-Petition Agents, the First Lien Lenders or the Second Lien Lenders (including Shearman & Sterling LLP, Jones Day, Davis Polk & Wardwell LLP, Covington & Burling LLP and Delaware Counsel);<br><br>(iii)    to the extent of the diminution of value of the interest of the First Lien Lenders and the Second Lien Lenders in the Prepetition Collateral, allowed, super-priority administrative expense claim status in the Bankruptcy Case of each DIP Loan Party pursuant to sections 503(b) and 507(b) of the Bankruptcy Code that is junior in priority only to the DIP Loan super-priority claims and, in the case of the Second Lien Credit Agreement super-priority claims, the First Lien Credit Agreement super-priority claims (the "**Adequate Protection Claims**"); and<br><br>(iv)    to the extent of the diminution of value of the interests of the First Lien Lenders and the Second Lien Lenders in Prepetition Collateral, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on the DIP Collateral pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code that are junior only to the DIP Liens and, in the case of the Second Lien Credit Agreement liens, the First Lien Credit Agreement liens (the "**Adequate Protection Liens**"). |

| | |
|---|---|
| | See DIP Credit Agreement at pp. 1–2; Interim Order at ¶ 11. |
| **Indemnity** | The Borrower will indemnify each of the DIP Agent, the DIP Lenders and their respective affiliates and their respective affiliates' related parties, on the terms set forth in section 9.05 of the DIP Credit Agreement.<br><br>See DIP Credit Agreement at pp. 98–100; Interim Order at ¶ 4. |
| **Releases** | The DIP Orders provide the DIP Agent and the DIP Lenders with customary releases reasonably acceptable to the DIP Agent and the DIP Lenders.<br><br>See Interim Order at ¶¶ G, 28. |
| **Stipulations** | Pursuant to paragraph E of the Interim Order, the Debtors, and, pursuant to the DIP Loan Documents, to the extent applicable, the Non-Debtor Guarantors, stipulate to the existence, validity and outstanding amount of the Prepetition Secured Facilities, as well as to the validity and perfection of the liens securing the obligations thereunder.<br><br>Further, the Debtors agree that they will not seek to prime obligations under the DIP Facility while it remains outstanding.<br><br>See Interim Order at ¶¶ E, 28. |

## REQUIREMENTS UNDER LOCAL RULE 4001-2

20.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtors provide justification for the inclusion of such highlighted provision(s).  Specifically, Local Rule 4001-2(a)(i) provides:

All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties-in-interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties-in-interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at

least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. §506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out;

(G) Provisions that prime any secured lien without the consent of that lienor; and

(H) Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(l).

21.     In the following paragraphs, the Debtors identify and discuss the following provisions of the DIP Credit Agreement and Interim Order in accordance with Local Rule 4001-2 in the context and circumstances of these cases.

22.     _Cross Collateralization._  Local Rule 4001-2(a)(i)(A) requires disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (_i.e._, clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law).  The DIP Credit Agreement does not grant cross-collateralization protection.

23.     _Stipulation and Challenge Provisions._   Local Rule 4001-2(a)(i)(B) requires disclosure of provisions that bind the estate or other parties-in-interest with respect to

the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties-in-interest at least seventy-five (75) days from the entry of the order and the Creditors' Committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.  Paragraph 28 of the Interim Order binds the estates and all other parties-in-interest with respect to the validity, perfection and amount of the Prepetition Secured Facilities, but is subject to the rights of any party-in-interest with requisite standing for a period of the earlier of (a) sixty (60) days after the appointment of any Creditors' Committee or (b) seventy-five (75) days after the Petition Date if no Creditors' Committee is appointed to file an Objection (as defined in the Interim Order).  Thus, the Debtors submit that parties-in-interest will have an adequate opportunity to investigate the Prepetition Secured Facilities and associated liens.

24.     _Section 506(c) Waiver._  Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c).  Paragraph 17 of the Interim Order provides in part that subject to entry of the Final Order, no person will be permitted to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out.  Because this waiver is subject to entry of the Final Order, the Debtors respectfully submit that parties-in-interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

25.     _Liens on Avoidance Actions_.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtors immediately grant the prepetition secured lenders liens on Avoidance Actions.  Paragraph 8(a) of the Interim Order provides the DIP Lenders with liens on proceeds of Avoidance Actions, subject to the entry of the Final Order, and

subject to the marshaling requirements set forth in paragraph 20.  This provision does not seek a security interest and lien on avoidance actions under chapter 5 of the Bankruptcy Code (with the exception of avoidance actions pursuant to section 549 of the Code) but rather, on the proceeds thereof.  Further, this provision is subject to the approval of the Court and entry of the Final Order.  As such, the Debtors respectfully submit that prepetition secured lenders are not being granted liens on the Avoidance Actions, and parties-in-interest will have an opportunity to be heard on the requested relief.

26.     _Roll-Up_.  Pursuant to Local Rule 4001-2(a)(i)(E), a movant must describe provisions of the proposed debtor-in-possession facility that deem prepetition secured debt to constitute postpetition debt.  Because the DIP Credit Agreement does not deem prepetition secured debt to constitute postpetition debt, Local Rule 4001-2(a)(i)(e) is inapplicable.

27.     _Carve-Out_.   Pursuant to Local Rule 4001-2(a)(i)(F), a movant must describe provisions of the proposed debtor-in-possession facility that provide disparate treatment for professionals retained by a creditors' committee with respect to a professional fee carve-out.  Paragraph 13 of the Interim Order provides a professional fee carve-out for the Debtors' professionals and professionals hired by any Creditors' Committee.  The Debtors submit that the treatment of the Debtors' professionals and any Committee's professionals under the Carve-Out is substantially similar and therefore there is no disparate treatment of any Committee's professionals.

28.     _Priming Liens_.  Pursuant to Local Rule 400l-2(a)(i)(G), a movant must describe provisions of the proposed debtor-in-possession facility that contemplates a priming of any secured lien without the consent of that lienor.  See Del. Bankr. L.R. 4001-2(a)(i)(G).  The DIP Credit Facility is a "priming" facility inasmuch as the DIP Credit Facility will be secured by

first priority, senior, priming, perfected liens on and security interests in all of the Debtors' right, title and interest in, to and under the Prepetition Collateral.  However, as discussed below, the DIP Credit Facility does not prime the liens of non-consenting lienholders.  The Prepetition Secured Parties have consented to the terms of the DIP Credit Agreement and the Interim and Final Orders, including the priming of the liens granted pursuant to the Prepetition Secured Facilities.

29.     *Waiver of Section 552(b) "Equities of the Case" Exception.*  Pursuant to Local Rule 4001-2(a)(i)(H), a movant must describe provisions of the proposed debtor-in-possession facility that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  Paragraph 17 of the Interim Order provides that subject to the entry of a Final Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting, the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Credit Facility.  Because this provision is subject to entry of the Final Order, the Debtors respectfully submit that parties-in-interest will have an opportunity to be heard with respect to this provision.

## RELIEF REQUESTED

30.     By this motion, the Debtors request entry of the Interim Order and the Final Order, without limitation:

(a)     authorizing the Debtors to (A) obtain postpetition financing pursuant to the terms and conditions of the DIP Credit Agreement and the DIP Facility, among the Borrower, the DIP Agent, and the DIP Lenders, the obligations of the Borrower under which are guaranteed pursuant to the Guarantee Agreement (as defined in the DIP Credit Agreement) executed in connection therewith by the Guarantors, and (B) incur the Obligations under (and as defined in) the DIP Credit Agreement;

(b)     authorizing the Debtors to execute and deliver the DIP Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Loan

Documents, including, without limitation, the payment of all principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(c)     authorizing the Debtors to grant security interests, liens, and super-priority claims, including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (including priming liens pursuant to section 364(d)(1)) of the Bankruptcy Code to the DIP Agent, for the benefit of the DIP Lenders), in the DIP Collateral as set forth in the DIP Orders, including, without limitation, all property constituting "Cash Collateral," as defined in Bankruptcy Code section 363(a) (the "**Cash Collateral**"), to secure all obligations under the DIP Loan Documents;

(d)     authorizing the Debtors' use of Cash Collateral of the Prepetition Secured Parties and the provision of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

(e)     authorizing the Debtors to borrow under the DIP Facility up to an aggregate principal amount of $100 million (to be issued net of 1.0% discount), $25 million of which (to be issued net of 1.0% discount) shall be available following entry of the Interim Order and the satisfaction of the other applicable conditions in the DIP Credit Agreement, with the remainder of the DIP Facility loans (to be issued net of 1.0% discount) to be made available upon entry of the Final Order and the satisfaction of the other applicable conditions in the DIP Credit Agreement and to use the proceeds thereof in accordance with the DIP Budget;

(f)     approving the Fee Letter and the Commitment Letter;

(g)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(h)     scheduling a final hearing Final Hearing to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(i)     granting related relief.

## BASIS FOR RELIEF

31.     The continued viability of the Debtors' businesses and the success of their

reorganization efforts hinge upon obtaining access to postpetition financing.   Absent access to

such financing, the Debtors would be forced to curtail their operations and would be faced with significant levels of employee and financial advisor attrition, resulting in irreparable harm to their businesses, going concern value, and their ability to reorganize.  Approval of the DIP Facility and the use of Cash Collateral will allow the Debtors to fund their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs.

32.    As set forth above and in the Tempke Declaration, given the Debtors' current financial condition, financing arrangements, and capital structure, they are unable to obtain financing on terms more favorable than the DIP Facility from sources other than the DIP Lenders.  See Tempke Decl. ¶¶ 21–27.  The Debtors have been unable to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or solely as an administrative expense under sections 364(a)–(b) of the Bankruptcy Code, (b) secured by a lien allowable only under sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, except under the terms and conditions provided in the Interim Order and the DIP Loan Documents, and (c) without granting to the DIP Agent, for the benefit of the DIP Lenders, liens on various of the assets of the Debtors pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code.  In fact, the proposed financing under the DIP Facility was the only viable financing option presented to the Debtors and their advisors.  Accordingly, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing pursuant to section 364 of the Bankruptcy Code.

**A.    The Debtors Satisfy the Requirements for Obtaining
Credit Pursuant to Section 364(c) of the Bankruptcy Code**

33.    Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on

encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority basis, or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c).

34.    In evaluating a debtor's proposed postpetition financing, courts consider a number of factors, including whether (a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim, (b) the postpetition financing is necessary to preserve the assets of the estate, and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  See In re L.A. Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.), 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988) (citing In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)).

35.    For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

### i.    *The Debtors Could Not Obtain Unsecured Financing*

36.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate by a good faith effort that credit was not available on an unsecured or administrative expense basis.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (debtor has an obligation to make "reasonable efforts, under the circumstances . . . to obtain [unsecured financing], in the ordinary course of business or otherwise").  Indeed, when few lenders are likely to be able and willing to extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989); see also In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request).

37.     The Debtors' and their advisors' discussions with potential sources of financing revealed that debtor-in-possession financing on an unsecured or junior basis was simply not available.  The Debtors' capital structure largely consists of funded debt obligations secured by substantially all of the Debtors' assets.  The significant prepetition secured obligations of the Debtors and lack of unencumbered assets rendered the Debtors unable to obtain financing other than on a secured, super-priority basis.

ii.     **The DIP Facility Is Necessary to Preserve Estate Assets and Is an Exercise of the Debtor's Reasonable Business Judgment**

38.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See, e.g., In re L.A. Dodgers LLC, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Barbara K. Enters., 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party-in-interest.") (quoting In re Ames

Dep't Stores, Inc., 115 B.R. at 40); Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 (noting that courts permit debtors to "exercise their basic business judgment" when obtaining debtor-in-possession financing).

39.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code."). Furthermore, a court may take into consideration non-economic benefits to a debtor offered by a proposed postpetition financing facility. In re ION Media Networks, Inc., 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (noting that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms" and the court must evaluate "non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

40.    The Debtors' decision to enter into the proposed DIP Facility indisputably satisfies this standard. The Debtors' decision to enter into the DIP Loan Agreement is the culmination of an intense, months-long process targeted at procuring the best available financing under the circumstances. During their search for financing, the Debtors engaged with their major creditor constituencies, and approached sophisticated third party lenders, in order to chart a

course that would preserve the value of their existing businesses, provide for a fair resolution of the claims of creditors, and prepare the Debtors to run a successful enterprise upon emergence. The willingness of the DIP Lenders to forgo cash repayment of the DIP Facility upon the effective date of the Plan and instead covert the principal amount of the DIP Loans outstanding into the Exit Facility on or as soon as practicable after such date is predicated on the fact that the DIP Lenders, by virtue of their position as prepetition First Lien Lenders and/or Second Lien Lenders, are intended to be the primary equity owners of the Debtors upon consummation of the Plan.   This unique position of the DIP Lenders, and their resulting interest in ensuring the Debtors are sufficiently capitalized and able to emerge from these Bankruptcy Cases on a secure financial footing, yielded terms that are far superior to any other debtor-in-possession financing that the Debtors could have obtained.

41.     The DIP Lenders are the only parties willing to allow the Debtors access to the amount of funding, on the timeline, necessitated by the Debtors' current liquidity position and expected liquidity needs going forward.   Given the Debtors' significantly constrained liquidity, the DIP Facility is of critical importance to continue operating the Debtors' businesses and preserving going-concern value.   Entry into the DIP Facility is therefore necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties-in-interest.   Accordingly, entry into the DIP Facility is a sound exercise of the Debtors' business judgment.

### iii.     The Terms of the DIP Facility Are Fair, Within the Range of Reasonableness, and Appropriate Under the Circumstances

42.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured

Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co.), 65 B.R. 358, 364-65, n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  When judged from the foregoing perspective, the terms and conditions of the DIP Facility are fair, within the range of reasonableness, and appropriate under the circumstances.

43.    The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through confirmation of the Plan as contemplated under the RSA.  Further, the DIP Orders provide a carve-out from the DIP Collateral to ensure the Debtors and any Creditors' Committee are adequately represented in the Bankruptcy Cases.

### a.    The Scope of the Carve-Out Is Appropriate

44.    The proposed DIP Facility and Interim Order provide that the liens in favor of the DIP Lenders are subject to the Carve-Out.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.  See In re Ames Dep't Stores, Inc., 115 B.R. at 40; see also In re Gen. Growth Props. Inc., 412 B.R. at 136-37. The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See In re Ames Dep't Stores, Inc., 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the Bankruptcy Cases by ensuring that assets remain for the payment of U.S. Trustee fees and

professional fees of the Debtors and any committee of unsecured creditors notwithstanding the grant of additional liens and claims under the DIP Facility and the Interim Order.

### b.     The Payment of Fees to the DIP Agent and DIP Lenders Is Appropriate

45.     The fees and charges to be paid to the DIP Agent (including administrative fees and fronting fees) and the DIP Lenders, as described in the overview of the proposed DIP Facility and provided for in Section 2.05 of the DIP Credit Agreement (or otherwise disclosed to the Court) are reasonable and appropriate under the circumstances and are on market terms. Courts recognize that lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code are often the only way to obtain financing, and routinely approve them.  See Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 318 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

46.     Accordingly, the Debtors respectfully submit that the terms of the DIP Facility are fair, within the range of reasonableness and appropriate under the circumstances and the DIP Agent and the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such facility.

## B.     Financing Pursuant to Section 364(d) of the Bankruptcy Code is Appropriate

47.     Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  See 11 U.S.C. § 364(d)(1); see also Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that

adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (holding that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

48.     The proposed DIP Facility and Interim Order provide that the DIP Agent, for its benefit and for the benefit of the DIP Lenders, shall be granted a perfected first priority priming security interest and lien on the DIP Collateral to the extent the DIP Collateral is subject to existing liens.  These Priming Liens (a) shall be senior in all respects to the interests in such property held by the First Lien Lenders and the Second Lien Lenders under the applicable Prepetition Secured Facilities (and of the other "secured parties" referenced therein) and the related security documents, and (b) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens; provided, however, that the Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Bankruptcy Cases.

49.     As noted above, the Prepetition Secured Parties have consented to the terms of the DIP Credit Agreement and the Interim and Final Orders, including the priming of the liens granted pursuant to the Prepetition Secured Facilities.  See Sky Valley, Inc., 99 B.R. at 122 (holding that secured creditors' consent to imposition of priming lien "relieved the debtor of having to demonstrate that [the lienholders] were adequately protected.").

50.     As additional adequate protection, and subject to the DIP Budget, the Debtors shall pay to the Prepetition Secured Parties (i) immediately upon entry of the Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented

fees and out-of-pocket expenses (including, but not limited to, the fees owed to the First Lien Agent for its services as administrative agent and collateral agent and the Second Lien Agent for its services as administrative agent and collateral agent, and fees and disbursements of legal counsel and financial advisors advising any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders) owing to such parties and incurred before the Petition Date; and (ii) from time to time after the Petition Date, in the form of cash payments equal to all reasonable and documented fees and out-of-pocket expenses owing to such parties (including, but not limited to, the fees owed to the First Lien Agent for its services as administrative agent and collateral agent and the Second Lien Agent for its services as administrative agent and collateral agent and fees and disbursements of legal counsel and financial advisors advising any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders, but in the case of the First Lien Lenders and the Second Lien Lenders, limited to one primary legal firm, one local Delaware firm and one financial advisory firm for each group) (all such payments, the "**Adequate Protection Payments**").

### i.  *The Debtors Are Unable to Obtain Financing From Any Other Source*

51.     Under section 364(d)(1)(A) of the Bankruptcy Code, the adequacy of a debtors' efforts to obtain postpetition financing is a case-specific inquiry.  Courts generally have found, however, that a debtor's good-faith efforts to seek credit from other sources is sufficient to carry this burden.  See In re Snowshoe Co., 789 F.2d at 1088 (recognizing "there is no duty to seek credit from every possible lender"); In re 425 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that while "[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every possible lender," it "must make an effort to obtain credit without priming a senior lien")

52.     As described above, the Debtors provided information to and engaged in discussions with a number of sophisticated parties with respect a junior capital raise and, later, debtor-in-possession financing, but no potential lenders were in a position to provide viable financing in light of the circumstances.  In determining to enter into the DIP Loan Documents, the Debtors considered a number of factors, including that the DIP Lenders have irreplaceable institutional knowledge of and familiarity with the Debtors' capital structure and businesses, the existence of the Prepetition Secured Parties' liens, the agreement on the provision of an Exit Facility, and the fact that the DIP Facility is being offered as part of a larger, overall restructuring plan, each of which weigh in favor of entering into the DIP Loan Documents.

ii.     ***The Prepetition Agents and Required Lenders, For Themselves and On Behalf of the Prepetition Secured Parties, Do Not Object to Being Primed***

53.     The First Lien Agent and Required Lenders (as defined in the First Lien Credit Agreement), for themselves and on behalf of the prepetition First Lien Lenders, and the Second Lien Agent and Required Lenders (as defined in the Second Lien Credit Agreement), for themselves and on behalf of the prepetition Second Lien Lenders, both to being primed by the DIP Facility and the obligations under the DIP Loan Documents.  Further, in accordance with section 364(d) of the Bankruptcy Code and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Secured Parties with additional adequate protection in the form of the payment of certain accrued and unpaid fees and disbursements owed under the Prepetition Secured Facilities, current payment of certain fees and reasonable and documented out-of-pocket expenses payable under the applicable Prepetition Secured Facilities, and allowed super-priority administrative expense claims and junior replacement liens, in each case to the extent of any diminution in value of the Prepetition

Secured Parties' respective interests in the DIP Collateral during the pendency of the Bankruptcy Cases and on the additional terms summarized above.

54.    The Bankruptcy Code does not explicitly define the phrase "adequate protection."  Section 361 of the Bankruptcy Code suggests, however, that adequate protection may be provided by (a) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property, (b) providing additional or replacement liens, or (c) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property.  This third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-specific basis, to determine what level of protection is appropriate to provide a secured party.  See In re Swedeland Dev. Grp., Inc., 16 F.3d at 564; In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case.").  In Swedeland, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained pre-bankruptcy," and "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been postpetition superpriority financing."  Swedeland, 16 F.3d at 564; see also Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.") (citations omitted).  Adequacy, the Third Circuit held, "depends directly on how effectively it compensates the secured creditor for loss of value."  In re

Swedeland, 16 F.3d at 564 (quoting In re Am. Mariner Indus., Inc., 734 F.2d 426, 435 (9th Cir. 1984)).

55.      The proposed adequate protection is limited in scope and justified under the circumstances to protect the Prepetition Secured Parties against the diminution in the value of their collateral resulting from the priming of their liens.  Accordingly, the Court should permit the Debtors to prime the liens securing the obligations under the Prepetition Secured Facilities in connection with the proposed DIP Facility.

**C.      The Debtors' Proposed Grant of Adequate
Protection to Use Cash Collateral Is Appropriate**

56.      Pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Prepetition Secured Parties subject to the consent of those parties or the grant of adequate protection.  See 11 U.S.C. § 363(c)(2).

57.      The First Lien Agent and Required Lenders (as defined in the First Lien Credit Agreement), for themselves and on behalf of the prepetition First Lien Lenders, and the Second Lien Agent and Required Lenders (as defined in the Second Lien Credit Agreement), for themselves and on behalf of the prepetition Second Lien Lenders, have both consented to the Debtors' use of the Cash Collateral, subject to the terms and conditions set forth in the Interim Order, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  Further, in accordance with section 364(c) of the Bankruptcy Code and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Agents and the Prepetition Secured Parties with additional adequate protection as summarized in this Motion.  See ¶¶ 47–50, *supra*.  Accordingly, the Debtors' use of Cash Collateral on the terms set forth in the Interim Order should be approved as

the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

**D.     The DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

58.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." See 11 U.S.C. § 364(e).

59.     As explained in detail herein, the terms of the DIP Facility and the Interim Order were negotiated in good faith and at arm's-length among the Debtors, on the one hand, the DIP Agent, the DIP Lenders, and certain of the Prepetition Secured Parties, on the other hand, and all of the obligations under the DIP Loan Documents will be extended by the DIP Lenders in good faith, as such term is used in section 364(e) of the Bankruptcy Code.  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as set forth herein.  Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lenders should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, the Final Order, or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**E.     Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code Is Appropriate Under the Circumstances**

60.     The proposed Interim Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted, as necessary, to permit (i) the Debtors to grant the DIP Liens to the DIP Agent and the DIP Lenders, (ii) the Debtors to perform under the

DIP Facility and incur the obligations under the DIP Loan Documents, (iii) any action of the DIP Agent or DIP Lenders to file and record financing statements, mortgages, or other instruments to provide further notice of and evidence the grant and perfection of the DIP Liens, and (iv) the DIP Agent and DIP Lenders to exercise certain rights and remedies under the DIP Loan Documents against the Debtors and the DIP Collateral.

61.    Stay modifications of this sort are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.  See, e.g., In American Apparel, Inc., Case No. 15-12055 (BLS) [Docket No. 248] (Bankr. D. Del. Nov. 2, 2015) (authorizing stay modifications in order to permit DIP lenders to exercise remedies upon an event of default); In re Molycorp, Inc., Case No. 15-11357 (CSS) [Docket No. 278] (Bankr. D. Del. July 24, 2015) (modifying automatic stay as necessary to effectuate the terms of the order); In re Coldwater Creek, Inc., Case No. 14-10867 (BLS) [Docket No. 576] (Bankr. D. Del. June 12, 2014) (modifying stay to authorize exercise of remedies upon default); In re Broadway 401 LLC, Case No. 10-10070 (KJC) [Docket No. 55] (Bankr. D. Del. Feb. 16, 2010) (modifying the stay to the extent necessary to effectuate the order).  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Loan Agreement and the proposed DIP Orders.

**F.    Liens on the Proceeds of Avoidance Actions Are Appropriate**

62.    The Interim Order contemplates that, subject to the entry of the Final Order and to the extent approved by the Court, the obligations of the Debtors under the DIP Facility shall be secured by a perfected first priority security interest and lien on and security interest in proceeds of Avoidance Actions.  Here, the DIP Agent and the DIP Lenders require such a lien and security interest on the proceeds of Avoidance Actions as a necessary condition to extending financing under the DIP Facility, and the Debtors acutely require financing under

the DIP Facility.  Accordingly, granting liens and security interests on the proceeds of Avoidance

Actions is justified under the circumstances.  Courts in this District have approved such liens in

similar circumstances. See, e.g., In American Apparel, Inc., Case No. 15-12055 (BLS) [Docket

No. 248] (Bankr. D. Del. Nov. 2, 2015) (authorizing liens on the proceeds of avoidance actions);

In re Molycorp, Inc., Case No. 15-11357 (CSS) [Docket No. 278] (Bankr. D. Del. July 24, 2015)

(same); In re Restora Healthcare Holdings, LLC, Case No. 14-10367 (PJW) [Docket No. 113]

(Mar. 7, 2014) (same); In re Bicent Holdings, LLC, Case No. 12-11304 (KG) [Docket No. 117]

(May 16, 2012) (same).

   63. The Interim Order, subject to entry of the Final Order, also provides for

the Adequate Protection Liens to attach to the proceeds of Avoidance Actions and will be junior

only to the DIP Liens.[9]  Courts in this District have recognized that liens on avoidance actions

may serve as adequate protection against the diminution in value of collateral securing

prepetition debt.  See, e.g., In re Atrium Corporation, 2010 WL 2822131 at *15 (Bankr. D.

Del. 2010) (granting replacement liens in all collateral securing the DIP facility, including

avoidance action proceeds); In re True Temper Sports, Inc., 2009 WL 7226692 at *15 (Bankr. D.

Del. 2009) (granting replacement liens in all collateral securing DIP facility, including avoidance

actions, as adequate protection for diminution in value of collateral securing debt to prepetition

first lien and second lien lenders); In re Comfort Co., Inc., 2008 WL 8191314 at *10 (Bankr. D.

Del. 2008) (granting prepetition lenders liens in all property securing the DIP facility, including

proceeds of avoidance actions, as adequate protection for diminution in value of prepetition

collateral).  Granting the Adequate Protection Liens on the proceeds of Avoidance Actions is

particularly appropriate under the circumstances of these Bankruptcy Cases, where postpetition

---

[9] However, to the extent the Bankruptcy Court grants a lien on the proceeds of Avoidance Actions upon the entry
of the Final Order, the DIP Agent and DIP Lenders shall use all reasonable efforts to first use all other DIP
Collateral or Prepetition Collateral other than proceeds of Avoidance Actions to repay the DIP Obligations.

causes of action, such as the Avoidance Actions, are the Debtors' only remaining material unencumbered assets. Therefore, it is appropriate that the Adequate Protection Liens attach to the Avoidance action proceeds in favor of the Prepetition Secured Parties as adequate protection for their secured prepetition position.

### G.   Funding to Non-Debtor Entities is Appropriate

64.   The proposed DIP Facility shall be used according to the DIP Budget, which includes funding to non-debtor entities. As set forth in the First Day Declaration and the Tempke Declaration, the funding of these non-debtor entities is crucial to maintaining the enterprise value of the Debtors. See First Day Declaration¶ 7; Tempke Declaration ¶¶ 9–13. Up to $50 million of the DIP Facility is to be used to fund a critically needed retention program for the Debtors' retail sales force. Approximately $40 million of the retention program spend is estimated to occur in early April with the remaining spend later in the second quarter. See DIP Budget. Specifically, funds will be used to institute a program at the Debtors' broker-dealer subsidiaries through which retention loans will be provided to the independent financial advisors engaged in the Independent Retail Advice business. Most of the Debtors' enterprise value is generated through the Independent Retail Advice business, and the maintenance and growth of that business depends upon the Debtors' ability to keep the current network of independent financial advisors largely intact. See, e.g., First Day Declaration¶¶ 5, 29 & 31. The Debtors believe that absent the retention program, the broker-dealer subsidiaries may experience significant attrition in the ranks of the financial advisor network, as advisors may be leery of maintaining their customers' securities business with subsidiaries of bankrupt entities. Id. ¶ 7.

65.   Additionally, the DIP facility will provide funding to non-debtor broker-dealer subsidiaries as required to maintain sufficient capital and liquidity to permit continued operation of such broker-dealer subsidiary, including as may be required under applicable laws,

regulations and supervisory requirements. Id. Although none of the broker-dealer subsidiaries have a current capital need and FINRA has not requested this capital, the Debtors require available liquidity to give comfort to their various constituents that the broker-deal subsidiaries will remain in regulatory compliance during the restructuring process. Id. n.6. The DIP Budget assumes $10 million of funding to non-debtor broker-dealer subsidiaries in the second week of the case. See DIP Budget.

**H.    Approval of the DIP Facility on an Interim Basis Is
          Necessary to Prevent Immediate and Irreparable Harm**

66.    Bankruptcy Rules 4001(b) and 4001(c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. See FED. R. BANKR. P. 4001(b), (c)(2). Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. See id. Similarly, Local Rule 4001-(b) provides that the Court may grant interim relief regarding a financing motion filed on or shortly after the Petition Date, pending review by interested parties of the DIP Facility, to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. See DEL. BANKR. L.R. 4001(b).

67.    Moreover, to the extent the Debtors are seeking authority to sell, use, or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may grant such relief to the extent it is necessary to avoid immediate and irreparable harm. See FED. R. BANKR. P. 6003(b).

68.    Courts have found that immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a

going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36, n.2 (discussing the elements

of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).   In examining

requests for interim relief under the immediate and irreparable harm standard, courts apply the

same business judgment standard applicable to other business decisions.  See, e.g., id. at 36; In re

Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).   After the 14-day period, the

request for financing is not limited to those amounts necessary to prevent the destruction of the

debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent

to the operation of its business.  See In re Ames Dep't Stores, 115 B.R. at 36.

       69.    Immediate and irreparable harm would result if the relief requested herein

is not granted on an interim basis.  As described above, and in further detail in the Tempke

Declaration and First Day Declaration, the Debtors have an immediate need to obtain access to

liquidity under the DIP Facility in order to, among other things, continue operation of their

businesses, make payroll, make capital expenditures, and satisfy other working capital and

operational needs, each of which is critical to the Debtors' ability to preserve and maintain their

going concern values for the benefit of all parties-in-interest.  Absent access to liquidity under

the DIP Facility and authorization to use the Cash Collateral, the Debtors will be unable to pay

their current and ongoing operating expenses or stave off significant employee and financial

advisor attrition resulting in significant loss of value for all parties-in-interest.

       70.    The importance of a debtor's ability to access postpetition financing

immediately upon the filing of its chapter 11 petition in order to prevent immediate and

irreparable harm to its estate has been recognized repeatedly in this District.  See, e.g., In

American Apparel, Inc., Case No. 15-12055 (BLS) [Docket No. 80] (Bankr. D. Del. Oct. 6, 2015)

(authorizing debtors to obtain postpetition financing on an interim basis); In re Allied Nevada

Gold Corp., Case No. 15-10503 (MFW) [Docket No. 70] (Bankr. D. Del. Mar. 12, 2015) (same);

In re Coldwater Creek, Inc., Case No. 14-10867 (BLS) [Docket No. 74] (Bankr. D. Del. Apr. 14, 2014) (same); In re Abitibi Bowater, Inc., Case No. 09-11296 (KJC) [Docket No. 64] (Bankr. D. Del. Apr. 17, 2009) (same).

71.    Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 4001(b) and 4001(c)(2) and Local Rule 4001-2(b) to support the relief requested on the terms described herein.

### REQUEST FOR A FINAL HEARING AND ESTABLISHING RELATED NOTICE PROCEDURES

72.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors respectfully request that the Court set a date and time for the Final Hearing that is no sooner than 14 days after the date of this motion and no later than 28 days from the Petition Date for consideration of entry of the Final Order.  In addition, the Debtors respectfully request that the Court authorize them to mail copies of this Motion and the signed Interim Order, which fixes the time, date and manager for the filing of objections, to the Notice Parties (as defined below).  Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is necessary.

### WAIVER OF BANKRUPTCY RULES 6004(H) AND LOCAL RULE 9013-1(M)

73.    The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).

74.    Pursuant to Local Rule 9013-1(m), requests for relief on less than seven days' notice and prior to the earlier of the creditors' committee formation meeting or the 11

U.S.C. § 341 meeting of creditors are "confined to matters of a genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations and such other matters as the Court may determine appropriate." DEL. BANKR. L.R. 9013-1(m)(ii).

75.     As set forth above, without immediate access to capital, the continued operation of the Debtors' businesses would be nearly impossible, resulting in serious and irreparable harm to the Debtors and their estates.  Accordingly, the Debtors submit that they have satisfied the requirements of Local Rule 9013-1(m) to support immediate authority to access the requested capital under the DIP Facility.

## NOTICE

76.     Notice of this Motion will be provided by overnight delivery and/or e-mail or facsimile to the following parties or, in lieu thereof, their counsel: (i) the Office of the United States Trustee for Region 3, serving the District of Delaware; (ii) counsel to the First Lien Lenders; (iii) counsel to the Second Lien Lenders; (iv) counsel to Luxor; (v) counsel to the Prepetition First Lien Agent, (vi) counsel to the Prepetition Second Lien Agent, (vii) counsel to the DIP Agent, (viii) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors on a consolidated basis; (ix) the United States Attorney's Office for the District of Delaware; (x) the United States Attorney General; (xi) the Internal Revenue Service; (xii) the Securities and Exchange Commission; (xiii) FINRA; (xiv) all entities known or reasonably believed to have asserted a security interest or lien against property of the Debtors; and (xiv) all parties entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant this Motion, enter the proposed form of Interim Order on an expedited basis, schedule the Final Hearing to consider the entry of the Final Order, enter the Final Order, and grant the Debtors such other and further relief as may be just and appropriate under the circumstances.

Dated: January 31, 2016
      Wilmington, DE

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Robert F. Poppiti, Jr. (No. 5052)
Ian J. Bambrick (No. 5455)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

-and-

DECHERT LLP
Michael J. Sage (*pro hac vice* application pending)
Shmuel Vasser (*pro hac vice* application pending)
Stephen M. Wolpert (*pro hac vice* application pending)
Andrew C. Harmeyer (*pro hac vice* application pending)
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*PROPOSED COUNSEL TO THE DEBTORS*
*AND DEBTORS-IN-POSSESSION*

## **EXHIBIT A**

**Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RCS CAPITAL CORPORATION., <u>et al</u>., | : | Case No. 16-10223 (___) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |
| | : | **Ref. Docket No. _____** |
| | : | |

**INTERIM ORDER (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING,
(B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND
(D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

Upon the motion dated January 31, 2016 (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-referenced chapter 11 cases (the "**Bankruptcy Cases**"), for entry of an interim order (this "**Interim Order**") and a final order (the "**Final Order**"), under sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001(b), 4001(c), 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**") and Rules 4001-2 and 9013-1(m) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: RCS Capital Corporation (4716); American National Stock Transfer, LLC (3206); Braves Acquisition, LLC (6437); DirectVest, LLC (9461); J.P. Turner & Company Capital Management, LLC (7535); RCS Advisory Services, LLC (4319); RCS Capital Holdings, LLC (9238); RCS Capital Securities, LLC (0821); SBSI Insurance Agency of Texas, Inc. (9203); SK Research LLC (4613); Trupoly, LLC (5836); and We R Crowdfunding, LLC (9785). The Debtors' corporate headquarters and mailing address is located at 405 Park Avenue, 14th Floor, New York, NY 10022.

[2] Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Motion or the DIP Credit Agreement (as defined below), as applicable.

(i)     authorizing the Debtors to (A) obtain postpetition financing pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Term Loan Agreement entered into on or about the date hereof attached hereto as <u>Exhibit 1</u> (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**"; and the term loan credit facility thereunder, the "**DIP Facility**"), among RCS Capital Corporation (a debtor in possession), as borrower (the "**Borrower**"), Barclays Bank PLC, as administrative agent and collateral agent (the "**DIP Agent**"), and the lenders party thereto from time to time (the "**DIP Lenders**"), the obligations of the Borrower under which are guaranteed pursuant to the Guarantee Agreement executed in connection therewith by the guarantors party thereto (the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**")), and (B) incur the Obligations under (and as defined in) the DIP Credit Agreement;

(ii)    authorizing the Debtors to execute and deliver the DIP Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Loan Documents, including, without limitation, the payment of all principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(iii)   authorizing the Debtors to grant security interests, liens, and super-priority claims, including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (including priming liens pursuant to section 364(d)(1)) of the Bankruptcy Code to the DIP Agent, for the benefit of the DIP Lenders), in the DIP Collateral as set forth herein, including, without limitation, all property constituting "Cash Collateral," as defined in Bankruptcy Code section 363(a) (the "**Cash Collateral**"), to secure all obligations under the DIP Loan Documents;

(iv)    authorizing the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined below) and the provision of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

(v)     authorizing the Debtors to borrow under the DIP Facility up to an aggregate principal amount of $100 million (to be issued net of 1.0% discount), $25 million of which (to be issued net of 1.0% discount) shall be available following entry of the Interim DIP Order and the satisfaction of the other applicable conditions in the DIP Credit Agreement, with the remainder of the DIP Facility loans (to be issued net of 1.0% discount) to be made available upon entry of the Final Order and the satisfaction of the

other applicable conditions in the DIP Credit Agreement and to use the proceeds thereof in accordance with the DIP Budget;

(vi)     approving the Fee Letter and the Commitment Letter;

(vii)    modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(viii)   scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(ix)     granting related relief.

An interim hearing on the Motion having been held by this Court on February [__], 2016 (the "**Interim Hearing**"); and this Court having found that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion and all pleadings related thereto, including the *Declaration of Christian Tempke in Support of Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "**Tempke Declaration**") and the *Declaration of David Orlofsky Chief Restructuring Officer of RCS Capital Corporation In Support of Chapter 11 Petitions and First Day Motions* filed contemporaneously with the Motion, and on the record made at the Interim Hearing, adequately establish just cause for the relief granted herein; and all objections, if any, to entry of this Interim Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

-3-

**THIS COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:[3]**

A.    On January 31, 2016 (the "**Petition Date**"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Bankruptcy Cases are being jointly administered for procedural purposes only under case number 16-10223 (___).  No official committee of unsecured creditors (upon the appointment thereof, the "**Committee**"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in these Bankruptcy Cases.

B.    This Court has jurisdiction over the Bankruptcy Cases, the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Bankruptcy Cases is proper before this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    On the Petition Date, the Debtors filed the Motion with this Court pursuant to Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by facsimile, electronic mail or overnight mail to the following parties and/or their respective counsel as indicated below:  (i) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "**U.S. Trustee**"); (ii) counsel to the First Lien Lenders; (iii) counsel to the Second Lien Lenders; (iv) counsel to Luxor (as defined below); (v) counsel to the First Lien Agent, (vi) counsel to the Second Lien Agent, (vii) counsel to the DIP Agent,

---

[3]    The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

-4-

(viii) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors on a consolidated basis; (ix) the United States Attorney's Office for the District of Delaware; (x) the United States Attorney General; (xi) the Internal Revenue Service; (xii) the Securities and Exchange Commission; (xiii) FINRA; (xiv) all entities known or reasonably believed to have asserted a security interest or lien against property of the Debtors; and (xv) all parties entitled to notice pursuant to Local Rule 9013-1(m) (the parties set forth in the preceding clauses (i) through (xv), collectively, the "**Notice Parties**").  Given the nature of the relief sought in the Motion, this Court concludes that no further notice is necessary for entry of this Interim Order.

D.    The Debtors and (i) certain First Lien Lenders (as defined below), (ii) certain Second Lien Lenders (as defined below) and (iii) Luxor Capital Group L.P. (together with its affiliates, "**Luxor**") have entered into that certain Restructuring Support Agreement dated January 29, 2016 (as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto, (collectively, the "**RSA**"), pursuant to which the parties have, among other things, agreed to support a restructuring and recapitalization of the Debtors and the other transactions contemplated therein, including the relief requested in the Motion pursuant to the terms thereof.

E.    Subject to paragraph 28 below, the Debtors hereby, and, pursuant to the DIP Loan Documents, to the extent applicable, the Non-Debtor Guarantors (as defined below), admit, stipulate and agree that:

(1)    First Lien Credit Facility:  Prior to the commencement of the Bankruptcy Cases, pursuant to the First Lien Credit Agreement, the lenders party to the First Lien Credit Agreement (the "**First Lien Lenders**"), extended to RCS Capital Corporation ("**RCS Capital**") (A) a $575.0 million Senior Secured First Lien Term Loan Facility (the "**First Lien Term Facility**") and (B) a $25.0 million Senior Secured First Lien Revolving Facility

(together with the First Lien Term Facility, the "**First Lien Credit Facility**"). The First Lien Credit Facility and certain obligations in respect of hedging agreements and cash management arrangements of RCS Capital and certain of its affiliates were guaranteed by certain affiliates, including certain subsidiaries, of RCS Capital (together with RCS Capital, the "**Existing Loan Parties**") and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the First Lien Loan Documents. All Obligations (as such term is defined in the First Lien Credit Agreement) of the Debtors and the other Existing Loan Parties arising under the First Lien Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the First Lien Lenders, including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**First Lien Loan Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the First Lien Loan Documents), L/C Exposure (as defined in the First Lien Credit Agreement) indemnification obligations and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the First Lien Loan Documents to Barclays Bank PLC, as Administrative Agent and Collateral Agent under the First Lien Loan Documents (the "**First Lien Agent**") or First Lien Lenders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, together with the hedging and cash management obligations (including, without limitation, obligations owing under or in connection with any Secured Cash Management Agreements (as defined in the First Lien Credit Agreement)), guaranteed and secured by the Loan Documents, shall hereinafter be referred to as the "**First Lien Obligations**."

(2)   <u>Second Lien Credit Facility</u>:   Prior to the commencement of the Bankruptcy Cases, pursuant to the Second Lien Credit Agreement, the lenders party to the Second Lien Credit Agreement (the "**Second Lien Lenders**") extended to RCS Capital a $150.0 million Senior Secured Second Lien Term Loan Facility (the "**Second Lien Credit Facility**"). The Second Lien Credit Facility and certain obligations in respect of hedging agreements and cash management arrangements of RCS Capital and certain of its affiliates were guaranteed by the Existing Loan Parties and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the Second Lien

Loan Documents.  All Obligations (as such term is defined in the Second Lien Credit Agreement) of the Debtors and the other Existing Loan Parties arising under the Second Lien Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Second Lien Lenders, including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**Second Lien Loan Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Second Lien Loan Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the Second Lien Loan Documents to Wilmington Trust, N.A., as administrative agent and collateral agent under the Second Lien Loan Documents (the "**Second Lien Agent,**" and, together with the First Lien Agent, the "**Prepetition Agents**") or Second Lien Lenders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**Second Lien Obligations**" and together with the First Lien Obligations, the "**Prepetition Secured Obligations**".

(3)     <u>First Lien Collateral</u>.  Pursuant to certain First Lien Loan Documents (the "**First Lien Collateral Documents**"), including that certain First Lien Collateral Agreement dated as of April 29, 2014, and entered into by and among the First Lien Agent, for the benefit of itself and the First Lien Lenders, RCS Capital and each other party signatory thereto (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**First Lien Collateral Agreement**"), each Debtor and each other Loan Party (as such term is defined in the First Lien Credit Agreement) granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders and the other holders of the First Lien Obligations (the "**First Lien Secured Parties**"), to secure such First Lien Obligations, a security interest in and continuing lien on substantially all of such Debtor's assets (subject to certain exceptions to the extent set forth in the First Lien Loan Documents).  All collateral granted or pledged by the Existing Loan Parties pursuant to the First Lien Loan Documents shall collectively be referred to herein as the "**First Lien Collateral**."

(4)     <u>Second Lien Collateral</u>.  Pursuant to certain Second Lien Loan Documents (the "**Second Lien Collateral Documents**"), including that certain Second Lien Collateral Agreement dated as of April 29, 2014, and entered

into by and among the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, RCS Capital and each other party signatory thereto (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Second Lien Collateral Agreement**"), each Debtor and each other Loan Party (as such term is defined in the Second Lien Credit Agreement) granted to the Second Lien Agent, for the benefit of itself and the Second Lien Lenders and the other holders of the Second Lien Obligations (the "**Second Lien Secured Parties**," and, together with the First Lien Secured Parties, the "**Prepetition Secured Parties**"),[4] to secure such Second Lien Obligations, a security interest in and continuing lien on substantially all of such Debtor's assets (subject to certain exceptions to the extent set forth in the Second Lien Loan Documents).  All collateral granted or pledged by the Existing Loan Parties pursuant to the Second Lien Loan Documents shall collectively be referred to herein as the "**Second Lien Collateral**" and the First Lien Collateral, together with the Second Lien Collateral, the "**Prepetition Collateral**."

(5)    Intercreditor Agreement:    That certain Amended and Restated Intercreditor Agreement, the form of which is attached hereto as Exhibit 2 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Intercreditor Agreement**" and, together with the First Lien Loan Documents and the Second Lien Loan Documents, the "**Prepetition Credit Documents**"), to be entered into by and between the DIP Agent, for the benefit of itself and the DIP Lenders, the First Lien Agent, for the benefit of itself and the First Lien Secured Parties and the Second Lien Agent, for benefit of itself and the Second Lien Secured Parties, and acknowledged by the Borrower and the Guarantors (as defined therein), will set forth, *inter alia*, the relative priority of the security interests in and liens on the DIP Collateral granted to the DIP Agent, for the benefit of itself and the DIP Lenders, and the Prepetition Collateral granted to the First Lien Agent, for the benefit of itself and the First Lien Secured Parties, and the Second Lien Agent, for the benefit of itself and the Second Lien Secured Parties.    The Intercreditor Agreement amends and restates the existing intercreditor agreement (to which the DIP Agent is not a party) and shall be enforceable among the parties thereto in determining the relative priorities and rights of the DIP Agent and DIP Lenders, the First Lien Secured Parties and the Second Lien Secured Parties (including, without limitation, the relative priorities and rights of the First Lien Secured Parties and the Second Lien Secured Parties with respect to the Adequate Protection Obligations (as defined below) granted hereunder), and such priorities and rights shall

---

[4]    For purposes of this Interim Order and the Final Order, Bank of America, N.A., shall constitute a Prepetition Secured Party in its capacity as former Administrative Agent and Collateral Agent under the Second Lien Loan Documents and the Second Lien Collateral Documents.

continue to be governed by the Prepetition Credit Documents, the Intercreditor Agreement, and all related agreements and documents.

(6)     <u>Validity of Prepetition Credit Documents</u>.    All Prepetition Credit Documents executed and delivered by the Debtors and their non-Debtor affiliate guarantors (the "**Non-Debtor Guarantors**")[5] to the Prepetition Secured Parties are valid, binding and enforceable in accordance with their terms by the Prepetition Secured Parties against each of the Debtors and Non-Debtor Guarantors and not subject to avoidance, whether under the Bankruptcy Code or otherwise.  The Prepetition Secured Parties duly and validly perfected their liens upon and security interests in the Prepetition Collateral by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments, certificates, or other property.  All of such financing statements were validly authorized by authorized representatives of the Debtors and Non-Debtor Guarantors.  Pursuant to the Prepetition Credit Documents, the Prepetition Secured Parties have properly perfected and non-avoidable security interests in and liens on all of the Prepetition Collateral, including, without limitation, Cash Collateral.

(7)     <u>Liens on Prepetition Collateral</u>.  The liens and security interests of the Prepetition Secured Parties in the Prepetition Collateral, including the Cash Collateral, as security for the Prepetition Secured Obligations, constitute valid, binding, enforceable and properly perfected liens and security interests and are not subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim (as defined in section 101(5) of the Bankruptcy Code, avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the DIP Liens and the Carve-Out (as defined below) in accordance with the provisions of this Interim Order).  The Debtors and Non-Debtor Guarantors further admit, acknowledge and agree that (A) the Prepetition Secured Obligations constitute legal, valid and binding obligations of each of the Debtors and Non-Debtor Guarantors, (B) no offsets, defenses, reductions, impairments, grounds for avoidance, recoupments, subordinations or disallowance (whether under the Bankruptcy Code or otherwise), Claims, crossclaims or counterclaims with respect to the Prepetition Secured Obligations exist and (C) no portion of the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim (as defined in section 101(5) of the

---

[5]     For purposes of this Interim Order and the Final Order, RCAP Holdings LLC, and RCS Capital Management LLC, are not Non-Debtor Guarantors.

Bankruptcy Code, avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(8)     <u>Cash Collateral</u>.  All cash proceeds of the Prepetition Collateral, including all such cash proceeds held in any of the Debtors' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts) are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any diminution in the value thereof.

(9)     <u>No Valid Claims</u>.  The Debtors and Non-Debtor Guarantors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), counterclaims, cross-claims, recoupments, causes of action, defenses or setoff rights against the Prepetition Secured Parties with respect to the First Lien Loan Documents and the Second Lien Loan Documents, whether arising at law or at equity, including, without limitation, any recharacterization, subordination (whether equitable or otherwise), avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code or any theory of "lender liability" under applicable State law or otherwise.

(10)    <u>Amount of Prepetition Secured Obligations</u>.  As of the Petition Date, the aggregate principal balance of the Prepetition Secured Obligations for which the Debtors and Non-Debtor Guarantors were truly and justly indebted to the Prepetition Secured Parties, without defense, counterclaim, cross-claim, Claim, challenge, recoupment or offset of any kind, are comprised of not less than approximately (A) an aggregate principal balance of $556 million on account of the First Lien Credit Facility, <u>plus</u> all other First Lien Obligations, and (B) an aggregate principal balance of no less than $153.2 million on account of the Second Lien Credit Facility, <u>plus</u> all other Second Lien Obligations.

(11)    <u>Priming of DIP Facility</u>.  In entering into the DIP Loan Documents, and as consideration therefor, each of the Debtors hereby agrees (and in the DIP Loan Documents, the Non-Debtor Guarantors that are subsidiaries of the Borrower will agree) that until such time as all outstanding obligations under the DIP Facility (the "**DIP Obligations**") have been irrevocably paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lenders in their sole and exclusive discretion have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not in

any way prime or seek to prime the claims, security interests and DIP Liens provided to the DIP Lenders under this Interim Order or the DIP Loan Documents by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(c)(1) or section 364(d) of the Bankruptcy Code or otherwise.

F.    Subject to paragraph 28 below, the admissions, stipulations and agreements set forth in paragraph E of this Interim Order are based upon and consistent with the Debtors' due diligence and analysis of the Prepetition Secured Parties' liens and claims and determination that subject to paragraph 14 below, the Debtors have no Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, cross-claims, recoupments, causes of action, challenges, grounds for subordination (whether equitable, contractual or otherwise), defenses or setoff rights with respect thereto.

G.    Each Debtor and Non-Debtor Guarantor and anyone who claims an interest by, through or under their estates forever and irrevocably release, discharge, and acquit each of the former, current, or future DIP Agents, DIP Lenders and Secured Parties (as such term is defined in the DIP Credit Agreement), and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with or

relating to the DIP Facility, and/or the DIP Loan Documents, or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability," claims, counterclaims, cross-claims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or other Secured Parties (as such term is defined in the DIP Credit Agreement).

H.    Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, independent contractors and customers, make payroll, make capital expenditures, satisfy other working capital and operational needs, provide funding to each non-Debtor broker-dealer subsidiary of the Borrower as required to maintain sufficient capital and liquidity to permit continued operation of such broker-dealer subsidiary, including as may be required under applicable laws, regulations and supervisory requirements and fund the administration and prosecution of these Bankruptcy Cases.  The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facility and the use of Cash Collateral under the terms of this Interim Order is vital to the preservation and maintenance of the going concern value of the Debtors' estates, the orderly

operation of the Debtors' businesses and, ultimately, the success of the Debtors' reorganization efforts. Consequently, without access to the DIP Facility and the continued use of Cash Collateral, to the extent authorized pursuant to this Interim Order, the Debtors and their estates would suffer immediate and irreparable harm.

I.    The DIP Facility is the best source of debtor in possession financing available to the Debtors. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Agent and the DIP Lenders on terms more favorable than the terms of the DIP Facility. The best available source of secured credit available to the Debtors is the DIP Facility. The Debtors are not able to operate and manage their business solely with the use of Cash Collateral. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order in order to satisfy their postpetition liquidity needs.

J.    The DIP Lenders have indicated a willingness to provide the DIP Facility, but solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court of the Final Order) and in the DIP Loan Documents. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order and the DIP Loan Documents represents the best financing presently available to the Debtors.

K.      Solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court of the Final Order) and in the DIP Loan Documents, including without limitation, compliance with the DIP Budget, the Prepetition Secured Parties are prepared to consent to: (i) the imposition of the Priming Liens (as defined below), which liens will prime the Primed Liens (as defined hereinafter) and (ii) the Debtors' use of the Prepetition Collateral (including the Cash Collateral), underlined provided that this Court authorizes the Debtors, pursuant to sections 361, 363 and 364(d) of the Bankruptcy Code, to grant to the First Lien Agent and the Second Lien Agent, on a joint and several basis, for the benefit of themselves and the First Lien Secured Parties and the Second Lien Secured Parties, respectively, as and for adequate protection and without in any way limiting the Prepetition Secured Parties' rights under section 552 of the Bankruptcy Code, but subject to the Carve-Out, (1) a security interest in and lien and mortgage upon the DIP Collateral (as defined hereinafter) in favor of the Prepetition Secured Parties, which shall have the priorities set forth in paragraph 11 hereof (the "**Adequate Protection Lien**"), (2) superpriority administrative expense claims under section 507(b) of the Bankruptcy Code (collectively, the "**Adequate Protection Claims**"), and (3) the Adequate Protection Payments (as defined in paragraph 11 hereof).

L.      The security interests and liens granted pursuant to this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders and other Secured Parties, are appropriate under section 364(d) of the Bankruptcy Code because, among other things:  (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtors' estates; and/or (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted pursuant to this Interim Order to the DIP Agent for the benefit

of itself and the DIP Lenders; and (iii) the interests of any holder of a valid, perfected, prepetition security interest or lien are otherwise adequately protected.  In particular, the security interests and liens of the Prepetition Secured Parties are adequately protected by the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims.

M.     Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the Debtors to execute the DIP Loan Documents, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in the best interest of the Debtors, their estates and creditors.  The terms of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.     The Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) and this Interim Order, in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and the DIP Agent and the DIP Lenders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that either this Interim Order or any provision thereof is vacated, reversed, or modified, whether on appeal or otherwise.  To the fullest extent permitted under section 364(e)

of the Bankruptcy Code, any liens or claims granted to the DIP Agent, the DIP Lenders and/or any of the Prepetition Secured Parties hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted in this Interim Order.

O.      The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties request a waiver of the provisions of sections 105 and 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code in connection with the DIP Facility at the Final Hearing.

P.      Based on the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      _Approval of Motion._  The Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order.  Any objections or responses to the relief requested in the Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the Final Hearing.  The rights of all parties-in-interest to object to entry of a Final Order are reserved.  This Interim Order shall become effective immediately upon its entry.  To the extent that the terms of the DIP Loan Documents differ from the terms of this Interim Order, this Interim Order shall control.

2.      _Authority to Enter Into DIP Loan Documents, Authority Thereunder._  The Debtors are hereby authorized to enter into the DIP Loan Documents, including the DIP Credit

Agreement, the Intercreditor Agreement, and such additional documents, instruments and agreements as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of this Interim Order.  The Borrower is hereby authorized to borrow money under the DIP Credit Agreement, on an interim basis, up to an aggregate principal or face amount not to exceed $25 million (to be issued net of 1.0% discount), and the Guarantors are hereby authorized to guaranty such borrowings and the other DIP Obligations, all in accordance with the terms of this Interim Order, the DIP Credit Agreement and the other DIP Loan Documents.

3.     *Use of Cash Collateral and DIP Loans.*   Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use the Cash Collateral and proceeds of the DIP Facility solely to (a) provide working capital to the Debtors; (b) fund fees and other payments contemplated in respect of the DIP Facility or the payment of fees and reasonable and documented out-of-pocket expenses and indemnities payable to any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders (including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel and financial advisors advising any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders) as adequate protection; (c) fund advisor retention loans as contemplated by the chapter 11 plan of reorganization filed by the Debtors contemporaneously with the Motion (the "**Plan**"); (d) provide funding to each non-Debtor broker-dealer subsidiary of the Borrower as required to maintain sufficient capital and liquidity to permit continued operation of such broker-dealer subsidiary, including as may be required under applicable laws, regulations and supervisory requirements; and (e) provide funding to subsidiaries of the Borrower that are not Debtors in the Bankruptcy Cases, in the case of each of clauses (a)-(e) hereof, solely to the extent set forth in, and in

accordance with, the DIP Budget approved by the DIP Lenders, including any variances to the line items contained in such DIP Budget (as the same may be amended, supplemented and/or updated in accordance with the DIP Credit Agreement) that are permitted under the DIP Credit Agreement.  The initial DIP Budget is attached hereto as <u>Exhibit 3</u>.  Proceeds of the DIP Facility shall not be used to fund the operations of, or the administration of any bankruptcy case of, any of RCAP Holdings, LLC, RCS Capital Management, LLC or any of the Debtors' affiliates that are not direct or indirect subsidiaries of RCS Capital Corporation.

4.      *Payment of DIP Fees and Expenses.*  The Debtors are hereby authorized to pay all reasonable fees, expenses and other amounts payable under the terms of the DIP Credit Agreement or any other DIP Loan Documents, including, without limitation, the Administrative Agent Fees and Upfront Fees (each as defined in the DIP Credit Agreement) and all reasonable out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Credit Agreement (including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel and financial advisors advising the DIP Agent and DIP Lenders) (collectively, the "**DIP Fees and Expenses**").  Subject to the same protocol regarding payment of the fees and expenses of the Prepetition Secured Parties provided for in paragraph 11(c) hereof, none of the DIP Fees and Expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  In addition, the Debtors are hereby authorized to indemnify the DIP Agent, the DIP Lenders and their respective affiliates and their respective affiliates' related parties, on the terms set forth in Section 9.05 of the DIP Credit Agreement.  All such unpaid fees, expenses and indemnities of the DIP Agent shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral

and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.

5.      *Validity of DIP Loan Documents.*  Upon execution and delivery of the DIP Loan Documents and entry of this Interim Order, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      *DIP Loans.*  All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Loan Documents (collectively, the "**DIP Loans**"):  (a) shall be evidenced by the books and records of the DIP Agent or the DIP Lenders; (b) shall bear interest payable at the rates set forth in the DIP Credit Agreement; (c) shall be secured in the manner specified in paragraph 8 below and in the DIP Loan Documents; (d) shall be payable in accordance with the terms of the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth herein and in the DIP Loan Documents.

7.      *Continuation of Prepetition Liens and Prepetition Liens Securing DIP Obligations.*  Until (a) the Loan Parties have paid in full in cash all DIP Obligations (or the DIP Loans have been applied on a dollar for dollar basis to loans to be made under the Exit Facility upon consummation of the Plan) and all Prepetition Secured Obligations shall have been exchanged and satisfied pursuant to the terms and conditions of the Plan, (b) the DIP Lenders' commitments under the DIP Facility have terminated, (c) all objections and challenges to (i) the liens and security interests of the Prepetition Secured Parties (including, without limitation, liens

granted for adequate protection purposes) and (ii) the Prepetition Secured Obligations have been waived, denied or barred, and (d) all of the Debtors' stipulations contained in paragraph E hereof (collectively, the "**Debtors' Stipulations**") have become binding upon their estates and parties-in-interest in accordance with paragraph 14 below, all liens and security interests of the Prepetition Secured Parties (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein. Without limiting the foregoing, notwithstanding any payment of all or any portion of the Prepetition Secured Obligations, the liens on the Prepetition Collateral in favor of the Prepetition Secured Parties shall continue in full force and effect and shall, and shall be deemed to, secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Liens granted to the DIP Agent and the DIP Lenders in paragraph 8 below) until the payment in full of all of the DIP Obligations and the termination of the DIP Lenders' commitments under the DIP Facility.

8.       *DIP Liens and DIP Collateral.*   To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on all prepetition and postpetition property of the Loan Parties, whether existing on the Petition Date or thereafter acquired (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "**DIP Collateral**"), subject only to (x) the Carve-Out and (y) any existing valid, perfected, enforceable and non-avoidable liens existing as of the Petition Date that are senior to the Prepetition Secured Parties' liens on the Prepetition Collateral, valid,

enforceable, unavoidable and fully perfected security interests, priming liens and mortgages as set forth in the DIP Loan Documents, including liens granted by the Non-Debtor Guarantors in favor of the DIP Agent and DIP Lenders (all such liens and security interests granted to the DIP Agent, for the benefit of itself, and the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**") and notwithstanding any agreement that may purport to prevent, hinder, or attach obligations with respect to the incurrence of the DIP Liens:

(a)     <u>First Lien on Cash Balances and Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the Debtors), deposit accounts, investment property, supporting obligations, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**").  Notwithstanding the prior sentence, Unencumbered Property shall in any event exclude the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code

and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.

(b)     <u>Liens Priming Liens of Prepetition Secured Parties</u>.     Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all DIP Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Prepetition Secured Parties (such priming liens granted to pursuant to this paragraph 8(b), the "**Priming Liens**" and such primed liens of the Prepetition Secured Parties, the "**Primed Liens**"). The priming security interests and liens granted pursuant to this paragraph 8(b) shall be senior in all respects to the interests in such property of any of the Prepetition Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of the Prepetition Secured Parties become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Liens**").

(c)     <u>Liens Junior to Certain Other Liens</u>.     Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all DIP Collateral (other than the property described in clause (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is

subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition

Date, or to any valid and non-avoidable liens in existence immediately prior to the Petition Date

that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code, which security interests and liens in favor of the DIP Agent are junior to such

valid, perfected, and non-avoidable liens.

(d)      <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens are valid, binding,

continuing, automatically perfected, non-avoidable, senior in priority, and superior to any

security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the

DIP Liens shall be junior only to Permitted Liens and the Carve-Out.  Pursuant to section 364(d)

of the Bankruptcy Code, the DIP Liens shall be senior to the liens of the Prepetition Secured

Parties, and any and all forms of adequate protection (if any) granted in the Bankruptcy Cases.

For purposes of this Interim Order, it shall be an Event of Default if, other than as set forth in this

Interim Order, the DIP Liens shall be made junior to, or *pari passu* with, any lien or security

interest heretofore or hereinafter granted in the Bankruptcy Cases or any case under chapter 7 of

the Bankruptcy Code upon the conversion of any of the Bankruptcy Cases, or in any other

proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"),

upon the conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy

Code (or in any other Successor Case), and/or upon the dismissal of any of the Bankruptcy Cases

or Successor Cases.  No lien or interest avoided and preserved for the benefit of the estate

pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP

Liens.

9.      *DIP Lenders' Superpriority Claims*.  Upon entry of this Interim Order, the

DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the

Bankruptcy Code, allowed superpriority administrative expense claims in each of the Bankruptcy Cases and any Successor Cases against each of the Debtors and their estates on a joint and several basis (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations:  (a) except as set forth in this Interim Order, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Bankruptcy Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof, including without limitation, upon entry of the Final Order, the proceeds of Avoidance Actions; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Carve Out.

          10.    *Fee Letter; DIP Fees*.  The fee letter executed by Barclays Bank PLC and RCS Capital Corporation in connection with the DIP Credit Agreement (the "**Fee Letter**"), and the commitment letter executed by Barclays Bank PLC and RCS Capital Corporation in connection with the DIP Credit Agreement (the "**Commitment Letter**") are each hereby approved.  Immediately upon the entry of this Interim Order, the Debtors shall pay to Barclays Bank PLC all fees set forth in the Fee Letter and the Commitment Letter including, without

limitation, the Administrative Agent Fees (as defined in the DIP Credit Agreement) and the Fronting Fees (as defined in the Fee Letter) incurred in connection with the DIP Facility.

11.    _Adequate Protection for Prepetition Secured Parties_.  Without in any way limiting the Prepetition Secured Parties' respective rights under the Bankruptcy Code, the Prepetition Secured Parties are entitled, pursuant to sections 361, and 363(e) of the Bankruptcy Code, to adequate protection of their interest in their respective Cash Collateral for the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Primed Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   The Prepetition Secured Parties are hereby granted the following:

(a)    Effective and perfected upon the date of entry of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims against each of the Debtors and their estates on a joint and several basis, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, including, without limitation, any such diminution resulting from:  (1) the use by the Borrower of such collateral and cash and property constituting proceeds of such collateral, (2) the imposition of the Priming Liens granted to the DIP Lenders which will prime the Prepetition Secured Parties' prepetition liens, (3) the Carve-Out, (4) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code and/or (5) any other reason (the "**Adequate Protection Obligations**").

(b)    To give effect to the Prepetition Secured Parties' intent to recognize the priorities established in the Intercreditor Agreement, the priority of the Adequate

Protection Liens shall be as follows:  pursuant to section 364(c) of the Bankruptcy Code, and subject only to the DIP Liens, any existing, valid, perfected, enforceable and non-avoidable liens that are senior to the DIP Liens, and the Carve-Out, (1) the Adequate Protection Liens granted to the First Lien Agent and the First Lien Lenders shall constitute first-priority security interests in and liens upon DIP Collateral and (2) the Adequate Protection Liens granted to the Second Lien Agent and the Second Lien Lenders shall constitute second-priority security interest in and liens upon DIP Collateral.  For the avoidance of doubt, (i) the Adequate Protection Liens of the Second Lien Secured Parties shall be subject and junior in priority in all respects to the Adequate Protection Liens of the First Lien Secured Parties; and (ii) the Adequate Protection Claims of the Second Lien Secured Parties shall be subject and junior in priority in all respects to the Adequate Protection Claims of the First Lien Secured Parties.

(c)     As additional adequate protection, and subject to the DIP Budget, the Debtors shall pay to the Prepetition Secured Parties (i) immediately upon entry of this Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented fees and out-of-pocket expenses (including, but not limited to, the fees owed to the First Lien Agent for its services as administrative agent and collateral agent and the Second Lien Agent for its services as administrative agent and collateral agent, and fees and disbursements of legal counsel and financial advisors advising any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders) owing to such parties and incurred before the Petition Date; and (ii) from time to time after the Petition Date, in the form of cash payments equal to all reasonable and documented fees and out-of-pocket expenses owing to such parties (including, but not limited to, the fees owed to the First Lien Agent for its services as administrative agent and collateral agent and the Second Lien Agent for its services as administrative agent and collateral

agent and fees and disbursements of legal counsel and financial advisors advising any Prepetition Agent, the First Lien Lenders, or the Second Lien Lenders, but in the case of the First Lien Lenders and the Second Lien Lenders, limited to one primary legal firm, one local Delaware firm and one financial advisory firm for each group) (all such payments, the "**Adequate Protection Payments**").   None of the fees and expenses payable pursuant to this paragraph 11 shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses) or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with this Court with respect thereto; provided, however, that the First Lien Agent, Second Lien Agent, First Lien Lenders and Second Lien Lenders shall submit copies of their professional fee invoices to the Debtors, the U.S. Trustee and the Committee, if appointed; and the Debtors, U.S. Trustee and the Committee, if appointed, shall have ten (10) days from receipt thereof to object in writing to the reasonableness of such invoices; to the extent that the Debtors, U.S. Trustee or the Committee, if appointed, so objects to any such invoices, payment of the allegedly unreasonable portion of such invoices will be subject to review by this Court; provided, further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  The Debtors shall pay the fees and expenses provided for in this paragraph 11(c) promptly after the foregoing ten (10)-day period; provided, however, to the extent a timely written objection is made, then the Debtors shall pay the undisputed portion of such fees promptly after the foregoing ten (10)-day period and pay whatever portion of the disputed portion of such fees is approved within ten (10)

days after this Court rules on such objection.   The same protocol provided for in this paragraph 11(c) shall apply to the fees and expenses provided for in paragraph 4 hereof.

(d)    The consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens is limited to the DIP Facility presently before this Court and shall not extend to any other postpetition financing or to any modified version of the DIP Facility. Furthermore, the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise, and, to the extent of any dispute regarding the payment or entitlement to adequate protection, including adequate protection granted pursuant to this Interim Order, the Debtors shall retain the burden of proof.

12.    _Automatic Effectiveness of Liens._   Except as expressly set forth herein (including, without limitation, with respect to the Carve-Out), the liens granted pursuant to this Interim Order shall not be (a) subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (b) subordinated to or made _pari passu_ with any other lien under sections 363 and 364 of the Bankruptcy Code other than as explicitly provided herein.  The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, properly perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, guaranty agreements, security agreements, pledge agreements, federal or state notices, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other

documents or the taking of possession or control of any DIP Collateral or the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Carve-Out and other permitted liens and encumbrances as provided herein and in the DIP Credit Agreement.  If the DIP Agent hereafter requests that the Debtors execute and deliver to the DIP Agent (and/or authorize the filing of) financing statements, guaranty agreements, security agreements, collateral assignments, mortgages or other instruments and documents considered by the DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized to execute and deliver (and/or authorize the filing of) such financing statements, security agreements, mortgages, collateral assignments, instruments and documents, and the DIP Agent is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

13.    *Carve Out.*  Notwithstanding anything to the contrary contained herein or in the DIP Credit Documents, the DIP Collateral, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens shall, solely in the event of the DIP Agent's issuance of a Carve-Out Trigger Notice (as defined below), be subject to the payment of the Carve-Out.  For the avoidance of doubt, if at any time the Carve-Out is not adequately funded in accordance with the provisions of this Interim Order, upon a realization against the Carve-Out, the unpaid portion of the Carve-Out shall be funded out of the DIP Collateral having priority over the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens.  For purposes of this Interim Order, the "**Carve-Out**" shall mean, collectively, the sum of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code

and 31 U.S.C. §3717, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) all fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date (as defined below), or any monthly fees payable to estate professionals (but not any success or transaction fees), in each case, by persons or firms retained by the Debtors or the Committee whose retention is approved by this Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professionals**," and the fees, costs and expenses of Professionals, the "**Professional Fees**"), to the extent such Professional Fees are allowed by this Court at any time (*i.e.*, before or after the Carve-Out Trigger Date) on a final basis; and (iv) all Professional Fees incurred on and after the Carve-Out Trigger Date by Professionals and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, whether by interim order, procedural order or otherwise; provided, that the payment of any Professional Fees of the Professionals (but excluding fees and expenses of third party professionals employed by individual members of the Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall not exceed $1,500,000 in the aggregate (the "**Professional Expense Cap**"); provided, further, that (A) any payments actually made in respect of Professional Fees incurred on or after the Carve-Out Trigger Date and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall reduce the Professional Expense Cap on a dollar-for-dollar basis and (B) for the avoidance of doubt, so long as no Carve-Out Trigger Date has occurred, the payment of Professional Fees shall not reduce the Professional Expense Cap.  For the purposes of the foregoing, "**Carve-Out Trigger Date**" means the first business day after (A) the occurrence and during the continuance of (x) an Event of Default (as defined below) or (y) a default in

-30-

accordance with the DIP Loan Documents, in each case, unless such Event of Default or default is cured or waived, and (B) delivery of written notice thereof (the "**Carve-Out Notice**") by the DIP Agent to (1) the U.S. Trustee, (2) the Borrower and counsel to the Debtors, and (3) counsel for the Committee, if appointed.  For the avoidance of doubt, the Carve-Out shall be senior to any claims arising under or relating to and liens securing the DIP Facility, the Prepetition Secured Obligations, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.  In any event, the DIP Agent reserves the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals.  Any funding or payment of the Carve-Out shall be added to, and made a part of, the DIP Obligations and adequate protection and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

14. _Investigation of Prepetition Liens._  The Debtors shall not assert or prosecute, and no portion of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) asserting or prosecuting any claims or causes of action against the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, or (b) challenging or raising any defenses to the Prepetition Secured Obligations or the DIP Obligations, the DIP Liens, the Adequate Protection Liens or the liens and security interests of the Prepetition Secured Parties with respect to the Prepetition Collateral (such liens and security interests, the "**Prepetition Liens**").  Notwithstanding the foregoing, (i) the Debtors shall be permitted to contest the occurrence and/or continuance of an Event of Default in accordance with the terms and

conditions of this Interim Order and (ii) no more than $50,000 of the proceeds of the DIP Facility or the DIP Collateral or Cash Collateral may be used by the Committee, to the extent one is appointed, to investigate the prepetition liens and claims of the Prepetition Secured Parties.

15.    *Cash Management System.*  The cash management system described in the Debtors' motion seeking authorization to use such system (among other relief) or in the DIP Credit Agreement (the "**Cash Management System**") and all accounts established in connection therewith shall be used for the purposes and on the terms and conditions set forth in the DIP Credit Agreement and the other DIP Loan Documents.  The Debtors and the DIP Agent are further authorized to enter into any control agreements with respect to deposit, securities intermediaries or commodity intermediaries (or amend existing control agreements) in accordance with the terms of the DIP Credit Agreement.

16.    *Shared Control Between Prepetition Agents and DIP Agent; Access; Insurance.*  The Prepetition Agents shall immediately share dominion and control with the DIP Agent with respect to each depository account of the Debtors or other third party that was subject to a deposit account control agreement with the Prepetition Agents as of the Petition Date, and each of such deposit account control agreements shall hereafter be enforceable by the DIP Agent against, and binding upon, each depository institution party thereto until the DIP Obligations have been paid in full in cash and the DIP Credit Agreement shall have been terminated, after which such deposit account control agreements shall again be solely enforceable by the Prepetition Agents.  Upon entry of this Interim Order, the Prepetition Agents and the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

17.    _Section 506(c) and 552(b) Waivers._    Subject to the entry of the Final Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Bankruptcy Cases or any Successor Cases, (a) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral, and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility and the First Lien Credit Facility or the Second Lien Credit Facility.

18.    _Restrictions on Granting Post-Petition Liens._    Except for the Carve-Out, liens and claims otherwise permitted pursuant to Section 2.20(a)(iii) of the DIP Credit Agreement or as expressly set forth in this Interim Order, it shall constitute an Event of Default if any of the Debtors incurs or requests authority to incur a claim or grants a lien (or a claim or lien is allowed) having a priority superior to or _pari passu_ with those granted pursuant to this Interim Order to the DIP Agent and the DIP Lenders, or the Prepetition Secured Parties, respectively, at any time during which any portion of the DIP Facility (or any refinancing thereof), the DIP Obligations or the adequate protection obligations owing to the Prepetition Secured Parties remains outstanding; provided, however, that the Debtors shall be entitled to incur such liens or request such authority in connection with obtaining postpetition financing, loans or financial accommodations (or a request therefor) that will indefeasibly repay in full all DIP Obligations in cash; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the

consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

19.     _Binding Nature of Order; Order Controls._   The provisions of this Interim Order shall be binding upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property).   In the event of any inconsistency between the provisions of this Interim Order and any of the DIP Loan Documents, the provisions of this Interim Order shall govern.

20.     _No Marshaling_.   In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral, as applicable, _provided_, that, to the extent the Bankruptcy Court grants a lien on the proceeds of Avoidance Actions upon the entry of the Final Order, the DIP Agent and the DIP Lenders shall use best efforts to first use all other DIP Collateral or Prepetition Collateral other than proceeds of Avoidance Actions to repay the DIP Obligations.

21.     _Survival of Order._   The provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order:   (i) confirming any plan of reorganization in any of the Bankruptcy Cases or any Successor Cases; (ii) converting any of the Bankruptcy Cases or any Successor Cases to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Bankruptcy Cases or any Successor Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged

in accordance with the terms of the DIP Credit Agreement.  The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Bankruptcy Cases, and the Debtors shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

22.    *Protection under Section 364(e) of the Bankruptcy Code.*  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or adequate protection obligations owing to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or adequate protection rights of the Prepetition Secured Parties, including without limitation, with respect to the use of Cash Collateral.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations or adequate protection rights of the Prepetition Secured Parties prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations owing to the Prepetition Secured Parties.

23.    _Events of Default._  Except as otherwise provided in this Interim Order or to the extent the DIP Agent may otherwise agree in writing, any occurrence of an "Event of Default" pursuant to the DIP Credit Agreement shall constitute an event of default hereunder, unless the DIP Agent has waived such default in accordance with the DIP Loan Documents (each, an "**Event of Default**").

24.    _Modification of Stay._  The automatic stay provisions of section 362 of the Bankruptcy Code shall be and hereby are automatically vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default and, in each case, after the provision by the DIP Agent to the Debtors of three (3) business days' prior written notice of such Event of Default (such three (3) business day period, the "**Remedies Notice Period**"), which written notice shall be served by the DIP Agent via electronic mail or facsimile on the Debtors, counsel to the Debtors, counsel to the First Lien Lenders, counsel to the First Lien Agent, counsel to the Second Lien Lenders, counsel to the Second Lien Agent, counsel to Luxor, counsel to the Committee (or, in the event no Committee has been appointed, to the Top 30 Creditors) and the U.S. Trustee and filed with the Court by counsel to the DIP Agent, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to this Court following the conclusion of the Remedies Notice Period and in the absence of a determination by the Court that an Event of Default has not occurred and/or is not continuing:  (a) immediately terminate the Debtors' use of Cash Collateral and cease making any DIP Loans to the Debtors; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the commitment to enter into the Exit Facility or provide any exit financing; (d) immediately set off any and all amounts in

accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided above unless and until this Court has determined that an Event of Default has not occurred and/or is not continuing.  For the avoidance of doubt, neither the DIP Agent nor any of the DIP Lenders shall exercise any such rights and remedies on account of an Event of Default until after expiration of the Remedies Notice Period.  Any party-in-interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. During the Remedies Notice Period, the Debtors shall be entitled to (x) use the proceeds of the DIP Facility or the Cash Collateral in accordance with the DIP Budget and fund the Carve-Out (in accordance with the procedures set forth herein), (y) contest the occurrence and/or continuance of the an Event of Default and (z) seek and obtain an emergency hearing before this Court, with proper notice to the DIP Agent, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.  The rights and remedies of the DIP Agent and the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Lenders may have under the DIP Loan Documents or otherwise. The Borrower shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

25.     _No Waiver of Remedies_.   The delay in or the failure of the Prepetition Secured Parties or the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Secured Parties' or DIP Lenders' rights and remedies.   Notwithstanding anything herein, but subject to the terms of the RSA as it relates to the Prepetition Secured Parties, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Secured Parties or the DIP Lenders under the Bankruptcy Code or under applicable non-bankruptcy law, including without limitation, the rights of the Prepetition Secured Parties and the DIP Lenders to (a) request conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of these Bankruptcy Cases, or the appointment of a trustee in these Bankruptcy Cases, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, an alternative plan, or (c) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the Prepetition Secured Parties and the DIP Lenders may have.

26.     _Limitations on Borrowings_.   It shall constitute an Event of Default if any of the Debtors obtain authorization from the Court for the Debtors or their estates to borrow money (other than in accordance with the DIP Credit Agreement) from any person other than the DIP Lenders; provided, however, that the Debtors may request and obtain such authorization in connection with postpetition financing, loans or financial accommodations that will indefeasibly repay in full all DIP Obligations; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

27.    *Modifications of DIP Loan Documents and Budgets.*  The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Agent, with the consent of the Required DIP Lenders (as defined in the DIP Loan Documents), providing for any non-material modifications to the DIP Loan Documents or of any other modifications to the DIP Loan Documents necessary to conform the DIP Loan Documents to this Interim Order; provided, however, that the Debtors shall provide notice of any material modification or amendment to the DIP Loan Documents that is adverse to the Debtors' estates to counsel to the Committee (if any), counsel to the First Lien Agent, counsel to the First Lien Lenders, counsel to the Second Lien Agent, counsel to Luxor, counsel to the Second Lien Lenders and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment.  If the Committee (if any) or the U.S. Trustee timely objects to any such material modification or amendment to the DIP Loan Documents, such modification or amendment shall be permitted only pursuant to an order of this Court.

28.    *Stipulations Regarding Prepetition Secured Obligations and Prepetition Liens Binding on Parties-in-interest.*  The Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest, including, without limitation, the Committee, unless (a) the Committee, or another party-in-interest (other than any of the Debtors) with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 14 hereof) (a "**Challenge**") challenging the amount, validity or enforceability of the Prepetition Secured Obligations, or the perfection or priority of the Prepetition Liens, or otherwise asserting any objections, defenses, Claims or causes of action on behalf of the Debtors' estates against the Prepetition Secured Parties relating to the Prepetition

Secured Obligations or the Prepetition Liens no later than the earlier of the date that is (X) seventy-five (75) days after the Petition Date or (Y) sixty (60) days after the appointment of the Committee, and (b) this Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  If no such Challenge is timely commenced as of such date, then, without further order of this Court, (x) the claims, liens and security interests of the Prepetition Secured Parties shall be deemed to be finally allowed for all purposes in these Bankruptcy Cases, any subsequent chapter 7 cases and any later-filed chapter 11 case filed by a Non-Debtor Guarantor and shall not be subject to challenge or objection by any party-in-interest as to validity, priority, amount or otherwise, and (y) the Debtors and their estates shall be deemed to have released any and all claims or causes of action against Prepetition Secured Parties with respect to the Prepetition Credit Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the Debtors' Stipulations shall be binding on the Debtors' estates, the Committee and all parties-in-interest.   If a Challenge is timely commenced, the Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest except to the extent such stipulations are specifically challenged in such Challenge as and when originally filed (ignoring any relation back principles).  To the extent a Challenge is withdrawn, denied or overruled, the Debtors' Stipulations specifically challenged in such Challenge also shall be binding on the Debtors' estates and all parties-in-interest.

29.     *Termination of Commitments and  Right to Use Cash Collateral.*   All commitments of the DIP Lenders and any consent or right of the Debtors to use Cash Collateral shall terminate and all amounts owing under the DIP Facility shall be due and payable, on the earliest to occur of the following events (collectively, the "**Cash Collateral Termination Events**"): (a) in the event the Final Order has not been entered by the Court within thirty-five

(35) days after the Petition Date, (b) in the event the Court declines to enter the Final Order, (c) the effective date of a confirmed plan, (d) subject to the other terms and conditions of this Interim Order, the Borrower's receipt of written notice (which notice may be delivered to the Debtors by facsimile or other electronic means of communication and in accordance with the DIP Credit Agreement) of the occurrence of an Event of Default (such notice, a "**Carve-Out Trigger Notice**"), (e) the payment in full in cash of the DIP Obligations and (f) as otherwise provided in the DIP Credit Agreement; provided that the Cash Collateral Termination Events set forth in the immediately preceding clauses (d) and (f) shall be subject to the Remedies Notice Period.

30.    *Master Proof of Claim.*  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Bankruptcy Cases or any successor cases to the contrary, none of the Prepetition Secured Parties will be required to file proofs of claim or requests for payment of administrative expenses in any of the Bankruptcy Cases or any Successor Cases for any claims arising under the Prepetition Credit Documents or with respect to any Adequate Protection Obligations, and the Debtors' Stipulations and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties with regard to all claims arising under the Prepetition Credit Documents and this Interim Order.  Notwithstanding the foregoing, the First Lien Agent, for the benefit of itself and the First Lien Lenders, and the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, are authorized and entitled, in their sole discretion, but are not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or proofs of claim and/or requests for payment of administrative expenses in each of the Bankruptcy Cases or any Successor Cases for any claim or administrative expense described herein.  The failure to file any

such proof of claim or request for payment of an administrative expense shall not affect the validity or enforceability of any of the Prepetition Loan Documents, this Interim Order, the Prepetition Obligations or any other obligations hereunder, or prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order; provided further that, for the avoidance of doubt, the filing of any proof of claim or request for payment of an administrative expense by any of the Prepetition Secured Parties shall not in any way prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order

31.     *Enforceability*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedures, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

32.     *Binding Effect*.  The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Interim Order by this Court.  In the event the provisions of this Interim Order are reversed, stayed, modified or vacated following any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the Prepetition Secured Parties granted pursuant to this Interim Order.

33.     _No Third Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors and the Prepetition Secured Parties.

34.     _No Liability to Third Parties_.  Subject to entry of the Final Order, none of the Prepetition Agents or other Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute), or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

35.     _Sale, Conversion, Dismissal, Plan_.  No order providing for either the sale of the ownership of the stock of any of the Debtors or their affiliates or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless (i) in connection and concurrently with any such event, the proceeds of such sale shall be used to satisfy, in cash, the DIP Obligations in accordance with the DIP Loan Documents, and (ii) such sale is expressly permitted by the DIP Loan Documents.  If an order dismissing or converting any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered, and unless otherwise agreed to by the DIP Agent with the consent of the Required Lenders, any proposed order shall provide that (i) the DIP Liens, the Adequate Protection Liens, DIP Superpriority Claim, and the Adequate Protection Obligations granted

hereunder and in the DIP Loan Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Secured Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents and the Prepetition Credit Documents are terminated in accordance with the DIP Loan Documents and the Prepetition Credit Documents, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims and the Adequate Protection Obligations and (iii) all postpetition indebtedness, obligations or liabilities incurred by any of the Debtors or other Obligors to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties prior to the date of such order, including without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

36.     _Headings_.    The headings of this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

37.     _Retention of Jurisdiction_.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

38.     _Joint and Several Liability_.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates or a substantive consolidation with any Non-Debtor Guarantor, it being understood, however, that the Debtors

and the Non-Debtor Guarantors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Loan Documents.

39.    *Non-Debtor Guarantors*.  Any Subsidiary (as defined in the DIP Credit Agreement) of the Debtors that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in the Court and is or is required to be a Subsidiary Guarantor (as defined in the DIP Credit Agreement) under the DIP Credit Agreement automatically and immediately, upon the filing of a petition for relief for such Subsidiary, shall be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Interim Order and the Final Order, including, those provisions granting security interests in, and liens on, the DIP Collateral, and DIP Superpriority Claims in each of the Bankruptcy Cases, shall, to the extent not already, immediately be applicable in all respects to such Subsidiary and its chapter 11 estate. Within five (5) business days of the filing of a petition for relief for any such Subsidiary, the Debtors shall file a notice with the Court indicating that the Subsidiary is a Subsidiary Guarantor under the DIP Credit Agreement and a "Grantor" (as such term is defined in the DIP Collateral Agreement).

40.    *Rights Under Sections 363(k) and 1129(b)*.  The full amount of the DIP Obligations and First Lien Obligations may be used to "credit bid" for the assets and property of the Debtors and Non-Debtor Guarantors as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Documents and First Lien Documents without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code or otherwise.

41.    *Final Hearing*.  The Final Hearing is scheduled for February ____, 2016, at ____:00 ____.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or

other parties-in-interest to any provisions of this Interim Order shall be deemed waived <u>unless</u> timely filed and served in accordance with this paragraph 41.  The Debtors shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties-in-interest in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules.  Without limiting the foregoing, the Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware by no later than 5:00 p.m. (prevailing Eastern Time) on February _____, 2016 (the "**Objection Deadline**").  The continued availability of the DIP Facility shall be subject to the entry in these Bankruptcy Cases, not later than thirty (30) days after the entry of this Interim Order of the Final Order, following proper notice and hearing thereon, which is in all respects reasonably satisfactory to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

Dated:  February __, 2016.

_____

UNITED STATES BANKRUPTCY JUDGE

## <u>EXHIBIT 1</u>

**DIP Credit Agreement**

*DRAFT 1/31/2016*

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

dated as of

[_____], 2016

among

RCS CAPITAL CORPORATION,
a Debtor and Debtor in Possession under
Chapter 11 of the Bankruptcy Code
as Borrower

THE LENDERS PARTY HERETO

and

BARCLAYS BANK PLC,
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

Page

Article I        DEFINITIONS ........................................................................ 1
  Section 1.01    Defined Terms ................................................ 1
  Section 1.02    Terms Generally ............................................. 28
Article II       THE CREDITS ....................................................................... 29
  Section 2.01    Commitments .................................................. 29
  Section 2.02    Loans .............................................................. 29
  Section 2.03    Borrowing Procedure ..................................... 30
  Section 2.04    Evidence of Debt; Repayment of Loans ......... 31
  Section 2.05    Fees ................................................................ 31
  Section 2.06    Interest on Loans ........................................... 32
  Section 2.07    Default Interest .............................................. 32
  Section 2.08    Termination and Reduction of Commitments .... 32
  Section 2.09    Repayment of Term Borrowings .................... 32
  Section 2.10    Voluntary Prepayment ................................... 33
  Section 2.11    Mandatory Prepayments ................................ 33
  Section 2.12    Reserve Requirements; Change in Circumstances ........... 34
  Section 2.13    Breakage ......................................................... 35
  Section 2.14    Pro Rata Treatment ........................................ 36
  Section 2.15    Sharing of Setoffs .......................................... 36
  Section 2.16    Payments ........................................................ 36
  Section 2.17    Taxes .............................................................. 37
  Section 2.18    Assignment of Commitments Under Certain Circumstances; Duty to Mitigate ...................... 40
  Section 2.19    Defaulting Lenders ........................................ 41
  Section 2.20    Priority and Liens .......................................... 43
Article III      REPRESENTATIONS AND WARRANTIES ............................ 44
  Section 3.01    Organization; Powers ..................................... 44
  Section 3.02    Authorization ................................................. 45
  Section 3.03    Enforceability ................................................ 45
  Section 3.04    Governmental Approvals ................................ 45

Section 3.05 Reserved ................................................................................ 45

Section 3.06 No Material Adverse Change ................................................ 45

Section 3.07 Title to Properties; Possession Under Leases .................... 46

Section 3.08 Companies ............................................................................. 46

Section 3.09 Litigation; Compliance with Laws; Anti-Money Laundering .......... 46

Section 3.10 Federal Reserve Regulations ............................................... 47

Section 3.11 Investment Company Act ..................................................... 47

Section 3.12 Use of Proceeds .................................................................... 47

Section 3.13 Tax Returns; Taxes .............................................................. 47

Section 3.14 No Material Misstatements .................................................. 48

Section 3.15 Employee Benefit Plans ....................................................... 48

Section 3.16 Environmental Matters ......................................................... 48

Section 3.17 Labor Matters ....................................................................... 48

Section 3.18 Solvency ................................................................................ 48

Section 3.19 Senior Indebtedness ............................................................. 49

Section 3.20 Intellectual Property ............................................................. 49

Section 3.21 Broker-Dealer and Investment Advisory Companies ........ 49

Section 3.22 Security Documents .............................................................. 50

Section 3.23 [Reserved .............................................................................. 51

Section 3.24 Certain Fees .......................................................................... 51

Section 3.25 No Defaults ........................................................................... 51

Section 3.26 Material Contracts ................................................................ 51

Section 3.27 [Reserved .............................................................................. 51

Section 3.28 Insurance ............................................................................... 51

Article IV    CONDITIONS OF EFFECTIVENESS AND LENDING ................ 52

Section 4.01 Conditions Precedent to Initial Borrowings ....................... 52

Section 4.02 Conditions Precedent to Delayed Draw Borrowing ........... 54

Section 4.03 Conditions Precedent to all Borrowings ............................. 55

Article V     AFFIRMATIVE COVENANTS .................................................... 56

Section 5.01 Existence; Compliance with Laws; Businesses and Properties ........ 56

Section 5.02 Insurance ............................................................................... 56

Section 5.03 Payment of Obligations ....................................................... 57

Section 5.04 Financial Statements, Reports, etc ...................................... 57

Section 5.05       Litigation and Other Notices.......................................................... 61

Section 5.06       Information Regarding Collateral ..................................................... 62

Section 5.07       Maintaining Records; Access to Properties and Inspections;
                   Maintenance of Ratings ..................................................... 62

Section 5.08       Use of Proceeds............................................................................. 63

Section 5.09       Compliance with Environmental Laws............................................ 63

Section 5.10       Further Assurances; Additional Subsidiary Guarantors; Pledge
                   of Additional Stock ........................................................... 63

Section 5.11       Registration Status ........................................................................ 64

Section 5.12       Regulatory Matters........................................................................ 65

Section 5.13       Compliance with Contracts............................................................ 65

Section 5.14       OFAC ............................................................................................ 66

Section 5.15       First and Second Day Orders ......................................................... 66

Section 5.16       Certain Case Milestones ................................................................ 66

Section 5.17       Post-Closing Actions ..................................................................... 67

Article VI       NEGATIVE COVENANTS .......................................................... 68

Section 6.01       Indebtedness.................................................................................. 68

Section 6.02       Liens.............................................................................................. 70

Section 6.03       Investments, Loans and Advances.................................................. 72

Section 6.04       Mergers, Consolidations, Sales of Assets and Acquisitions.............. 74

Section 6.05       Restricted Payments; Restrictive Agreements................................. 75

Section 6.06       Other Indebtedness and Agreements .............................................. 76

Section 6.07       [Reserved] .................................................................................... 77

Section 6.08       Compliance with the DIP Budget ................................................... 77

Section 6.09       Transactions with Affiliates............................................................ 77

Section 6.10       Fiscal Year .................................................................................... 77

Section 6.11       Lines of Business .......................................................................... 78

Article VII       EVENTS OF DEFAULT ................................................................ 78

Section 7.01       Events of Default .......................................................................... 78

Section 7.02       Application of Proceeds................................................................. 83

Article VIII       THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT;
                   ETC ........................................................................................ 84

Article IX       MISCELLANEOUS ...................................................................... 90

Section 9.01    Notices; Electronic Communications ................................................ 90

Section 9.02    Survival of Agreement ................................................................... 92

Section 9.03    Binding Effect .............................................................................. 92

Section 9.04    Successors and Assigns ................................................................. 93

Section 9.05    Expenses; Indemnity .................................................................... 97

Section 9.06    Right of Setoff .............................................................................. 99

Section 9.07    Applicable Law ............................................................................. 99

Section 9.08    Waivers; Amendment .................................................................... 99

Section 9.09    Interest Rate Limitation ............................................................... 102

Section 9.10    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ................................................................................. 102

Section 9.11    Entire Agreement ........................................................................ 103

Section 9.12    WAIVER OF JURY TRIAL ......................................................... 103

Section 9.13    Severability ................................................................................ 103

Section 9.14    Counterparts ............................................................................... 103

Section 9.15    Headings .................................................................................... 104

Section 9.16    Jurisdiction; Consent to Service of Process ................................... 104

Section 9.17    Confidentiality ............................................................................ 104

Section 9.18    No Waiver; Cumulative Remedies; Enforcement ............................ 105

Section 9.19    USA PATRIOT Act Notice .......................................................... 106

Section 9.20    Release of Liens .......................................................................... 106

Section 9.21    Collateral and Guaranty Matters .................................................. 106

Section 9.22    INTERCREDITOR AGREEMENT ............................................... 107

EXHIBITS

Exhibit A      -      Form of Assignment and Acceptance
Exhibit B      -      Form of Borrowing Request
Exhibit C      -      Form of Collateral Agreement
Exhibit D      -      Form of Term Note
Exhibit E-1    -      Form of Approved Reorganization Plan
Exhibit E-2    -      Prepackaged Plan Term Sheet
Exhibit F      -      Form of Compliance Certificate
Exhibit G      -      Form of Guarantee Agreement
Exhibit H      -      Form of Secretary's Certificate
Exhibit I      -      Forms of United States Tax Compliance Certificate
Exhibit J      -      Form of Interim DIP Order
Exhibit K      -      Form of Prepayment Notice
Exhibit L      -      Form of DIP Budget

SCHEDULES

Schedule 1.01(a)    -    Mortgaged Properties
Schedule 1.01(b)         Non-Core Companies
Schedule 2.01    -    Commitments and Pro Rata Shares
Schedule 3.01    -    Applicable Companies
Schedule 3.08    -    Companies
Schedule 3.16    -    Environmental Matters
Schedule 6.01    -    Indebtedness
Schedule 6.02    -    Liens
Schedule 6.03    -    Investments, Loans and Advances
Schedule 6.09    -    Transactions with Affiliates
Schedule 7.01    -    Certain Events
Schedule 9.01    -    Notice

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT, dated as of [●], 2016 (this "*Agreement*"), among RCS Capital Corporation, a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "*Borrower*"), the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article I) and Barclays Bank PLC, as administrative agent (in such capacity, including any successor thereto, the "*Administrative Agent*") and as collateral agent (in such capacity, including any successor thereto, the "*Collateral Agent*") for the Secured Parties.

## PRELIMINARY STATEMENTS

(1)     On January [__], 2016 (the "*Petition Date*"), the Borrower and each of the Subsidiary Guarantors other than the Subsequent Filing Loan Parties (collectively, and together with any other Affiliates that become debtors in the Cases (including the Subsequent Filing Loan Parties upon commencement of any of their respective Cases), the "*Debtors*") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (the bankruptcy case of each Debtor is referred to herein as a "*Case*" and are collectively referred to herein as the "*Cases*") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(2)     In connection with the Cases, the Borrower has requested that the Lenders provide it with a senior secured superpriority debtor-in-possession term loan facility in an aggregate principal amount not to exceed $100,000,000, consisting of $25,000,000 in Initial Commitments and $75,000,000 in Delayed Draw Commitments. All of the Borrower's obligations under the DIP Facility (as defined herein) are to be guaranteed by the Subsidiary Guarantors and secured by first priority Liens (subject to the Carve-Out and to other exceptions set forth herein and in the other Loan Documents) on the Collateral. The Lenders are willing to extend such credit under such facility to the Borrower on the terms and subject to the conditions set forth herein.

In consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"*Adequate Protection Parties*" shall mean the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Second Lien Agent and the Pre-Petition Second Lien Lenders.

"*Adequate Protection Payments*" shall mean, collectively, the following payments to the Adequate Protection Parties:

(a)      all accrued and unpaid fees and disbursements owed to the Adequate Protection Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Parties (including Shearman & Sterling LLP, Jones Day, Davis Polk & Wardwell LLP and Covington & Burling LLP and Delaware local counsel retained by each of the Adequate Protection Parties (collectively, "**_Delaware Counsel_**")) incurred prior to the Petition Date in accordance with the Pre-Petition Debt Documents; and

(b)      when due, current payment of all fees and reasonable and documented out-of-pocket expenses and indemnities payable to the Adequate Protection Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Parties (including Shearman & Sterling LLP, Jones Day, Davis Polk & Wardwell LLP and Covington & Burling LLP and Delaware Counsel).

"**_Administrative Agent_**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**_Administrative Agent Fees_**" shall have the meaning assigned to such term in Section 2.05(a).

"**_Advisor Retention Loans_**" shall have the meaning specified in Section 6.03(n).

"**_Affiliate_**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**_Agents_**" shall have the meaning assigned to such term in Article VIII.

"**_Agreement_**" shall have the meaning assigned to such term in the introductory statement hereto.

"**_Agreement Value_**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to any such Hedging Agreement, (i) for any date on or after the date such Hedging Agreement has been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (which may include a Lender or any Affiliate of a Lender).

"**_Applicable Laws_**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

-2-

"***Approved Reorganization Plan***" shall mean the plan of reorganization substantially in the form of Exhibit E, and modifications or supplements with respect thereto, other than any modification or supplement that (a) alters the debt capital structure of the Loan Parties, (b) allows for the incurrence of material Indebtedness upon the effective date of the Approved Reorganization Plan not otherwise contemplated under the Approved Reorganization Plan (without giving effect to any such modification or supplement), (c) changes the priority of any Indebtedness from that set forth in the Approved Reorganization Plan (without giving effect to any such modification or supplement) or (d) is otherwise materially adverse to the Lenders.

"***Asset Sale***" shall mean the sale, transfer or other disposition (other than as a result of a Casualty Event) by any Company of (a) any Equity Interests of any Subsidiary of the Borrower (other than directors' qualifying shares) or (b) any other assets of a Company, in each case other than (i) cash, Permitted Investments, or inventory, damaged, unnecessary obsolete or worn out assets, equipment no longer used or useful in the business of the Companies, scrap and other assets, in each case sold, transferred or otherwise disposed of in the ordinary course of business (including allowing any registrations or any applications for registration of any Intellectual Property to lapse or go abandoned); (ii) the sale or discount without recourse of accounts receivable in connection with the compromise thereof or the assignment of past due accounts receivable for collection; (iii) the lapse or abandonment of Intellectual Property rights in the ordinary course of business, which in the reasonable good faith determination of the Borrower are not material to the conduct of the business of the Companies taken as a whole; and (iv) the sale, transfer or other disposition in the ordinary course of business of mutual funds purchased in reliance on Section 6.03(o).

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, substantially in the form of Exhibit A on the Closing Date or such other form as shall be approved by the Administrative Agent and the Borrower (which approval shall not be unreasonably withheld, conditioned or delayed).

"***Assignment Tax***" shall have the meaning provided in the definition of the term "Other Taxes."

"***Attrition***" shall mean: (a) with respect to an Independent Financial Advisor, that such Independent Financial Advisor's securities registration with the Cetera Entity retail broker-dealer has been terminated, and (b) with respect to a Financial Institution Client, that the client accounts associated with bank networking agreements with Cetera Investment Services, Inc. have been bulk transferred from Cetera Investment Services, Inc. to a third party broker-dealer.

"***Avoidance Action***" shall mean the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"***Borrower***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Borrower Materials***" shall have the meaning assigned to such term in Section 9.01.

"***Borrowing***" shall mean Loans made on the same date.

"***Borrowing Request***" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent.

"***Broker-Dealer***" shall mean each Company registered as a broker-dealer pursuant to the Exchange Act, which shall include on the Closing Date the following entities only: [Investors Capital Corporation, Cetera Advisors LLC, Cetera Advisor Networks LLC, Cetera Investment Services LLC, Cetera Financial Specialists LLC, Summit Brokerage Services, Inc., First Allied Securities, Inc., Legend Equities Corporation, Girard Securities, Inc. and VSR Financial Services, Inc.][1]

"***Budget Variance Report***" shall mean a report certified by a Responsible Officer of the Borrower, in form reasonably satisfactory to the Lenders, delivered in accordance with Section 5.04(k), showing (a) the actual cumulative total net cash flows as of the end of the week immediately preceding the week during which such Budget Variance Report is delivered and (b) commencing with the second Thursday following the Petition Date, the variance, expressed as both a percentage and as a dollar amount, of such amounts for the applicable weeks, on a rolling basis (and without giving effect to the making of any Loans or prepayments of any Loans), from the corresponding anticipated amount therefor set forth in the most recent DIP Budget (each a "***Variance***").

"***Business Day***" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

---

[1] Company and Dechert to confirm.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Capital Stock**" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation and including, without limitation, membership interests and partnership interests) and any and all warrants, rights or options to purchase any of the foregoing.

"**Carve-Out**" shall have the meaning specified in the DIP Orders.

"**Case**" or "**Cases**" shall have the meaning assigned to such term in the preliminary statements.

"**Casualty Event**" shall mean any loss of or damage to, or any condemnation or other taking by a Governmental Authority of, any property or assets of a Company for which a Company receives insurance proceeds, or proceeds of a condemnation award or other compensation.

"**Cetera Broker-Dealer**" shall mean each Cetera Entity that is a Broker-Dealer.

"**Cetera Entities**" shall mean the Broker-Dealers and their respective Affiliates collectively operating under the marketing brand of "Cetera Financial Group", including [Braves Acquisition, LLC,][2] Cetera Financial Holdings, Inc., Chargers Acquisition, LLC, First Allied Holdings Inc., Investors Capital Holdings, LLC, Summit Financial Services Group, Inc. and VSR Group, LLC and, in each case, their respective direct and indirect Subsidiaries.

"**Change in Law**" shall mean (a) the adoption of any law, treaty, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.12, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided*, *however*, that for purposes of this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, orders, requests, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been adopted and gone into effect after the date hereof, regardless of the date enacted, adopted or issued.

---

[2] Company and Dechert to confirm.

"***Change of Control***" shall mean and be deemed to have occurred if (a) any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended), other than the Permitted Investors, shall at any time have acquired direct or indirect beneficial ownership of a percentage of the voting power of the outstanding Voting Stock of the Borrower that exceeds 35% thereof; (b) Continuing Directors shall not hold at least a majority of the voting rights of the board of directors of the Borrower; or (c) any "change in control" (or comparable term) with respect to any Company shall occur under and as defined in any indenture or agreement governing Material Indebtedness owing to any third party for borrowed money to which any Company is a party.

"***Charges***" shall have the meaning assigned to such term in Section 9.09.

"***Closing Date***" shall mean the date on which all conditions set forth in section 4.01 have been satisfied or waived in accordance with Section 9.08.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended.

"***Collateral***" shall mean all the "Collateral" (or similar term) as defined in any Security Document or in any DIP Order and all other property of whatever kind and nature pledged or charged as collateral under any Security Document or any DIP Order, and shall also include the Mortgaged Properties.

"***Collateral Agent***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Collateral Agreement***" shall mean the Collateral Agreement entered into by the Loan Parties and the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C, as the same may be amended, supplemented or otherwise modified from time to time.

"***Commitment***" shall mean an Initial Commitment or a Delayed Draw Commitment. The aggregate principal amount of all Commitments on the Closing Date is $100,000,000.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Companies***" shall mean the Borrower and its Subsidiaries.

"***Compliance Certificate***" shall have the meaning assigned to such term in Section 5.04(d).

"***Confirmation Order***" shall mean an order or orders of the Bankruptcy Court confirming the Approved Reorganization Plan.

"***Continuing Director***" shall mean, at any date, an individual (a) who is a member of the board of directors of Borrower on the Closing Date, (b) who, as of the date of determination, has been a member of such board of directors for at least the twelve preceding

months or (c) who has been nominated to be a member of such board of directors by a majority of the other Continuing Directors then in office.

"***Control***" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "***Controlling***" and "***Controlled***" shall have meanings correlative thereto.

"***Creditors' Committee***" shall mean the official committee of unsecured creditors in the Cases.

"***Debt Incurrence Prepayment Event***" shall mean any issuance or incurrence by any Company of any Indebtedness other than Indebtedness permitted to be issued or incurred under Section 6.01(a) or (g).

"***Debtor***" shall have the meaning assigned to such term in the preliminary statements of this Agreement.

"***Debtor Relief Laws***" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief statute, law, ordinance, rule or regulation of the United States of America, any State thereof or the District of Columbia, or other applicable jurisdictions from time to time in effect.

"***Default***" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"***Defaulting Lender***" shall mean, subject to Section 2.19(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian,

conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) became the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.19(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"***Delayed Draw Commitment***" shall mean, with respect to each Lender, the commitment of such Lender to make Delayed Draw Loans hereunder as set forth on Schedule 2.01(b), or in the Assignment and Acceptance pursuant to which such Lender assumed its Delayed Draw Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.  The aggregate principal amount of all Delayed Draw Commitments on the Closing Date is $75,000,000.

"***Delayed Draw Loan***" shall have the meaning specified in Section 2.01.

"***DIP Assumption Motion***" shall have the meaning assigned to such term in Section 5.16(e).

"***DIP Budget***" shall mean a statement of the Borrower's projected receipts and disbursements on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Petition Date occurs, including the anticipated uses of the Loans for each week during such period, and in substantially the form of Exhibit L hereto.  As used herein, "***DIP Budget***" shall initially refer to Exhibit L and, thereafter, the most recent DIP Budget delivered by the Borrower and approved by the Required Lenders in accordance with Section 5.04(k).  For the avoidance of doubt, the DIP Budget will not include operating cash flows of Subsidiaries that are not Debtors.

"***DIP Collateral***" shall have the meaning assigned to such term in Section 2.20(a)(ii).

"***DIP Discount***" means the Interim Discount and the Final Discount.

"***DIP Facility***" shall mean the term loan facility provided by the Lenders pursuant to this Agreement.

"***DIP Facility Maturity Date***" shall mean the earliest of (a) the Effective Date, (b) the date of termination in whole of the Commitments pursuant to Section 2.09 or 7.01 and (c) the date that is six (6) months after the Closing Date.

"*DIP Orders*" shall mean the Interim DIP Order and the Final DIP Order.

"*DIP Permitted Liens*" shall have the meaning assigned to such term in Section 2.20(a)(iii).

"*Disclosure Statement*" shall mean, with respect to the Approved Reorganization Plan, a related disclosure statement in form and substance reasonably satisfactory to the Administrative Agent, the Required Lenders, the Borrower and, to the extent relating to the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Lenders or the Pre-Petition Second Lien Agent, subject to Pre-Petition Agent Approval, together with any amendments, supplements or other modifications thereto that are consistent with any permitted modifications to the Approved Reorganization Plan or otherwise reasonably acceptable to the foregoing parties.

"*Disqualified Stock*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the 91st day after the DIP Facility Maturity Date (other than upon the occurrence of change of control, asset sale event or casualty or condemnation event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale event or casualty or condemnation event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than contingent indemnification obligations and other contingent obligations, in each case, not then due and owing) or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the 91st day after the DIP Facility Maturity Date.  For the avoidance of doubt, any Equity Interest that is convertible solely into, or exchangeable solely for, Qualified Capital Stock of the Borrower shall not be Disqualified Stock.

"*Dollars*" or "*$*" shall mean lawful money of the United States of America.

"*Domestic Companies*" shall mean all Companies organized under the laws of the United States of America, any state thereof or the District of Columbia.

"*Early Warning Threshold*" shall mean the level at which a Broker-Dealer is required to give an "early warning" notice of reductions in its level of Regulatory Net Capital to the SEC or a Regulatory Supervising Organization pursuant to the rules and regulations of the Exchange Act (or any successor statute) or of such Regulatory Supervising Organization then applicable to any Broker-Dealer.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established

in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Effective Date***" shall mean the date upon which all conditions precedent to the effectiveness of each of the Approved Reorganization Plan and the Prepackaged Plan have either been satisfied or expressly waived in accordance with the terms thereof, and on which the transactions to occur on the Effective Date pursuant to each of the Approved Reorganization Plan or the Prepackaged Plan occur or are consummated.

"***Eligible Assignee***" shall mean any Person (other than a natural Person) that is a Lender, (i) an Affiliate of a Lender, (ii) a Related Fund of a Lender and (iii) any other Person (other than a natural person) approved by the Administrative Agent in accordance with Section 9.04(b) (such approval not to be unreasonably withheld, conditioned or delayed).

"***Environmental Laws***" shall mean all applicable federal, state and local laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), in each case, relating to protection of the environment, natural resources or human health and safety, to the extent relating to exposure to Hazardous Materials.

"***Environmental Liability***" shall mean all liabilities, obligations, damages, losses, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) exposure to any Hazardous Materials, (c) the Release of any Hazardous Materials or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Equity Interests***" shall mean shares of Capital Stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right (other than Indebtedness that is convertible into, or exchangeable for, any such equity interest) entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Affiliate***" shall mean any trade or business (whether or not incorporated) that, together with any of the Company is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"***ERISA Event***" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived), (b) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(b) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by any Company or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of any Company or any of their ERISA Affiliates from any Plan or Multiemployer Plan, (e) the receipt by any Company or any of their ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the imposition of a lien pursuant to Section 430(k) of the Code or ERISA or a limitation under Section 436 of the Code, (g) the receipt by any Company or any of their ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA, (h) the occurrence of an act or an omission with respect to any Plan that would reasonably be expected to result in the imposition on any Company or any of their ERISA Affiliates of material fines or penalties under the Code in respect of any Plan including without limitation, the occurrence of a prohibited transaction within the meaning of Section 4975 of the Code or (i) the imposition of liability on any Company or any of their ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***Events of Default***" shall have the meaning assigned to such term in Section 7.01.

"***Exchange Act***" shall mean the Securities Exchange Act of 1934, as amended.

"***Excluded Collateral***" shall have the meanings assigned to such term in the Collateral Agreement.

"***Excluded Company***" shall mean (a) Docupace Technologies, LLC, but only for so long as such Person is not a wholly owned subsidiary of the Borrower and the consent of any Person other than the Borrower or one of its Subsidiaries must be obtained for such Person to Guarantee the Obligations and grant Liens on its property to secure the Obligations and such consent has not been so obtained, and (b) each Broker-Dealer.

"***Excluded Equity Interests***" shall have the meaning assigned to such term in the Collateral Agreement.

"*Excluded Taxes*" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) income or franchise Taxes imposed on (or measured by) such recipient's net income by a jurisdiction as a result of such recipient being organized or having its principal office or, in the case of any Lender, having its applicable lending office, in such jurisdiction or as a result of any other present or former connection between such recipient and such jurisdiction (other than any connection arising solely from such recipient having executed, delivered, performed its obligations under, become a party to, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to and/or enforced this Agreement or any other Loan Documents), (b) any branch profits Taxes under Section 884(a) of the Code, or any similar Tax, imposed by any other jurisdiction described in clause (a) above, (c) any U.S. federal withholding Tax imposed pursuant to FATCA, (d) in the case of a Lender (other than an assignee pursuant to a request by any Loan Party under Section 2.18(a)), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender pursuant to a law in effect at the time such Lender acquires its interest in the applicable Commitment or applicable Loan not funded pursuant to a Commitment by such Lender (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new lending office (or assignment), to receive additional amounts from any Loan Party with respect to such withholding Tax pursuant to Section 2.17 and (e) any withholding Tax attributable to a Lender's failure to comply with Section 2.17(e).

"*FATCA*" shall mean Sections 1471 through 1474 of the Code as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or other official administrative interpretations thereof and, for the avoidance of doubt, any intergovernmental agreements and any "foreign financial institution" agreements entered into to implement the foregoing.

"*Federal Funds Effective Rate*" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"*Fees*" shall mean the Administrative Agent Fees and Fronting Fees.

"*Final Discount*" shall have the meaning assigned to such term in Section 2.01.

"*Final DIP Order*" shall mean an order of the Bankruptcy Court entered in the Cases, in substantially the form of the Interim DIP Order, with such modifications thereto as are in form and substance satisfactory to the Borrower, the Administrative Agent and the Required Lenders in their sole discretion, and reasonably satisfactory to the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent (*provided* that any such order that does not approve the full amount of the DIP Facility shall not be satisfactory), which order shall authorize on a final basis this Agreement and the other Loan Documents.

"***Final DIP Order Entry Date***" shall mean the date on which the Final DIP Order is entered by the Bankruptcy Court.

"***Financial Advisor***" shall mean a Person registered as (i) a representative (as such term is defined in NASD Rule 1031(b)) of a Broker-Dealer or (ii) an investment adviser representative (as defined in 17 CFR 275.203A-3(a)) of an Investment Adviser Company.

"***Financial Institution Clients***" shall mean those financial institutions who have entered into bank networking agreements with Cetera Investment Services, Inc.

"***Financial Officer***" of any Person shall mean the chief financial officer, responsible financial officer, principal accounting officer, treasurer or controller of such Person.

"***FINRA***" shall mean the Financial Industry Regulatory Authority, Inc. created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.

"***First Day Orders***" shall mean all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed by the Debtors on or about the Petition Date.

"***Flood Documentation***" shall mean, with respect to each Mortgaged Property located in the United States or any territory thereof, a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination (together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the Borrower and the applicable Loan Party relating thereto).

"***Flood Insurance Laws***" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"***Foreign Lender***" shall mean any Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"***Fees***" shall have the meaning assigned to such term in Section 2.05(a).

"***GAAP***" shall mean generally accepted accounting principles (GAAP), as in effect from time to time; *provided* that any lease that is recharacterized as a capital lease and any obligations that are recharacterized as Capital Lease Obligations, in each case due to a change in GAAP after the Closing Date shall not be treated as a capital lease or Capital Lease Obligation, as the case may be, but shall instead be treated as it would have been in accordance with GAAP in effect on the Closing Date.

"***Governmental Authority***" shall mean any federal, state, local, county, provincial or foreign court or governmental agency, authority, instrumentality, regulatory body or

-13-

Regulatory Supervisory Organization exercising, in each case, any legislative, judicial, administrative or regulatory functions.

"*Granting Lender*" shall have the meaning assigned to such term in Section 9.04(i).

"*Gross Dealer Concessions*" shall mean all compensable commissions, trailing commissions and advisory fee revenues received by the Cetera Entity retail broker-dealer measured at an Independent Financial Advisor or Financial Institution Client level on a trailing twelve month basis.  For the avoidance of doubt, the Attrition percentage shall be calculated with the numerator using the prior twelve months of Attrited Gross Dealer Concession and the denominator using the prior four prior quarters' of Gross Dealer Concessions (excluding the current quarter) of the Cetera Entities.

"*Guarantee*" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee obligation of any guaranteeing Person hereunder shall be deemed to be the lower of (i) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (ii) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of such Guarantee obligation shall be such guaranteeing Person's maximum reasonably anticipated liability in respect thereof.

"*Guarantee Agreement*" shall mean (a) the Guarantee Agreement made by each Subsidiary Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit G, and (b) any other guarantee of the Obligations made by a Company in form and substance reasonably acceptable to the Collateral Agent, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"*Hazardous Materials*" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that for each of (a) and (b) above, is prohibited, limited or regulated by or pursuant to any Environmental Law.

"*Hedging Agreement*" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of ISDA Master Agreement, including any such obligations or liabilities under any ISDA Master Agreement.

"*Hedging Obligations*" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"*Indebtedness*" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments representing extensions of credit, (c) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding (i) trade accounts payable and accrued obligations incurred in the ordinary course of business, (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) obligations resulting from take-or-pay contracts entered into in the ordinary course of business)); (d) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person (including all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person (excluding trade accounts payable and other accrued obligations, in each case incurred in the ordinary course of business)), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness so secured, (e) all Guarantees by such Person of obligations of others of the type referred to in clauses (a), (b), (c) or (f) of this defined term, (f) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (g) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Stock of such Person or any other Person or any warrants, rights or options to acquire such Disqualified Stock, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (i) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances, in each case, if and to the extent that any of the foregoing indebtedness (other than Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer, to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness do not provide that such Person is liable therefor.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 9.05(b).

"**Independent Financial Advisors**" shall mean those representatives registered with the retail broker-dealer Subsidiaries of the Borrower and the Cetera Entities.

"**Information**" shall have the meaning assigned to such term in Section 9.17.

"**Initial Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01(a), or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.  The aggregate principal amount of all Commitments on the Closing Date is $25,000,000.

"**Initial Lender**" shall mean Barclays Bank PLC; *provided* that Barclays Bank PLC shall cease to be an Initial Lender on any date on which it ceases to have a Commitment or an outstanding Loan.

"**Initial Loan**" shall have the meaning specified in Section 2.01.

"**Intellectual Property**" shall have the meaning assigned to such term in the Collateral Agreement.

"**Intercreditor Agreement**" shall mean that certain Amended and Restated Intercreditor Agreement, dated as of [•], 2016, among the Collateral Agent, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Agent and the loan parties named therein, as the same may be further amended, restated, waived or otherwise modified as permitted thereby and hereby.

"**Interest Payment Date**" shall mean the last Business Day of each calendar month.

"**Interest Rate**" shall mean 8.00%.

"**Interim Discount**" shall have the meaning assigned to such term in Section 2.01.

"**Interim DIP Order**" shall mean an interim order entered by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit J (as modified in a manner satisfactory to the Borrower, the Administrative Agent and the Required Lenders in their sole discretion and reasonably satisfactory to the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent).

"**Interim DIP Order Entry Date**" shall mean the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"***Investment Advisers Act***" shall mean the Investment Advisers Act of 1940, as amended.

"***Investment Adviser Company***" shall mean each Company registered as an investment adviser pursuant to the Investment Advisers Act.

"***Investment Company Act***" shall mean the Investment Company Act of 1940, as amended.

"***Investments***" shall mean, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including Guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and other investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, and return of capital, repayment or other amount received in cash by such Person or a Subsidiary of such Person in respect of such Investment.

"***IRS***" shall mean the United States Internal Revenue Service.

"***ISDA Master Agreement***" shall mean the Master Agreement (Multicurrency-Cross Border) published by the International Swap and Derivatives Association, Inc., as in effect from time to time.

"***Lenders***" shall mean (a) the Initial Lender and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a "Lender."

"***Lien***" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"***Loan Documents***" shall mean this Agreement, the Security Documents, the Guarantee Agreement, the Intercreditor Agreement, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e) and any other document executed by or on behalf of any of the Loan Parties that is delivered to any of the Secured Parties in connection with the foregoing and expressly designated as a "Loan Document."

"***Loan Parties***" shall mean the Borrower and the Subsidiary Guarantors.

"***Loans***" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01.

"***Margin Stock***" shall have the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" shall mean any event, circumstance or condition that has had a materially adverse effect on (a) the business, financial condition or operating results of the Companies, taken as a whole, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Cases, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under any Loan Document or (c) the rights and remedies of the Lenders under any Loan Document.

"***Material Broker-Dealer***" shall mean, at any date of determination,  (i) Cetera Investment Services LLC and (ii) each other Cetera Broker-Dealer whose revenues during the most recently ended Test Period were equal to or greater than 2% of the consolidated revenues of the Cetera Broker-Dealers for such period (the "***Material Broker-Dealer Individual Threshold***"), in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Cetera Broker-Dealers that are not Material Broker-Dealers constitute in the aggregate revenues during such Test Period equal to or greater than 5% of the consolidated revenues of the Cetera Broker-Dealers for such period, in each case determined in accordance with GAAP (the "***Material Broker-Dealer Aggregate Threshold***", and together with the Material Broker-Dealer Individual Threshold, the "***Material Broker-Dealer Thresholds***"), then the Borrower shall, on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Cetera Broker-Dealers as "Material Broker-Dealers" such that the Material Broker-Dealer Aggregate Threshold is no longer exceeded; *provided* that any such Cetera Broker-Dealer so designated as a Material Broker-Dealer may cease to be a Material Broker-Dealer at the end of a subsequent Test Period so long as the Material Broker-Dealer Thresholds are not exceeded at such time.

"***Material Contract***" shall mean any contract, the loss of which has or would be reasonably likely to result in a Material Adverse Effect.

"***Material Indebtedness***" shall mean the Indebtedness under the Pre-Petition First Lien Credit Agreement or the Pre-Petition Second Lien Credit Agreement, and any other Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of the Companies in an aggregate principal amount exceeding $5,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of any Company in respect of any Hedging Agreement at any time shall be the Agreement Value of such Hedging Agreement at such time.

"***Maximum Rate***" shall have the meaning assigned to such term in Section 9.09.

"***Milestone***" shall have the meaning assigned to such term in Section 5.16.

"***Moody's***" shall mean Moody's Investors Service, Inc., or any successor thereto.

-18-

"***Mortgaged Properties***" shall mean, initially, the owned real properties of the Loan Parties specified on Schedule 1.01(a), and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.10.

"***Mortgages***" shall mean the mortgages, deeds of trust, assignments of leases and rents, modifications and other security documents delivered pursuant to Section 5.10, each in form and substance reasonably satisfactory to the Collateral Agent.

"***Multiemployer Plan***" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"***Net Cash Proceeds***" shall mean, with respect to any Prepayment Event, (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of any Company in respect of such Prepayment Event, as the case may be, less (b) the sum of:

      (i)     the amount, if any, of all taxes actually paid or reasonably estimated to be payable by any Company in connection with such Prepayment Event,

      (ii)     the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by any Company, *provided* that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

      (iii)     the amount of any Indebtedness (other than the Loans and Pre-Petition Debt) secured by a Lien on the assets that are the subject of such Prepayment Event to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

      (iv)     in the case of any Asset Sale or Casualty Event by a Company that is not wholly-owned by another Company, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not permitted to be distributed to or for the account of a Company, and

      (v)     reasonable and customary fees, premiums, costs and expenses paid by the Companies in connection with any of the foregoing,

in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above.

"***Non-Core Asset Sale Proceeds***" shall mean any Net Cash Proceeds of the disposition of the assets or Equity Interests of any Non-Core Company.

"***Non-Core Company***" shall mean any Company that, prior to the date of the Restructuring Support Agreement, was disclosed by the Borrower as, and agreed by the Lenders

to constitute, a "non-core company," *provided* that any such Company shall automatically cease to be a Non-Core Company upon any other Company making any Investment in or otherwise transferring any assets or property to such Company. Each Non-Core Company existing as of the Closing Date is set forth on Schedule 1.01(b).

"***Non-Defaulting Lender***" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"***Non-Loan Parties***" shall mean the Companies that are not Loan Parties.

"***Note Purchase and Class B Share Agreement***" means that certain Note Purchase and Class B Share Agreement dated as of November 8, 2015, between the Borrower and RCAP Holdings, LLC as in effect on November 8, 2015.

"***Obligations***" shall mean (a) the obligation of the Borrower to pay (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower or any other Loan Party to any of the Secured Parties under this Agreement and each of the other Loan Documents, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and (b) the due and punctual payment and performance of all other obligations of the other Loan Parties under or pursuant to this Agreement and each of the other Loan Documents.

"***OFAC***" shall have the meaning assigned to such term in Section 3.09(c).

"***Operational Report***" shall mean a report certified by a Responsible Officer of the Borrower, in form reasonably acceptable to the Required Lenders, delivered in accordance with Section 5.04(k), setting forth operational statistics, including, without limitation, rates of Attrition and the associated Gross Commission Value as of the end of the week immediately preceding the week during which such Operational Report is delivered.

"***Other Taxes***" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery, enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any Taxes imposed with respect to an assignment by a Lender (other than an assignment made pursuant to Section 2.18) (an "***Assignment Tax***") if such Assignment Tax is imposed as a result of any present or former connection between the assignor or assignee and the jurisdiction imposing the Assignment Tax, other than any connection arising from the assignor or assignee having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to and/or enforced any Loan Document.

"***Participant Register***" shall have the meaning assigned to such term in Section 9.04(f).

"***PBGC***" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"***Perfection Certificate***" shall mean the Perfection Certificate substantially in the form of Exhibit B to the Collateral Agreement.

"***Permitted Investments***" shall mean:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(c)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(d)    investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(e)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (d) above;

(f)    investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(g)    other short-term investments utilized by any of the Foreign Companies in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"***Permitted Investors***" shall mean any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) that on the Petition Date has acquired direct or indirect beneficial ownership of a percentage of the voting power of the outstanding Voting Stock of the Borrower that exceeds 35% thereof.

"***Permitted Liens***" shall mean Liens expressly permitted pursuant to Section 6.02 of this Agreement.

"***Permitted Prior Liens***" shall have the meaning assigned to such term in Section 2.20(a)(iii).

"***Permitted Variance***" shall mean (a) any positive Variance or (b) any negative Variance that, on a cumulative basis, does not exceed the greater of (i) $1,500,000 and (ii) the dollar amount resulting from multiplying the total net operating cash flows in the applicable DIP Budget by the percentage set forth below for the applicable week under the heading "Cumulative Variance".

| Week of applicable DIP Budget | Cumulative Variance |
|---|---|
| 1 | 40% |
| 2 | 40% |
| 3 | 30% |
| 4 or after | 20% |

"***Person***" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"***Petition Date***" shall have the meaning assigned to such term in the preliminary statements of this Agreement.

"***Plan***" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code, and in respect of which any Company or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"***Platform***" shall have the meaning assigned to such term in Section 9.01.

"***Prepackaged Plan***" shall mean the plan of reorganization consistent in all respects with the term sheet attached hereto as Exhibit E-2 and containing the principal terms of a proposal to restructure debt and equity interests issued by the Borrower and the Subsidiary Guarantors and provide adequate working capital to such entities, including a debt for debt and equity exchange and a compromise of other existing liabilities pursuant to a "prepackaged" plan of reorganization.

"***Prepayment Event***" shall mean any Asset Sale, Debt Incurrence Prepayment Event or Casualty Event.

"***Pre-Petition Agent Approval***" shall mean the consent or approval of the Pre-Petition First Lien Agent or the Pre-Petition Second Lien Agent, as the case may be, which consent or approval shall be granted in accordance with the directions of the "Required Lenders" under and in accordance with the Pre-Petition First Lien Loan Documents or the "Required Lenders" under and in accordance with the Pre-Petition Second Lien Loan Documents, as the case may be; *provided*, that the Pre-Petition First Lien Agent and the Pre-Petition Second Lien Agent, acting reasonably, may grant or withhold their respective consents or approvals without such instructions to the extent that the matter with respect to which such consent is granted or withheld affects the rights or liabilities of the Pre-Petition First Lien Agent or the Pre-Petition Second Lien Agent, as the case may be.

"***Pre-Petition Debt***" shall mean, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor, including the Indebtedness under the Senior Notes, the Pre-Petition First Lien Loan Documents and the Pre-Petition Second Lien Loan Documents.

"***Pre-Petition Debt Documents***" shall mean the Pre-Petition First Lien Loan Documents and the Pre-Petition Second Lien Loan Documents.

"***Pre-Petition First Lien Agent***" shall mean Barclays Bank PLC, as administrative agent and collateral agent under the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Credit Agreement***" shall mean that certain First Lien Credit Agreement, dated as of April 29, 2014 (as amended by Amendment No. 1, dated as of June 30, 2015, as further amended by Amendment No. 2, dated as of November 8, 2015, among the Borrower, RCAP Holdings, RCAP Management, the Pre-Petition First Lien Lenders and the Pre-Petition First Lien Agent.

"***Pre-Petition First Lien Lenders***" shall mean the "Lenders" under (and as defined in) the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Loan Documents***" shall mean the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition Payment***" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments", (iii) trade payables (including, without limitation, in respect of reclamation claims) or (iv) other pre-petition claims against any Debtor.

"***Pre-Petition Second Lien Agent***" shall mean Wilmington Trust, N.A., as administrative agent and collateral agent under the Pre-Petition Second Lien Credit Agreement.

"***Pre-Petition Second Lien Credit Agreement***" shall mean that certain Second Lien Credit Agreement, dated as of April 29, 2014 (as amended by Amendment No. 1, dated as of June 30, 2015, as further amended by Amendment No. 2, dated as of November 8, 2015, among the Borrower, RCAP Holdings, RCAP Management, the Pre-Petition Second Lien Lenders and the Pre-Petition Second Lien Agent.

"***Pre-Petition Second Lien Lenders***" shall mean the "Lenders" under (and as defined in) the Pre-Petition Second Lien Credit Agreement.

"***Pre-Petition Second Lien Loan Documents***" shall mean the "Loan Documents" as defined in the "Pre-Petition Second Lien Credit Agreement".

"***Prime Rate***" shall mean for any day a per annum rate of interest equal to the "prime rate," as published in the "Money Rates" column of The Wall Street Journal, from time to time, or if for any reason such rate is no longer available, the rate established by the Administrative Agent as its "prime rate", which rate shall be established by the Administrative Agent based upon various factors including its costs and desired return, general economic conditions and other factors, and is used by the Administrative Agent as a reference point for pricing some loans, which may be priced at, above, or below such rate.  Any change in the Prime Rate shall take effect as of the opening of business on the date of any such change as published in The Wall Street Journal, or as established by the Administrative Agent, as applicable.

"***Primed Liens***" shall have the meaning assigned to such term in Section 2.20(a)(iv).

"***Priming Liens***" shall have the meaning assigned to such term in Section 2.20(a)(iv).

"***Pro Rata Percentage***" of any amount means, with respect to any Lender at any time, the product of such amount times a fraction (i) the numerator of which is the aggregate amount of Loans and unused Commitments of such Lender outstanding at such time and (ii) the denominator of which is the aggregate amount of Loans and unused Commitments of all Lenders outstanding at such time.

"***Public Lender***" shall have the meaning assigned to such term in Section 9.01.

"***Qualified Capital Stock***" of any Person shall mean any Equity Interest of such Person that is not Disqualified Stock.

"***RCAP Holdings***" shall mean RCAP Holdings, LLC, a Delaware limited liability company.

"***RCS Management***" shall mean RCS Capital Management, LLC, a Delaware limited liability company.

"***Register***" shall have the meaning assigned to such term in Section 9.04(d).

"***Regulation S-X***" shall mean Regulation S-X (and the interpretations of the SEC thereunder) under the Securities Act.

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulatory Net Capital***" shall mean, as to each Broker-Dealer, the total amount of regulatory capital as calculated pursuant to SEC Rule 15c3-1 and the rules and regulations of, and reported to the SEC or any applicable Regulatory Supervising Organization, as adjusted pursuant to the rules and regulations of such Regulatory Supervising Organization.

"***Regulatory Supervising Organization***" shall mean, as applicable, FINRA, the Securities Investor Protection Corporation, the SEC or any governmental or self-regulatory organization, exchange, clearing house or financial regulatory authority of which a Broker-Dealer is a member or to whose rules it is subject.

"***Related Fund***" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"***Related Indemnified Person***" of an Indemnitee shall mean (1) any Controlling person or Controlled Affiliate of such Indemnitee, (2) the respective directors, officers, or employees of such Indemnitee or any of its Controlling persons or Controlled Affiliates and (3) the respective agents of such Indemnitee or any of its Controlling persons or Controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnitee, Controlling person or such Controlled Affiliate; *provided* that each reference to a Controlled Affiliate or Controlling person in this sentence pertains to a Controlled Affiliate or Controlling person involved in the negotiation or syndication of this Agreement or any other Loan Document.

"***Related Parties***" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, partners, agents and advisors (including financial advisors)  of such Person and such Person's Affiliates.

"***Release***" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment.

 "***Required Lenders***" shall mean, at any time, Lenders having Loans and unused Commitments representing more than 50% of the sum of all Loans outstanding and unused Commitments at such time; *provided* that the unused Commitments and outstanding Loans of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"***Requirement of Law***" shall mean, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"***Responsible Officer***" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"*Restricted Indebtedness*" shall mean Indebtedness of any Company the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.06(b).

"*Restricted Payment*" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Company, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to any Company's stockholders, partners or members (or the equivalent Persons thereof).

"*Restructuring Support Agreement*" shall mean that certain Restructuring Support Agreement, dated as of January 29, 2016, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time, other than in a manner that materially adversely affects the interests, rights or remedies of any of the Administrative Agent or the Lenders.

"*Retention and Communication Plan*" shall mean [_____]$^3$.

"*RSA Assumption Motion*" shall have the meaning assigned to such term in Section 5.16(g).

"*S&P*" shall mean Standard & Poor's Financial Services LLC, or any successor thereto.

"*SEC*" shall mean the U.S. Securities and Exchange Commission.

"*Secured Parties*" shall have the meaning assigned to such term in the Collateral Agreement.

"*Securities Act*" shall mean the Securities Act of 1933, as amended.

"*Security Documents*" shall mean the Mortgages, the Collateral Agreement, the DIP Orders and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.10.

"*Senior Notes*" means the senior unsecured notes issued pursuant to the terms of the Senior Notes Agreements.

"*Senior Notes Agreements*" means, collectively, (A) the Note Purchase and Class B Share Agreement and (B) the Note Purchase Agreement, dated as of November 8, 2015, between the Borrower and the applicable Senior Notes Investors, pursuant to which the Borrower issued the Senior Notes.

"*Solvent*" shall mean as of any date (a) the fair value of the assets of the Companies, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities,

---

$^3$ Company and Dechert to provide.

subordinated, contingent or otherwise as of such date; (b) the present fair saleable value of the property of the Companies as of such date, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured as of such date; (c) the Companies, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured as of such date; and (d) the Companies, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(i).

"*Stock Equivalents*" shall mean all securities convertible into or exchangeable for Capital Stock and all warrants, options or other rights to purchase or subscribe for any Capital Stock, whether or not presently convertible, exchangeable or exercisable.

"*Subordinated Indebtedness*" shall mean Indebtedness of any Loan Party that is by its terms expressly subordinated in right of payment to the obligations of such Loan Party under this Agreement and the Guarantee Agreement, as applicable.

"*Subordinated Loan Documents*" shall mean each of the agreements, documents and instruments providing for or evidencing any Subordinated Indebtedness permitted to be issued or incurred under Section 6.01, as amended, supplemented or otherwise modified in accordance with Section 6.06.

"*Subsequent Filing Loan Party*" shall mean any Loan Party that (a) did not file its Case on the Petition Date and (b) is required to commence a Case after the Petition Date under the Restructuring Support Agreement.

"*Subsidiary*" or "*subsidiary*" of any Person shall mean and include (a) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"*Subsidiary Guarantor*" shall mean each Subsidiary of Borrower listed on Schedule 3.08 that is identified as a "Subsidiary Guarantor" and each other Subsidiary of the Borrower that is or becomes a party to the Guarantee Agreement.

"*Superpriority Claim*" shall mean a claim against any Debtor in any of the Cases which is an administrative expenses claim having priority over any or all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code.

"**Synthetic Lease**" shall mean, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Synthetic Lease Obligations**" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations.

"**Synthetic Purchase Agreement**" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which any Company is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than any Company of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of any Company (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, assessments, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which the financial statements and certificates required by Section 5.04 shall have been required to be delivered to the Administrative Agent (or, before the first delivery of financial statements, the most recent period of four fiscal quarters at the end of which financial statements are available).

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the entry into the Restructuring Support Agreement, (c) the restructuring transactions contemplated under the Approved Reorganization Plan, (d) the entry of the DIP Orders and (e) the payment of the fees and expenses related to the foregoing.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**United States Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 2.17(e)(i)(C).

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"*U.S. Lender*" shall mean any Lender that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"*Variance*" shall have the meaning assigned to such term in the definition of "Budget Variance Report".

"*Voting Stock*" shall mean, with respect to any Person as of any date, the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*wholly owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' and foreign national qualifying shares) or other ownership interests representing 100% of the outstanding Equity Interests are, at the time any determination is being made, owned or held by such Person or one or more wholly owned Subsidiaries of such Person or by such Person and one or more wholly owned Subsidiaries of such Person.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Write-Down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02  Terms Generally.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of such Loan Document and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, *however*, that for purposes of determining the outstanding amount of any Indebtedness, (i) any election by the Borrower to measure an item of Indebtedness using fair value (as permitted by the Financial Accounting Standards Board Accounting Standards Codification 825-10-25, and any statements replacing, modifying or superseding such guidance) shall be disregarded and such determination shall be made as if such election had not been made and (ii) any original issue discount with respect to such Indebtedness shall not be deducted in determining the outstanding amount of such Indebtedness.

-29-

## ARTICLE II

## THE CREDITS

SECTION 2.01  Commitments.  Subject to the terms and conditions herein and in the DIP Orders and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make (a) a single Loan to the Borrowers on the second Business Day after the Interim DIP Order Entry Date in a principal amount equal to the lesser of its Initial Commitment and its Pro Rata Percentage of $25,000,000 (each, an "***Initial Loan***"), net of discount of 1.0% (the "***Interim Discount***")  and (b) a single Loan on any Business Day on or after the second Business Day after the Final DIP Order Entry Date in a principal amount equal to the lesser of its Delayed Draw Commitment  and its Pro Rata Percentage of $75,000,000 (each, a "***Delayed Draw Loan***"), net of discount of 1.0% (the "***Final Discount***"). Amounts repaid or prepaid in respect of any Loan may not be reborrowed.  It is understood and agreed that the principal amount Initial Loans and Delayed Draw of the Loans made by any Lender hereunder shall not exceed such Lender's Initial Commitment or such lender's Delayed Draw Commitment, respectively.

SECTION 2.02  Loans.

(a)  Each Loan shall be made in Dollars as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided, however*, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  The Loans comprising any Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $2,000,000 or equal to the remaining available balance of the applicable Commitments.

(b)  Each Lender may at its option make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 2:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)  Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in

reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand (but without duplication) such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.03  <u>Borrowing Procedure</u>.  In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing prior to 12:00 noon (New York City time) at least one (1) Business Day prior to the date of such Borrowing (or such later time as agreed by the Administrative Agent in its reasonable discretion).  Each such Borrowing Request shall specify the following information:  (i) the date of such Borrowing (which shall be a Business Day); (ii) the number and location of the account to which funds are to be disbursed; and (iii) the aggregate principal amount of the Loans to be made pursuant to such Borrowing; *provided*, *however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

SECTION 2.04  <u>Evidence of Debt; Repayment of Loans</u>.

(a)    The Borrower hereby unconditionally agrees to pay to the Administrative Agent for the account of each Lender (i) the principal amount of each Loan of such Lender as provided in Section 2.11 and (ii) the accrued and unpaid interest on each Loan of such Lender as provided in Section 2.06.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Subsidiary Guarantor and each Lender's share thereof.

-31-

(d)      The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded absent manifest error; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)      Any Lender may request that Loans made by it hereunder be evidenced by a promissory note substantially in the form of Exhibit D.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in form and substance reasonably acceptable to the Administrative Agent and the Borrower.  Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05  Fees; Discount.

(a)      The Borrower agrees to pay to (i) the Administrative Agent the fees at the times and in the amounts as set forth in any fee letters or other agreements with the Administrative Agent ("***Administrative Agent Fees***") and (ii) to the Initial Lender the fronting fees at the times and in the amounts set forth in any fee letter or other agreements with the Initial Lender (the "***Fronting Fees***").

(b)      The Lenders are authorized to fund the Initial Loans net of the Interim Discount and the Delayed Draw Loans net of the Final Discount.

(c)      All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees shall be refundable under any circumstances, absent manifest error in the calculation of such Fees.

SECTION 2.06  Interest on Loans.

(a)      Subject to the provisions of Section 2.07, the Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be at all times, and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Interest Rate.

(b)      Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement.

SECTION 2.07  Default Interest.  If the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise or any Event of Default shall occur and be continuing, then, until such defaulted amount shall have been paid in full or such Event of Default shall no longer exist, all Obligations shall bear interest (after as well as before judgment), payable on demand, at a rate equal to 10.00% per annum.

SECTION 2.08  <u>Termination and Reduction of Commitments</u>.

(a)      Following the making of the Initial Loans Loan pursuant to Section 2.01, the Initial Commitment of each Lender shall terminate.  Following the making of the Delayed Draw Loans pursuant to Section 2.01, the Delayed Draw Commitment of each Lender shall terminate.  Any remaining Initial Commitments or Delayed Draw Commitments  shall automatically terminate on the second Business Day following the entry of the Interim DIP Order (in the case of the Initial Loans) and the Final DIP Order (in the case of the Delayed Draw Loans).

(b)      Upon at least three Business Days' prior written or fax notice to the Administrative Agent (or such later time as agreed by the Administrative Agent in its reasonable discretion), the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Commitments (if any); *provided*, *however*, that each partial reduction of the Commitments shall be in an integral multiple of $1,000,000 and in a minimum amount of $5,000,000. Each notice delivered by the Borrower pursuant to this Section 2.08(b) shall be irrevocable.

(c)      Each reduction in the Commitments hereunder shall be made ratably among the Lenders in accordance with their respective applicable Commitments.

SECTION 2.09  <u>Repayment of Term Borrowings</u>.

(a)      To the extent not previously paid, all Loans shall be due and payable on the DIP Facility Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(b)      All repayments pursuant to this Section 2.09 shall be subject to Section 2.13, but shall otherwise be without premium or penalty.

SECTION 2.10  <u>Voluntary Prepayment</u>.

(a)      The Borrower shall have the right at any time and from time to time to prepay (or cause to be prepaid) any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice to the Administrative Agent before 12:00 noon, New York City time; *provided*, *however*, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000.

(b)      [Reserved.]

(c)     Each notice of prepayment shall be substantially in the form of Exhibit K to this Agreement (or such other form as agreed to by the Administrative Agent) and shall specify the prepayment date, the principal amount of each Borrowing (or portion thereof) to be prepaid and application of the prepayment to the remaining scheduled amortization payments and may be revoked or extended (*provided* that the provisions of Section 2.13 shall apply with respect to any such revocation or extension).  All prepayments under this Section 2.10 shall be subject to Section 2.13, but otherwise without premium or penalty.  All prepayments under this Section 2.10 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.11  Mandatory Prepayments.

(a)     [Reserved.]

(b)     Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Asset Sale (including pursuant to a sale and leaseback transaction and by way of merger or consolidation) of any property or asset of any Company (including the sale, transfer or other disposition of Equity Interests of any such Company), other than Asset Sales permitted by clauses (ii), (v) or (solely as it relates to clause (ii)) (vii) of Section 6.04(b), the Borrower shall apply or cause to be applied 100% of the Net Cash Proceeds received with respect thereto  to prepay outstanding Loans in accordance with Section 2.11(g); provided, however, that any Non-Core Asset Sale Proceeds shall only be required to be applied to repayment of the DIP Facility to the extent that such proceeds exceed $15,000,000 per individual disposition (or series of related dispositions) or $30,000,000 in the aggregate for all such dispositions during the term of this Agreement, in each case to the extent of such excess.

(c)     Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Casualty Event in respect of property with a fair market value immediately prior to such event equal to or greater than $500,000, the Borrower shall apply (or cause to be applied) 100% of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.11(g).

(d)     [Reserved.]

(e)     Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Debt Incurrence Prepayment Event, the Borrower shall apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.11(g).

(f)     [Reserved.]

(g)     Mandatory prepayments required by this Section 2.11 shall be allocated pro rata to the outstanding Loans.

(h)     The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.11, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least two Business Days' prior written notice of

such prepayment.  Each notice of prepayment shall be substantially in the form of Exhibit K to this Agreement (or such other form as agreed to by the Administrative Agent) and shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings under this Section 2.11 shall be subject to Section 2.13, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.  Following receipt of such certificate, the Administrative Agent will promptly notify each Lender holding Loans of the contents thereof and of such Lender's pro rata share of the prepayment.

SECTION 2.12  <u>Reserve Requirements; Change in Circumstances</u>.

(a)        Notwithstanding any other provision of this Agreement, if any Change in Law (i) shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender, (ii) shall impose on such Lender any other condition affecting this Agreement or Loans made by such Lender (other than Taxes) or (iii) shall subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loans made by it, or change the basis of taxation of payment to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes indemnifiable under Section 2.17 or any Taxes described in clauses (c), (d) or (e) of the definition of Excluded Taxes), and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan or increase the cost to any Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount reasonably deemed by such Lender to be material, then from time to time as specified in clause (c) below, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)        If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time as specified in clause (c) below, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)        A certificate of a Lender setting forth in reasonable detail the calculation of the amount or amounts (and the basis thereof) necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)        Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on

capital shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 270 days prior to the date that such Lender notifies the Borrower of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 270-day period.  The protection of this Section 2.12(d) shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.13  Breakage.  The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of any default in the making of any payment or prepayment required to be made hereunder.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.13 (and setting forth in reasonable detail the calculations thereof and the basis therefor) shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.14  Pro Rata Treatment.  Subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders, and each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans and each reduction of the Commitments shall be allocated pro rata among the applicable Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans); it being acknowledged that this Section 2.14 shall not apply to any payment obtained by any Lender as consideration for the assignment or participation in any Loan to any assignee or participant in accordance with this Agreement.  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.15  Sharing of Setoffs.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise

of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided*, *however*, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.15 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest and (ii) the provisions of this Section 2.15 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any of its Affiliates. The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.16  Payments.

(a)    The Borrower shall make each payment (including principal of, or interest on, any Borrowing or any Fees or other amounts) hereunder and under any other Loan Document not later than 12:00 noon, New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at its offices as notified to the Borrower from time to time. The Administrative Agent shall promptly distribute to each applicable Lender its applicable share of any payments received by the Administrative Agent on behalf of such Lender.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of, or interest on, any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.17  Taxes.

(a)    Except to the extent required by applicable law (as determined in good faith by the applicable withholding agent), any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes. If the Administrative Agent, any Loan Party or any other applicable withholding agent is required by law to deduct any Taxes from or in respect of any sum paid or payable by any Loan Party under any Loan Document, then the applicable withholding agent shall make such deduction and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If any such Taxes are Indemnified Taxes or Other Taxes, then the sum payable shall be increased as necessary so that after all such

-37-

required deductions of Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by, or required to be withheld or deducted from payments to, the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document, and any Other Taxes paid or payable by the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth in reasonable detail the basis for, and the calculation of, the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on behalf of itself or a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or any other Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement or under any other Loan Document shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, deliver to the Borrower and the Administrative Agent such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, each Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender is subject to backup withholding or information reporting requirements.  Each Lender shall, whenever a lapse in time or change in circumstances renders any such documentation (including any specific documentation required in this Section 2.17(e)) obsolete, expired or inaccurate in any respect, deliver promptly to the Borrower and the Administrative Agent updated documentation or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(e)(i), (ii) and (iii) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material

unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Without limiting the generality of the foregoing:

> (i)      each Foreign Lender, to the extent it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a party to this Agreement, whichever of the following is applicable:

>> (A)      Two (2) duly completed, executed copies of IRS Form W-8BEN or IRS Form W-BEN-E (or successor forms) establishing eligibility for benefits of an income tax treaty to which the United States is a party,

>> (B)      Two (2) duly completed, executed copies of IRS Form W-8ECI (or successor forms),

>> (C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two (2) duly completed, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or successor forms), and (y) a certificate substantially in the form of Exhibit I (a "*United States Tax Compliance Certificate*") certifying that such Foreign Lender is not (A) a "bank" as such term is used in Section 881(c)(3)(A) of the Code, (B) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, or (C) a controlled foreign corporation related to the Borrower within the meaning of Section 881(c)(3)(C) of the Code, or

>> (D)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership), two (2) duly completed, executed copies of IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this Section 2.17(e) if such beneficial owner were a Lender, as applicable (*provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such direct or indirect partners).

> (ii)      each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such U.S. Lender becomes a party to this Agreement, two (2) duly completed, executed copies of IRS Form W-9 (or successor forms) certifying that such U.S. Lender is not subject to U.S. federal backup withholding.

> (iii)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those

contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the applicable Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two (2) duly completed, executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(f)    If the Administrative Agent or any Lender determines, in its good faith discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified or received additional amounts pursuant to this Section 2.17, it shall pay over such refund to the relevant Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out of pocket expenses of the Administrative Agent or such Lender (including any Taxes) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the applicable Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest, additions to tax or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to take any action to obtain any refund that would be, in the sole and reasonable judgment of the Administrative Agent or any Lender, legally or commercially or otherwise disadvantageous to a Lender in any material respect or to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.  Any resulting refund shall be governed by Section 2.17(f).

SECTION 2.18  Assignment of Commitments Under Certain Circumstances; Duty to Mitigate.

(a)    In the event:

(i)      any Lender delivers a certificate requesting compensation pursuant to Section 2.12,

(ii)     [Reserved.]

(iii)    any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.17, or

(iv)     any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders,

then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) above, all of its interests, rights and obligations with respect to the Loans or Commitments that is the subject of the related consent, amendment, waiver or other modification) to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (w) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (x) the Borrower shall have received the prior written consent of the Administrative Agent, which consents shall not unreasonably be withheld, conditioned or delayed and (y) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all Fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Sections 2.12 and 2.13); *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.12 or the amounts paid pursuant to Section 2.17, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under Section 2.17, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.12 in respect of such circumstances or event or shall waive its right to further payments under Section 2.17 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.

(b)     If (i) any Lender shall request compensation under Section 2.12 or (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden reasonably deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.12 or would reduce amounts payable pursuant to Section 2.17, as the case may be, in the future.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

SECTION 2.19  <u>Defaulting Lenders</u>.

(a)     <u>Defaulting Lender Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)     <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.01, 4.02 and/or 4.03, as applicable, were satisfied or waived, such

payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.19 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to actions taken by the Required Lenders (including approval of amendments, waivers and similar actions) and fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.20  Priority and Liens.  At all times during the term hereof:

(a)     The Borrower hereby represents and warrants that upon entry of each DIP Order (except as provided in clause (ii) below), its Obligations hereunder and the Obligations of each Debtor under the other Loan Documents:

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code and subject to the Carve-Out, shall at all times constitute an allowed Superpriority Claim on a joint and several basis in the Case of such Loan Party;

(ii)     upon entry of the Final DIP Order, pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out, shall at all times be secured by first priority, valid, binding, enforceable and perfected security interests in, and Liens upon, all unencumbered tangible and intangible property of such Loan Party, including any such property that is subject to valid and perfected Liens in existence on the Petition Date, which Liens are thereafter released or otherwise extinguished in connection with the satisfaction of the obligations secured by such Liens (collectively, the "***DIP Collateral***") (excluding (x) assets of deferred compensation plans for financial advisors and (y) any Avoidance Actions (but including the proceeds therefrom;

(iii)     pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve-Out, shall at all times be secured by junior, valid, binding, enforceable and perfected security interests in, and Liens upon, all (A) property of such Loan Party's

estates that, on the Petition Date, was subject to a valid and perfected Lien (other than the Liens securing Indebtedness under the Pre-Petition Debt Documents) or becomes subject to a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of prepetition claims is expressly permitted under the Bankruptcy Code (the "***Permitted Prior Liens***"), (B) property of such Loan Party's estates that is subject to valid rights of setoff, and (C) property of such Loan Party's estates that is subject to such other Liens as are expressly permitted under Section 6.02(c), (d), (e), (f), (g), (h), (k), (l), (m), (n) or (p) (such Liens described in this clause (C), along with the Permitted Prior Liens, the "***DIP Permitted Liens***"); *provided* that the Liens granted under the Loan Documents shall not be subject or subordinate to (1) notwithstanding anything to the contrary in the Loan Documents or the DIP Orders, any DIP Permitted Lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates, (2) except as provided in the DIP Orders and the Loan Documents, any Liens arising after the Petition Date including, any Liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or court for any liability of the Loan Parties; (3) any intercompany or affiliate Liens of the Loan Parties or (4) the Liens of the Pre-Petition First Lien Loan Documents or the Pre-Petition Second Lien Loan Documents; and

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out, shall at all times be secured by first priority, priming, valid, binding, enforceable and perfected security interests in, and Liens upon, the DIP Collateral of each Loan Party (the "***Priming Liens***") to the extent the DIP Collateral is subject to existing liens that secure the obligations of such Loan Party under the Pre-Petition Debt Documents (the "***Primed Liens***").  The Priming Liens (x) shall be senior in all respects to the interests in such property of the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien Lenders under the applicable Pre-Petition Debt Documents (and of the other "secured parties" referenced therein) and the related security documents, and (y) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens.  The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Cases.

(b)    The Secured Parties' Liens and Superpriority Claim as described in Section 2.20(a) shall have priority over any claims arising under sections 105 and/or 506(c) of the Bankruptcy Code, and shall be subject and subordinate only to the Carve-Out.  Except as set forth herein, no other claim having a priority superior to or pari passu with that granted to Secured Parties by the Interim DIP Order and Final DIP Order, whichever  is then in effect, shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c)    Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, any other Secured Party or any of the Collateral under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and the Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, to assert or

impose or seek to assert  or impose, any such costs or expenses of administration against Administrative Agent, the Lenders or any other Secured Party.

(d)     Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of such Loan Party, any chapter 11 trustee, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of such Loan Party's cases are converted to cases under chapter 7 of the Bankruptcy Code).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01  Organization; Powers.  Each Company (a) is duly organized or incorporated, validly existing and (if applicable) in good standing under the laws of the jurisdiction of its organization or incorporation (to the extent such jurisdiction provides for the designation of entities organized or incorporated thereunder as existing in good standing); except: (i) as listed in Schedule 3.01 or (ii) where failure to do so, in the case of any Company that is a Non-Loan Party, would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, (b) has all requisite organizational power and authority to own its property and assets and to carry on its business as now conducted and (c) is qualified to do business in every jurisdiction where such qualification is required, except in the case of clause (b) or (c) where the failure so to qualify would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the DIP Orders and subject, in the case of each such Loan Party, to the terms thereof, each Loan Party has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02  Authorization.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the DIP Orders and subject, in the case of each such Loan Party,  to the terms thereof, the Transactions (a) have been duly authorized by all requisite corporate or limited liability company (or other organizational form), and, if required by Applicable Law, stockholder or member action, as applicable, of each Loan Party, (b) will not (i) violate (A) any provision of law, statute, rule or regulation or (B) any order of any Governmental Authority, except, in the case of this clause (i), such violation as could not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, (ii) be in conflict with, result in a breach of or constitute a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument, except such consequences as could not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any

Lender, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by any Company (other than any Lien created hereunder or under the Security Documents) and (c) will not violate any provision of the certificate or articles of incorporation or certificate of formation or other constitutive documents or by-laws or limited liability company agreement or memorandum or articles of association of any Company.

SECTION 3.03  Enforceability.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the DIP Orders and subject, in the case of each such Loan Party, to the terms thereof, this Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject, other than in the case of any Loan Party that is a Debtor, to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity and an implied covenant of good faith and fair dealing.

SECTION 3.04  Governmental Approvals.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the DIP Orders and subject, in the case of each such Loan Party, to the terms thereof, no order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to authorize or is required as a condition to (i) the execution, delivery and performance by any Loan Party of any Loan Document to which it is a party or any of its obligations thereunder or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which any Loan Party is a party, except (i) solely with respect to any Loan Party that is not a Debtor, the filing and recording of financing statements and other documents necessary in order to perfect the Liens created by the Security Documents or (ii) where the failure to obtain such order, consent, approval, license, authorization, validation, filing recording, registration or exemption would not reasonably be expected to have be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 3.05  Reserved.

SECTION 3.06  No Material Adverse Change.  Since January 4, 2016, there have been no events or developments that, individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.07  Title to Properties; Possession Under Leases.

(a)     Each Company has good and marketable title to, or valid leasehold interests in, or valid license to use, all properties that are necessary for the operation of their respective businesses as currently conducted (including each Mortgaged Property, if any), except where the failure to have such good title, interest or license would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  All such properties and assets are free and clear of Liens other than Permitted Liens and minor defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.

(b)     Each Company has complied in all respects with all obligations under all material leases and licenses to which it is a party, except where non-compliance would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

(c)     Schedule 1.01(d) sets forth each real property owned in fee by any Loan Party as of the Closing Date.

SECTION 3.08   Companies.   Schedule 3.08 sets forth as of the Closing Date a list of all of the Companies and the percentage ownership interest of such Company by one or more other Companies and the designation of such Company as a Subsidiary Guarantor or an Excluded Company.

SECTION 3.09   Litigation; Compliance with Laws; Anti-Money Laundering.

(a)     There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened against any Company or any business, property or rights of any such Person (i) that involve any Loan Document or (ii) as to which, if adversely determined, would reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

(b)     No Company or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default would reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

(c)     No Company nor any director or officer, to the knowledge of any Company, any agent, employee or Affiliate of any Company is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and the Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any person or country for the purpose of funding any operations in, financing any investments or activities in, or making any payments to any person or country subject to any U.S. sanctions administered by OFAC.

(d)     Each Company is in compliance, in all material respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act and (iii) applicable anti-money laundering laws.

(e)     No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to

-47-

obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 3.10  Federal Reserve Regulations.  No Company is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board) and no proceeds of any Borrowings will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock other than in accordance with the provisions of Regulation U, Regulation T or Regulation X issued by the Board.

SECTION 3.11  Investment Company Act.  No Company is an "investment company" as defined in, or subject to regulation under, the Investment Company Act.

SECTION 3.12  Use of Proceeds.  The proceeds of the Loans under the DIP Facility shall be used in accordance with the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance) to: (i) provide working capital to the Loan Parties that are Debtors in the Cases; (ii) fund interest, discount, fees and other payments contemplated hereunder, including, without limitation, the Adequate Protection Payments; (iii) fund the Advisor Retention Loans up to an aggregate amount of $50,000,000; (iv) provide funding to each Broker-Dealer that is not a Debtor (other than J.P. Turner & Company, LLC) to the extent required to maintain sufficient Regulatory Net Capital and liquidity to permit continued operation of such Broker-Dealer, including as may be required under Applicable Laws or by any Regulatory Supervising Organization and (v) to provide funding to Subsidiaries that are not Debtors in the Cases.  The proceeds of the Loans borrowed under the DIP Facility shall not be used to fund the operations of, or the administration of any Case of, any of RCAP Holdings, RCS Management, or any Subsidiary or Affiliate that is not Debtor, except as expressly set forth in clauses (iv) and (v) above.

SECTION 3.13  Tax Returns; Taxes.  Each of the Companies has filed or caused to be filed all federal and material other Tax returns required to have been filed by it and has paid or caused to be paid all material Taxes (whether or not shown on a Tax return and including in the capacity as withholding agent) due and payable by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Company shall have set aside on its books adequate reserves in accordance with GAAP.  There is no current or proposed material Tax assessment, deficiency or other claim against any of the Companies.

SECTION 3.14  <u>No Material Misstatements</u>.  No written information, report, financial statement, exhibit or schedule (other than general market data not prepared by or specific to the Companies) furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained any material misstatement of fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and upon assumptions believed by management of the Borrower to be reasonable at the time delivered.

SECTION 3.15  <u>Employee Benefit Plans</u>.  The Companies and their respective ERISA Affiliates are in compliance with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder other than noncompliance which would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to be materially adverse to any Company or Lender.  Except as would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of the Financial Accounting Standards Board Accounting Standards Codification 715 – Compensation – Retirement Benefits) did not, as of the last annual valuation date prior to the date of this Agreement, exceed the fair market value of the assets of all such underfunded Plans.

SECTION 3.16  <u>Environmental Matters</u>.  Except as set forth on Schedule 3.16 or except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, no Company (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Companies, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Companies, any basis to reasonably expect to become subject to any Environmental Liability.

SECTION 3.17  <u>Labor Matters</u>.  Except as would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender:  (a) there are no strikes or other labor disputes against any Company pending or, to the knowledge of any Company, overtly threatened in writing and (b) no Company has been in material violation of the Fair Labor Standards Act or any other Applicable Laws dealing with wage and hour matters.

SECTION 3.18  [<u>Reserved</u>].

SECTION 3.19  <u>Senior Indebtedness</u>.  To the extent any Subordinated Indebtedness is outstanding, the Obligations constitute "senior indebtedness," "designated senior indebtedness" or any other such comparable term under, and as defined in, the Subordinated Loan Documents related thereto.

SECTION 3.20  <u>Intellectual Property</u>.  Each of the Companies that is a Loan Party owns or has a license or other right to use all Intellectual Property necessary for the present conduct of its business, and operates its respective businesses without any known infringement or violation with the Intellectual Property rights of others, except for such Intellectual Property, licenses and rights, the loss of which, and such infringements, violations or conflicts that, in any such case, individually or in the aggregate would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 3.21  <u>Broker-Dealer and Investment Advisory Companies</u>.

(a)  The Loan Parties are not required to be registered with the SEC or any other governmental entity as a broker or dealer.  Each Broker-Dealer which is required to be registered as a broker or dealer with the SEC under the Exchange Act is duly so registered, is a member of FINRA or another self-regulatory organization of which it is required to be a member, and is duly registered and licensed under any applicable state laws, is in compliance in all material respects with the applicable provisions of the Exchange Act and the rules thereunder, and is in compliance in all material respects with all applicable rules of FINRA except as would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  Each Broker-Dealer is duly registered as a broker or dealer under, and in compliance in all material respects with the laws of all jurisdictions in which it is required to be so registered. All Persons associated with any Broker-Dealer required to be registered or licensed with FINRA or with any other self-regulatory organization or other governmental entity are duly registered or licensed except where any failure to be so registered or licensed individually, or in the aggregate, would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  Each Investment Adviser Company which is required to be registered as an investment adviser with the SEC under the Investment Advisers Act is duly so registered.  No proceeding is pending or threatened with respect to the suspension, revocation, or termination of any such registrations and the termination or withdrawal of any such registrations is not contemplated by the Loan Parties.

(b)  To the knowledge of the Loan Parties, no Broker-Dealer or its "associated persons" (as defined in the Exchange Act) is currently ineligible or disqualified pursuant to Section 15, Section 15B or Section 15C of the Exchange Act to serve as a broker or dealer or "associated person" of a broker or dealer except as would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.  There are no proceedings or investigations pending by any governmental entity or self-regulatory organization that could likely result in ineligibility or statutory disqualification except as would not otherwise be materially adverse to the Companies, taken as a whole, or any Lender.

(c)  Each Broker-Dealer has maintained net capital (as such term is defined in Rule 15c3-1 under the Exchange Act) in excess of any Early Warning Threshold and the minimum level of net capital required by the SEC or other applicable governmental entity or self-regulatory organization sufficient to permit each such Broker-Dealer to operate its business under FINRA rules.

(d)     The Loan Parties have delivered or made available to all Lenders a true and correct copy of the currently effective Broker-Dealer Form BD and any amendments thereto filed with the SEC and FINRA by each Broker-Dealer.  The information contained in such forms and reports and the information contained in the Investment Adviser Companies' Forms ADV as on file with the Investment Adviser Registration Depository, was, at the time of filing, complete and accurate in all material respects.  Each Broker-Dealer has made available to the Administrative Agent a true, correct and complete copy of such entity's currently effective FINRA Membership Agreement.  Each Broker-Dealer has not exceeded in any material way with respect to its business, the business activities enumerated in its FINRA Membership Agreement or any other applicable restriction agreement or other limitations imposed in connection with its FINRA or state registrations or licenses with any other self-regulatory organization or governmental authority.

(e)     As of the date hereof, no Broker-Dealer has received notice that it is the subject of a disciplinary action by a governmental entity or self-regulatory organization alleging that the Broker-Dealer's written supervisory procedures with respect to insider trading, privacy policies, business continuity plans, and anti-money laundering are inadequate.

(f)     As of the date hereof, no Investment Adviser Company has received notice that it is the subject of a disciplinary action by a governmental entity alleging that the Investment Adviser Company's code of ethics or compliance procedures with respect to insider trading, privacy policies and business continuity plans are inadequate.

(g)     As of the date hereof, no Broker-Dealer or Investment Adviser Company has received notice that it is the subject of a disciplinary action by a governmental entity or self-regulatory organization alleging violation of privacy protection laws and regulations.

(h)     No Broker-Dealer or Investment Adviser Company has received a notice from the SEC, FINRA, or any other government authority, self-regulatory organization or securities exchange of any alleged rule violation or other circumstance which could reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

(i)     No governmental authorization, and no notice to or filing with, any governmental authority or any other third party is required for the exercise by any Lender of its rights under the Loan Documents, except with respect to the exercise of any remedies with respect to, or any other transfer of, the equity interests or assets of any Broker-Dealer, giving all necessary notices to third parties and obtaining all necessary governmental authorizations in connection with such exercise of remedies or transfer including, without limitation, to the extent required under the FINRA's NASD Rule 1017, except, in each case, as would not otherwise be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 3.22  Security Documents.  With respect to each Loan Party that is a Debtor, upon the entry of the DIP Orders and subject to the terms thereof and except as expressly provided in Section 2.20, the DIP Orders (i) are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties  legal, valid, enforceable and perfected first priority Liens on, and security interests in, the Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents and any Liens and

privileges arising mandatorily by Law.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the DIP Orders and subject, in the case of each such Loan Party, to the terms thereof and except as expressly provided in Section 2.20, the Security Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable first priority Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Security Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents and any Liens and privileges arising mandatorily by Law.

SECTION 3.23  [Reserved].

SECTION 3.24  Certain Fees.  No broker's or finder's fee or commission will be payable by any Loan Party with respect hereto or to any of the transactions contemplated by the Loan Documents, except as payable to the Agents and the Lenders pursuant to the Loan Documents.

SECTION 3.25  No Defaults.  No Default has occurred and is continuing or would result from the consummation of the Transactions.

SECTION 3.26  Material Contracts.  Each Material Contract of each Company is in full force and effect in accordance with the terms thereof.  To the extent requested by the Administrative Agent, each Company has delivered to the Administrative Agent a true and complete copy of each such Material Contract.  No Company (nor, to its knowledge, any other party thereto) is in breach of or in default under any such Material Contract, except as a result solely of the commencement of the Cases and except where such breach or default has not and would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 3.27  [Reserved.]

SECTION 3.28  Insurance.  The properties of the Companies are insured with financially sound and reputable insurers (after giving effect to self-insurance), in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Company operates.

**ARTICLE IV**

**CONDITIONS OF EFFECTIVENESS AND LENDING**

SECTION 4.01  Conditions Precedent to Initial Borrowings.  The effectiveness of this Agreement and the obligation of each Lender to make the Initial Loans to

the Borrower on the Closing Date is subject to the satisfaction or waiver in accordance with Section 9.08 of the following conditions precedent:

(a)    This Agreement, the Guarantee Agreement, the Collateral Agreement, the Intercreditor Agreement and each of the other Loan Documents and other documentation relating to the Loans provided hereunder shall be in form and substance reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Lenders, and counterparts hereof and thereof shall have been duly executed by the applicable Loan Parties and each other party thereto and delivered to the Administrative Agent and the Collateral Agent.

(b)    The Administrative Agent shall have received an opinion of Dechert LLP, counsel for the Loan Parties, and any local counsel for the Loan Parties, in each case, (i) dated the Closing Date, (ii) addressed to the Administrative Agent, the Collateral Agent and the Lenders on the Closing Date, and (iii) covering customary matters relating to the Loan Documents and the Transactions.

(c)    The Administrative Agent shall have received a certificate of each Loan Party substantially in the form of Exhibit H, with appropriate insertions and attachments, including such Loan Party's organizational or constitutional documents and resolutions (including, if applicable, shareholder resolutions) or board minutes authorizing the execution, delivery and performance of its obligations under the Loan Documents and, in the case of the Borrower, the borrowings hereunder.

(d)    The Administrative Agent and the Lenders shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including reimbursement or payment of all reasonable and documented out-of-pocket fees and expenses (including the reasonable and documented fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions.

(e)    The Collateral Agent shall have received (i) all Pledged Securities (such term (or similar term) as defined in the Collateral Agreement), if any, required to be delivered to the Collateral Agent on the Closing Date pursuant to the Collateral Agreement, together with duly executed undated blank stock powers, or other equivalent instruments of transfer reasonably acceptable to the Collateral Agent, (ii) evidence that all Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and United States Copyright Office, reasonably requested by the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by any Security Document and perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent for filing, registration or recording or any other actions reasonably required to be taken by the Administrative Agent or the Collateral Agent under the Loan Documents and (iii) a certificate from the applicable Loan Party's insurance broker or other evidence reasonably satisfactory to it that all insurance required to be maintained pursuant to Section 5.02 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.02; *provided* that to extent that any items in the foregoing clause (i) are unable to be delivered by the Loan Parties on the Closing Date after their use of commercially

reasonable efforts to do so, such items may be delivered within 15 days after the Closing Date (or such later date as the Administrative Agent or Required Lenders may agree).

(f)    The Collateral Agent shall have received a Perfection Certificate dated the Closing Date and duly executed by a Responsible Officer of each of the Loan Parties.

(g)    The Approved Reorganization Plan shall have been filed by each Debtor (other than the Subsequent Filing Loan Parties) in the Cases on the Petition Date.

(h)    [Reserved].

(i)    The Petition Date shall have occurred, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with the form and substance of the First Day Orders sought by the Borrower, and such First Day Orders shall have been entered on or prior to the Closing Date.

(j)    The Interim DIP Order Entry Date shall have occurred not later than two (2) days after the Petition Date.

(k)    The Restructuring Support Agreement shall have become effective in accordance with its terms and shall be in full force and effect.

(l)    On or prior to the Petition Date, the board of directors or other applicable governing body of each Subsequent Filing Loan Party shall have authorized such Subsequent Filing Loan Party to file a chapter 11 petition in the Bankruptcy Court in accordance with the Prepackaged Plan.

(m)    The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 4.01 and in Section 4.03.

(n)    The Administrative Agent and the Lenders shall have received, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with, the DIP Budget for the period of thirteen weeks commencing with the week during which the Petition Date occurred.

(o)    The Administrative Agent and the Lenders shall have received, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with, the Retention and Communication Plan.

(p)    No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(q)    The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim DIP Order.

-54-

(r)     The Administrative Agent shall have received, at least two (2) Business Days prior to the Closing Date, to the extent reasonably requested at least five (5) days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(s)     The Administrative Agent shall have received copies of a good standing certificate or certificate of status, as applicable and bring down good-standings for each Loan Party in its jurisdiction of organization.

(t)     The Interim DIP Order shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; *provided* that if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

SECTION 4.02  Conditions Precedent to Delayed Draw Borrowing. The obligation of each Lender to its Delayed Draw Loan is subject to the satisfaction or waiver in accordance with Section 9.08 of the following conditions precedent:

(a)     The Final DIP Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the written consent of the Required Lenders; *provided* that if the Final DIP Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)     (i) All material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final DIP Order, including a final cash management order and any order establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(c)     The Borrower shall have paid all Fees and reasonable and documented out-of-pocket expenses of the Lenders (including the reasonable and documented fees and expenses of outside counsel and financial advisors) accrued and payable on or prior to the date of such Borrowing.

(d)     The aggregate amount of the Loans made on or prior to such date shall not exceed the aggregate amount authorized by the Final DIP Order.

(e)     The Administrative Agent shall have received an opinion of Dechert LLP, counsel for the Loan Parties, and any local counsel for the Loan Parties, in each case, (i) dated as of the date of such Borrowing, (ii) addressed to the Administrative Agent, the Collateral Agent

and the Lenders as of the date of such Borrowing and (iii) covering customary matters relating to the Loan Documents and the Transactions.

(f)     From and after January 4, 2016, there shall have been no Attrition greater than 10% of the Gross Dealer Concessions of all Independent Financial Advisors (excluding Cetera Investment Services, Inc. which has no Independent Financial Advisors) and the Financial Institution Clients of Cetera Investment Services, Inc.

(g)     The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 4.02 and in Section 4.03.

SECTION 4.03  Conditions Precedent to all Borrowings.  The obligation of each Lender to make advances to the Borrower in accordance with Section 2.01 is subject to the satisfaction or waiver in accordance with Section 9.08 of the following conditions precedent:

(a)     The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03.

(b)     The representations and warranties set forth in Section 2.20 and Article III and in each other Loan Document shall be true and correct in all material respects (and in all respects with respect to representations and warranties qualified by materiality) on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (and in all respects with respect to representations and warranties qualified by materiality) as of such earlier date.

(c)     At the time of and immediately after such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(d)     The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)     There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that would reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in paragraphs (b) through (e) of this Section 4.03.

## ARTICLE V

## AFFIRMATIVE COVENANTS

The Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other Obligations (other than indemnification and other contingent obligations, in each case, not then due and owing) then payable under any Loan Document shall have been paid in full, the Borrower will, and will cause each of its Subsidiaries to:

SECTION 5.01   Existence; Compliance with Laws; Businesses and Properties.

(a)      Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except (i) other than with respect to the Borrower, to the extent that the failure to do so would not reasonably be expected to be materially adverse to any Loan Party or Lender or (ii) as otherwise expressly permitted under Section 6.04.

(b)      (i) Comply with all Requirements of Law except (x) for such non-compliance that would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender or (y) to the extent excused or unenforceable under the Bankruptcy Code, and (ii) maintain property used or useful to the conduct of its business in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times, except in each case to the extent the failure to do so would not be reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 5.02   Insurance.

(a)      Keep its insurable properties insured at all times by financially sound and reputable insurers on customary terms for similar businesses; maintain such other insurance as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, including hazard and business interruption insurance, public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)      Cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable or mortgage endorsement, as applicable, and cause all such policies to name the Administrative Agent and the Collateral Agent as an additional insured, in each case in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent in each case as of the Closing Date in the case of

such policies existing on the Closing Date and, in the case of such policies issued after the Closing Date, within 10 days of issuance of such policy (or such later date as the Administrative Agent or Required Lenders may agree); at the Administrative Agent's request, deliver certified copies of all such policies to the Collateral Agent; and use commercially reasonable efforts to cause each such policy to contain a non-cancellation endorsement (x) by reason of nonpayment of premium except upon not less than 10 days' prior written notice (as such period may be extended by the Administrative Agent) by the insurer to the Administrative Agent or (y) for any other reason except upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent (or such later date as the Administrative Agent or Required Lenders may agree).

(c)     If at any time the area in which any Improvements (as defined in the Mortgages) are located is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to applicable Flood Insurance Laws and (ii) deliver to the Administrative Agent customary evidence of such insurance.

SECTION 5.03  Payment of Obligations.  Pay and discharge promptly when due (a) all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, and (b) all lawful claims for labor, materials and supplies or otherwise (in the case of any Debtor, solely to the extent arising post-petition) that, if unpaid, could reasonably be expected to give rise to a Lien upon such properties or any part thereof; *provided, however*, that such payment and discharge shall not be required with respect to any such Tax, assessment or governmental charge or levy (i) in the case of any Debtor, subject to the Bankruptcy Code and to the extent that the same is excused by the Bankruptcy Court or the Bankruptcy Code, and (ii) in the case of any Loan Party that is not a Debtor,  so long as (x) the validity or amount thereof shall be contested in good faith by appropriate proceedings, and (y) the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.04  Financial Statements, Reports, etc.   In the case of the Borrower, furnish to the Administrative Agent, which shall furnish to each Lender:

(a)     within 90 days (or by such earlier date as the SEC may require for the filing of annual reports on Form 10-K) after the end of each fiscal year, commencing with the fiscal year ended December 31, 2015, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, and a written statement of the Borrower's management setting forth a discussion of the Borrower's financial condition and results of operations, in each case, for the fiscal year then ended, including the notes thereto, all in reasonable detail, setting forth comparative figures for the immediately preceding fiscal year, and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the year;

Such financial statements shall be audited by PricewaterhouseCoopers LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall not be qualified as to the scope of such audit or contain any "going concern" qualification (other than a "going concern qualification" with respect to the Cases)) to the effect that such consolidated financial statements fairly present in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently (except as otherwise disclosed therein) applied;

(b)    within 45 days (or by such earlier date as the SEC may require for the filing of quarterly reports on Form 10-Q) after the end of each of the first three fiscal quarters of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and a written statement of the Borrower's management setting forth a discussion of the Borrower's financial condition and results of operations, in each case, for the fiscal quarter then ended and the then elapsed portion of the fiscal year, all in reasonable detail setting forth comparative figures for the same periods in the immediately preceding fiscal year and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the period, all certified by one of its Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently (except as otherwise disclosed therein) applied, subject to normal year-end audit adjustments and the absence of required footnote disclosures;

(c)    within two Business Days after its filing with the Bankruptcy Court, a copy of each "Monthly Operating Report" filed with the Bankruptcy Court; and, concurrently therewith, (i) a monthly operating report for the retail segment that includes an income statement and provides detail as to asset levels, recruitment and attrition statistics of financial advisors and FTEs and (ii) such other information as the Required Lenders may reasonably request (so long, in the case of this clause (ii), as such other information is reasonably available to the Borrower); *provided* that the obligations set forth in this subsection (c) shall be deemed satisfied to the extent such information is included in the "Monthly Operating Report" filed with the Bankruptcy Court for the applicable month on or prior to the date specified for compliance in this Section 5.04(c);

(d)    concurrently with any delivery of financial statements under paragraph (a), (b) or (c) above, a certificate of a Financial Officer substantially in the form of Exhibit F (a "*Compliance Certificate*") certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(e)    [reserved];

(f)     the Borrower shall, (i) on a date (which shall be a Business Day) following the end of each of its fiscal years (which date will be specified by Borrower to the Administrative Agent in writing at least 10 days prior to such date and which date shall be no later than 120 days following the end of each such fiscal year), hold a meeting (which may be telephonic) and (ii) upon the reasonable request of the Administrative Agent, on a date (which shall be a Business Day) following the end of each of the first three fiscal quarters of each fiscal year (which date will be specified by Borrower to the Administrative Agent in writing at least 7 days prior to such date and which date shall be no later than 60 days following the end of each such period), participate in a conference call, in each case, with the Administrative Agent and the Lenders that choose to attend, to discuss the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for such fiscal year or such fiscal quarter (and for the period from the beginning of the current fiscal year to the end of such fiscal quarter), as the case may be;

(g)     promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by any Company (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that any Company shall send to the holders of any publicly issued debt of any Company, in their capacity as such holders, lenders or agents (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement);

(h)     promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(i)     promptly, from time to time, and subject to the limitations set forth in the last sentence of Section 5.07(a), such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request;

(j)     (i) promptly provide the Administrative Agent and the Lenders with (A) all Financial and Operational Combined Uniform Single (FOCUS) Reports provided to FINRA or filed with the SEC in respect of each Broker-Dealer; (B) for each Broker-Dealer that does not qualify for an exemption from Rule 15c3-3 under the Exchange Act pursuant to paragraph (k) thereof, a weekly report setting forth the 15c3-3 reserve calculations of such Broker-Dealer, including without limitation, the underlying calculation used to produce such reserve calculations; (C) on a bi-weekly basis, all reports provided by any Broker-Dealer to FINRA under FINRA Rule 4530 (other than reports required pursuant to Sections (a)(2), (d)(e), (f)(4), (g) and (h) thereof); (D) all other material written presentations and reports with respect to one or more Broker-Dealers provided to any Regulatory Supervisory Organization or any of the clearinghouses, clearing banks or clearing brokers through which such Broker-Dealer transacts (together with the Regulatory Supervisory Organizations, collectively, the "***Relevant***

*Organizations*") with respect to such Broker-Dealer's net capital, liquidity and compliance with financial responsibility rules; (E) any "early warning" notification of reductions in its level of Regulatory Net Capital delivered by a Broker-Dealer to a Regulatory Supervisory Organization, including those under Rule 17a-11 under the Securities Exchange Act of 1934 or FINRA Rule 4120; (F) any notice received by a Broker-Dealer under FINRA Rule 4110; and (G) any written communications received by the Borrower or any other Company from a Relevant Organization with respect to any material investigation or inquiry that could reasonably be expected to lead to an enforcement action; and (ii) provide the Administrative Agent and the Lenders on a weekly basis, or such other frequency as may be agreed between the Borrower and the Required Lenders, with an oral report with regard to all communications with the Relevant Organizations relating to the matters described in clause (i) above;

(k)    (i) commencing on the second Thursday after the Petition Date and no later than Thursday of each succeeding calendar week, and on any other date on which a Borrower may deliver the same to the Bankruptcy Court, (A) a Budget Variance Report as of the end of the immediately preceding calendar week and (B) an Operational Report as of the end of the immediately preceding calendar week and (ii) every four weeks, and on any other date on which a Borrower may deliver the same to the Bankruptcy Court, a DIP Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period; *provided* that the Required Lenders, in their reasonable discretion, shall have the right to dispute any updates or amendments contained in any budget delivered pursuant to this clause (ii) by providing the Borrower specific notice thereof within five (5) Business Days after the delivery by the Borrower of such updates or amendments; *provided, further,* that, (x) to the extent the Required Lenders do not provide such dispute notice within such period of five (5) Business Days, the updates to or amendments of the DIP Budget shall be deemed approved and consented to by the Required Lenders and shall be deemed to constitute the DIP Budget upon the expiration of such period of five (5) Business Days, and (y) to the extent the Required Lenders do provide such dispute notice within such period of five (5) Business Days, then the DIP Budget, without giving effect to such updates or amendments, shall continue to constitute the DIP Budget until otherwise agreed to among the Loan Parties and the Required Lenders; and

(l)    (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court or delivering to the Creditors' Committee, any other statutory committee appointed in the Cases or the United States Trustee, as the case may be, the Final DIP Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, the Approved Reorganization Plan or any other reorganization plan to be filed with the Bankruptcy Court and/or any disclosure statement related thereto and (ii) by the earlier of (1) two Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (2) at the same time as such documents are provided by any of the Debtors to the Creditors' Committee, any other statutory committee appointed in the Cases or the United States Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure.

To the extent any document required to be delivered pursuant to Section 5.04(a), (b) or (g) is filed with the SEC electronically and is fully available to the public generally at or prior to the time such document is required to be delivered pursuant to this Section 5.04, such document shall be deemed to have been delivered on the date on which such document is filed and posted unless the Borrower provides the Administrative Agent with prior written notice that such filing is not intended to satisfy any delivery requirement hereunder.

SECTION 5.05  Litigation and Other Notices.  Furnish to the Administrative Agent prompt written notice of any of the following:

(a)    any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against any Company that, if determined adversely would reasonably be materially adverse to the Companies, taken as a whole;

(c)    the occurrence or reasonable expectation of an occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, or is reasonably expected to occur, would reasonably be expected to result in the imposition of a Lien on any Company or liability of any Company in an aggregate amount that could reasonably be expected to be materially adverse to the Companies, taken as a whole; and

(d)    any development that could reasonably be expected to be materially adverse to the Companies, taken as a whole.

SECTION 5.06  Information Regarding Collateral.

(a)    Furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's legal name, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) in any Loan Party's form of corporate organization, (iv) in any Loan Party's chief executive office or (v) in any Loan Party's organizational identification number, if any. The Companies also agree to promptly notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)    At the time of each delivery of the monthly financial statements with respect to the preceding fiscal month pursuant to Section 5.04(c), the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.06, or if there are changes, setting forth the information required pursuant to Sections 1(a) and 2 of the Perfection Certificate.

SECTION 5.07  Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings.

(a)     Keep proper books of record and account in which full, true and correct entries in conformity in all material respects with GAAP are made of all material financial dealings and transactions in relation to its business and activities.  Each Company will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or the Required Lenders to, upon written notice to the Borrower and at the Borrower's expense, visit and inspect the financial records and the properties of such Person at reasonable times and frequency and to make extracts from, and copies of, such financial records, and permit any representatives designated by the Administrative Agent or the Required Lenders to discuss the affairs, finances and condition of such Person with the officers thereof and (*provided* that a representative of the Borrower is given the opportunity to be present) independent accountants therefor; *provided* that, so long as no Event of Default has occurred and is continuing, (i) only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Required Lenders under this Section 5.07, (ii) any such visit and inspection by the Administrative Agent in excess of two per calendar year shall be at the expense of the Administrative Agent.  Notwithstanding anything to the contrary in Section 5.04(i) or this Section 5.07, no Company shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Requirement of Law or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     The Borrower shall use commercially reasonable efforts to obtain, and thereafter maintain, facility and recovery ratings (but, in each case, no particular rating) of the Credit Facilities by Moody's.

SECTION 5.08  Use of Proceeds.  Use the proceeds of the Loans only for the purposes specified in Section 3.12.

SECTION 5.09  Compliance with Environmental Laws.  Except as would not reasonably be expected to be materially adverse to the Companies, taken as a whole, comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action required by Environmental Law in accordance in all material respects with Environmental Laws; *provided*, *however*, that no Company shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

SECTION 5.10  Further Assurances; Additional Subsidiary Guarantors; Pledge of Additional Stock.

(a)     Subject to any applicable limitations set forth in the Security Documents, execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing

statements, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority of the security interests created or intended to be created by the Security Documents.  Subject to any applicable limitations set forth in the Security Documents, the Companies will cause each of their respective direct or indirect Subsidiaries (other than any Excluded Company) formed or otherwise purchased or acquired after the Closing Date, and each other wholly owned direct or indirect Subsidiary of a Company that ceases to constitute an Excluded Company, within 15 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Required Lenders may agree in their reasonable discretion), to execute a supplement to each of the Guarantee Agreement and any applicable Security Document in order to become a Subsidiary Guarantor under the Guarantee Agreement and a grantor under such Security Documents or, to the extent reasonably requested by the Collateral Agent, enter into a new Security Document substantially consistent with the analogous existing Security Documents and otherwise in form and substance reasonably satisfactory to such Collateral Agent, will cause the certificates, if any, representing the Capital Stock of such Subsidiary of such Company and intercompany notes owing from such Subsidiary of such Company to any Loan Party to be delivered to the Collateral Agent to the extent required by the applicable Security Documents, together with stock powers or other appropriate instruments of transfer duly endorsed in blank, and will cause such Subsidiary of such Company to take all other action reasonably requested by the Collateral Agent to grant a perfected Lien on and security interest in its assets to substantially the same extent as created by the Loan Parties on the Closing Date.

Subject to any applicable limitations set forth in the Security Documents, if any assets are acquired by the Borrower or another Loan Party after the Closing Date (other than assets (i) with a fair market value (determined at the time of acquisition of such assets) less than $1,000,000 (as such fair market value is reasonably determined by the Borrower in good faith), (ii) constituting Excluded Collateral and (iii) constituting Collateral under the applicable Security Document that become subject to the Lien of the applicable Security Document upon acquisition thereof), the Companies will within 15 days of the acquisition thereof (or such longer period as the Required Lenders may agree in their reasonable discretion) notify the Collateral Agent thereof and will within 15 days of the acquisition thereof (or such longer period as the Required Lenders may agree in their reasonable discretion) cause such assets to be subjected to valid and enforceable Liens securing the Obligations and will take, and cause the applicable Loan Parties to take, such actions as shall be necessary or reasonably requested by the Collateral Agent to grant and perfect such Liens in accordance with all requirements of applicable law consistent with the applicable requirements of the Security Documents.

Such security interests and Liens will be created under and as required by the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent, and the Borrower shall deliver or cause to be delivered to the Administrative Agent or Collateral Agent all such instruments and documents (including the Flood Documentation, legal opinions, title insurance policies, surveys and lien searches) as the Collateral Agent shall reasonably request in connection therewith.

(b)    Subject to any applicable limitations set forth in the Security Documents, the Companies will cause all certificates representing Equity Interests and Stock Equivalents of any Company (other than any Excluded Equity Interests) held directly by a Loan Party, to be delivered to the Collateral Agent as security for the Obligations accompanied by undated instruments of transfer executed in blank under the Security Documents.

SECTION 5.11  Registration Status.  The Companies shall maintain the Investment Adviser Companies' status as registered "investment advisers" under the Investment Advisers Act, except where the failure to maintain such registration would not be reasonably likely to be materially adverse to the Companies, taken as a whole.  The Companies shall cause each Broker-Dealer that is not a Debtor to maintain (i) its registration as a registered "broker-dealer" under the Exchange Act and under the laws of each state in which such registration is required in connection and where a failure to obtain such registration would be likely to be materially adverse to the Companies, taken as a whole, and (ii) its membership in FINRA and each other Regulatory Supervisory Organization necessary for the operation of its business, except where the failure to maintain such registration would not be reasonably likely to be materially adverse to the Companies, taken as a whole, or any Lender.

SECTION 5.12  Regulatory Matters.  Each Company shall cause (a) (i) the Broker-Dealers to take all reasonable action to maintain all rights, privileges, broker-dealer licenses and memberships, broker-dealer registrations necessary or desirable in the normal conduct of its business, except, in each case, to the extent that failure to do so would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, (ii) all Broker-Dealers to comply with all material rules and regulations of the SEC and FINRA applicable to it (including such rules and regulations dealing with net capital requirements) and, to the extent applicable to any Broker-Dealer, all similar, equivalent or comparable foreign statutes, rules, regulations and other regulatory requirements, except, in each case, where the failure to so comply would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, (iii) all Broker-Dealers to deliver after the end of each fiscal quarter of each fiscal year of the Borrower or promptly after the date such information is filed with the SEC, a copy of each Broker-Dealer's Financial and Operational Combined Uniform Single Report filed with the SEC for such fiscal quarter and (iv) all Broker-Dealers to promptly deliver copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation by such agency regarding financial or other operational results of any Company, in each case which are reasonably likely to be determined adversely and which if determined adversely, would reasonably be expected to be materially adverse to any Company or Lender, and (b) (i) all of its Investment Adviser Companies to take all reasonable action to maintain all rights, privileges and investment adviser registrations necessary or desirable in the normal conduct of its business, except, in each case, to the extent that failure to do so would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, (ii) all of its Investment Adviser Companies to comply with all material rules and regulations of the SEC applicable to it and, to the extent applicable to any Investment Adviser Company, all similar, equivalent or comparable foreign statutes, rules, regulations, and other regulatory requirements, except, in each case, where the failure to so comply would not reasonably be expected to be materially adverse to the Companies, taken as a whole, or any Lender, and (iii) unless previously delivered, all of its Investment Adviser Companies to

-65-

promptly deliver copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation by such agency regarding financial or other operational results of any Investment Adviser Company, in each case which are reasonably likely to be determined adversely and which if determined adversely, would reasonably be expected to be materially adverse to any Company or Lender.

SECTION 5.13  Compliance with Contracts.  Perform and observe all material terms and provisions of each material contract to be performed or observed by it (except to the extent of breaches or violations thereof arising solely from the commencement of the Cases), maintain each such material contract to which it is a party in full force and effect, and enforce each such material contract in accordance with its material terms except where the failure to do so, either individually or in the aggregate, would not be reasonably expected to be materially adverse to the Companies, taken as a whole, or any Lender (after giving effect to any replacement or substitute agreements entered into in accordance with the terms of the Loan Documents).

SECTION 5.14  OFAC.  Comply in all respects with all applicable laws, rules, regulations, and orders of or administered by OFAC.

SECTION 5.15  First and Second Day Orders.  Cause all proposed "first day" orders and "second day" orders submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Administrative Agent and the Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are reasonably acceptable to the Required Lenders in their sole discretion.

SECTION 5.16  Certain Case Milestones.  Ensure the satisfaction of the following milestones relating to Cases in accordance with the applicable timing referred to below (or such later dates as approved by the Required Lenders), as well as certain other agreed milestones as may relate to the Cases (collectively, the "***Milestones***" and individually, a "***Milestone***"):

(a)      the Borrower shall file a motion seeking approval of the DIP Facility on the Petition Date, and the Interim DIP Order shall be entered by the Bankruptcy Court in the Cases no later than two (2) Business Days after the Petition Date;

(b)      on or prior to the Petition Date, the board of directors or other applicable governing body shall have authorized each Subsequent Filing Loan Parties to file a chapter 11 petition with the Bankruptcy Court;

(c)      each Debtor (other than the Subsequent Filing Loan Parties) in the Cases shall file the Disclosure Statement on or prior to February 5, 2016;

(d)      an order approving assumption of the Restructuring Support Agreement shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) days after the Petition Date;

(e)       the Final DIP Order shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(f)       each Subsequent Filing Loan Party shall file a Case on or before March 25, 2016 and shall file the Prepackaged Plan on or prior to such date;

(g)       each Subsequent Filing Loan Party shall, on the date such Subsequent Filing Loan Party files its Case, file a motion seeking to assume its Obligations under the Loan Documents (the "***DIP Assumption Motion***"), which motion shall be reasonably acceptable in form and substance to the Administrative Agent, the Lenders and the Borrower, and, to the extent relating to the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Lenders or the Pre-Petition Second Lien Agent, be subject to Pre-Petition Agent Approval;

(h)       an order approving the DIP Assumption Motion, which order shall be reasonably acceptable in form and substance to the Administrative Agent, the Lenders and the Borrower, and, to the extent relating to the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Lenders or the Pre-Petition Second Lien Agent, be subject to Pre-Petition Agent Approval, shall be entered in the applicable Case no later than two (2) Business Days after the date of filing of such DIP Assumption Motion;

(i)       each Subsequent Filing Loan Party shall, on the date such Subsequent Filing Loan Party files its Case, file a motion seeking to assume its obligations under the Restructuring Support Agreement (the "***RSA Assumption Motion***"), which motion shall be reasonably acceptable in form and substance to the Administrative Agent, the Lenders and the Borrower and, to the extent relating to the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Lenders or the Pre-Petition Second Lien Agent, be subject to Pre-Petition Agent Approval;

(j)       an order approving the RSA Assumption Motion, which order shall be reasonably acceptable in form and substance to the Administrative Agent, the Lenders and the Borrower, and to the extent relating to the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Lenders or the Pre-Petition Second Lien Agent, be subject to Pre-Petition Agent Approval, shall be entered in the applicable Case no later than thirty-five (35) Business Days after the date of filing of such motion;

(k)       each Subsequent Filing Loan Party shall complete solicitation of votes on the Prepackaged Plan on or before March 15, 2016, and shall have received votes from Pre-Petition First Lien Lenders and Pre-Petition Second Lien Lenders consistent  with section 1126 of the Bankruptcy Code (which shall include a sufficient number of votes to satisfy the claims voting acceptance threshold established by section 1126 of the Bankruptcy Code).

(l)       an order approving the Disclosure Statement shall be entered by the Bankruptcy Court in the cases no later than forty (40) days after the Petition Date;

(m)       the Confirmation Order and an order confirming the Prepackaged Plan shall be entered by the Bankruptcy Court in the Cases no later than May 1, 2016; and

(n)     the Effective Date shall occur no later than May 15, 2016.

SECTION 5.17  <u>Post-Closing Actions</u>.  No later than 30 days following the Closing Date (or such later time as agreed to in writing by the Administrative Agent in its sole discretion) each Loan Party shall deliver or cause to be delivered to the Administrative Agent an executed control agreement in accordance with Sections 4.03(f) and 4.03(g) of the Collateral Agreement with respect to each Deposit Account, Securities Account or Commodity Account (in each case, as defined in the Collateral Agreement) in existence on the Closing Date (other than any such accounts not required to be subject to Control (as defined in the Collateral Agreement) pursuant to the Collateral Agreement).

## ARTICLE VI

## <u>NEGATIVE COVENANTS</u>

The Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other Obligations (other than indemnification and other contingent obligations, in each case, not then due and owing) then payable under any Loan Document have been paid in full, the Borrower will not, and will not cause or permit any of its Subsidiaries to:

SECTION 6.01  <u>Indebtedness</u>.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness arising under the Loan Documents, the Pre-Petition First Lien Loan Documents or the Pre-Petition Second Lien Loan Documents;

(b)     Indebtedness outstanding on the Closing Date listed on Schedule 6.01;

(c)     Indebtedness (including Capital Lease Obligations, Synthetic Lease Obligations, and mortgage financings as purchase money obligations) and Disqualified Stock existing on the Petition Date, without any subsequent amendment or other modification thereto or extension thereof, and incurred by any Company to finance the purchase, lease, construction, installation, repair or improvement of property (real or personal), plant or equipment, whether through the purchase of assets or the Capital Stock of any Person owning such assets and Indebtedness arising from the conversion of the obligations of any Company under or pursuant to any "synthetic lease" transactions to on-balance sheet Indebtedness of such Company; *provided* that such Indebtedness was incurred prior to or within 270 days after such purchase, lease, construction, installation, repair or improvement of such property, plant or equipment;

(d)     Indebtedness incurred by any Company constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, performance or surety bonds, health, disability or other employee benefits (whether current or former) or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims, performance or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance;

(e)     Indebtedness arising from agreements of any Company providing for indemnification, adjustment of purchase price, earn-out or similar obligations, in each case, incurred or assumed in connection with a permitted disposition of any business or assets of such Company and the deferred purchase price of assets, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business or assets of a Company for the purpose of financing such acquisition;

(f)     Indebtedness of a Loan Party owing to a Company incurred prior to the Petition Date; *provided* that any such Indebtedness owing to a Non-Loan Party is unsecured and is subordinated in right of payment to the Obligations; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Company ceasing to be a Company or any other subsequent transfer of any such Indebtedness (except to a Company) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause;

(g)     to the extent permitted by Section 6.03, Indebtedness of a Non-Loan Party owing to a Company; *provided* that any subsequent transfer of any such Indebtedness (except to a Company) shall be deemed to be an incurrence of such Indebtedness not permitted by this clause;

(h)     Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) under Hedging Agreements in effect on the Petition Date, without any subsequent amendment or other modification thereto or extension thereof, for the purpose of limiting interest rate risk with respect to exchange rate risk or commodity pricing risk;

(i)     obligations in respect of self-insurance, performance, bid, appeal and surety bonds and completion guarantees and similar obligations provided by any Company or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business;

(j)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(k)     any Guarantee by any Company of Indebtedness or other obligations of any Company so long as in the case of a Guarantee by a Non-Loan Party, such Indebtedness could have been incurred directly by the Company providing such Guarantee;

(l)      (i) Indebtedness incurred in the ordinary course of business of the Companies with banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances and other cash management services, and (ii) Indebtedness in respect of netting services, overdraft protection, credit card programs, automatic clearinghouse arrangements and similar arrangements in each case incurred in the ordinary course of business and in connection with deposit accounts;

(m)      Indebtedness issued by any Company prior to the Petition Date, without any subsequent amendment or other modification thereto or extension thereof, to future, current or former officers, directors, managers, employees and consultants thereof or any direct or indirect parent thereof, their respective estates, heirs, family members, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower to the extent described in Section 6.05(a)(iii); and

(n)      other Indebtedness expressly provided for in the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance) or the DIP Orders.

Accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this covenant.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness, *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this covenant.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

SECTION 6.02  Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (real or personal, tangible or intangible), except:

(a)      Liens on property or assets of any Company existing on the date hereof and set forth on Schedule 6.02;  *provided* that (i) such Lien does not extend to any other property or asset of any Company other than (A) after acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted by Section 6.01 and (B) the proceeds and products thereof and (ii) such Lien shall secure only those obligations that it secures on the Closing Date and extensions, renewals and replacements thereof permitted hereunder;

(b)      any Lien created under the Loan Documents, the DIP Orders, the Pre-Petition First Lien Loan Documents or the Pre-Petition Second Lien Loan Documents;

(c)       Liens for Taxes not yet due or which are being contested in compliance with Section 5.03;

(d)       carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or for which adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(e)       pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations or in connection with performance bonds, surety bonds or statutory obligations incurred in the ordinary course of business and consistent with past practice;

(f)       Liens to secure the performance of bids, trade contracts (other than for Indebtedness), payment of premiums to insurance carriers, leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)       zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Companies;

(h)       Liens existing on the Petition Date solely in real property, improvements to real property or equipment (or, in the case of improvements, constructed) by any Company; *provided* that (i) such Liens secure Indebtedness permitted by Section 6.01(c), (ii) such Liens were incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition (or construction or improvement), (iii) the Indebtedness secured thereby does not exceed the cost of such real property, improvements or equipment at the time of such acquisition (or construction or improvement) and (iv) such Liens do not apply to any other property or assets of any Company;

(i)       judgment Liens securing judgments not constituting an Event of Default under Section 7.01;

(j)       Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(k)       Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor under any lease or license permitted by this Agreement;

(l)      Liens that are rights of setoff, bankers liens or similar non-consensual liens relating to deposit or securities accounts in favor of banks, other depositary institutions and securities intermediaries arising in the ordinary course of business;

(m)      Liens arising from precautionary UCC filing statements regarding operating leases or consignments;

(n)      (i) contractual or statutory Liens of landlords, to the extent relating to the property and assets relating to any lease agreements with such landlord (so long as the rent payable under any such lease agreement is not more than 30 days past due, unless being contested in good faith and for which reserves have been established in accordance with GAAP), (ii) contractual Liens of suppliers (including sellers of goods) or service providers to the extent limited to property or assets relating to such contract, (iii) contractual or statutory Liens of governmental or other customers to the extent limited to the property or assets relating to such contract, and (iv) Liens in favor of governmental bodies to secure advance or progress payments pursuant to any contract or statute, in each case, incurred or granted in the ordinary course of business;

(o)      licenses, existing on the Petition Date, of the Intellectual Property of any Company so long as such licenses do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of such Company, or (ii) materially impair the value of the Intellectual Property subject thereto;

(p)      Liens with respect to earnest money deposits made in connection with any Asset Sale, in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(q)      Liens on assets of Docupace Technologies, LLC (including Equity Interests owned by Docupace Technologies, LLC issued by other Non-Loan Parties); *provided* that (i) such Liens do not extend to, or encumber, assets that constitute Collateral or the Equity Interests of any Loan Party and (ii) such Liens extending to the assets of Docupace Technologies, LLC secure only Indebtedness incurred by Docupace Technologies, LLC pursuant to Section 6.01;

(r)      Liens on insurance policies and the proceeds thereof securing Indebtedness permitted pursuant to Section 6.01(d);

(s)      Liens on (i) cash deposits maintained for regulatory capital requirements or held on behalf of clients in the course of the ordinary course of business and (ii) receivables required to be directed for subsequent payment to clients in the ordinary course of business; and

(t)      other Liens on assets securing Indebtedness, and attaching to assets having a value, and attaching to assets with a value, not to exceed $1,000,000 at any one time outstanding.

SECTION 6.03  <u>Investments, Loans and Advances</u>.  Purchase, hold or acquire any Investment except:

(a)    Investments held by any Company in the form of Permitted Investments or that were Permitted Investments when made;

(b)    loans or advances to officers, directors, employees, consultants and independent contractors of any Company (i) for travel, entertainment, relocation and analogous ordinary business purposes and (ii) to the extent outstanding on the Petition Date, in connection with such Person's purchase of Equity Interests of the Borrower; *provided* that no cash or Permitted Investments are actually advanced pursuant to this clause (ii); *provided further* that the aggregate principal amount outstanding at any time under clause (i) above shall not exceed $[_____];

(c)    Investments by (i) any Company in the Borrower or any wholly-owned Subsidiary of the Borrower that is a Subsidiary Guarantor or a Broker-Dealer and (ii) any wholly-owned Subsidiary of the Borrower in Borrower or a wholly-owned Subsidiary of the Borrower that is a Subsidiary Guarantor or a Broker Dealer; *provided* that any such Investments by a Loan Party in a Non-Loan Party shall be made in the form of Indebtedness (other than Indebtedness described in subsection (l) of this Section 6.03), and such Non-Loan Party shall provide a note evidencing such Indebtedness to such Loan Party, which note shall be pledged to the Collateral Agent pursuant to the Security Documents, *provided* that, in each case, such Investments are either (x) outstanding on the Petition Date or (y) consistent with the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance) and permitted by the DIP Orders;

(d)    to the extent constituting Investments, transactions expressly permitted (other than by reference to Section 6.03) under Sections 6.01, 6.02, 6.04 (including the receipt of noncash consideration for the dispositions of assets permitted thereunder), 6.05 and 6.06;

(e)    Investments in Hedging Agreements permitted under Section 6.01;

(f)    promissory notes and other noncash consideration received in connection with dispositions permitted by Section 6.04(b);

(g)    Investments in the ordinary course of business consisting of (i) endorsements for collection or deposit and (ii) customary trade arrangements with customers;

(h)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(i)    the licensing, sublicensing or contribution of Intellectual Property pursuant to joint marketing arrangements with Persons other than the Companies in the ordinary course of business;

(j)        subject to, and in accordance with, the cash management orders entered in the Cases, advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(k)        Guarantees of any Company of leases entered into in the ordinary course of business;

(l)        to the extent otherwise consistent with the DIP Budget (including by reason of a Permitted Variance) and the DIP Orders, Investments consisting of contributions by any Company to the capital of any Broker-Dealer, or Investments in any Broker-Dealer consisting of subordinated Indebtedness that qualifies as having been issued pursuant to a satisfactory subordination agreement, as that term is used for purposes of Appendix D to Rule 15c3-1 under the Exchange Act, to the extent such Investments are required to permit the continued operation and liquidity of such Broker-Dealer, including as may be required by applicable law or regulation;

(m)        Investments by any Company in the Equity Interests of Persons that are affiliated with independent Financial Advisors of the Borrower or its Subsidiaries that are either outstanding on the Petition Date or expressly provided for in the DIP Budget;

(n)        subject to and in accordance with the orders entered in the Cases and the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance), Investments constituting loans to Financial Advisors affiliated with the Borrower (other than loans to Affiliates (that are not Companies) or their respective representatives) under the Retention and Communication Plan (i) in an aggregate amount for such loans not to exceed $44,000,000, plus (ii) Investments consisting of agreements to forgive existing retention loans outstanding on the Petition Date, in an aggregate amount not to exceed $10,000,000 for all such loans forgiven (the loans contemplated by the foregoing clause (i) are referred to herein as "***Advisor Retention Loans***");

(o)        Investments in the form of ordinary course loans to Financial Advisors affiliated with the Borrower (other than loans to Affiliates (that are not Companies) or their respective representatives) consistent with past practice so long as such Investments are either outstanding on the Petition Date or expressly provided for in the DIP Budget;

(p)        Investments in the ordinary course of business consistent with practice in one or more mutual funds designated by a Financial Advisor who is affiliated with the Borrower, to the extent that such Investments comprise part of such Financial Advisor's deferred compensation plan; and

(q)        Investments in existence on the Closing Date and described on Schedule 6.03.

SECTION 6.04   Mergers, Consolidations, Sales of Assets and Acquisitions.

(a)    Merge, consolidate or amalgamate with or into any other Person, or permit any other Person to merge, consolidate or amalgamate with or into it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all its assets (whether now owned or hereafter acquired), or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or line of business, unit or division of such Person, except that (A) any Subsidiary of the Borrower or any other Person may be merged, consolidated or amalgamated with or into the Borrower; *provided* that the Borrower shall be the continuing or surviving Person and the security interest granted by the Borrower pursuant to the DIP Orders and the Security Documents shall remain in full force and effect, (B) any Company (other than the Borrower) may merge, consolidate or amalgamate with or into any other Company or any other Person (or dispose of all or substantially all of its business units, assets and other properties) in a transaction in which the surviving entity is or becomes a Subsidiary of a Company (and in the case of any merger, consolidation, amalgamation or disposition involving one or more Subsidiary Guarantors, a Subsidiary Guarantor shall be the continuing or surviving entity and the security interest granted by the such Loan Party pursuant to the DIP Orders and/or the Security Documents (as the case may be) shall remain in full force and effect or the Person formed by or surviving any such merger, consolidation, amalgamation, or disposition (if other than a Subsidiary Guarantor) shall execute a supplement to the Guarantee and any applicable Security Documents), (C) any Non-Core Company may sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets in a transaction permitted by clause (b)(i) or clause (b)(ii) below, (D) Advisor Direct, Inc. may liquidate or dissolve and (E) any Company (other than the Borrower) may sell, transfer, lease or otherwise dispose of all or substantially all of its assets to the Borrower or any Subsidiary (*provided* that, if such transferring Company is a Subsidiary Guarantor, the transferee in such transaction shall be the Borrower or another Subsidiary Guarantor).

(b)    Make any Asset Sale (other than those Asset Sales permitted under paragraph (a) above), except for:

(i)    sales, transfers or other dispositions of other assets for fair market value by any Company; *provided* that (A) with respect to any disposition (other than a disposition of assets of a Non-Core Company) pursuant to this Section 6.04(b)(i), such Company shall receive 100% of such consideration in the form of cash and (B) the Net Cash Proceeds thereof shall be promptly applied to the prepayment of the Loans as required by Section 2.13(b);

(ii)    any Company may dispose of property or assets to Borrower or any wholly owned Subsidiary of Borrower, and any wholly owned Subsidiary of Borrower may dispose of property or assets to a wholly owned subsidiary of Borrower; *provided* that (A) if the transferor of such property is a Subsidiary Guarantor or the Borrower, the transferee thereof must either be the Borrower or a Subsidiary Guarantor, and (B) to the extent such transaction constitutes an Investment, such transaction is made in compliance with Section 6.03(c);

(iii)    the Companies may sell, transfer and otherwise dispose of Investments in joint ventures to the extent required by, or made pursuant to customary

buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

   (iv) the Companies may effect any transaction permitted (other than by reference to Section 6.04) by Section 6.03, 6.04(a), 6.05 or 6.06;

   (v) the Companies may sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

   (vi) the unwinding of any Hedging Agreement; and

   (vii) subject to and in accordance with the applicable orders entered in the Cases, Asset Sales of any asset between or among one or more Companies as a substantially concurrent interim disposition in connection with a disposition otherwise permitted pursuant to clauses (i) through (vi) above.

Notwithstanding the foregoing, the Borrower shall not, and shall not permit any of its Subsidiaries to, sell, transfer or otherwise dispose of any Cetera Entity or any of their respective Subsidiaries (or all or substantially all of the assets of any Cetera Entity or any of their respective Subsidiaries).

SECTION 6.05  Restricted Payments; Restrictive Agreements.

   (a) Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so; *provided*, *however*, that:

   (i) any Company may declare and make Restricted Payments to the Borrower;

   (ii) to the extent constituting Restricted Payments, any Company may take actions expressly permitted by Section 6.03 (other than Section 6.03(d)); and

   (iii) the Borrower may make Restricted Payments in an amount equal to withholding or similar taxes payable or expected to be payable by any present or former employee, director, officer, manager, consultant or independent contractor (or their respective Affiliates, estates or immediate family members); *provided* that the aggregate amount of Restricted Payments (other than deemed repurchases made for no value) pursuant to this Section 6.05(a)(iii) shall not exceed $500,000.

   (b) Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any Company to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Company (other than the Borrower) to pay dividends or other distributions with respect to any of its Equity Interests or the ability of any Company to make or repay loans or advances to any Company or to Guarantee Indebtedness of any Company; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, any Pre-

Petition First Lien Loan Document or Pre-Petition Second Lien Loan Document, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Company pending such sale, *provided* such restrictions and conditions apply only to the Company that is to be sold and such sale is permitted hereunder, (C) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (D) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof, (E) the foregoing shall not apply to customary restrictions on cash or other deposits or net worth required by customers under contracts entered into in the ordinary course of business and joint venture agreements or other similar arrangements if such provisions apply only to the Person (and the equity interests in such Person) that is the subject thereof, (F) the foregoing shall not apply to provisions in agreements or instruments that prohibit the payment of dividends or the making of other distributions with respect to Equity Interests of a Person other than on a pro rata basis and (G) the foregoing shall not apply to customary restrictions and conditions contained in any agreement relating to any Asset Sale (or other disposition of assets) permitted under this Agreement pending the consummation of such Asset Sale (or other disposition of assets).

SECTION 6.06  Other Indebtedness and Agreements.

(a)    Permit any (i) waiver, supplement, modification, amendment, termination or release of any Indebtedness, that would be adverse in any material respect to the Lenders or other Secured Parties (and, in the case of Indebtedness under the Pre-Petition First Lien Loan Documents or the Pre-Petition Second Lien Loan Documents, any waiver, supplement, modification, amendment or termination that is prohibited by the Intercreditor Agreement) or (ii) waiver, supplement, modification or amendment of (x) its certificate of incorporation, certificate of formation, by-laws, operating, management or partnership agreement or other organizational documents or (y) any management agreement, in each case to the extent any such waiver, supplement, modification or amendment would be materially adverse to the Lenders (it being understood and agreed that any material increase in the fees payable under any management agreement shall be deemed to be materially adverse to the Lenders).

(b)    Make any distribution, whether in cash, property, securities or a combination thereof, in respect of, or pay, or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness other than (i) Indebtedness under the Loan Documents and, (ii) payments permitted by the DIP Orders in respect of Indebtedness (including Adequate Protection Payments).

SECTION 6.07  [Reserved].

SECTION 6.08  Compliance with the DIP Budget.  Permit any Variance to exist other than (except in the case of expenditures or contributions for employee or financial advisor retention in respect of Broker-Dealers or Investment Advisor Companies or Investments in Broker-Dealers) a Permitted Variance.

SECTION 6.09  <u>Transactions with Affiliates</u>.  Enter into any transactions with any of their respective Affiliates on terms that are not substantially as favorable to such Company as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate, as determined by the board of directors of Borrower in good faith, *provided* that the foregoing restrictions shall not apply to:

(a)  transactions permitted by Section 6.05;

(b)  the Transactions;

(c)  employment, indemnification and severance arrangements between the Companies and their respective officers, directors, managers, employees or consultants (including management and employee benefit plans or agreements, stock option plans and other compensatory arrangements) in the ordinary course of business and payments pursuant thereto;

(d)  payments by the Companies pursuant to an intercompany expense sharing agreement among such Companies; *provided* that such payments are permitted by the DIP Budget (including by reason of a Permitted Variance) and the DIP Orders;

(e)  transactions or payments pursuant to any agreement or arrangement as in effect as of, or otherwise contemplated on, the Closing Date and as set forth on Schedule 6.09, or any amendment thereto (so long as any such amendment is not materially adverse to the Lenders when taken as a whole as compared to the applicable agreement as in effect on the Closing Date) or similar agreements entered into thereafter;

(f)  to the extent permitted by the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance) and the DIP Order, reasonable and customary payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to employees, officers, directors, managers or consultants of the Companies and employment agreement, stock option plans and other similar arrangements with such employees, officers, directors, manager or consultants; and

(g)  transactions undertaken pursuant to membership in a purchasing consortium existing on the Petition Date and of which such Company is a member on the Petition Date;

SECTION 6.10  <u>Fiscal Year</u>.  Make any change to the fiscal year of the Borrower.

SECTION 6.11  <u>Lines of Business</u>.  Engage in any material line of business substantially different from those lines of business conducted by the Companies on the Closing Date or any business substantially related or incidental thereto.

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01  <u>Events of Default</u>.  In case of the happening of any of the following events ("***Events of Default***"):

(a)      any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished on or after the Closing Date in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)      default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)      default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in clause (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d)      default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.01 (with respect to the existence of the Borrower only), 5.05(a), 5.08, 5.10, 5.11, 5.12, 5.15, 5.16 or Article VI;

(e)      default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (b), (c) or (d) above) to which it is a party and such default shall continue unremedied for a period of 30 days after the earlier of (i) the date that any Responsible Officer of any Loan Party obtains (or reasonably should have obtained) knowledge of such default and (ii) the date that any Loan Party receives written notice of such default from the Required Lenders or the Administrative Agent (any such notice to be identified as a "notice of default" and to refer specifically to the applicable provision of this Agreement or the applicable Loan Document to which the default relates);

(f)      (i) any Company shall default in the payment of any principal or interest due in respect of any Material Indebtedness, in each case beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created, or (ii) any other event or condition occurs, in either case that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; *provided* that this clause (ii) shall not apply to (x) with respect to Indebtedness consisting of any Hedging Agreements, termination events or equivalent events pursuant to the terms of such Hedging Agreements, and (y) secured Indebtedness that becomes

due solely as a result of the sale, transfer or other disposition of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that (A) any such failure to pay any principal or interest by any Debtor or any such event relating to any Material Indebtedness incurred prior to the Petition Date and owed by any Debtor, in each case caused by the Cases; and (B) any of the matters set forth on Schedule 7.01, in the case of each of clauses (A) and (B), shall not constitute an Event of Default under this subsection (f);

(g)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction or commenced before any other Governmental Authority seeking (i) relief in respect of any Company that is not a Debtor (any such Subsidiary, an "***Applicable Subsidiary***"), or of a substantial part of the property or assets of any Applicable Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, administration, insolvency, receivership, examinership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, examiner or similar official for any Applicable Subsidiary or for a substantial part of the property or assets of any Applicable Subsidiary or (iii) the winding-up or liquidation of any Applicable Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)     any Applicable Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, administration, insolvency, receivership, examinership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, examiner or similar official for an Applicable Subsidiary or for a substantial part of the property or assets of an Applicable Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing; *provided* any such event with respect to a Subsequent Filing Loan Party in accordance with Section 5.16 and the Restructuring Support Agreement shall not constitute an Event of Default;

(i)     one or more judgments shall be rendered against any Company or any combination thereof (x) for the payment of money in an aggregate amount in excess of $5,000,000 (to the extent not paid or fully covered by insurance provided by a carrier not disputing coverage) or (y) that could reasonably be expected to be materially adverse to any Company or any Lender, and, in each case, the same shall remain undischarged for a period of 15 consecutive days during which such judgments shall not be effectively satisfied, vacated, discharged, stayed (including by virtue of the automatic stay) or bonded pending appeal;

(j)     an ERISA Event shall have occurred that, when taken together with any other ERISA Event, could reasonably be expected to be materially adverse to any Company or any Lender;

(k)     any Loan Document shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantee Agreement, as a result of the discharge of a Subsidiary Guarantor in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans;

(l)     any Security Document shall cease to be in full force or effect or ceases to create a valid and perfected first priority Lien in favor of the Collateral Agent on the Collateral covered thereby (other than as expressly permitted hereunder or thereunder), or any grantor, pledgor or mortgagor thereunder or any Loan Party shall deny or disaffirm in writing, or otherwise attempt to invalidate or impair, any grantor's, pledgor's or mortgagor's obligations under such Security Document or the enforceability or validity of such Security Document or the validity or perfection of any Lien thereof;

(m)     the Indebtedness under any Subordinated Indebtedness or the Lien of any Pre-Petition First Lien Loan Document or Pre-Petition Second Lien Loan Document, shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert), for any reason, to be validly subordinated to the Obligations or the Liens of the Security Documents as provided in the Subordinated Loan Documents, the applicable subordination or intercreditor agreement or the DIP Order;

(n)     there shall have occurred a Change of Control;

(o)     any Material Broker-Dealer (i) shall be suspended or expelled from membership or participation in any clearing organization; (ii) shall experience the termination or material interruption of any clearing contract between such Broker-Dealer and any clearing broker; or (iii) shall fail to maintain all material registrations and licenses necessary for its operations;

(p)     the commencement of a liquidation under the Securities Investor Protection Act or chapter 7 of the Bankruptcy Code in respect of any Broker-Dealer;

(q)     an Affiliate of a Company shall become a Lender under the Credit Agreement, a Pre-Petition First Lien Lender or a Pre-Petition Second Lien Lender; or

(r)     the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code;

(s)     the entry of an order appointing a chapter 11 trustee in any of the Cases;

(t)     the entry of an order in any of the Cases appointing an examiner having expanded powers relating to the operation of the business of any Loan Party (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(u)     the entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties;

(v)       the filing of any pleading by any Loan Party seeking, or otherwise consenting to, any of the matters set forth in clauses (r) through (u) above;

(w)       (A) an amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of, the Approved Reorganization Plan, in each case, that is materially adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the Loan Documents, (B) the Loan Parties shall have filed, commenced or participated in furtherance of any solicitation in respect of a proposed Reorganization Plan other than in accordance with the Restructuring Support Agreement, (C) the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a Reorganization Plan and solicit acceptances thereof, (D) the Bankruptcy Court shall grant relief that is inconsistent with the Approved Reorganization Plan or the Restructuring Support Agreement in any material respect and that is materially adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the Loan Documents or (E) any of the Loan Parties or any of their Affiliates shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the Restructuring Support Agreement and such motion or pleading has not been withdrawn prior to the earlier of (x) three Business Days of the Borrower receiving notice from the Administrative Agent and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(x)       the failure of any Loan Party to comply in any material respect with the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order;

(y)       the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Required Lenders;

(z)       the entry of an order in the Cases charging any of the Collateral under section 105 or 506(c) of the Bankruptcy Code against the Lenders under which any Person takes action against the Collateral or that becomes a final non-appealable order or the commencement of other actions that is materially adverse to the Administrative Agent, the Lenders or their respective rights and remedies under the DIP Facility in any of the Cases or inconsistent with the Loan Documents;

(aa)      any Asset Sale or other disposition of all or a material portion of the Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted by Section 6.04(b));

(bb)      the entry by the Bankruptcy Court of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow (A) a third party to proceed with foreclosure (or granting a deed in lieu of foreclosure) against any material portion of the Collateral or (B) any other actions that would reasonably be expected to be materially adverse to the Debtors or their estates (taken as a whole);

(cc)    the existence of any claims or charges, other than permitted under the Loan Documents, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code pari passu or senior to the DIP Facility, or there shall arise (A) any claim having priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code (other than the Carve-Out) or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, in each case except as expressly provided herein or in the Interim DIP Order or the Final DIP Order (but only in the event specifically consented to by the Administrative Agent), whichever is then in effect;

(dd)    except as permitted by the DIP Orders and/or this Agreement or as otherwise agreed to by the Administrative Agent and the Required Lenders, any Debtor shall make any material Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" orders of the Bankruptcy Court reasonably satisfactory to the Administrative Agent and the Required Lenders or by other orders entered by the Bankruptcy Court;

(ee)    the Loan Parties or any of their Subsidiaries, or any Person claiming by or through the Loan Parties any of their Subsidiaries, except for the Creditors' Committee, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders relating to the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders; or

(ff)    the Restructuring Support Agreement (A) shall be terminated or breached by any party thereto or shall otherwise cease to be in full force and effect, or (B) shall have been amended, supplemented or otherwise modified in any manner that materially adversely affects the interests, rights or remedies of any of the Administrative Agent and the Lenders;

then:

(a)    in every such event (other than an event described in paragraph (g), (h), (p) or (r) above), and at any time thereafter during the continuance of such event, subject to the DIP Orders, the Administrative Agent may (with the consent of the Required Lenders), and shall (at the request of the Required Lenders), by notice to the Borrower, take any or all of the following actions, at the same or different times, (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event described in paragraph (g), (h), (p) or (r) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind,

-83-

all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(b)     at any time during the continuance of such event, after the Administrative Agent or the Required Lenders have given at least five (5) Business Days' prior written notice (the "***Notice Period***") to the Loan Parties (during which period the Event of Default is not cured) as set forth below, the Required Lenders may direct the Administrative Agent to seek relief from the automatic stay to foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations or otherwise exercise remedies against the Collateral as permitted by Applicable Laws.  During the Notice Period, the Loan Parties may continue to use the proceeds of the DIP Facility and/or cash collateral in accordance with the DIP Budget (including, subject to Section 6.08, by reason of a Permitted Variance) and the terms of this Agreement.  In addition to the other remedies set forth in this Section 7.01, the Administrative Agent, at the direction of the Required Lenders, shall have the authority to credit bid all or a portion of the Obligations, whether pursuant to a sale under section 363 of the Bankruptcy Code, a plan pursuant to section 1129(b) of the Bankruptcy Code or otherwise.

SECTION 7.02   Application of Proceeds.  The Administrative Agent and the Collateral Agent shall apply (a) the proceeds of any collection, sale, foreclosure or other realization upon any Collateral, including any Collateral consisting of cash, and (b) any amounts received in respect of the Obligations following the termination of the Commitments and any of the Loans becoming due and payable pursuant to Section 7.01, in each case as follows (subject to the Intercreditor Agreement):

FIRST, to the payment of all costs and expenses incurred by the Administrative Agent or the Collateral Agent (in their respective capacities as such hereunder or under any other Loan Document) in connection with any collection, sale, foreclosure or realization or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent and/or the Collateral Agent hereunder or under any other Loan Document on behalf of any Loan Party, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, any amounts for which the Administrative Agent and/or the Collateral Agent is entitled to indemnification, fees, or reimbursement of costs or expenses under the terms of any Loan Document, and any other Obligations owed to the Administrative Agent  and/or the Collateral Agent, in their respective capacities as such hereunder or under any other Loan Document;

SECOND, to the payment in full of all Obligations consisting of interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Loans owed to them on the date of any such distribution);

THIRD, to the payment in full of all Obligations (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) consisting of unpaid principal amount of the Loans and any premium thereon or breakage or termination fees, costs or expenses related thereto (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

FOURTH, to the payment in full of all other Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution); and

FIFTH, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Administrative Agent and the Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys, balances or amounts in accordance with this Agreement and the other Loan Documents.  Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT; ETC.

Each Lender hereby irrevocably appoints Barclays Bank, PLC as its Administrative Agent and each Secured Party hereby irrevocably appoints Barclays Bank, PLC as its Collateral Agent (the Administrative Agent and the Collateral Agent are referred to collectively as the "*Agents*"), and Barclays Bank, PLC hereby accepts such appointments.  Each Lender and each other Secured Party hereby authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents and the Intercreditor Agreement, together with such actions and powers as are reasonably incidental thereto, including to negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement, the Security Documents and the Intercreditor Agreement, (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender and (iii) in the event of a foreclosure by the Agents on any of the Collateral pursuant to a public or private sale or a sale of any of the Collateral pursuant to

Section 363 of the Bankruptcy Code, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, with the consent or at the direction of the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale.  It is understood and agreed that the use of the term "Agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions other than pursuant to the sixth paragraph of this Section (and then to the extent set forth therein).

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Company or any Affiliate thereof as if it were not an Agent hereunder and without any duty to account therefor to the Lenders.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08); *provided* that neither Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to any Company that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity.  Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).  Neither

Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  No Agent shall be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall either Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the DIP Facility as well as activities as Agent.  Neither Agent shall be responsible for the negligence or misconduct of any sub-agents, or any Related Parties of any sub-agents, except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the elapsing of the 30-day period for the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with, so long as no Default or Event of Default shall have occurred and be continuing, the approval of the Borrower (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by the Borrower if the Borrower

has not responded within five Business Days of a request for such approval), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, with, so long as no Default or Event of Default shall have occurred and be continuing, the approval of the Borrower (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by the Borrower if the Borrower has not responded within five Business Days of a request for such approval), on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  If no successor Agent has been appointed by the 30th day after the date the retiring Agent may appoint a successor Agent pursuant to the immediately preceding sentence, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint, with, so long as no Default or Event of Default shall have occurred and be continuing, the approval of the Borrower (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by the Borrower if the Borrower has not responded within five Business Days of a request for such approval), a successor Administrative Agent and/or Collateral Agent, as the case may be.  From the date of effectiveness of any such resignation (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

The Collateral Agent, the successor Agent, the Lenders and the Loan Parties shall execute all documents and take all other actions necessary or in the opinion of successor Agent reasonably desirable in connection with the substitution by successor Agent of Collateral Agent as holder of the security under the Loan Documents, all in accordance with applicable law.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relating to the Loan Documents relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:  (a) to file and

prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.05 and 9.05) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.  Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.05 and 9.05.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of the Collateral Agent or any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of the Collateral Agent or any Lender or to authorize the Administrative Agent to vote in respect of the claim of the Collateral Agent or any Lender in any such proceeding.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

The Borrower, on behalf of itself and each of its Subsidiaries, waives and releases, to the fullest extent permitted by law, any claims that it may have against any Agent or Lender with respect to any breach or alleged breach of agency or fiduciary duty.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an

amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.08 of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Indemnified Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Each Lender and each Loan Party hereby acknowledges and agrees that, notwithstanding anything to the contrary herein, Barclays Bank PLC shall, in its role as fronting lender under the Commitment Documents, benefit from all of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of this Article VIII and Section 9.05 of this Agreement.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01  Notices; Electronic Communications.  Notices and other communications (other than with respect to ordinary course notices delivered pursuant to Article II) provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or e-mail, as follows:

(a)    if to any Company, to it at 405 Park Avenue, New York, NY 10022, Attn:  Mason Allen (Telephone No.:  866-904-2988; email:  mallen@rcscapital.com); with a copy to Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036, Attn:  Michael Sage, Esq. (Telephone No.:  212-698-3500; Fax No.:  212-698-3599; Email:  michael.sage@dechert.com) and Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, PA 19104, Attn:  Sarah Gelb, Esq. (Telephone No.:  215-994-4000; Fax No.:  215-994-2222; Email:  sarah.gelb@dechert.com);

(b)    if to the Administrative Agent, as set forth on Schedule 9.01; and

(c)    if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if such day is a Business Day, otherwise on the first Business Day after receipt) if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.  As agreed to among the Companies, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the email address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or

relates to a Borrowing Request or a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause the Companies, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders (or potential lenders) materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower, its affiliates or their respective securities that is not of a type that is public information of the Borrower or would be public if such affiliate had publicly-traded or Rule 144A securities) (each, a "**Public Lender**").  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws (*provided, however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.17); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC," unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information:  (1) the Loan Documents and (2) notification of changes in the terms of the DIP Facility.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS

RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Loan Parties, the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect until the Commitments and all Lenders of Credit (other than those that have been collateralized on terms reasonably satisfactory to the Administrative Agent) have been terminated and the principal of or any accrued interest on any Loan, any Fee or all other Obligations payable under any Loan Documents is outstanding (other than indemnification and other contingent obligations, in each case, not then due and owing).  The provisions of Sections 2.12, 2.13, 2.17, 9.05, 9.17 (for a period of one year after the termination of this Agreement) and 9.20 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and

when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04  Successors and Assigns.

(a)  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)  Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); *provided, however*, that (i) the amount of the Commitment or Loans of the assigning Lender (other than Affiliates or Related Funds of such Lenders) subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans), unless otherwise agreed by the Administrative Agent; *provided* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire (in the form supplied by the Administrative Agent and in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal and state securities laws) and all applicable tax forms required pursuant to Section 2.17(e).  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.17 and 9.05, as well as to any Fees and DIP Discount accrued for its account and not yet paid).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance; (ii) except as set forth in clause (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of any Company or the performance or observance by any Loan Party of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose as non-fiduciary agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender.

(e)    Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, administrative questionnaire (in the form supplied by the Administrative Agent) completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in

paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower, to such assignment and any applicable tax forms required pursuant to Section 2.17(e), the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)    Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided, however*, that (i) such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.12, 2.13 and 2.17 to the same extent as if they were Lenders (subject to the limitations and requirements of such Sections and Section 2.18 and it being understood that the documentation required under Section 2.17(e) shall be delivered solely to the participating Lender) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement, the other Loan Documents (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Commitments in which such participating bank or Person has an interest or releasing all or substantially all of the Collateral).  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal and interest amounts of each participant's interest in the Loans or other obligations under this Agreement (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and the Borrower and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided such participating bank or other Person agrees to be subject to Section 2.15 or 2.18(b) as though it were a Lender.  A participant shall not be entitled to receive any greater payment under Section 2.12, 2.13 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to the

participant, except to the extent that a participant's right to a greater payment results from a Change in Law after the participant becomes a participant.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.17.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section shall not apply to such pledge or assignment of a security interest; *provided* that no such assignment or pledge shall release a Lender from any of its obligations hereunder or substitute any such assignee or pledgee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPV***"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that neither the grant to any SPV nor the exercise by any SPV of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Sections 2.12, 2.13 and 2.17) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPV occurred.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV

to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)    The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(k)    Notwithstanding any other provision of any Loan Document, no Lender may assign any Loan or any interest therein to the Borrower or any of its Affiliates.

SECTION 9.05    Expenses; Indemnity.

(a)    The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders in connection with the syndication of the DIP Facility and the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) and the transactions contemplated thereby or incurred by the Administrative Agent, the Collateral Agent, or the Lenders in connection with the enforcement or protection of its rights under this Agreement and the other Loan Documents or in connection with the Loans made, including (i) all reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the DIP Facility, the preparation, negotiation, execution, delivery and administration of the Loan Documents and the development, preparation and execution of, and any waiver, amendment, supplement or modification to, this Agreement and the other Loan Documents (whether or not any such amendment, waiver, supplement or modification becomes effective) and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented fees, disbursements and other charges of (A) Shearman & Sterling LLP, as counsel to the Administrative Agent, (B) Jones Day and Davis Polk & Wardwell LLP, each as counsel to certain of the Lenders, and local and specialty counsel engaged by the Lenders or the Administrative Agent and of financial advisors to the Lenders engaged prior to the Petition Date (or any replacement thereof) and (ii) in connection with the enforcement or protection of the rights of any Lender, the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings the reasonable and documented fees, charges and disbursements of one New York counsel (and counsel in each other relevant local jurisdiction) for the Administrative Agent and Collateral Agent and one other New York counsel (and counsel in each other relevant local jurisdiction) to all such Lenders, taken as a whole and, in the case of the Lenders, additional counsel in the event of a conflict of interest to all affected parties.

(b)    The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender, and each Related Party of any of the foregoing Persons (including, in the case of the Administrative Agent and the Lenders, (i) Shearman & Sterling LLP and (ii) Jones Day and Davis Polk & Wardwell LLP, respectively (each such Person being

called an "**_Indemnitee_**") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented counsel fees, charges and disbursements (including reasonable, documented and invoiced out-of-pocket legal expenses of counsel (including local and specialty counsel)) incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of any claim, litigation, investigation or proceeding relating to (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including the syndication of the DIP Facility) or (ii) the use of the proceeds of the Loans, whether or not any Indemnitee is a party thereto and, upon demand, to pay and reimburse each Indemnified Person for any reasonable and documented out-of-pocket legal expenses of counsel to the Indemnitees (including local and specialty counsel), or other legal or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit proceeding (including any inquiry or investigation) or claim (including without limitation in connection with the enforcement of the indemnification obligations set forth herein) (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates); _provided_ that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee or relate to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.  Notwithstanding any other provision of this Agreement, no Indemnitee will be responsible or liable to you or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent the same resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any Related Indemnified Person of such Indemnitee (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Collateral Agent or any other Secured Party under paragraphs (a) or (b) of this Section 9.05, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; _provided_ that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Loans and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender may, with the consent of the Required Lenders and the Administrative Agent (*provided* that no such consent shall be required if an Event of Default shall have occurred and be continuing pursuant to Section 7.01(g) or (h)), at any time and from time to time, except to the extent prohibited by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and payable, now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.19 (to the extent applicable) and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The applicable Lender shall endeavor to notify the Borrower and the Administrative Agent of such setoff; *provided* that the failure to provide such notice shall not affect the validity of such setoff or application under this Section 9.06.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.07  Applicable Law.  THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS OR TO THE EXTENT THE COLLATERAL AGENT REQUIRES SUBMISSION TO ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY SECURITY DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 9.08  Waivers; Amendment.

(a)    No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other

or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)    Subject to the Intercreditor Agreement, neither the Loan Documents nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) and acknowledged by the Administrative Agent (it being understood that, notwithstanding the foregoing, amendments, modifications and waivers to the Intercreditor Agreement shall only require the consent of Borrower or any other Loan Party to the extent set forth therein); *provided*, *however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or extend any scheduled principal payment (but not prepayment) date or date for the payment of any interest on or any fees payable with respect to any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on or reduce any fees payable with respect to any Loan, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the Superpriority Claim status of the Lenders under the DIP Orders or under any other Loan Documents without the consent of each Lender, (iv) amend or modify the provisions of Section 9.04(j) or the provisions of this Section 9.08 or release one or more Subsidiary Guarantors (other than in connection with the sale of such Subsidiary Guarantor in a transaction permitted by Section 6.04 or as otherwise expressly provided in this Agreement or any Security Document or the Intercreditor Agreement) that represent all or substantially all of the value of the guarantees of the Obligations pursuant to the Loan Documents or all or substantially all of the Collateral, without the prior written consent of each Lender, (v) impose any additional restriction on any Lender's ability to assign any of its rights or obligations without the written consent of such Lender, (vi) [reserved], (vii) modify the protections afforded to an SPV pursuant to the provisions of Section 9.04(i) without the written consent of such SPV, or (viii) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Commitments on the date hereof); *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable*; provided further* that no amendment or modification to Section 7.02 that directly and adversely affects the relative priorities of any Secured Party (other than a Lender or Agent, in each case in such capacity, subject to the other provisions of this Section 9.08) to receive applications of proceeds in respect of the Obligations will have any effect as to such Secured Party without the consent of such Secured Party.

-101-

(c)     Notwithstanding anything in clause (b) or otherwise herein to the contrary, (i) any amendment or modification that would extend the final maturity date of the Loans of any Lender, in each case, with such Lender's prior written consent, or increase the rate of interest and fees payable on the Loans of such Lender, shall not require the prior written consent of each Lender, so long as such extension is offered to all Lenders holding such Loans on a pro rata basis based on the aggregate principal amount of such Loans then outstanding, (ii) the payment in full of any Loans on the applicable final maturity date of such Loans and the payment of interest and fees made on account of the Commitments and/or Loans of any Lender as required under this Agreement after giving effect to an amendment or other modification described in the preceding clause (i), shall not be deemed to violate Section 2.14 or be an event that would require the purchase of participations pursuant to Section 2.15; *provided* that, except as expressly set forth in the preceding clause (i), no such amendment or modification shall alter the pro rata requirements of Section 2.14, (iii) if the Borrower shall request (A) the release of any Collateral to be sold to a Person that is not a Loan Party as part of any Asset Sale or other disposition permitted under Section 6.04 and shall deliver to the Collateral Agent a certificate to the effect that such Asset Sale or other disposition and the disposition of the proceeds thereof will comply with the terms of this Agreement or (B) the subordination of the Lien of the Collateral Agent, for the benefit of the Secured Parties, on any item of Collateral to any Lien permitted by Section 6.02(h) and shall deliver to the Collateral Agent a certificate to the effect that the incurrence of such other Lien on the Collateral will comply with the terms of this Agreement, then the Collateral Agent shall and is hereby authorized to, without the consent of any Lender, execute and deliver all such instruments as may be required to effect the release of such Collateral (in the case of an Asset Sale or other disposition described in clause (A)) or the subordination of the Lien of the Collateral Agent, for the benefit of the Secured Parties, in such Collateral (in the case of such other Lien as described in clause (B)), and (iv) the Collateral Agent, the Borrower and the applicable Subsidiary Guarantors may amend, supplement or otherwise modify any Security Document so long as such amendment, supplement or other modification is not materially adverse to any Secured Party and such amendment shall become effective without any further consent of any other party to such Security Document.  For the avoidance of doubt, any amendment or modification of the type described in the preceding clause (i) extending the final maturity date of the Loans of any Lender will require the prior written consent of such Lender (but not the Required Lenders).

(d)     The Administrative Agent and the Borrower may amend any Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document) to (i) correct any errors, mistakes, omissions, defects or inconsistencies (including, but not limited to, an incorrect cross-reference), or to effect administrative changes (including with respect to parallel debt provisions) that are not adverse to any Lender and (ii) provide for the appointment of one or more syndication agents and/or documentation agents. Notwithstanding anything to the contrary contained herein, any such amendment shall become effective without any further consent of any other party to such Loan Document other than the Administrative Agent and the Borrower.

(e)     Without the consent of any other person, the applicable Loan Party or Loan Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the

granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(f)    Notwithstanding anything to the contrary contained in this Section 9.08, the Guarantee Agreement and any Security Document and related documents executed by any Company in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent or the Collateral Agent, as applicable, at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such documents to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein).

SECTION 9.09  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10  Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(i)    the effects of any Bail-in Action on any such liability, including, if applicable:

(ii)    a reduction in full or in part or cancellation of any such liability;

(iii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(b)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

SECTION 9.11    Entire Agreement.  This Agreement and the other Loan Documents, together with the DIP Orders, constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement, the other Loan Documents and the DIP Orders.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.  In the event of any conflict between this Agreement or any other Loan Document and the DIP Orders, the DIP Orders shall control.

SECTION 9.12    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.13    Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.14    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall

constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.  Delivery of an executed signature page to this Agreement by facsimile or other customary means of electronic transmission, including by PDF file, shall be as effective as delivery of an original signed counterpart of this Agreement.

SECTION 9.15  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.16  <u>Jurisdiction; Consent to Service of Process</u>.

(a)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, any New York State court or federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents (other than under any Security Document governed by a law other than the laws of the State of New York or with respect to any Collateral subject thereto), or for recognition or enforcement of any judgment, and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)      The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court sitting in the Borough of Manhattan, and any appellate court from any thereof.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)      Nothing set forth in this Section 9.15 shall limit the rights of any Agent or Lender to bring any action arising out of the Loan Documents in any other jurisdiction.

SECTION 9.17  <u>Confidentiality</u>.  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel, other advisors and administration, settlement and other similar service providers in connection with the administration and management of this Agreement and the other Loan Documents (including to

the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans) and to other Persons authorized by the Administrative Agent, Collateral Agent, and Lenders to organize, present or disseminate such Information in connection with disclosures otherwise made in accordance with this Section 9.16 (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Company or any of their respective obligations, (e) to any rating agency when required by it; *provided* that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of the Information relating to the Loan Parties received by it from any Agent or any Lender, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section 9.16, "***Information***" shall mean all non-public information received from or on behalf of any Company and related to any Company or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a non-confidential basis prior to its disclosure by or on behalf of the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.18  <u>No Waiver; Cumulative Remedies; Enforcement</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents and the other documents and agreements related thereto against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Article VII for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.06 (subject to the terms of Section 2.15), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Laws; and *provided*, *further*, that

if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.15, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 9.19  USA PATRIOT Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and each Subsidiary Guarantor, which information includes the name and address of the Borrower and each Subsidiary Guarantor and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

SECTION 9.20  Release of Liens.  If any of the Collateral shall be sold, transferred or otherwise disposed of by a Loan Party to a Person that is not a Loan Party in a transaction permitted by this Agreement (including by way of merger, consolidation or in connection with the sale of a Company otherwise permitted hereunder), then the Liens created by any of the Security Documents on such property shall be automatically released and in connection therewith, the Collateral Agent, at the request and sole expense of the Borrower or such other Loan Party, upon delivery of such customary certificates of a Responsible Officer as may be reasonably requested by the Collateral Agent certifying such sale, transfer or disposition is not prohibited by the Loan Documents, shall execute and deliver without recourse, representation or warranty all releases or other documents reasonably necessary or desirable to evidence the release of the Liens created by any of the Security Documents on such Collateral.

SECTION 9.21  Collateral and Guaranty Matters.  Each of the Lenders irrevocably authorize the Collateral Agent, at its option and in its discretion,

(a)  to release or re-assign any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon termination of the Commitments and the payment in full of all Obligations (other than indemnification and other contingent obligations, in each case, not then due and owing), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, (iii) that constitutes Excluded Collateral, or (iv) if approved, authorized or ratified in writing in accordance with Section 9.19;

(b)  to release any Subsidiary Guarantor from its obligations under this Agreement and other Loan Documents if such Person ceases to be a Company as a result of a transaction permitted hereunder; and

(c)  to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(h).

Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release, re-assign or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under this Agreement and other Loan Documents pursuant to this Section 9.20.  In each case under this Section 9.20, the Loan Party that has granted the Collateral or Guarantee being released will provide such officer's certificates that the Collateral Agent shall reasonably request certifying as to the applicable circumstance allowing release or subordination of such Collateral or Guarantee.  In each case as specified in this Section 9.20, the Collateral Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or re-assignment of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Subsidiary Guarantor from its obligations under the Loan Documents, in each case in accordance with the terms of the Loan Documents and this Section 9.20.

SECTION 9.22  INTERCREDITOR AGREEMENT.  EACH LENDER AUTHORIZES AND INSTRUCTS THE COLLATERAL AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT ON BEHALF OF SUCH LENDER, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY IT IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT, AS THE CASE MAY BE.  THE PROVISIONS OF THIS SECTION 9.21 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE INTERCREDITOR AGREEMENT, THE FORM OF WHICH IS ATTACHED AS AN EXHIBIT TO THIS AGREEMENT.  REFERENCE MUST BE MADE TO THE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE COLLATERAL AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENT.

SECTION 9.23  Electronic Execution of Assignments and Certain Other Documents.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptance, amendments or other modifications, Borrowing Requests, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to

procedures approved by it; *provided, further*, without limiting the foregoing, upon the reasonable request of the Borrower or the Administrative Agent, any electronic signature shall be promptly followed by such manually executed counterpart.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

RCS CAPITAL CORPORATION

By: _____
Name:
Title:

Barclays Bank PLC, as Administrative Agent and Collateral Agent

By: _____

Name:

Title:

Barclays Bank PLC, as Lender


By: _____
Name:
Title:

# **EXHIBIT 2**

**Amended and Restated Intercreditor Agreement**

*DRAFT 1/31/16*

<u>AMENDED AND RESTATED INTERCREDITOR AGREEMENT</u>

**BARCLAYS BANK PLC**,
<u>as Super Priority Lien Collateral Agent</u>
<u>and Super Priority Lien Administrative Agent</u>

**BARCLAYS BANK PLC**,
<u>as First Lien Collateral Agent</u>
<u>and First Lien Administrative Agent</u>

<u>and</u>

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

(as successor to BANK OF AMERICA, N.A.),
<u>as Second Lien Collateral Agent</u>
<u>and Second Lien Administrative Agent</u>

<u>and</u>

**THE GRANTORS**

Dated as of April 29, 2014

As amended and restated on [●], 2016

# TABLE OF CONTENTS

**Page**

SECTION 1.        DEFINITIONS.................................................................................. 2

    1.1    Defined Terms ................................................................................. 2
    1.2    Terms Generally............................................................................ 14

SECTION 2.        LIEN PRIORITIES ......................................................................... 15

    2.1    Relative Priorities......................................................................... 15
    2.2    Failure to Perfect.......................................................................... 15
    2.3    Nature of Super Priority Lien Obligations; First Lien Obligations .................... 16
    2.4    Prohibition on Contesting Liens .................................................... 17
    2.5    No New Liens ............................................................................... 17
    2.6    Similar Liens and Agreements...................................................... 20
    2.7    Certain Cash Collateral ................................................................ 20

SECTION 3.        ENFORCEMENT ........................................................................... 20

    3.1    Exercise of Remedies.................................................................... 20
    3.2    Actions Upon Breach.................................................................... 27

SECTION 4.        PAYMENTS .................................................................................... 28

    4.1    Application of Proceeds ................................................................ 28
    4.2    Payment Turnover......................................................................... 29
    4.3    Permitted Mandatory Prepayments of Second Lien Obligations..................... 30

SECTION 5.        OTHER AGREEMENTS ................................................................ 30

    5.1    Releases........................................................................................ 30
    5.2    Insurance...................................................................................... 33
    5.3    Amendments to Loan Documents ................................................. 34
    5.4    Rights As Unsecured Creditors..................................................... 39
    5.5    Bailee for Perfection .................................................................... 40
    5.6    When Discharge of Obligations Deemed to Not Have Occurred ................. 44
    5.7    Purchase Right ............................................................................. 45

SECTION 6.        INSOLVENCY OR LIQUIDATION PROCEEDINGS............................. 46

    6.1    Use of Cash Collateral and Financing Issues................................ 46
    6.2    Sale Issues.................................................................................... 46
    6.3    Relief from the Automatic Stay .................................................... 47
    6.4    Adequate Protection..................................................................... 48
    6.5    No Waiver .................................................................................... 49
    6.6    Avoidance Issues ......................................................................... 50
    6.7    Separate Grants of Security and Separate Classification................ 50
    6.8    Reorganization Securities ............................................................ 51
    6.9    Post-Petition Claims..................................................................... 51
    6.10   Waiver.......................................................................................... 52
    6.11   Expense Claims............................................................................. 52

i

# TABLE OF CONTENTS
### (continued)

**Page**

6.12    Other Matters ....................................................................................... 52
6.13    Effectiveness in Insolvency or Liquidation Proceedings ...................... 53
6.14    Voting ................................................................................................... 53

SECTION 7.         RELIANCE; WAIVERS; ETC ................................................. 53

7.1     Non-Reliance ........................................................................................ 53
7.2     No Warranties or Liability .................................................................... 54
7.3     No Waiver of Lien Priorities ................................................................ 55
7.4     Obligations Unconditional .................................................................... 60
7.5     Certain Notices ..................................................................................... 61

SECTION 8.         SUBORDINATION; STANDSTILL ........................................ 62

8.1     Agreement to Subordinate .................................................................... 62
8.2     Liquidation, Dissolution, Bankruptcy .................................................. 62
8.3     Payment Blockage ................................................................................ 62
8.4     Default Not Prevented .......................................................................... 63
8.5     Subrogation ........................................................................................... 63
8.6     Relative Rights ..................................................................................... 63
8.7     Subordination May Not Be Impaired by Super Priority Lien Grantors ............... 63
8.8     Reliance by Super Priority Lien Claimholders on Subordination Provisions ...... 63
8.9     Standstill ............................................................................................... 64

SECTION 9.         MISCELLANEOUS ................................................................ 64

9.1     Conflicts ............................................................................................... 64
9.2     Effectiveness; Continuing Nature of this Agreement; Severability ...... 64
9.3     Amendments; Waivers .......................................................................... 65
9.4     Information Concerning Financial Condition of Companies ................ 65
9.5     Subrogation ........................................................................................... 66
9.6     Application of Payments ....................................................................... 66
9.7     SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL ....... 66
9.8     Notices .................................................................................................. 67
9.9     Further Assurances ............................................................................... 68
9.10    APPLICABLE LAW .............................................................................. 68
9.11    Binding on Successors and Assigns ..................................................... 68
9.12    Specific Performance ........................................................................... 68
9.13    Headings ............................................................................................... 68
9.14    Counterparts ......................................................................................... 68
9.15    Authorization ........................................................................................ 69
9.16    No Third Party Beneficiaries ............................................................... 69
9.17    Provisions Solely to Define Relative Rights ........................................ 69
9.18    Additional Grantors .............................................................................. 69
9.19    First Allied Repayment ........................................................................ 69

# AMENDED AND RESTATED INTERCREDITOR AGREEMENT

This AMENDED AND RESTATED INTERCREDITOR AGREEMENT, is dated as of [●], 2016, and entered into by and among Barclays Bank PLC, in its capacity as collateral agent for the Super Priority Lien Obligations (as defined below), including its successors and assigns from time to time (the "**Super Priority Lien Collateral Agent**") and in its capacity as administrative agent for the Super Priority Lien Obligations (as defined below), including its successors and assigns in such capacity from time to time (the "**Super Priority Lien Administrative Agent**"), Barclays Bank PLC, in its capacity as collateral agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**") and in its capacity as administrative agent for the First Lien Obligations (as defined below), including its successors and assigns in such capacity from time to time (the "**First Lien Administrative Agent**"), and Wilmington Trust, National Association (as successor to Bank of America, N.A.) , in its capacity as collateral agent for the Second Lien Obligations (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**") and in its capacity as administrative agent for the Second Lien Obligations (as defined below), including its successors and assigns in such capacity from time to time (the "**Second Lien Administrative Agent**") and is consented to by the Grantors (as defined below) signatory hereto on the Amendment and Restatement Effective Date (as defined below) and each other Grantor that acknowledges this Agreement from time to time pursuant to <u>Section 9.18</u>. Capitalized terms used herein but not otherwise defined herein have the meanings set forth in <u>Section 1</u> below.

## RECITALS

WHEREAS, the Borrower, the other RCS Companies, the lenders party thereto, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Syndication Agent, and Barclays Bank PLC, as Administrative Agent and Collateral Agent, have entered into that certain First Lien Credit Agreement dated as of the Effective Date providing for a first lien senior secured revolving credit and term loan facility to the Borrower (as amended, restated, supplemented, modified or Refinanced from time to time, the "**Initial First Lien Credit Agreement**");

WHEREAS, the Borrower, the other RCS Companies, the lenders party thereto, Barclays Bank PLC, as Syndication Agent, and Wilmington Trust, National Association (as successor to Bank of America, N.A.), as Administrative Agent and Collateral Agent, have entered into that certain Second Lien Credit Agreement dated as of the Effective Date providing for a second lien senior secured term loan to the Borrower (as amended, restated, supplemented, modified or Refinanced from time to time, the "**Initial Second Lien Credit Agreement**");

WHEREAS, the Borrower, the lenders party thereto, and Barclays Bank PLC, as Administrative Agent and Collateral Agent, have entered into that certain Superpriority Secured n-Possession Term Loan Agreement dated as of the Amendment and Restatement Effective Date providing for super-priority secured term loans to the Borrower (as amended, restated, supplemented, modified or Refinanced from time to time, the "**Initial Super Priority Lien Credit Agreement**");

WHEREAS, the obligations of the Borrower under the Initial First Lien Credit Agreement, any Cash Management Agreements with any First Lien Claimholders (or their affiliates) and any Hedge Agreements provided by any of the First Lien Claimholders (or their affiliates) have been guaranteed by the First Lien/Second Lien Guarantors pursuant to the First Lien Loan Documents and are secured by substantially all of the assets of the Borrower and the First Lien/Second Lien Guarantors pursuant to the terms of the First Lien Security Documents;

WHEREAS, the obligations of the Borrower under the Initial Second Lien Credit Agreement have been guaranteed by the First Lien/Second Lien Guarantors pursuant to the Second Lien Loan Documents and are secured by substantially all of the assets of the Borrower and the First Lien/Second Lien Guarantors pursuant to the terms of the Second Lien Security Documents;

WHEREAS, the obligations of the Borrower under the Initial Super Priority Lien Credit Agreement will be guaranteed by the Super Priority Lien Guarantors pursuant to the Super Priority Lien Loan Documents and will be secured by substantially all of the assets of the Borrower and such Super Priority Lien Guarantors pursuant to the terms of the Super Priority Lien Security Documents;

WHEREAS, the Super Priority Lien Loan Documents, the First Lien Loan Documents and the Second Lien Loan Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral;

WHEREAS, in order to induce the Super Priority Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Borrower, each of the First Lien Collateral Agent, on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of the Second Lien Claimholders, has agreed to the lien subordination, claim subordination, intercreditor and other provisions set forth in this Agreement; and

WHEREAS, in order to induce the First Lien Collateral Agent and the First Lien Claimholders to continue to consent to the Grantors' having incurred the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Borrower, or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders agreed to the lien subordination, intercreditor and other provisions set forth in the Existing Intercreditor Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

SECTION 1.   Definitions.

**1.1**      Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"**Affiliate**" means, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agreement**" means this Amended and Restated Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Agreement Value**" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to any such Hedge Agreement, (i) for any date on or after the date such Hedge Agreement has been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreement (which may include a First Lien Lender or any Affiliate of a First Lien Lender).

"**Amendment and Restatement Effective Date**" means [●], 2016.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "**Bankruptcy,**" as now and hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency or similar federal, state or foreign law for the relief of debtors.

"**Borrower**" means RCS Capital Corporation, a Delaware corporation, including such Person as debtor and debtor-in-possession, any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding and the Reorganized Borrower.

"**Business Day**" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"**Capital Stock**" means and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation and including, without limitation, membership interests and partnership interests) and any and all warrants, rights or options to purchase any of the foregoing.

"**Cash Management Agreement**" means any agreement pursuant to which a bank or other financial institution agrees to provide (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearinghouse fund transfer services, return items and interstate depository network services, and cash management services for collections, operating, payroll and trust accounts, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services) and (c) any other demand deposit or operating account relationships or other cash management services.

"**Cash Management Bank**" means any Person that is an Agent (as defined in the First Lien Credit Agreement) or First Lien Lender or an Affiliate of an Agent or a First Lien Lender, in each case, under the Initial First Lien Credit Agreement, on the Effective Date or at the time it provides any services under a Cash Management Agreement.

"**Cash Management Obligations**" means obligations owed by any Company to any Cash Management Bank in connection with, or in respect of, any Cash Management Agreement.

"**Collateral**" means any of the assets or property of any Grantor, whether tangible or intangible, constituting any of Super Priority Lien Collateral, First Lien Collateral or Second Lien Collateral and whether or not the Liens on such assets or property are allowed, disallowed or avoided in any respect.

"**Common Grantor**" means any Person that is both a Super Priority Lien Grantor and a First Lien/Second Lien Grantor.

"**Companies**" means any of the RCS Companies, the Target and their respective Subsidiaries.

"**Conforming Amendment**" means, as applicable, any amendment to any First Lien Loan Document that is substantively identical to a corresponding amendment to a comparable provision of a Second Lien Loan Document that is an amendment to such Second Lien Loan Document of the type described in Section 5.5(c)(ii).

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Collateral**" means any Collateral consisting of any Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the Uniform Commercial Code), cash and any other Collateral as to which a first priority Lien shall or may be perfected through possession or control by the secured party or any agent therefor; provided, however, that in no event shall any cash collateral provided to the First Lien Collateral Agent pursuant to and subject to the terms of the Initial First Lien Credit Agreement constitute Control Collateral for purposes of this Agreement.

"**Controlled Account**" means those certain Deposit Accounts (as defined in the Uniform Commercial Code) of any Grantor subject to Liens under the terms of the Super Priority Lien Collateral Security Documents, the First Lien Collateral Security Documents or the Second Lien Security Documents.

"**DIP Financing**" has the meaning set forth in Section 6.1.

"**DIP Orders**" shall have the meaning specified in the Super Priority Lien Credit Agreement.

"**Discharge of First Lien Obligations**" means, except to the extent otherwise provided in Section 5.6, (i) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate set forth in the First Lien Credit Agreement, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First Lien Loan Documents and termination of all commitments to lend or otherwise extend credit under the First Lien Loan Documents up to the First Lien Cap, (ii) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including legal fees and other expenses, costs or charges accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such fees, expenses, costs or charges is, or would be, allowed in such Insolvency or Liquidation Proceeding), (iii) termination, cancellation or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent) of, all letters of credit issued under the First Lien Loan Documents and (iv) termination or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent) of any Hedge Agreement with a First Lien Claimholder and the payment in full in cash of all Hedging Obligations then owing to a First Lien Claimholder.

"**Discharge of Super Priority Lien Obligations**" means, except to the extent otherwise provided in Section 5.6, (i) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate set forth in the Super Priority Lien Credit Agreement, whether or not a claim for such interest is, or would be, allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Super Priority Lien Loan Documents and termination of all commitments to lend or otherwise extend credit under the Super Priority Lien Loan Documents and (ii) payment in full in cash of all other Super Priority Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including legal fees and other expenses, costs or charges accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for such fees, expenses, costs or charges is, or would be, allowed in such Insolvency or Liquidation Proceeding).

"**Disposition**" has the meaning set forth in Section 5.1(b)(ii).

"**Effective Date**" means April 29, 2014.

"**Exercise of Remedies**" has the meaning set forth in Section 5.1(b)(i).

"**Existing Intercreditor Agreement**" means the Intercreditor Agreement, dated as of April 29, 2014, among the Grantors signatory thereto on the Effective Date, each other Grantor that became party thereto from time to time pursuant to Section 9.18 thereof, Barclays Bank PLC, in its capacity as collateral agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time, and Wilmington Trust, National Association (as successor to Bank of America, N.A.), in its capacity as collateral agent for the Second Lien Obligations under the Second Lien Credit Agreement (as defined below), as amended from time to time prior to the Amendment and Restatement Effective Date.

5

"**First Allied Entities**" has the meaning set forth in the First Lien Credit Agreement.

"**First Allied Repayment**" has the meaning set forth in the First Lien Credit Agreement.

"**First Lien Cap**" has the meaning set forth in the definition of First Lien Obligations.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at such time, including without limitation the First Lien Lenders and any agent under the First Lien Credit Agreement.

"**First Lien Collateral**" means all of the assets and property of any First Lien/Second Lien Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any First Lien Obligations.

"**First Lien Credit Agreement**" means (i) the Initial First Lien Credit Agreement and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase (subject to the limitations set forth herein), Refinance in whole or in part the indebtedness and other obligations outstanding under (x) the Initial First Lien Credit Agreement or (y) any subsequent First Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a First Lien Credit Agreement hereunder. Any reference to the First Lien Credit Agreement hereunder shall be deemed a reference to any First Lien Credit Agreement then in existence.

"**First Lien Enforcement Date**" means the date which is 180 days after the occurrence of (i) an Event of Default (under and as defined in the First Lien Credit Agreement) and (ii) the Super Priority Lien Collateral Agent's receipt of written notice from the First Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the First Lien Credit Agreement) has occurred and is continuing and (y) the First Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the First Lien Credit Agreement; provided that the First Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders have commenced and are diligently pursuing any enforcement action with respect to any or all of the Collateral, (2) at any time that the Specified Insolvency Proceedings remain pending or any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the acceleration of the First Lien Obligations (if any) is rescinded in accordance with the terms of the First Lien Credit Agreement.

"**First Lien Lenders**" means the "**Lenders**" under and as defined in the First Lien Credit Agreement.

"**First Lien Loan Documents**" means the First Lien Credit Agreement and the other Loan Documents (or equivalent term) (as defined in the First Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement

among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**First Lien Obligations**" means all "**Obligations**" (or equivalent term) under and as defined in the First Lien Credit Agreement; <u>provided</u> that the aggregate principal amount of, without duplication, any revolving credit commitments, revolving credit loans, letters of credit, term loans, bonds, debentures, notes or similar instruments (excluding, in any event, Cash Management Obligations and Hedging Obligations) provided for under the First Lien Credit Agreement or any other First Lien Loan Document (or any Refinancing thereof) in excess of $776,250,000 (the "**First Lien Cap**"), shall not constitute First Lien Obligations for purposes of this Agreement; <u>provided further</u> that for the avoidance of doubt, "First Lien Obligations" shall include (x) all interest (including without limitation default interest) and fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) at the rates specified in the relevant First Lien Loan Document with respect to such principal amount of the First Lien Obligations that do not exceed the First Lien Cap and (x) all costs and charges incurred in connection with the First Lien Loan Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding, irrespective of whether any claim for such interest, fees, expenses, costs or charges is or would be allowed as a claim in such Insolvency or Liquidation Proceeding.

"**First Lien/Second Lien Collateral**" means all of the assets and property of any First Lien/Second Lien Grantor, whether tangible or intangible, constituting each of First Lien Collateral and Second Lien Collateral and whether or not the liens on any such assets or property are allowed, disallowed or avoided in any respect.

"**First Lien/Second Lien Grantors**" means the Borrower and the First Lien/Second Lien Guarantors and all Persons that have executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Security Document or a Second Lien Security Document.

"**First Lien/Second Lien Guarantors**" means each of the Persons that from time to time is or is required to be a guarantor under the First Lien Loan Documents or the Second Lien Loan Documents.

"**First Lien Security Documents**" means the Security Documents (or equivalent term) (as defined in the First Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted (or purported to be granted) securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Governmental Authority**" shall mean any federal, state, local, county, provincial or foreign court or governmental agency, authority, instrumentality or regulatory body exercising, in each case, any legislative, judicial, administrative or regulatory functions.

"**Grantors**" means each of the Persons that from time to time is a First Lien/Second Lien Grantor or a Super Priority Lien Guarantor.

"**Guarantors**" means each of the Persons that from time to time is a First Lien/Second Lien Guarantor or a Super Priority Lien Guarantor.

"**Hedge Agreements**" (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of ISDA Master Agreement, including any such obligations or liabilities under any ISDA Master Agreement.

"**Hedging Obligation**" of any Person means any obligation of such Person owing to a First Lien Claimholder or Second Lien Claimholder, as applicable, pursuant to any Hedge Agreements.

"**Indebtedness**" means and includes, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments representing extensions of credit, (c) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding (i) trade accounts payable and accrued obligations incurred in the ordinary course of business, (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP (as defined in the Initial First Lien Credit Agreement) and (iii) obligations resulting from take-or-pay contracts entered into in the ordinary course of business)); (d) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person (including all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person (excluding trade accounts payable and other accrued obligations, in each case incurred in the ordinary course of business)), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness so secured, (e) all Guarantees by such Person of obligations of others of the type referred to in clause (a), (b), (c) or (f) of this defined term, (f) all Capital Lease Obligations (as defined in the Initial First Lien Credit Agreement) and Synthetic Lease Obligations (as defined in the Initial First Lien Credit Agreement) of such Person, (g) net obligations of such Person under any Hedge Agreements, valued at the Agreement Value thereof, (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Stock (as defined in the Initial First Lien Credit Agreement) of such Person or any other Person or any warrants, rights or options to acquire such Disqualified Stock, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (i) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances, in each case, if and to the extent that any of the foregoing indebtedness (other than Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a

general partner or joint venturer, to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness do not provide that such Person is liable therefor.

"**Initial First Lien Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Initial RCS Debtors**" means [-][1]

"**Initial Second Lien Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Initial Super Priority Lien Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Insolvency or Liquidation Proceeding**" means (i) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Bankruptcy Law with respect to any Grantor, (ii) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets or liabilities, (iii) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (iv) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Other RCS Entities**" means those Guarantors other than those Guarantors that are Initial RCS Debtors.

"**Permitted Adequate Protection Payments**" means the "Adequate Protection Payments"  (as defined in the DIP Order) or any other adequate protection payments granted to the First Lien Claimholders or the Second Lien Claimholders in the DIP Orders.

"**Person**" means and includes any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**RCS Companies**" means the Borrower, RCS Capital Management, LLC and RCAP Holdings, LLC.

"**Recovery**" has the meaning set forth in <u>Section 6.6</u>.

---

[1]        NTD: To include all RCS entities that will be Debtors on Day 1.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, restructure, replace or repay, or to issue other Indebtedness, in exchange or replacement for, such indebtedness. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Reorganized Borrower**" means the reorganized Borrower following the approval of the Specified Plan.

"**Required Lenders**" has the meaning set forth in the Super Priority Lien Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement dated as of January 29, 2016 among the Borrower, the Guarantors and each of the creditor parties identified on the signature pages thereto, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at such time, including without limitation the Second Lien Lenders and any agent under the Second Lien Credit Agreement.

"**Second Lien Collateral**" means all of the assets and property of any First Lien/Second Lien Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" has the meaning set forth in the preamble hereof.

"**Second Lien Credit Agreement**" means (i) the Initial Second Lien Credit Agreement, (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, Refinance in whole or in part the indebtedness and other obligations outstanding under the Initial Second Lien Credit Agreement or other agreement or instrument referred to in this clause (ii), subject to the limitations set forth herein and in the First Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a Second Lien Credit Agreement hereunder. Any reference to the Second Lien Credit Agreement hereunder shall be deemed a reference to any Second Lien Credit Agreement then in existence.

"**Second Lien Enforcement Date**" means the date which is 180 days after the occurrence of (i) an Event of Default (under and as defined in the Second Lien Credit Agreement) and (ii) (A) prior to the Discharge of Super Priority Lien Obligations, the Super Priority Lien Collateral Agent's and the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Credit Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Second Lien Credit Agreement and (B) after the Discharge of Super Priority Lien Obligations, the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Credit Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of

acceleration thereof or otherwise) in accordance with the terms of the Second Lien Credit Agreement; provided that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Super Priority Lien Collateral Agent, the Super Priority Lien Claimholders, the First Lien Collateral Agent or the First Lien Claimholders have commenced and are diligently pursuing any enforcement action with respect to any or all of the Collateral, (2) at any time that the Specified Insolvency Proceeding is pending or any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the acceleration of the Second Lien Obligations (if any) is rescinded in accordance with the terms of the Second Lien Credit Agreement.

"**Second Lien Lenders**" means the "**Lenders**" under and as defined in the Second Lien Credit Agreement.

"**Second Lien Loan Documents**" means the Second Lien Credit Agreement and the Loan Documents (or equivalent term) (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, including any intercreditor or joinder agreement among holders of Second Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**Second Lien Obligations**" means all "**Obligations**" (or equivalent term) under and as defined in the Second Lien Credit Agreement. "**Second Lien Obligations**" shall include (i) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) in accordance with the rate specified in the relevant Second Lien Loan Document and (ii) all fees, expenses, costs and charges incurred in connection with the Second Lien Loan Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding irrespective of whether any claim for such interest, fees, expenses, costs or charges is or would be allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Second Lien Security Documents**" means the Security Documents (or equivalent term) (as defined in the Second Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted (or purported to be granted) securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Shared Collateral**" means all of the assets and property of any Common Grantor, whether tangible or intangible, constituting each of Super Priority Lien Collateral, First Lien Collateral and Second Lien Collateral and whether or not the Liens on any such assets or property are allowed, disallowed or avoided in any respect; provided, for the avoidance of doubt, the term "Shared Collateral" shall not include any assets or property of any Grantor that constitutes Super Priority Lien Collateral if such assets or property do not also constitute First Lien Collateral and Second Lien Collateral.

"**Specified Confirmation and Release**" means an order of the United States Bankruptcy Court for the District of Delaware pursuant to Section 1129 of Chapter 11 of the Bankruptcy

11

Code, (i) confirming the Specified Plan, (ii) irrevocably extinguishing in full all First Lien Obligations and (iii) irrevocably extinguishing in full all Second Lien Obligations.

"**Specified Consideration**" means the Specified Debt Securities, the Specified Equity Securities or any other consideration paid to the First Lien Claimholders or Second Lien Claimholders under and pursuant to the Specified Plan.

"**Specified Debt Securities**" means the debt securities of the Reorganized Borrower provided to certain First Lien Claimholders under and pursuant to the Specified Plan.

"**Specified Equity Securities**" means the equity securities of the Reorganized Borrower provided to certain First Lien Claimholders and Second Lien Claimholders under and pursuant to the Specified Plan.

"**Specified Insolvency Proceeding**" means the Joint Plan of Reorganization for RCS Capital Corporation and its Affiliated Debtors under Chapter 11 of the Bankruptcy Code filed with the United States Bankruptcy Court for the District of Delaware on or about [●], 2016 (as amended, supplemented or otherwise modified from time to time).

"**Specified Plan**" means (i) the Joint Plan of Reorganization for RCS Capital Corporation and its Affiliated Debtors under Chapter 11 of the Bankruptcy Code filed with the United States Bankruptcy Court for the District of Delaware on [●], 2016 (as amended, supplemented or otherwise modified from time to time) and (ii) the chapter 11 plan of reorganization for certain Other RCS Entities, in each case, consistent with the terms of the Restructuring Support Agreement.

"**Subsidiary**" or "**subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time. Unless otherwise expressly provided, all references herein to a "**Subsidiary**" shall mean a Subsidiary of the Borrower.

"**Super Priority Lien Claimholders**" means, at any relevant time, the holders of Super Priority Lien Obligations at such time, including without limitation the Super Priority Lien Lenders and any agent under the Super Priority Lien Credit Agreement.

"**Super Priority Lien Collateral**" means all of the assets and property of any Super Priority Lien Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Super Priority Lien Obligations.

"**Super Priority Lien Collateral Agent**" has the meaning set forth in the Recitals hereto.

"**Super Priority Lien Credit Agreement**" means (i) the Initial Super Priority Lien Credit Agreement and (ii) any other credit agreement, loan agreement, note agreement,

promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase (subject to the limitations set forth herein), Refinance in whole or in part the indebtedness and other obligations outstanding under the (x) Initial Super Priority Lien Credit Agreement or (y) any subsequent Super Priority Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a "Super Priority Lien Credit Agreement" for purposes herein. Any reference to the Super Priority Lien Credit Agreement hereunder shall be deemed a reference to any Super Priority Lien Credit Agreement then in existence.

"**Super Priority Lien Grantor**" means the Borrower and the Super Priority Lien Guarantors and all Persons that have executed and delivered, or may from time to time hereafter execute and deliver, a Super Priority Lien Security Document.

"**Super Priority Lien Guarantors**" means each of the Persons that from time to time is or is required to be a guarantor under the Super Priority Lien Loan Documents.

"**Super Priority Lien Lenders**" means the "Lenders" under and as defined in the Super Priority Lien Credit Agreement.

"**Super Priority Lien Loan Documents**" means the Super Priority Lien Credit Agreement and the other Loan Documents (or equivalent term) (as defined in the Super Priority Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Super Priority Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Super Priority Lien Obligations, including any intercreditor or joinder agreement among holders of Super Priority Lien Obligations, to the extent such are effective at the relevant time, as each may be modified from time to time in accordance with this Agreement.

"**Super Priority Lien Obligations**" means all "Obligations" (or equivalent term) under and as defined in the Super Priority Lien Credit Agreement; <u>provided</u> that for the avoidance of doubt, "Super Priority Lien Obligations" shall include (x) all interest (including without limitation default interest) and fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) at the rates specified in the relevant Super Priority Lien Loan Document with respect to such principal amount of the Super Priority Lien Obligations and (y) all costs and charges incurred in connection with the Super Priority Lien Loan Documents and provided for thereunder, in each case whether before or after commencement of an Insolvency or Liquidation Proceeding, irrespective of whether any claim for such interest, fees, expenses, costs or charges is or would be allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Super Priority Lien Security Documents**" means the Security Documents (or equivalent term) (as defined in the Super Priority Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted (or purported to be granted) securing any Super Priority Lien Obligations or under which rights or remedies with respect to such Liens are governed and any order entered by the United States Bankruptcy Court

for the District of Delaware granting Liens in favor of the Super Priority Lien Claimholders to secure the Super Priority Lien Obligations.

"**Target**" shall mean Cetera Financial Holdings, Inc.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

**1.2**    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 2.    Lien Priorities.

**2.1**    Relative Priorities.

(a)    Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the First Lien Obligations or the Second Lien Obligations granted on the Shared Collateral or of any Liens securing the Super Priority Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC, or any applicable law or the First Lien Loan Documents or the Second Lien Loan Documents or any other circumstance whatsoever, the First Lien Collateral Agent, on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby agree that: (i) any Lien on the Shared Collateral securing any Super Priority Lien Obligations now or hereafter held by or on behalf of the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Shared Collateral securing any of the First Lien Obligations or the Second Lien Obligations, in each case regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise; and (ii) any Lien on the Shared Collateral now or hereafter held by or on behalf of the First Lien Collateral Agent or the Second Lien Collateral Agent, any First Lien Claimholder or any Second Lien Claimholder or any agent or trustee therefor, in

each case regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Shared Collateral securing any Super Priority Lien Obligations.

(b)     Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the First Lien/Second Lien Collateral or of any Liens securing the First Lien Obligations granted on the First Lien/Second Lien Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second Lien Loan Documents or any other circumstance whatsoever, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that: (i) any Lien on the First Lien/Second Lien Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the First Lien/Second Lien Collateral securing any of the Second Lien Obligations, regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise; and (ii) any Lien on the First Lien/Second Lien Collateral now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by judgment, grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the First Lien/Second Lien Collateral securing any First Lien Obligations.

**2.2**     Failure to Perfect.

(a)     All Liens on the Shared Collateral securing any Super Priority Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Shared Collateral securing any First Lien Obligations or Second Lien Obligations for all purposes, notwithstanding any failure of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders to adequately perfect its security interests in the Shared Collateral, the subordination of any Lien on the Shared Collateral securing any Super Priority Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the Shared Collateral securing any Super Priority Lien Obligations.

(b)     All Liens on the First Lien/Second Lien Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the First Lien/Second Lien Collateral securing any Second Lien Obligations for all purposes, notwithstanding any failure of the First Lien Collateral Agent or the First Lien Claimholders to adequately perfect its security interests in the First Lien/Second Lien Collateral, the subordination of any Lien on the First Lien/Second Lien Collateral securing any First Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the First Lien/Second Lien Collateral securing any First Lien Obligations.

**2.3**     Nature of Super Priority Lien Obligations; First Lien Obligations.

15

(a)      The First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, and the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that, subject to the terms of the Super Priority Lien Loan Documents, (i) subject to Section 5.3 hereof, the terms of the Super Priority Lien Obligations may be modified, extended or amended from time to time, and (ii) the aggregate amount of the Super Priority Lien Obligations may, subject to compliance with Section 6.1 hereof, be Refinanced; provided that, in the case of any such Refinancing, the aggregate principal amount of the Super Priority Lien Obligations is not increased except to the extent any such increase is permitted pursuant to Section 6.1 hereof or has been consented to by the First Lien Collateral Agent and the Second Lien Collateral Agent (in each case acting at the direction of the applicable Required Lenders).

(b)      The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that, subject to the terms of the First Lien Loan Documents, (i) a portion of the First Lien Obligations are revolving in nature, (ii) the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (iii) the terms of the First Lien Obligations may be modified, extended or amended from time to time, and (iv), subject to the limitations on the aggregate principal amount of First Lien Obligations set forth in the definition of "First Lien Obligations" or in Section 5.3, the aggregate amount of the First Lien Obligations may be increased or Refinanced, in either event, without notice to or consent by the Second Lien Claimholders and without affecting the provisions hereof.

(c)      The Lien priorities provided in Section 2.1 and 2.2 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or Refinancing of any of the Super Priority Lien Obligations, the First Lien Obligations or the Second Lien Obligations, or any portion thereof. As between the Borrower and the other Grantors and the Second Lien Claimholders, the foregoing provisions will not limit or otherwise affect the obligations of the Borrower and the Grantors contained in any Second Lien Loan Document with respect to the incurrence of additional First Lien Obligations.

**2.4**     Prohibition on Contesting Liens.  Each of the Super Priority Lien Collateral Agent, the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity, extent, perfection, allowability, or enforceability of a Lien held by or on behalf of any of the Super Priority Lien Claimholders in the Super Priority Lien Collateral, by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; provided that nothing in this Agreement shall be construed (i) to prevent or impair the rights of the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the Super Priority Lien Obligations as provided in Section 2.1 and 3.1 or (ii) to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in Section 2.1 and 3.1.

**2.5**    <u>No New Liens</u>.

(a)    <u>Limitation on other Collateral for First Lien Claimholders</u>.  So long as any Second Lien Obligations remain outstanding, and subject to <u>Section 2.7</u> and <u>Section 6</u>, (i) the First Lien Collateral Agent agrees that, after the Effective Date, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Security Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien Claimholders. If the First Lien Collateral Agent or any First Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Security Documents, then the First Lien Collateral Agent (or the relevant First Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other First Lien Loan Document hold and be deemed to have held such Lien and security interest for the benefit of the Second Lien Collateral Agent as security for the Second Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under  <u>Section 4</u>.

(b)    <u>Limitation on other Collateral for First Lien Claimholders and Second Lien Claimholders</u>.

(i)  Until the date upon which the Discharge of Super Priority Lien Obligations shall have occurred, (A)(1) the First Lien Collateral Agent agrees that, after the Amendment and Restatement Effective Date, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Super Priority Lien Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Super Priority Lien Collateral Agent under the Super Priority Lien Security Documents or otherwise and (2) the Second Lien Collateral Agent agrees that, after the Effective Date, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Super Priority Lien Grantor securing any Second Lien Obligations which assets are not also subject to the Lien of the Super Priority Lien Collateral Agent under the Super Priority Lien Security Documents, and (B) each Super Priority Lien Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent or the Second Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders. If either (x) the First Lien Collateral Agent or any First Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Super Priority Lien

17

Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Super Priority Lien Collateral Agent under the Super Priority Lien Security Documents or (y) the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Super Priority Lien Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the Super Priority Lien Collateral Agent under the Super Priority Lien Security Documents, then the  First Lien Collateral Agent (or the relevant First Lien Claimholder) or the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), as applicable, shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any First Lien Loan Document or Second Lien Loan Document, (i) notify the Super Priority Lien Collateral Agent promptly upon becoming aware thereof and, unless such Super Priority Lien Grantor shall promptly grant a similar Lien on such assets or property to the Super Priority Lien Collateral Agent as security for the Super Priority Lien Obligations, shall assign such Lien to the Super Priority Lien Collateral Agent as security for all Super Priority Lien Obligations for the benefit of the Super Priority Lien Claimholders (but may retain a junior lien on such assets or property subject to the terms hereof) and (ii) until such assignment or such grant of a similar Lien to the Super Priority Lien Collateral Agent, shall be deemed to hold and have held such Lien and security interest for the benefit of the Super Priority Lien Collateral Agent and the other Super Priority Lien Claimholders as security for the Super Priority Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4. To the extent that the provisions of the immediately preceding sentence are not complied with for any reason, without limiting any other right or remedy available to the Super Priority Lien Collateral Agent or any other Super Priority Lien Claimholder, (x) the First Lien Collateral Agent agrees, for itself and on behalf of the other First Lien Claimholders, that any amounts received by or distributed to any First Lien Claimholder pursuant to or as a result of any Lien granted in contravention of this Section 2.5 shall be subject to distribution and turnover under Section 4 and (y) the Second Lien Collateral Agent agrees, for itself and on behalf of the other Second Lien Claimholders, that any amounts received by or distributed to any Second Lien Claimholder pursuant to or as a result of any Lien granted in contravention of this Section 2.5 shall be subject to distribution and turnover under Section 4.

(ii)  Until the date upon which the Discharge of First Lien Obligations shall have occurred, (A) the Second Lien Collateral Agent agrees that, after the Effective Date, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Security Documents, and (B) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has

granted a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien Claimholders. If the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Security Documents, then the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Second Lien Loan Document, (i) notify the First Lien Collateral Agent promptly upon becoming aware thereof and, unless such Grantor shall promptly grant a similar Lien on such assets or property to the First Lien Collateral Agent as security for the First Lien Obligations, shall assign such Lien to the First Lien Collateral Agent as security for all First Lien Obligations for the benefit of the First Lien Claimholders (but may retain a junior lien on such assets or property subject to the terms hereof) and (ii) until such assignment or such grant of a similar Lien to the First Lien Collateral Agent, shall be deemed to hold and have held such Lien and security interest for the benefit of the First Lien Collateral Agent and the other First Lien Claimholders as security for the First Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4. To the extent that the provisions of the immediately preceding sentence are not complied with for any reason, without limiting any other right or remedy available to the First Lien Collateral Agent or any other First Lien Claimholder, the Second Lien Collateral Agent agrees, for itself and on behalf of the other Second Lien Claimholders, that any amounts received by or distributed to any Second Lien Claimholder pursuant to or as a result of any Lien granted in contravention of this Section 2.5 shall be subject to distribution and turnover under Section 4.

2.6     Similar Liens and Agreements.  The parties hereto agree that it is their intention that (x) the Super Priority Lien Collateral include all collateral included in the First Lien Collateral or the Second Lien Collateral and (y) the First Lien Collateral and the Second Lien Collateral be identical. In furtherance of the foregoing and of Section 9.9, the parties hereto agree, subject to the other provisions of this Agreement, including Section 2.7:

(a)     upon request by the Super Priority Lien Collateral Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Super Priority Lien Collateral, the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Super Priority Lien Loan Documents, First Lien Loan Documents and the Second Lien Loan Documents; and

(b)     that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guarantees for the First Lien Obligations and the Second Lien Obligations shall be in all material respects the same forms of documents other than with respect to (i) the senior and subordinate nature of the security

19

interests in the Collateral securing the respective obligations thereunder and (ii) the delivery of Collateral, the security interest in which may be perfected only by possession or control by a single Person of such Collateral.

Notwithstanding anything to the contrary set forth in this <u>Section 2.6</u> or any other provision of this Agreement, (i) except for the limited agreements of the Super Priority Lien Collateral Agent pursuant to <u>Section 5.5</u>, none of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Collateral for the benefit of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent or the Second Lien Claimholders and (ii) except for the limited agreements of the First Lien Collateral Agent pursuant to <u>Section 5.5</u>, none of the First Lien Collateral Agent or the First Lien Claimholders shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Collateral for the benefit of the Second Lien Collateral Agent or the Second Lien Claimholders.

     **2.7**   <u>Certain Cash Collateral</u>.  Notwithstanding anything in this Agreement or any other First Lien Loan Documents or Second Lien Loan Documents to the contrary, collateral consisting of cash and cash equivalents pledged to secure First Lien Obligations consisting of reimbursement obligations in respect of letters of credit or otherwise held by the First Lien Collateral Agent pursuant to the terms of the First Lien Credit Agreement (or any equivalent successor provision) shall be applied as specified in the First Lien Credit Agreement and will not constitute First Lien/Second Lien Collateral.

     SECTION 3.  <u>Enforcement</u>.

     **3.1**   <u>Exercise of Remedies</u>.

     (a)   So long as the Discharge of Super Priority Lien Obligations and the Discharge of First Lien Obligations have not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor:

     (i)  the Second Lien Collateral Agent and the Second Lien Claimholders:

     (A)   from the Effective Date until the occurrence of the Second Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set-off or recoupment) with respect to any Super Priority Lien Collateral or any First Lien/Second Lien Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or proceeding (including, without limitation, any Insolvency or Liquidation Proceeding) with respect to any Lien held by it under the Second Lien Security Documents or any other Second Lien Loan Document or otherwise;

(B)      will not contest, protest or object to any foreclosure proceeding or action brought by (x) the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder or any other exercise by the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder, of any rights and remedies relating to the Super Priority Lien Collateral or other collateral under the Super Priority Lien Loan Documents or otherwise or (y) from and after the Discharge of Super Priority Lien Obligations, the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder, of any rights and remedies relating to the Collateral under the First Lien Loan Documents, provided that the respective interests of the Second Lien Claimholders attach to the proceeds of the First Lien/Second Lien Collateral, subject to the relative priorities described in Section 2 and Section 4; and

(C)      will not object to the forbearance by (x) the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Super Priority Lien Collateral or (y) from and after the Discharge of Super Priority Lien Obligations, the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the First Lien/Second Lien Collateral; and

(b)      So long as the Discharge of Super Priority Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor:

(i)  the First Lien Collateral Agent and the First Lien Claimholders:

(A)      from the Amendment and Restatement Effective Date until the occurrence of the First Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set-off or recoupment) with respect to any Super Priority Lien Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the First Lien Collateral Agent or any First Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or proceeding (including, without limitation, any Insolvency or Liquidation Proceeding) with respect to any Lien held by it under the First Lien Security Documents or any other First Lien Loan Document or otherwise;

(B)      will not contest, protest or object to any foreclosure proceeding or action brought by the Super Priority Lien Collateral Agent

21

or any Super Priority Lien Claimholder or any other exercise by the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder, of any rights and remedies relating to the Super Priority Lien Collateral under the Super Priority Lien Loan Documents, provided that the respective interests of the First Lien Claimholders attach to the proceeds thereof, subject to the relative priorities described in Section 2 and Section 4;

(C)     will not object to the forbearance by the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Super Priority Lien Collateral; and

(ii)  subject to Section 5.1, the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Super Priority Lien Collateral without any consultation with or the consent of the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder; provided, that (in each instance in a manner not otherwise inconsistent with the terms of this Agreement):

(A)     in any Insolvency or Liquidation Proceeding commenced by or against a Common Grantor, the First Lien Collateral Agent or the Second Lien Collateral Agent may file a claim, proof of claim, or statement of interest with respect to the First Lien Obligations or the Second Lien Obligations, as applicable,

(B)     the First Lien Collateral Agent or the Second Lien Collateral Agent, as applicable, may take any action (not adverse to the Liens on the Shared Collateral securing the Super Priority Lien Obligations, or the rights of any Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect (but not enforce) its Lien on the Shared Collateral,

(C)     the First Lien Claimholders and the Second Lien Claimholders shall be entitled to file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the First Lien Claimholders or the Second Lien Claimholders, as applicable, including without limitation any claims secured by the Shared Collateral, if any, in each case in accordance with the terms of this Agreement,

(D)     in any Insolvency or Liquidation Proceeding commenced by or against any Common Grantor, the First Lien Claimholders and the

22

Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the First Lien/Second Lien Grantors arising under either Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement,

(E)     in any Insolvency or Liquidation Proceeding commenced by or against any Common Grantor, the First Lien Claimholders and the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, to the extent consistent with the provisions hereof, and

(F)     the First Lien Collateral Agent or any First Lien Claimholder may exercise any of its rights or remedies with respect to the Shared Collateral upon the occurrence and during the effective continuation of the First Lien Enforcement Date.

In exercising rights and remedies with respect to the Super Priority Lien Collateral, the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders may enforce the provisions of the Super Priority Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders to sell or otherwise dispose of Super Priority Lien Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)     after the Discharge of Super Priority Lien Obligations has occurred and subject to Section 5.1, the First Lien Collateral Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the First Lien/Second Lien Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; provided, that (in each instance in a manner not otherwise inconsistent with the terms of this Agreement)

(A)     in any Insolvency or Liquidation Proceeding commenced by or against a First Lien/Second Lien Grantor, the Second Lien Collateral Agent may file a claim, proof of claim, or statement of interest with respect to the Second Lien Obligations,

(B)     the Second Lien Collateral Agent may take any action (not adverse to the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect (but not enforce) its Lien on the First Lien/Second Lien Collateral,

23

(C)     the Second Lien Claimholders shall be entitled to file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Second Lien Claimholders, including without limitation any claims secured by the First Lien/Second Lien Collateral, if any, in each case in accordance with the terms of this Agreement,

(D)     in any Insolvency or Liquidation Proceeding commenced by or against a First Lien/Second Lien Grantor, the Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the First Lien/Second Lien Grantors arising under either Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement,

(E)     in any Insolvency or Liquidation Proceeding commenced by or against a First Lien/Second Lien Grantor, the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, to the extent consistent with the provisions hereof, and

(F)     the Second Lien Collateral Agent or any Second Lien Claimholder may exercise any of its rights or remedies with respect to the First Lien/Second Lien Collateral upon the occurrence and during the effective continuation of the Second Lien Enforcement Date.

Subject to the terms hereof, in exercising rights and remedies with respect to the First Lien/Second Lien Collateral after the Discharge of Super Priority Lien Obligations has occurred, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the First Lien Collateral Agent and the First Lien Claimholders to sell or otherwise dispose of First Lien/Second Lien Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(d)     (i)  Except (i) with respect to Permitted Adequate Protection Payments, or (ii) as expressly provided in Section 6.4 and 6.8, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Super Priority Lien Collateral or any proceeds of Super Priority Lien Collateral (other than any Specified Consideration) in connection with the exercise of any right or remedy (including set-off or recoupment) with respect to any Super Priority Lien Collateral, and that any Collateral or proceeds taken or received by it (other than any Specified Consideration) will be paid over to the Super Priority Lien Collateral Agent

pursuant to Section 4.2, unless and until the Discharge of Super Priority Lien Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of Super Priority Lien Obligations has occurred, except as expressly provided in Section 3.1(b) and 3.1(c), the sole right of each the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the First Lien/Second Lien Collateral pursuant to the First Lien Security Documents or the Second Lien Security Documents, as applicable, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Super Priority Lien Obligations has occurred in accordance with the terms of the First Lien Loan Documents or the Second Lien Security Documents, as applicable, and applicable law; provided that, notwithstanding anything to the contrary in the foregoing sentence or otherwise in this Agreement, the First Lien Collateral Agent and any First Lien Claimholders shall not be required to pay over to the Super Priority Lien Collateral Agent any Permitted Adequate Protection Payments or the Specified Consideration.

(ii)  Except as expressly provided in Section 6.4 and Section 6.8, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of First Lien/Second Lien Collateral (other than any Specified Consideration) in connection with the exercise of any right or remedy (including set-off or recoupment) with respect to any First Lien/Second Lien Collateral, and that any First Lien/Second Lien Collateral or proceeds taken or received by it (other than any Specified Consideration) will be paid over to the First Lien Collateral Agent pursuant to Section 4.2, unless and until the Discharge of First Lien Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 3.1(c), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the First Lien/Second Lien Collateral is to hold a Lien on the First Lien/Second Lien Collateral pursuant to the Second Lien Security Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred in accordance with the terms of the Second Lien Loan Documents and applicable law; provided that, notwithstanding anything to the contrary in the foregoing sentence or otherwise in this Agreement, the Second Lien Collateral Agent and any Second Lien Claimholders shall not be required to pay over to the Super Priority Lien Collateral Agent or the First Lien Collateral Agent any Permitted Adequate Protection Payments or the Specified Consideration.

(e)

(i)  Subject to the proviso in clause (c) of Section 3.1(b) and in each case prior to the Discharge of Super Priority Lien Obligations, (A)each of the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees, respectively, that the First Lien Collateral Agent and the

First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the Super Priority Lien Loan Documents, including any sale, lease, exchange, transfer or other disposition of the Super Priority Lien Collateral, whether by foreclosure or otherwise, and (B) each of the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or, respectively, the First Lien Claimholders or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders seek to enforce or collect the Super Priority Lien Obligations or the Liens granted in any of the Super Priority Lien Collateral.

(ii)  Subject to the proviso in <u>Section 3.1(c)</u>, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that (A) the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the First Lien Loan Documents, including any sale, lease, exchange, transfer or other disposition of the First Lien/Second Lien Collateral, whether by foreclosure or otherwise, and (B) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral.

(f)

(i)  Each of the First Lien Collateral Agent and the Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained, respectively, in (x) the First Lien Security Documents or any other First Lien Loan Document or (y) the Second Lien Security Documents or any other Second Lien Loan Document shall be deemed to restrict in any way the rights and remedies of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders with respect to the Super Priority Lien Collateral as set forth in this Agreement and the Super Priority Lien Loan Documents.

(ii)  The Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Security Documents or any other Second Lien Loan Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the First Lien/Second Lien Collateral as set forth in this Agreement and the First Lien Loan Documents.

**3.2**    <u>Actions Upon Breach</u>.

(a)

(i)  If, prior to the Discharge of Super Priority Lien Obligations, any First Lien Claimholder or Second Lien Claimholder, contrary to this Agreement, commences or participates in any action or proceeding against a Super Priority Lien Grantor or the Super Priority Lien Collateral (other than the Specified Insolvency Proceeding), the Super Priority Lien Collateral Agent may interpose in the name of the Super Priority Lien Claimholders or in the name of such Super Priority Lien Grantor the making of this Agreement as a defense or dilatory plea.

(ii)  If any Second Lien Claimholder, contrary to this Agreement, commences or participates in any action or proceeding against a First Lien/Second Lien Grantor or the First Lien/Second Lien Collateral, the First Lien Collateral Agent may interpose in the name of the First Lien Claimholders or in the name of such First Lien/Second Lien Grantor the making of this Agreement as a defense or dilatory plea.

(b)

(i)  If, prior to the Discharge of Super Priority Lien Obligations, any First Lien Claimholder or any Second Lien Claimholder, contrary to this Agreement, in any way takes, or attempts or threatens to take, any action with respect to the Super Priority Lien Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement, but excluding any action with respect to the Specified Insolvency Proceeding), or fails to take any action required by this Agreement, the Super Priority Lien Collateral Agent (in its own name or in the name of a Super Priority Lien Guarantor) may obtain relief against such First Lien Claimholder or Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, (A) it being understood and agreed by the First Lien Collateral Agent, on behalf of each First Lien Claimholder, and the Second Lien Collateral Agent, on behalf of each Second Lien Claimholder, that the Super Priority Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (B) the First Lien Collateral Agent, on behalf of each First Lien Claimholder, and the Second Lien Collateral Agent, on behalf of each Second Lien Claimholder, waives any defense that the Super Priority Lien Claimholders cannot demonstrate damage or be made whole by the awarding of damages.

(ii)  If, after the Discharge of Super Priority Lien Obligations, any Second Lien Claimholder, contrary to this Agreement, in any way takes, or attempts or threatens to take, any action with respect to the First Lien/Second Lien Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, the First Lien Collateral Agent (in its own name or in the name of a First Lien/Second Lien Guarantor) may obtain relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Collateral

Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (ii) the Second Lien Collateral Agent on behalf of each Second Lien Claimholder waives any defense that the First Lien Claimholders cannot demonstrate damage or be made whole by the awarding of damages.

SECTION 4.    Payments.

**4.1**    Application of Proceeds. (a) So long as the Discharge of Super Priority Lien Obligations has not occurred, any proceeds of Super Priority Lien Collateral received in connection with the sale or other disposition of such Super Priority Lien Collateral, or collection on such Super Priority Lien Collateral upon the exercise of remedies (other than receipt by any First Lien Claimholder or Second Lien Claimholder of Specified Consideration), shall be applied by the Super Priority Lien Collateral Agent to the Super Priority Lien Obligations in such order as specified in the relevant Super Priority Lien Loan Documents. Upon the Discharge of Super Priority Lien Obligations, the Super Priority Lien Collateral Agent shall deliver to the First Lien Collateral Agent any proceeds of First Lien/Second Lien Collateral held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the First Lien Loan Documents until the Discharge of First Lien Obligations has occurred.

(b)    So long as the Discharge of First Lien Obligations has not occurred, except as provided under subsection (a) above, any proceeds of First Lien/Second Lien Collateral received in connection with the sale or other disposition of such First Lien/Second Lien Collateral, or collection on such First Lien/Second Lien Collateral upon the exercise of remedies (other than receipt by any Second Lien Claimholder of Specified Consideration), shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the relevant First Lien Loan Documents. Upon the Discharge of First Lien Obligations, except as provided under subsection (a) above, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any proceeds of First Lien/Second Lien Collateral held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Loan Documents until the discharge of Second Lien Obligations has occurred. Upon the payment in full in cash of the Second Lien Obligations, except as provided in subsection (a) above, the Second Lien Collateral Agent shall deliver to the First Lien Collateral Agent any proceeds of First Lien/Second Lien Collateral (other than Specified Consideration) held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the First Lien Collateral Agent to the amount of any First Lien Obligations in excess of the First Lien Cap in such order as specified in the First Lien Loan Documents until such First Lien Obligations have been paid in full in cash (or the termination or cash collateralization (in an amount reasonably satisfactory to the First Lien Collateral Agent) of all letters of credit issued under the First Lien Loan Documents and any Hedge Agreement with a First Lien Claimholder and the payment in full of all Hedging Obligations then owing to a First Lien Claimholder).

**4.2**     Payment Turnover.  (a) So long as the Discharge of Super Priority Lien Obligations has not occurred and except as specifically permitted by Section 4.3, any Super Priority Lien Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(b), but excluding any Permitted Adequate Protection Payments or any Specified Consideration) received by the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder in connection with the exercise of any right or remedy (including set-off or recoupment) in respect of the Super Priority Lien Collateral shall be segregated and held in trust and forthwith paid over to the Super Priority Lien Collateral Agent for the benefit of the Super Priority Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Super Priority Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the First Lien Collateral Agent, any First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholder. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)     Except as set forth in subsection (a) above, so long as the Discharge of First Lien Obligations has not occurred and except as specifically permitted by Section 4.3, any First Lien/Second Lien Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(b), but excluding any Adequate Protection Payments or any Specified Consideration) received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) in respect of the First Lien/Second Lien Collateral shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First  Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

**4.3**     Permitted Mandatory Prepayments of Second Lien Obligations.  Notwithstanding the foregoing provisions of this Section 4, (x) mandatory prepayments required under Section 2.13 of the Second Lien Credit Agreement may be made and applied to the Second Lien Obligations (A) only if the payment is permitted by the First Lien Credit Agreement and the Super Priority Lien Credit Agreement or (B) at all times following the Discharge of First Lien Obligations and the Discharge of Super Priority Lien Obligations and (y) mandatory prepayments required under Section 2.13 of the First Lien Credit Agreement may be made and applied to the Super Priority Lien Obligations (A) only if the payment is permitted by the Super Priority Lien Credit Agreement or (B) at all times following the Discharge of Super Priority Lien Obligations.

SECTION 5.   Other Agreements.

**5.1**     Releases.

(a)        If, prior to the Discharge of Super Priority Lien Obligations, in connection with:

(i)  the exercise of any Super Priority Lien Collateral Agent's remedies in respect of the Shared Collateral, including any sale, lease, exchange, transfer or other disposition of any such Shared Collateral (an "**Exercise of Remedies**");

(ii)  subject to clauses (y) of the proviso below, any sale, lease, exchange, transfer or other disposition of any Shared Collateral permitted under the terms of the Super Priority Lien Loan Documents (whether or not an Event of Default (under and as defined in the Super Priority Lien Credit Agreement), has occurred and is continuing) (a "Disposition"); or

(iii)  any release of Liens on the assets of any Common Grantor, all of the Capital Stock of which is being released pursuant to any other provision of this <u>Section 5.1(a)</u>;

the Super Priority Lien Collateral Agent, for itself or on behalf of any of the Super Priority Lien Claimholders, or the United States Bankruptcy Court for the District of Delaware releases any of the Super Priority Lien Collateral Agent's Liens on any part of the Shared Collateral, or releases any Common Grantor from its obligations under its guaranty of the Super Priority Lien Obligations in connection with the sale or other disposition of all of the Capital Stock of such Common Grantor, then the Liens, if any, of (x) the First Lien Collateral Agent, for itself or for the benefit of the First Lien Claimholders, on such Shared Collateral, and the obligations of such Common Grantor under its guaranty of the First Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**First Lien Release**") and (y) the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Shared Collateral, and the obligations of such Common Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**Second Lien Release**") and each of the First Lien Collateral Agent, for itself or on behalf of any such First Lien Claimholders, and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the Super Priority Lien Collateral Agent or such Common Grantor such termination statements, releases and other documents as the Super Priority Lien Collateral Agent or such Common Grantor may request to effectively confirm such release; <u>provided</u>, <u>however</u>, that (i) the First Lien Release shall not occur without the consent of the First Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Shared Collateral the net proceeds of the disposition of which will not be applied to repay the Super Priority Lien Obligations, or the Liens of the First Lien Claimholders do not attach to such net proceeds in the manner and priority set forth in this Agreement or (y) in the case of a Disposition that is not in connection with an Exercise of Remedies, if the Disposition is prohibited by or not otherwise permitted under any provision of the First Lien Credit Agreement and (ii) the Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Shared Collateral the net proceeds of the disposition of which will not be applied to repay (and, in the case of revolving loans (including swingline loans), to reduce permanently commitments with respect to the Super Priority Lien Obligations or the First Lien Obligations, or the Liens of the Second Lien Claimholders do not attach to such net proceeds in the manner and priority set forth

in this Agreement or (y) in the case of a Disposition that is not in connection with an Exercise of Remedies, if the Disposition is prohibited by or not otherwise permitted under any provision of the Second Lien Credit Agreement.  Notwithstanding anything herein to the contrary, upon the Specified Confirmation and Release (i) the Liens in favor of the Super Priority Lien Collateral Agent, for itself and on behalf of the Super Priority Lien Claimholders, and the guaranty of the Super Priority Lien Obligations in favor of the Super Priority Lien Collateral Agent, for itself and on behalf of the benefit of the Super Priority Lien Claimholders, shall be automatically, unconditionally and simultaneously released, (ii) the Liens in favor of the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, and the guaranty of the First Lien Obligations in favor of the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, shall be automatically, unconditionally and simultaneously released and (iii) the Liens in favor of the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, and the guaranty of the Second Lien Obligations in favor of the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, shall be automatically, unconditionally and simultaneously released.

(b)     If, after the Discharge of Super Priority Lien Obligations (or, prior to the Discharge of Super Priority Lien Obligations, solely with respect to the First Lien/Second Lien Collateral that does not constitute Shared Collateral), in connection with:

(i)  the exercise of any First Lien Collateral Agent's remedies in respect of the First Lien/Second Lien Collateral, including any sale, lease, exchange, transfer or other disposition of any such First Lien/Second Lien Collateral (a "**First Lien/Second Lien Exercise of Remedies**"); or

(ii)  subject to clause (y) of the proviso below, any sale, lease, exchange, transfer or other disposition of any First Lien/Second Lien Collateral permitted under the terms of the First Lien Loan Documents (whether or not an Event of Default (under and as defined in the First Lien Credit Agreement), has occurred and is continuing) (a "**First Lien/Second Lien Disposition**"), or

(iii)  any release of Liens on the assets of any First Lien/Second Lien Grantor, all of the Capital Stock of which is being released pursuant to any other provision of this Section 5.1(b);

the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the First Lien/Second Lien Collateral, or releases any First Lien/Second Lien Grantor from its obligations under its guaranty of the First Lien Obligations in connection with the sale or other disposition of all of the Capital Stock of such First Lien/Second Lien Grantor, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such First Lien/Second Lien Collateral, and the obligations of such First Lien/Second Lien Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**First Lien/Second Lien Release**") and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such First Lien/Second Lien Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such First Lien/Second Lien

Grantor may request to effectively confirm such release; <u>provided</u>, <u>however</u>, that the First Lien/Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of a First Lien/Second Lien Exercise of Remedies, as to any First Lien/Second Lien Collateral the net proceeds of the disposition of which will not be applied to repay (and, in the case of revolving loans (including swingline loans), to reduce permanently commitments with respect to) the First Lien Obligations or the Liens of the Second Lien Claimholders do not attach to such net proceeds in the manner and priority set forth in this Agreement or (y) in the case of a First Lien/Second Lien Disposition that is not in connection with a First Lien/Second Lien Exercise of Remedies, if the Disposition is prohibited by or not otherwise permitted under any provision of the Second Lien Credit Agreement.

(c)    (i)    Until the Discharge of Super Priority Lien Obligations occurs, each of (x) the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders and (y) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the Super Priority Lien Collateral Agent and any officer or agent of the Super Priority Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the First Lien Collateral Agent or the Second Lien Collateral Agent, as applicable, or such holder or in the Super Priority Lien Collateral Agent's own name, from time to time in the Super Priority Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this <u>Section 5.1</u>, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this <u>Section 5.1</u>, including any endorsements or other instruments of transfer or release. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(ii)  Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this <u>Section 5.1</u>, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this <u>Section 5.1</u>, including any endorsements or other instruments of transfer or release. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(d)    (i)    From and after the Discharge of Super Priority Lien Obligations Discharge (or, prior to the Discharge of Super Priority Lien Obligations, solely with respect to the First Lien/Second Lien Collateral that does not constitute Shared Collateral) and until the Discharge of Super Priority Lien Obligations occurs, to the extent that the Super Priority Lien Collateral Agent for itself and on behalf of the Super Priority Lien Claimholders has released any Lien on Shared Collateral or any Common

Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated, then each of the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders and the Second Lien Collateral Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such Shared Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in <u>Section 2</u>.

      (ii)  Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders (A) has released any Lien on First Lien/Second Lien Collateral or any First Lien/Second Lien Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (B) obtains any new Liens or additional guaranties from First Lien/Second Lien Grantors, then the Second Lien Collateral Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such First Lien/Second Lien Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in <u>Section 2</u>.

    **5.2**    <u>Insurance</u>.  (i) Until the date upon which the Discharge of Super Priority Lien Obligations shall have occurred, as between the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders, on the one hand, and the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Super Priority Lien Grantors under the Super Priority Lien Loan Documents, (a) to adjust or settle any insurance policy or claim covering any Super Priority Lien Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting any Super Priority Lien Collateral. Until the date upon which the Discharge of Super Priority Lien Obligations shall have occurred, and subject to rights of the Super Priority Lien Grantors under the Super Priority Lien Loan Documents, all proceeds of any such policy and any such award in respect of any Super Priority Lien Collateral that are payable to the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and/or the Second Lien Collateral Agent shall be paid to the Super Priority Lien Collateral Agent for the benefit of the Super Priority Lien Claimholders to the extent required under the Super Priority Lien Loan Documents with respect to the Super Priority Lien Obligations and thereafter, in accordance with the priorities set forth in <u>Section 5.1</u>.  If the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the Super Priority Lien Collateral Agent in accordance with the terms of <u>Section 4.2</u>.

      (ii)  From and after the Discharge of Super Priority Lien Obligations Discharge (or, prior to the Discharge of Super Priority Lien Obligations, solely with respect to the First Lien/Second Lien Collateral that does not constitute Shared Collateral) and until the date upon which the Discharge of First Lien Obligations shall have occurred, as between the First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right,

subject to the rights of the First Lien/Second Lien Grantors under the First Lien Loan Documents, (a) to adjust or settle any insurance policy or claim covering any Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting any First Lien/Second Lien Collateral. Until the date upon which the Discharge of First Lien Obligations shall have occurred, and subject to rights of the First Lien/Second Lien Grantors under the First Lien Loan Documents, all proceeds of any such policy and any such award in respect of any First Lien/Second Lien Collateral that are payable to the First Lien Collateral Agent and the Second Lien Collateral Agent shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders to the extent required under the First Lien Loan Documents with respect to the First Lien Obligations (including for purposes of cash collateralization of commitments, letters of credit, Cash Management Agreements and Hedge Agreements ) and thereafter, to the extent no First Lien Obligations are outstanding, to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the applicable Second Lien Loan Documents; then to the First Lien Collateral Agent with respect to any Indebtedness to the First Lien Claimholders for any amounts owing thereto in excess of the First Lien Cap; and then, to the extent no Second Lien Obligations are outstanding, to the owner of the subject property or as a court of competent jurisdiction may otherwise direct. If the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of <u>Section 4.2</u>.

**5.3**    <u>Amendments to Loan Documents</u>.

(a)    The Super Priority Lien Loan Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms and the Super Priority Lien Credit Agreement may be Refinanced in each case, without the consent of the (x) First Lien Collateral Agent or the First Lien Claimholders or (y) Second Lien Collateral Agent or the Second Lien Claimholders; provided, however, that (i) the aggregate principal amount of the Super Priority Lien Obligations shall not be increased (whether in connection with a Refinancing or otherwise) except to the extent any such increase is permitted pursuant to Section 6.1 hereof or has been consented to by the First Lien Collateral Agent and the Second Lien Collateral Agent (in each case acting at the direction of the applicable Required Lenders), and (ii) in connection with any Refinancing the terms of such Refinancing shall comply with Section 6.1 hereof and the holders of such Refinancing debt (or their agent on their behalf) bind themselves in writing to the terms of this Agreement.

(b)    The First Lien Loan Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced in each case, without the consent of (x) the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders or (y) the Second Lien Collateral Agent or the Second Lien Claimholders; <u>provided</u>, <u>however</u>, that (i) the holders

of such Refinancing debt (or their agent on their behalf) bind themselves in writing to the terms of this Agreement and (ii) the aggregate principal or face amount of First Lien Obligations (other than Cash Management Obligations and Hedging Obligations) shall not exceed the First Lien Cap; provided further, however, that any such amendment, restatement, supplement, modification or Refinancing shall not, without the prior written consent of Second Lien Collateral Agent and the Super Priority Lien Collateral Agent increase the interest rate by more than 300 basis points per annum (excluding increases resulting from the accrual of interest at the default rate, increases due to fluctuations in the Alternate Base Rate, the Adjusted LIBO Rate or other index rate or increases due to the operation of a pricing grid no more favorable to the First Lien Lenders than the pricing grid set forth in the First Lien Credit Agreement in effect on the Effective Date); *provided, further,* that: any such amendment, restatement, supplement, modification or Refinancing shall not, without the prior written consent of the Super Priority Lien Collateral Agent: (i) change to earlier dates upon which payments of principal or interest are due thereon or (ii) increase the material non-monetary obligations (other than those set forth in immediately preceding clause (i)) of the First Lien/Second Lien Grantors thereunder or confer any additional material rights on First Lien Claimholders, unless in the case of this clause (ii), the Super Priority Lien Collateral Agent and the Super Priority Lien Lenders are informed at least 3 Business Days after the same shall become effective, of such amendment, supplement, modification, or Refinancing and have an opportunity to make a conforming amendment relative thereto (it being understood and agreed that the Grantors (to the extent constituting Common Grantors) agree to make such conforming amendments to the Super Priority Lien Loan Documents as may be required to give effect to the foregoing).

(c)     Until the Discharge of Super Priority Lien Obligations and the Discharge of First Lien Obligations occur, the Second Lien Loan Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms and the Second Lien Credit Agreement may be Refinanced in each case, without the consent of [(x) the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders or (y)] the First Lien Collateral Agent or the First Lien Claimholders provided, however, that the holders of such Refinancing debt (or their agent on their behalf) bind themselves in writing to the terms of this Agreement; provided further, however, that any such amendment, restatement, supplement, modification, or Refinancing shall not (except, other than as otherwise contemplated by clause (iii) below with respect to non-monetary obligations referred to in such clause, with respect to any Conforming Amendment (provided that any Conforming Amendment shall maintain an equivalent proportionate difference between dollar amounts or ratios, as the case may be, in the relevant provision in the Second Lien Credit Agreement and those in the corresponding covenant in the First Lien Credit Agreement, to the extent that such difference exists between the Second Lien Credit Agreement and the First Lien Credit Agreement on the Effective Date (and, in the case of a new covenant or event of default being added to (or expanded to cover new parties or areas in) the First Lien Credit Agreement, the difference in dollar amounts or ratios between such covenant or event of default in the First Lien Credit Agreement and the Second Lien Credit Agreement shall be 15% more restrictive toward the Companies in the First Lien Credit Agreement)), without the prior written consent of First Lien Collateral Agent and he Super Priority Lien Collateral Agent:

(i)  increase the interest rate by more than 300 basis points per annum (excluding increases resulting from the accrual of interest at the default rate or increases due to fluctuations in Adjusted LIBO Rate or the Alternate Base Rate or other index rate);

(ii)  change to earlier dates any dates upon which payments of principal or interest are due thereon; or

(iii)  increase the material non-monetary obligations (other than those set forth in immediately preceding clauses (i) and (ii)) of Grantors thereunder or confer any additional material rights on Second Lien Claimholders, unless in the case of this clause (iii), (x) the Super Priority Lien Collateral Agent and the Super Priority Lien Lenders and (y) the First Lien Collateral Agent and the First Lien Lenders are informed, at least 3 Business Days after the same shall become effective, of such amendment, supplement, modification, or Refinancing and have an opportunity to make a Conforming Amendment relative thereto (and such Conforming Amendment shall benefit from the terms set forth in immediately preceding clause (a) above). Further, the First Lien/Second Lien Grantors agree to make such Conforming Amendments to the Super Priority Lien Loan Documents and the First Lien Loan Documents to give effect to the foregoing.

(d)      (i)  Notwithstanding the foregoing clauses (a), (b) and (c) of this Section 5.3, until the date upon which the Discharge of Super Priority Lien Obligations shall have occurred, without the prior written consent of the Super Priority Lien Collateral Agent, no First Lien Security Document or Second Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Credit Agreement, First Lien Security Document, Second Lien Credit Agreement or Second Lien Security Document, would contravene any of the terms of this Agreement or the DIP Orders.

(ii)  Notwithstanding the foregoing clauses (a), (b) and (c) of this 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, without the prior written consent of the First Lien Collateral Agent, no Second Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Credit Agreement or Second Lien Security Document, would contravene any of the terms of this Agreement.

(e)      (i)  The First Lien Collateral Agent agrees that each First Lien Security Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Amended and Restated Intercreditor Agreement, dated as of [●], 2016 as the same may be amended, supplemented, modified or

36

replaced from time to time (the "**Intercreditor Agreement**") between Barclays Bank PLC, as Super Priority Lien Collateral Agent, Barclays Bank PLC, as First Lien Collateral Agent and Wilmington Trust, National Association, as Second Lien Collateral Agent, and the Grantors (as defined therein). In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern."

(ii)  The Second Lien Collateral Agent agrees that each Second Lien Security Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Amended and Restated Intercreditor Agreement, dated as of [●], 2016 as the same may be amended, supplemented, modified or replaced from time to time (the "**Intercreditor Agreement**") between Barclays Bank PLC, as Super Priority Lien Collateral Agent, Barclays Bank PLC, as First Lien Collateral Agent and Wilmington Trust, National Association, as Second Lien Collateral Agent, and the Grantors (as defined therein). In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern."

In addition, the First Lien Collateral Agent agrees that each First Lien Security Document under which any Lien on real property owned by any Common Grantor is granted to secure the First Lien Obligations covering any Shared Collateral shall contain such other language as the Super Priority Lien Collateral Agent may reasonably request to reflect the priority of the Super Priority Lien Security Document covering such Shared Collateral over such First Lien Security Document.

In addition, the Second Lien Collateral Agent agrees that each Second Lien Security Document under which any Lien on real property owned by any First Lien/Second Lien Grantor is granted to secure the Second Lien Obligations covering any Collateral shall contain such other language as the Super Priority Lien Collateral Agent or the First Lien Collateral Agent, as applicable, may reasonably request to reflect the priority of the Super Priority Lien Document or First Lien Security Document, as applicable, covering such Shared Collateral over such Second Lien Security Document.

(f)    (i)  Notwithstanding the foregoing clauses (a), (b) and (c) of this Section 5.3, until the date upon which the Discharge of Super Priority Lien Obligations shall have occurred, in the event the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders enter into any amendment, waiver or consent in respect of any of the Super Priority Lien Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any Super Priority Lien Security Document or changing in any manner the rights of the Super Priority Lien

Collateral Agent, the Super Priority Lien Claimholders, or the Super Priority Lien Grantors thereunder, then such amendment, waiver or consent shall, at the election of the Super Priority Lien Collateral Agent, automatically apply in a comparable manner to any comparable provision of (x) the First Lien Security Documents without the consent of the First Lien Collateral Agent or the First Lien Claimholders and without any action by the First Lien Collateral Agent or any Grantor and (y) the Second Lien Security Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any Grantor; provided, however, (A) that no such amendment, waiver or consent shall be effective to (i) release any Lien of the First Lien Security Document or the Second Lien Security Documents, (ii) remove assets subject to the Lien of the First Lien Security Documents or the Second Lien Security Documents, (iii) permit any Liens on the Collateral not permitted under the First Lien Security Documents or the Second Lien Loan Documents or Section 6, or (iv) impose duties on the First Lien Collateral Agent or the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i) and (ii), to the extent that a release of, or adverse effect on the perfection or priority of, such Lien is permitted by Section 5.1 or Section 6, and (B) notice of such amendment, waiver or consent shall have been given to the First Lien Collateral Agent and the Second Lien Collateral Agent no later than 10 Business Days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness or validity thereof; and provided further that this paragraph is intended solely to set forth provisions by which the First Lien Security Documents and the Second Lien Security Documents shall be automatically affected by amendments, waivers and consents given by the Super Priority Lien Collateral Agent and Super Priority Lien Claimholders under the Super Priority Lien Credit Agreement and the Super Priority Lien Security Documents and is not intended to impose any liability on the Super Priority Lien Collateral Agent or Super Priority Lien Claimholders.

(ii)  Notwithstanding the foregoing clauses (a), (b) and (c) of this Section 5.3, until the date upon which the Discharge of First Lien Obligations shall have occurred, in the event the First Lien Collateral Agent or the First Lien Claimholders enter into any amendment, waiver or consent in respect of any of the First Lien Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Security Document or changing in any manner the rights of the First Lien Collateral Agent, the First Lien Claimholders, or the First Lien/Second Lien Grantors thereunder, then such amendment, waiver or consent shall automatically apply in a comparable manner to any comparable provision of the Second Lien Security Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any First Lien/Second Lien Grantor; provided, however, (A) that no such amendment, waiver or consent shall be effective to (i) release any Lien of the Second Lien Security Documents, (ii) remove assets subject to the Lien of the Second Lien Security Documents, (iii) permit any Liens on the Collateral not permitted under the Second Lien Loan Documents or Section 6, or (iv) impose duties on the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i) and (ii), to the extent that a release of, or adverse

effect on the perfection or priority of, such Lien is permitted by <u>Section 5.1</u> or <u>Section 6</u>, and (B) notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent no later than 10 Business Days after its effectiveness, <u>provided</u> that the failure to give such notice shall not affect the effectiveness or validity thereof; and <u>provided further</u> that this paragraph is intended solely to set forth provisions by which the Second Lien Security Documents shall be automatically affected by amendments, waivers and consents given by the First Lien Collateral Agent and First Lien Claimholders under the First Lien Credit Agreement and the First Lien Security Documents and is not intended to impose any liability on the First Lien Collateral Agent or First Lien Claimholders.

**5.4** <u>Rights As Unsecured Creditors</u>.  (a) Except as otherwise set forth in <u>Section 2.1</u> or <u>Section 3.1</u>, and subject to Section 8 hereof, until the Discharge of Super Priority Lien Obligations has occurred, the First Lien Collateral Agent and the First Lien Claimholders may exercise rights and remedies as unsecured creditors against any First Lien/Second Lien Grantor in accordance with the terms of the First Lien Loan Documents and applicable law so long as such exercise does not violate any express provision of this Agreement, including, without limitation, Section 8 hereof. Except as otherwise set forth in <u>Section 2.1(a)</u> and <u>Section 4</u>, nothing in this Agreement shall prohibit the receipt by the First Lien Collateral Agent or any First Lien Claimholders of Permitted Adequate Protection Payments. In the event that any First Lien Claimholder becomes a judgment Lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the First Lien Obligations subject to this Agreement.

(b)     Except as otherwise set forth in <u>Section 2.1</u> or <u>Section 3.1</u>, and subject to Section 8.1 hereof, the Second Lien Collateral Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against any First Lien/Second Lien Grantor in accordance with the terms of the Second Lien Loan Documents and applicable law so long as such exercise does not violate any express provision of this Agreement, including without limitation, Section 8.1 hereof. Except as otherwise set forth in <u>Section 2.1</u> and <u>Section 4</u>, nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any Second Lien Claimholders of Permitted Adequate Protection Payments. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the Collateral. In the event that any Second Lien Claimholder becomes a judgment Lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the Second Lien Obligations subject to this Agreement.

**5.5** <u>Bailee for Perfection</u>.

(a)     (i) The Super Priority Lien Collateral Agent agrees to hold the Control Collateral constituting Shared Collateral that is in its possession or control (or in the possession or control of its agents or bailees) for the benefit of and on behalf of the Super

Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders and any permitted assignee of any thereof solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral constituting Shared Collateral, subject to the terms and conditions of this <u>Section 5.5</u>. The First Lien Collateral Agent and the Second Lien Collateral Agent hereby acknowledges that the Super Priority Lien Collateral Agent will obtain "control" under the UCC over each Controlled Account constituting Shared Collateral as contemplated by the Super Priority Lien Documents, the First Lien Security Documents and the Second Lien Security Documents for the benefit of the Super Priority Lien Collateral Agent (on behalf of itself and the Super Priority Lien Claimholders) the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) pursuant to the control agreements relating to each such respective Controlled Account.  This subsection (a) shall not apply to any property or assets not constituting Shared Collateral.

(ii)  The First Lien Collateral Agent agrees to hold the Control Collateral that is in its possession or control (or in the possession or control of its agents or bailees) for the benefit of and on behalf of the Super Priority Lien Claimholders (if such Control Collateral constitutes Super Priority Lien Collateral) and for the First Lien Claimholders and the Second Lien Claimholders (if such Control Collateral constitutes First Lien/Second Lien Collateral) and, in each case any permitted assignee of any thereof solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral, subject to the terms and conditions of this <u>Section 5.5</u>. The Second Lien Collateral Agent hereby acknowledges that the First Lien Collateral Agent will obtain "control" under the UCC over each Controlled Account constituting First Lien/Second Lien Second Lien Collateral as contemplated by the First Lien Security Documents and the Second Lien Security Documents for the benefit of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) pursuant to the control agreements relating to each respective Controlled Account.

(b)       (i)  Subject to the terms of this Agreement, the Super Priority Lien Collateral Agent shall be entitled to deal with the Control Collateral constituting Shared Collateral in accordance with the terms of the Super Priority Lien Loan Documents as if the Liens of (x) the First Lien Claimholders under the First Lien Loan Documents and (y) the Second Lien Claimholders under the Second Lien Loan Documents did not exist until the earlier of (i) the date upon which the Discharge of Super Priority Lien Obligations shall have occurred and (ii) the First Lien Enforcement Date, and neither the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise of such rights by the First Lien Collateral Agent in any respect. The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Super Priority Lien Collateral Agent to the same extent and on the same terms that the Grantors are required to do so in accordance with the Super Priority Lien Credit Agreement. The Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse,

indemnify and hold harmless the Super Priority Lien Collateral Agent to the same extent and on the same terms that the Super Priority Lien Claimholders are required to do so for the Super Priority Lien Collateral Agent in accordance with the Super Priority Lien Credit Agreement, the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Credit Agreement.

(ii)  Subject to the terms of this Agreement, as between the First Lien Collateral Agent and the Second Lien Collateral Agent, the First Lien Collateral Agent shall be entitled to deal with the Control Collateral constituting First Lien/Second Lien Collateral in accordance with the terms of the First Lien Loan Documents as if the Liens of the Second Lien Claimholders under the Second Lien Loan Documents did not exist until the earlier of (i) the date upon which the Discharge of First Lien Obligations shall have occurred and (ii) the Second Lien Enforcement Date and neither the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise of such rights by the First Lien Collateral Agent in any respect. The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the First Lien Collateral Agent to the same extent and on the same terms that the Grantors are required to do so in accordance with the First Lien Credit Agreement. The First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the First Lien Collateral Agent to the same extent and on the same terms that the First Lien Claimholders are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Credit Agreement.

(c)

(i)  Except as set forth below, the Super Priority Lien Collateral Agent shall have no obligation whatsoever to (x) the First Lien Collateral Agent or any First Lien Claimholder or (y) the Second Lien Collateral Agent or any Second Lien Claimholder including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5.  In acting for the benefit of and on behalf of the Super Priority Lien Collateral Agent, the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders and the First Lien Claimholders, the duties or responsibilities of the Super Priority Lien Collateral Agent under this Section 5.5 shall be limited solely (A) to physically holding the Control Collateral constituting Shared Collateral delivered to the Super Priority Lien Collateral Agent by any Grantor as agent for the Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders for purposes of perfecting the Lien held by the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent and (B) delivering such Control Collateral as set forth in Section 5.5(f).

(ii)  Except as set forth below, the First Lien Collateral Agent shall have no obligation whatsoever to the Second Lien Collateral Agent or any Second Lien Claimholder including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this 5.5.  In acting for the benefit of and on behalf of the Second Lien Collateral Agent, the Second Lien Claimholders and the First Lien Claimholders, the duties or responsibilities of the First Lien Collateral Agent under this 5.5 shall be limited solely (A) to physically holding the Control Collateral constituting First Lien/Second Lien Collateral delivered to the First Lien Collateral Agent by any Grantor as agent for the First Lien Claimholders and the Second Lien Claimholders for purposes of perfecting the Lien held by the First Lien Collateral Agent and the Second Lien Collateral Agent and (B) delivering such Control Collateral as set forth in Section 5.5(f).

(d)    The rights of the First Lien Collateral Agent with respect to the Shared Collateral shall at all times be subject to the terms of this Agreement and to the Super Priority Lien Collateral Agent's rights under the Super Priority Lien Loan Documents. The rights of the Second Lien Collateral Agent with respect to the Shared Collateral and the First Lien/Second Lien Collateral shall at all times be subject to the terms of this Agreement, to the Super Priority Lien Collateral Agent's rights under the Super Priority Lien Loan Documents and to the First Lien Collateral Agent's rights under the First Lien Loan Documents.

(e)

(i)  The Super Priority Lien Collateral Agent shall not have by reason of the First Lien Loan Documents, the Second Lien Loan Documents or this Agreement or any other document a fiduciary relationship in respect of the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder, and (x) the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder and (y) the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, each hereby waives and releases the Super Priority Lien Collateral Agent from all claims and liabilities arising pursuant to the Super Priority Lien Collateral Agent's role under this Section 5.5 as sub-agents and gratuitous bailees with respect to the Control Collateral.

(ii)  The First Lien Collateral Agent shall not have by reason of the Super Priority Lien Loan Documents, the Second Lien Loan Documents or this Agreement or any other document a fiduciary relationship in respect of the Super Priority Lien Collateral Agent, any Super Priority Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder, and (x) the Super Priority Lien Collateral Agent, for itself and on behalf of each Super Priority Lien Claimholder and (y) the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, hereby waives and releases the First Lien Collateral Agent from all claims and liabilities arising pursuant to the First Lien

42

Collateral Agent's role under this Section 5.5 as sub-agents and gratuitous bailees with respect to the Control Collateral.

(f)

(i)  Upon the Discharge of Super Priority Lien Obligations, the Super Priority Lien Collateral Agent shall deliver the remaining Control Collateral (if any) constituting First Lien/Second Lien Collateral together with any necessary endorsements, first, to the First Lien Collateral Agent to the extent First Lien Obligations remain outstanding, second, to the Second Lien Collateral Agent to the extent First Lien Obligations remain outstanding and third, to the Borrower to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Control Collateral). The Super Priority Lien Collateral Agent further agrees to take all other action reasonably requested by each such Person in connection with such Person obtaining a first-priority interest in the Control Collateral pursuant to the terms hereof or as a court of competent jurisdiction may otherwise direct. The Borrower and the other Grantors shall take such further action as is required to effectuate each such transfer contemplated hereby and shall indemnify the Super Priority Lien Collateral Agent for loss or damage suffered by the Super Priority Lien Collateral Agent as a result of such transfer, except for loss or damage suffered by the Super Priority Lien Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith. The Super Priority Lien Collateral Agent shall have no obligations to follow instructions from (x) the First Lien Collateral Agent or any other First Lien Claimholder or (y) the Second Lien Collateral Agent or any other Second Lien Claimholder, in each case in contravention of this Agreement.

(ii)  Upon the Discharge of First Lien Obligations, the First Lien Collateral Agent shall deliver the remaining Control Collateral (if any) constituting First Lien/Second Lien Collateral and not constituting Super Priority Lien Collateral, together with any necessary endorsements, first, to the Second Lien Collateral Agent to the extent Second Lien Obligations remain outstanding, second, to the First Lien Collateral Agent to the extent there is any outstanding Indebtedness thereto in excess of the First Lien Cap and third, to the Borrower to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Control Collateral). The First Lien Collateral Agent further agrees to take all other action reasonably requested by each such Person in connection with such Person obtaining a first-priority interest in the Control Collateral pursuant to the terms hereof or as a court of competent jurisdiction may otherwise direct. The Borrower and the other Grantors shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the First Lien Collateral Agent for loss or damage suffered by the First Lien Collateral Agent as a result of such transfer, except for loss or damage suffered by the First Lien Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith. The First Lien Collateral Agent shall have no obligations to follow instructions from the Second

43

Lien Collateral Agent or any other Second Lien Claimholder in contravention of this Agreement.

**5.6**    When Discharge of Obligations Deemed to Not Have Occurred.

(a)    If at any time in connection with, substantially concurrently with or after the Discharge of Super Priority Lien Obligations has occurred, thereafter one or more Super Priority Lien Grantors enters into any Refinancing of any Super Priority Lien Loan Document evidencing a Super Priority Lien Obligation which Refinancing is permitted hereby, then such Discharge of Super Priority Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Super Priority Lien Obligations), and the obligations under such Refinancing Super Priority Lien Loan Document shall automatically be treated as Super Priority Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the Super Priority Lien Collateral Agent under such Super Priority Lien Loan Documents shall be a Super Priority Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that such Super Priority Lien Grantor(s) has entered into a new Super Priority Lien Loan Document, each of the First Lien Collateral Agent and the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as such Grantor(s) or such new collateral agent shall reasonably request in order to provide to such new collateral agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and deliver to such new collateral agent any Control Collateral constituting Super Priority Lien Collateral in its possession or control, together with any necessary endorsements or otherwise allow such new collateral agent to obtain control of such Control Collateral. If the new Super Priority Lien Obligations under the new Super Priority Lien Loan Documents are secured by assets of the Super Priority Lien Grantors of the type constituting First Lien/Second Lien Collateral that do not also secure the First Lien Obligations or the Second Lien Obligations, then the First Lien Obligations or the Second Lien Obligations, as applicable, shall be secured at such time by a second priority or third priority Lien, respectively, on such assets to the same extent provided in the First Lien Security Documents or the Second Lien Security Documents, as applicable.

(b)    If at any time in connection with, substantially concurrently with or after the Discharge of First Lien Obligations has occurred, thereafter one or more First Lien/Second Lien Grantors enters into any Refinancing of any First Lien Loan Document evidencing a First Lien Obligation which Refinancing is permitted hereby and by the terms of the Super Priority Lien Loan Documents and the Second Lien Loan Documents, then such Discharge of First Lien Obligations shall automatically be deemed to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First Lien Obligations), and the obligations under such Refinancing First Lien Loan Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Loan

Documents shall be a First Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that such First Lien/Second Lien Grantor(s) has entered into a new First Lien Loan Document (which notice shall include the identity of the new collateral agent (such agent, the "**New Agent**")), the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as such First Lien/Second Lien Grantor(s) or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and deliver to the New Agent any Control Collateral constituting First Lien/Second Lien Collateral in its possession or control, together with any necessary endorsements or otherwise allow the New Agent to obtain control of such Control Collateral. If the new First Lien Obligations under the new First Lien Loan Documents are secured by assets of the First Lien/Second Lien Grantors of the type constituting First Lien/Second Lien Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Security Documents.

**5.7**    Purchase Right.  Without prejudice to the enforcement of the First Lien Claimholders' remedies, the First Lien Claimholders agree that at any time following (a) acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within sixty (60) days of the occurrence thereof or (c) the commencement of an Insolvency or Liquidation Proceeding (each, a "**Purchase Event**"), within thirty (30) days of the Purchase Event, one or more of the Second Lien Claimholders may request, and the First Lien Claimholders hereby offer the Second Lien Claimholders the option, to purchase all, but not less than all, of the aggregate amount of First Lien Obligations outstanding at the time of purchase at par, plus any premium that would be applicable upon prepayment of the First Lien Obligations and accrued and unpaid interest, fees, and expenses, without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment and Acceptance (as such term is defined in the First Lien Credit Agreement)). If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request. If one or more of the Second Lien Claimholders exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent. If none of the Second Lien Claimholders exercise such right, the First Lien Claimholders shall have no further obligations pursuant to this Section 5.7 for such Purchase Event and may take any further actions in their sole discretion in accordance with the First Lien Loan Documents and this Agreement.

SECTION 6.    Insolvency or Liquidation Proceedings.

**6.1**    Use of Cash Collateral and Financing Issues.  (a) Each of the First Lien Collateral Agent, on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of the Second Lien Claimholders, consents to, and agrees that it will raise no objection to, the Super Priority Lien Loan Documents and the use of cash collateral contemplated thereby and by the DIP Orders and that, during the pendency of the Specified Insolvency Proceeding, the

obtaining of financing under Section 363 or Section 364 of the Bankruptcy Code and the use of cash collateral shall be determined by and subject to the DIP Orders.

(b)    With respect to any Insolvency or Liquidation Proceeding other than the Specified Insolvency Proceeding, until the Discharge of First Lien Obligations has occurred, if a Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Collateral Agent shall desire to permit the use of cash collateral on which the First Lien Collateral Agent or any other creditor has a Lien, or to permit such Grantor to obtain financing, from one or more of the First Lien Claimholders under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a "**DIP Financing**"), then, so long as the maximum principal amount of Indebtedness that may be outstanding from time to time in connection with such DIP Financing (not including any First Lien Obligations rolled up therein) shall not exceed an amount equal to $100,000,000, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, (A) agrees that it will raise no objection to such use of cash collateral or DIP Financing nor support any other Person objecting to, such sale, use, or lease of cash collateral or DIP Financing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4) and, to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all obligations relating thereto), (y) any adequate protection Liens provided to the First Lien Claimholders and (z) any "carve-out" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent; and (B) agrees that notice received two (2) calendar days prior to the entry of an order approving such usage of cash collateral or approving such DIP Financing shall be adequate notice; provided that the foregoing shall not prohibit the Second Lien Collateral Agent or the Second Lien Claimholders from objecting solely to any provisions in any DIP Financing relating to, describing or requiring any provision or content of a plan of reorganization other than any provisions requiring that the DIP Financing be paid in full in cash.

**6.2**    Sale Issues.  (a) Until the Discharge of Super Priority Lien Obligations has occurred, each of (x) the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders and (y) the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to or oppose a sale or other disposition of any Shared Collateral (and any post-petition assets subject to adequate protection liens in favor of the First Lien Collateral Agent or the Second Lien Collateral Agent, as applicable) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Required Lenders under the Super Priority Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the First Lien Claimholders and the Second Lien Claimholders in the Collateral (and any post-petition assets subject to adequate protection liens, if any, in favor of the First Lien Collateral Agent or the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement, provided that the First Lien Claimholders and the Second Lien Claimholders may assert any objection to the proposed bidding procedures or protections to be utilized in connection with any such sale or disposition that may be asserted by any unsecured creditor of any Grantor, and further provided that the First

Lien Claimholders and the Second Lien Claimholders are not deemed to have waived any rights to credit bid on the Collateral in any such sale or disposition under Section 363(k) of the Bankruptcy Code (or any similar provision under the Bankruptcy Code or any other applicable law), so long as any such credit bid provides for the payment in full in cash of the Super Priority Lien Obligations and, in the case of credit bid by any Second Lien Claimholders, the First Lien Obligations. If requested by the Super Priority Lien Collateral Agent in connection therewith, the First Lien Collateral Agent and the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

(b)    The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to or oppose a sale or other disposition of any First Lien/Second Lien Collateral (and any post-petition assets subject to adequate protection liens in favor of the First Lien Collateral Agent) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Required Lenders under the First Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the Second Lien Claimholders in the First Lien/Second Lien Collateral (and any post-petition assets subject to adequate protection liens, if any, in favor of the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement, provided that the Second Lien Claimholders may assert any objection to the proposed bidding procedures or protections to be utilized in connection with any such sale or disposition that may be asserted by any unsecured creditor of any First Lien/Second Lien Grantor, and further provided that the Second Lien Claimholders are not deemed to have waived any rights to credit bid on the Collateral in any such sale or disposition under Section 363(k) of the Bankruptcy Code (or any similar provision under the Bankruptcy Code or any other applicable law), so long as any such credit bid provides for the payment in full in cash of the First Lien Obligations and, in the case of a credit bid prior to the Discharge of Super Priority Lien Obligations, the Super Priority Lien Obligations. If requested by the First Lien Collateral Agent in connection therewith, the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

**6.3**    <u>Relief from the Automatic Stay</u>.  (a) Until the Discharge of Super Priority Lien Obligations has occurred, each of (x) the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders and (y) the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Super Priority Lien Collateral, without the prior written consent of the Super Priority Lien Collateral Agent, or (ii) oppose any request by the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder to seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Super Priority Lien Collateral.

(b)    Until the Discharge of First Lien Obligations has occurred, as between the First Lien Collateral Agent and the Second Lien Collateral Agent, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the First Lien/Second Lien Collateral, without the prior written consent of the First Lien Collateral Agent, or (ii) oppose any request by the First Lien Collateral Agent or any First Lien Claimholder to seek relief from the

automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the First Lien/Second Lien Collateral.

**6.4**    Adequate Protection.

(a)    Each of the Super Priority Lien Collateral Agent, on behalf of the Super Priority Lien Claimholders, the First Lien Collateral Agent, on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of the Second Lien Claimholders, consents to, and agrees that it will raise no objection to, the adequate protection rights provided to the First Lien Claimholder and the Second Lien Claimholders under the DIP Orders.  Furthermore, each of the Super Priority Lien Collateral Agent, on behalf of the Super Priority Lien Claimholders, the First Lien Collateral Agent, on behalf of the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of the Second Lien Claimholders agrees that, during the pendency of the Specified Insolvency Proceeding, the adequate protection rights of the First Lien Claimholders and the Second Lien Claimholders shall be determined by and subject to the DIP Orders.

(b)    With respect to any Insolvency or Liquidation Proceeding other than the Specified Insolvency Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting) (i) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection. In any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, may seek adequate protection in respect of the Second Lien Obligations, subject to the provisions of this Agreement, only if (A) the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral including replacement liens on post-petition collateral and (B) such additional protection requested by the Second Lien Collateral Agent is in the form of a Lien on such additional collateral, which Lien, if granted, will be subordinated to the adequate protection Liens securing the First Lien Obligations and the Liens securing any DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any such DIP Financing. In the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional or replacement collateral, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a Lien on such additional or replacement collateral as security for the First Lien Obligations and for any DIP Financing and that any Lien on such additional or replacement collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any DIP Financing (and all obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on

the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any DIP Financing.

(c)    Similarly, with respect to any Insolvency or Liquidation Proceeding other than the Specified Insolvency Proceeding, if the First Lien Claimholders are granted adequate protection in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request a superpriority claim, which super-priority claim will be junior in all respects to the superpriority claim granted to the First Lien Collateral Agent and the First Lien Claimholders, and, in the event that the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent and the providers of any DIP Financing also shall be granted a superpriority claim, which superpriority claim will be senior in all respects to the superpriority claim granted to the Second Lien Collateral Agent and the Second Lien Claimholders.

(d)    Notwithstanding the foregoing, with respect to any Insolvency or Liquidation Proceeding other than the Specified Insolvency Proceeding, if the First Lien Claimholders are deemed by a court of competent jurisdiction to be fully secured on the petition date of any Insolvency or Liquidation Proceeding or are otherwise granted adequate protection in the form of payments in the amount of current post-petition interest, incurred fees and expenses or other cash payments, then the Second Lien Collateral Agent and the Second Lien Claimholders shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post-petition interest, incurred fees and expenses or other cash payments (subject to the right of the First Lien Claimholders to object to the reasonableness of the amounts so sought by the Second Lien Claimholders).

**6.5**    No Waiver.  (a) Nothing contained herein shall prohibit or in any way limit the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the First Lien Collateral Agent, any of the First Lien Claimholders, the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the First Lien Collateral Agent, any First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the First Lien Collateral Agent, any First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the First Lien Loan Documents or the Second Lien Loan Documents, as applicable, or otherwise; provided, however, that this Section 6.5 shall not limit the rights of the First Lien Claimholders or the Second Lien Claimholders under the proviso in Section 3.1(b) or 3.1(c), as applicable, or under Section 6.4 or Section 6.9.

(b)    Nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Collateral

Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Loan Documents or otherwise; provided, however, that this Section 6.5 shall not limit the rights of the Second Lien Claimholders under the proviso in Section 3.1(b) or 3.1(c), as applicable, or under Section 6.4 or Section 6.9.

**6.6** Avoidance Issues.  (a) If any Super Priority Lien Claimholder is required in any Insolvency or Liquidation Proceeding, or otherwise, to turn over or otherwise pay to the estate of a Grantor any amount in respect of a Super Priority Lien Obligation (a "**Super Priority Lien Recovery**"), then such Super Priority Lien Claimholders shall be entitled to a reinstatement of Super Priority Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Super Priority Lien Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect obligations of the parties hereto from such date of reinstatement. To the extent any Super Priority Lien Claimholder is required to make a Super Priority Lien Recovery, any Collateral or proceeds thereof (other than any Specified Consideration) received by the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder after a Discharge of Super Priority Lien Obligations and prior to the reinstatement of such Super Priority Lien Obligations shall be delivered to the Super Priority Lien Collateral Agent upon such reinstatement in accordance with Section 4.2.

(b)     If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding, or otherwise, to turn over or otherwise pay to the estate of a Grantor any amount in respect of a First Lien Obligation (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. To the extent any First Lien Claimholder is required to make a Recovery, any Collateral or proceeds thereof (other than any Specified Consideration) received by the Second Lien Collateral Agent or any Second Lien Claimholder after a Discharge of First Lien Obligations and prior to the reinstatement of such First Lien Obligations shall be delivered to the First Lien Collateral Agent upon such reinstatement in accordance with Section 4.2.

**6.7** Separate Grants of Security and Separate Classification.  Each of the Grantors, the Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders acknowledges and agrees that (i) the grants of Liens pursuant to the Super Priority Lien Security Documents, the First Lien Security Documents and the Second Lien Security Documents constitute three separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, (x) the Second Lien Obligations are fundamentally different from the First Lien Obligations and the Super Priority Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding and (y) the Super Priority Lien Obligations are fundamentally different from the First Lien Obligations and the Second Lien Obligations and must be separately

classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the Super Priority Lien Claimholders, the First Lien Claimholders and Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Super Priority Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees, costs and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency or Liquidation Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the First Lien Claimholders or the Second Lien Claimholders), with the First Lien Claimholders and the Second Lien Claimholders hereby acknowledging and agreeing to turn over to the Super Priority Lien Claimholders amounts otherwise received or receivable by them from, or in respect of, any Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the First Lien Claimholders or the Second Lien Claimholders.

**6.8**    <u>Reorganization Securities</u>.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of Super Priority Lien Obligations, on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the Super Priority Lien Obligations, on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.9**    <u>Post-Petition Claims</u>.

(a)    Neither the Second Lien Collateral Agent nor any other Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the First Lien Collateral Agent's Lien held for the benefit of the First Lien Claimholders, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)    Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Obligations).

**6.10**    Waiver.  (a)  Each of (x) the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders and (y) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder arising out of the election of the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Super Priority Lien Collateral in any Insolvency or Liquidation Proceeding.

(b)    The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the First Lien Collateral Agent or any First Lien Claimholder arising out of the election of the First Lien Collateral Agent or any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the First Lien/Second Lien Collateral in any Insolvency or Liquidation Proceeding.

**6.11**    Expense Claims.  (a)  Neither (x) the First Lien Collateral Agent nor any First Lien Claimholder nor (y) the Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the Super Priority Lien Collateral Agent or any Super Priority Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the Super Priority Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Discharge of Super Priority Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the Super Priority Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

(b)    Neither the Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the First Lien Collateral Agent or any First Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the First Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Discharge of First Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

**6.12**    Other Matters.  To the extent that the Second Lien Collateral Agent or any Second Lien Claimholder has or acquires rights under Section 361, Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Collateral Agent agrees, on behalf of itself and the Second Lien Claimholders not to assert any of such rights without the prior written consent of the First Lien Collateral Agent; provided that if requested by the First Lien Collateral Agent, the Second Lien Collateral Agent shall timely exercise such rights in the manner requested by the First Lien Collateral Agent, including any rights to payments in respect of such rights.

**6.13**    Effectiveness in Insolvency or Liquidation Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an

Insolvency or Liquidation Proceeding. All references in this Agreement to any Grantor shall include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

**6.14**    Voting.  No Second Lien Claimholder (whether in the capacity of a secured creditor or an unsecured creditor) shall propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization that is inconsistent with the priorities or other provisions of this Agreement, other than with the prior written consent of the First Lien Collateral Agent or to the extent any such plan is proposed or supported by the number of First Lien Claimholders required under Section 1126(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law.

SECTION 7.    Reliance; Waivers; Etc.

**7.1**    Non-Reliance.  The consent by the First Lien Claimholders to the execution and delivery of the Second Lien Loan Documents and the grant to the Second Lien Collateral Agent on behalf of the Second Lien Claimholders of a Lien on the First Lien/Second Lien Collateral and all loans and other extensions of credit made or deemed made on and after the Effective Date by the First Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Second Lien Credit Agreement, the other Second Lien Loan Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Credit Agreement, the other Second Lien Loan Documents or this Agreement.

(a)    The consent by the Second Lien Claimholders to the execution and delivery of the First Lien Loan Documents and the grant to the First Lien Collateral Agent on behalf of the First Lien Claimholders of a Lien on the First Lien/Second Lien Collateral and all loans and other extensions of credit made or deemed made on and after the Effective Date by the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and the First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the First Lien Credit Agreement, the other First Lien Loan Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement, the other First Lien Loan Documents or this Agreement.

(b)    The consent by the First Lien Claimholders and the Second Lien Claimholders to the execution and delivery of the Super Priority Lien Loan Documents and the grant to the Super Priority Lien Collateral Agent on behalf of the Super Priority

Lien Claimholders of a Lien on the Super Priority Lien Collateral and all loans and other extensions of credit made or deemed made on and after the Amendment and Restatement Effective Date by the First Lien Claimholders or the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Super Priority Lien Collateral Agent, on behalf of itself and the Super Priority Lien Claimholders, acknowledges that it and the Super Priority Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Super Priority Lien Credit Agreement, the other Super Priority Lien Loan Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Super Priority Lien Credit Agreement, the other Super Priority Lien Loan Documents or this Agreement.

**7.2** **No Warranties or Liability.** (a) The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Loan Documents, acknowledges and agrees that each of the Second Lien Collateral Agent, the Second Lien Claimholders, the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with a Grantor (including the First Lien Loan Documents and the Second Lien Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

(b)    The Super Priority Lien Collateral Agent, on behalf of itself and the Super Priority Lien Claimholders under its Super Priority Lien Loan Documents, acknowledges and agrees that each of (x) the First Lien Collateral Agent and the Second Lien Claimholder and (y) the Second Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the

First Lien Loan Documents or the Second Lien Loan Documents, respectively, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the First Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Each of (x) the First Lien Collateral Agent, on behalf of itself and the First Lien Obligations and (y) the Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents or the Second Lien Loan Documents, respectively, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Super Priority Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective Super Priority Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Each of (x) the First Lien Collateral Agent and the First Lien Claimholders and (y) the Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the Super Priority Lien Collateral Agent or any of the Super Priority Lien Claimholders, and the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders shall have no duty to (x) the First Lien Collateral Agent or the First Lien Claimholders or (y)  the Second Lien Collateral Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with a Grantor (including the Super Priority Lien Loan Documents, First Lien Loan Documents and the Second Lien Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

**7.3**    <u>No Waiver of Lien Priorities</u>.

(a)      (i)  No right of the Super Priority Lien Claimholders, the Super Priority Lien Collateral Agent or any of them to enforce any provision of this Agreement or any Super Priority Lien Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of a Grantor or by any act or failure to act by any Super Priority Lien Claimholder or the Super Priority Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Super Priority Lien Loan Documents, the First Lien Loan Documents or any of the Second Lien Loan Documents, regardless of any knowledge thereof which the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders, or any of them, may have or be otherwise charged with.

(ii)  No right of the First Lien Claimholders, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of a Grantor or by any act or failure to act by any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Loan Documents or any of the Second Lien Loan Documents,

regardless of any knowledge thereof which the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Grantors under the Super Priority Lien Loan Documents), the Super Priority Lien Claimholders, the Super Priority Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the Super Priority Lien Loan Documents or applicable law, without the consent of, or notice to, the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)    make loans and advances to any Super Priority Lien Grantor or issue, guaranty or obtain letters of credit for account of any Super Priority Lien Grantor or otherwise extend credit to any Super Priority Lien Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any Default or Event of Default (under and as defined in the Super Priority Lien Credit Agreement) or failure of condition is then continuing;

(ii)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Super Priority Lien Obligations or any Lien on any Super Priority Lien Collateral or guaranty thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Super Priority Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension) or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the Super Priority Lien Collateral Agent or any of the Super Priority Lien Claimholders, the Super Priority Lien Obligations or any of the Super Priority Lien Loan Documents; provided, however, the foregoing shall not prohibit (x) the First Lien Collateral Agent and the First Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the First Lien Credit Agreement as a result of any Grantor's violation of the terms thereof or (y) the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the Second Lien Credit Agreement as a result of any Grantor's violation of the terms thereof.

(iii)    subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Super Priority Lien Collateral or any liability of any Super Priority Lien Grantor to the Super Priority Lien Claimholders or the Super

Priority Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv)  settle or compromise any Super Priority Lien Obligation or any other liability of any Super Priority Lien Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Super Priority Lien Obligations) in any manner or order;

(v)  exercise or delay in or refrain from exercising any right or remedy against a Super Priority Lien Grantor or any security or any other Person, elect any remedy and otherwise deal freely with Company, any other Super Priority Lien Grantor or any Super Priority Lien Collateral and any security and any guarantor or any liability of any Super Priority Lien Grantor to the Super Priority Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

(vi)  take or fail to take any Lien securing the Super Priority Lien Obligations or any other collateral security for any Super Priority Lien Obligations or take or fail to take any action which may be necessary or appropriate to ensure that any Lien securing Super Priority Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any Super Priority Lien Obligation or any Obligation secured thereby; or

(vii)  otherwise release, discharge or permit the lapse of any or all Liens securing the Super Priority Lien Obligations or any other Liens upon any property at any time securing any Super Priority Lien Obligations.

(c)     Without in any way limiting the generality of Section 7.3(a) (but subject to the rights of the First Lien/Second Lien Grantors under the First Lien Loan Documents and subject to the provisions of Section 5.3), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Loan Documents or applicable law, without the consent of, or notice to, (x) the Super Priority Lien Collateral Agent, any Super Priority Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Super Priority Lien Collateral Agent, any Super Priority Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if, in the case of the Second Lien Collateral Agent and Second Lien Claimholders, any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)  make loans and advances to any First Lien/Second Lien Grantor or issue, guaranty or obtain letters of credit for account of any First Lien/Second

Lien Grantor or otherwise extend credit to any First Lien/Second Lien Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any Default or Event of Default (under and as defined in the First Lien Credit Agreement) or failure of condition is then continuing (subject, in each case, to the limits set forth in the definition of "First Lien Obligations" and Section 5.3);

(ii)  change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of any First Lien/Second Lien Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension, subject to the limits set forth in the definition of "First Lien Obligations") or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Loan Documents; provided, however, the foregoing shall not prohibit the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the Second lien Credit Agreement as a result of any First Lien/Second Lien Grantor's violation of the terms thereof.

(iii)  subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien/Second Lien Collateral or any liability of any First Lien/Second Lien Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv)  subject to the provisions of this Agreement, settle or compromise any First Lien Obligation or any other liability of any First Lien/Second Lien Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

(v)  subject to the provisions of this Agreement, exercise or delay in or refrain from exercising any right or remedy against a First Lien/Second Lien Grantor or any security or any other Person, elect any remedy and otherwise deal freely with Company, any other First Lien/Second Lien Grantor or any First Lien Collateral and any security and any guarantor or any liability of any Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

(vi)  subject to the terms of this Agreement, take or fail to take any Lien securing the First Lien Obligations or any other collateral security for any First Lien Obligations or take or fail to take any action which may be necessary or

appropriate to ensure that any Lien securing First Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any First Lien Obligation or any Obligation secured thereby; or

(vii)  subject to the provisions of this Agreement, otherwise release, discharge or permit the lapse of any or all Liens securing the First Lien Obligations or any other Liens upon any property at any time securing any First Lien Obligations.

(d)      (i)  Each of the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the Super Priority Lien Claimholders and the Super Priority Lien Collateral Agent shall have no liability to the First Lien Collateral Agent, any First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholders, and each of the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any Super Priority Lien Claimholder and the Super Priority Lien Collateral Agent, arising out of any and all actions which the Super Priority Lien Claimholders or the Super Priority Lien Collateral Agent may take or permit or omit to take with respect to: (i) the Super Priority Lien Loan Documents, (ii) the collection of the Super Priority Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any Super Priority Lien Collateral (including, without limitation, the Control Collateral included therein, as applicable). Each of the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the Super Priority Lien Claimholders and the Super Priority Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the Super Priority Lien Collateral, the Super Priority Lien Obligations or otherwise.

(ii)  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any First Lien Claimholder and the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to: (i) the First Lien Loan Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any First Lien/Second Lien Collateral (including, without limitation, the Control Collateral, included therein as applicable). The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or

preservation of the First Lien/Second Lien Collateral, the First Lien Obligations or otherwise.

(e)    The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.  Until the Discharge of Super Priority Lien Obligations has occurred, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Super Priority Lien Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4**    <u>Obligations Unconditional</u>.  All rights, interests, agreements and obligations of the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders, First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Super Priority Lien Loan Documents, any First Lien Loan Documents or any Second Lien Loan Documents or any setting aside or avoidance of any Lien;

(b)    except as otherwise set forth in the Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the Super Priority Lien Obligations, First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Super Priority Lien Loan Document, any First Lien Loan Document or any Second Lien Loan Document;

(c)    any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Super Priority Lien Obligations, First Lien Obligations or Second Lien Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of any Grantor; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the Super Priority Lien Obligations or the First Lien Obligations, or of the (x) First Lien Collateral Agent or any First Lien Claimholder in respect of this Agreement or (y) Second Lien Collateral Agent or any Second Lien Claimholder in respect of this Agreement.

**7.5**    Certain Notices.

(a)    (i)  Promptly upon the satisfaction of the conditions set forth in clauses (i) and (ii) of the definition of Discharge of Super Priority Lien Obligations, the Super Priority Lien Collateral Agent shall deliver written notice confirming same to the First Lien Collateral Agent and the Second Lien Collateral Agent; provided that the failure to give any such notice shall not result in any liability of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(ii)  Promptly upon the satisfaction of the conditions set forth in clauses (i), (ii), (iii) and (iv) of the definition of Discharge of First Lien Obligations, the First Lien Collateral Agent shall deliver written notice confirming same to the Second Lien Collateral Agent; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(b)    (i)  Promptly upon (or as soon as practicable following) the commencement by the Super Priority Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any Shared Collateral (including by way of a public or private sale of Shared Collateral), the Super Priority Lien Collateral Agent shall notify the First Lien Collateral Agent and the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(ii)  Promptly upon (or as soon as practicable following) the commencement by the First Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any First Lien/Second Lien Collateral (including by way of a public or private sale of First Lien/Second Lien Collateral), the First Lien Collateral Agent shall notify the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

SECTION 8.    Subordination; Standstill.

**8.1**    Agreement to Subordinate.  Each Grantor agrees, and each of the First Lien Administrative Agent on behalf of the First Lien Claimholders and the  Second Lien Administrative Agent on behalf of the Second Lien Claimholders (the First Lien Claimholders and the Second Lien Claimholders, collectively, the "**Subordinated Creditors**") agrees, that all payments (whether from the Borrower or any Guarantor) under the First Lien Loan Documents and the Second Lien Loan Documents are subordinated in right of payment, to the extent and in the manner provided in this Section 8, to the prior payment in full of all Super Priority Lien

Obligations, and that the subordination is for the benefit of, and enforceable by, the Super Priority Lien Claimholders.

      **8.2**    <u>Liquidation, Dissolution, Bankruptcy</u>.  Upon any payment or distribution of any Super Priority Lien Grantor's assets of any kind or character, whether in cash, property or securities, to creditors upon any total or partial liquidation, dissolution, winding up, reorganization, assignment for the benefit of creditors or marshaling of any Super Priority Lien Grantor's assets or in any Insolvency or Liquidation Proceeding relating to any Super Priority Lien Grantor or its property, whether voluntary or involuntary, all principal of, interest on and all other amounts due or to become due will be paid, first, to all Super Priority Lien Obligations in full in cash, or such payment duly provided for to the satisfaction of the Super Priority Lien Claimholders, before any payment or distribution of any kind or character is made on account of any principal of or other amounts owing in respect of the First Lien Obligations or the Second Lien Obligations (collectively, the "**Subordinated Obligations**") (other than in the form of Specified Consideration), or for the acquisition of any of the Subordinated Obligations for cash, property or otherwise.

      **8.3**    <u>Payment Blockage</u>.  (a) Until the Discharge of Super Priority Lien Obligations shall have occurred, the Super Priority Lien Grantors will not be permitted to make any payment or distribution of any kind or character with respect to the Subordinated Obligations other than (a) Specified Consideration or (b) in accordance with the Super Priority Lien Loan Documents and the DIP Orders (including the Permitted Adequate Protection Payments).

      (b)    Except with respect of payment of Specified Consideration, upon any payment or distribution of the assets of the Super Priority Lien Grantors to creditors upon a total or partial liquidation or dissolution or reorganization of or similar proceeding relating to any of the Super Priority Lien Grantors or its property:

      (i)  the Super Priority Lien Claimholders will be entitled to receive payment in full in cash of such Super Priority Lien Obligations before the Subordinated Creditors shall be entitled to receive any payment or distribution of any kind or character with respect to any obligations on, or relating to, the Subordinated Obligations;

      (ii)  until the Discharge of Super Priority Lien Obligations shall have occurred, any payment or distribution to which any of the Subordinated Creditors would be entitled but for the subordination provisions in this Article 10 shall be made to the Super Priority Lien Administrative Agent, except that the Subordinated Creditors may receive Specified Consideration; and

      (iii)  if a distribution is made to any Subordinated Creditor that, due to the subordination provisions in this Section 8, should not have been made to it, such Subordinated Creditor will be required to hold such distribution in trust for the Super Priority Lien Claimholders and to pay it over to the Super Priority Lien Administrative Agent.

**8.4**     Default Not Prevented.  The subordination and payment blockage provisions set forth in this Section 8 will not prevent an Event of Default under the Super Priority Lien Loan Documents, the First Lien Loan Documents or the Second Lien Loan Documents from occurring.

**8.5**     Subrogation.  After the Discharge of Super Priority Lien Obligations shall have occurred, and until the Subordinated Obligations are paid in full, the Subordinated Creditors shall be subrogated to the rights of the Super Priority Lien Claimholders to receive distributions applicable to the Super Priority Lien Obligations. A distribution made under this Section 8 to the Super Priority Lien Claimholders which otherwise would have been made to Subordinated Creditors is not, as between the Super Priority Lien Grantors and the Subordinated Creditors, a payment by the Super Priority Lien Grantors on such Super Priority Lien Obligations.

**8.6**     Relative Rights.  This Section 8 defines the relative rights of the Subordinated Creditors and the Super Priority Lien Claimholders. Nothing in this Article 8 shall:

(a)     impair, as between the Super Priority Lien Grantors and the Subordinated Creditors, the obligations of the Super Priority Lien Grantors with respect to the Subordinated Obligations, which is absolute and unconditional, to pay principal of the Subordinated Obligations in accordance with the terms thereof; or

(b)     prevent any Subordinated Creditor from exercising its available remedies upon a Default, subject to the rights of the Super Priority Lien Claimholders to receive distributions otherwise payable to the Subordinated Creditors.

**8.7**     Subordination May Not Be Impaired.  No right of any Super Priority Lien Claimholder to enforce the subordination of the Subordinated Obligations shall be impaired by any act or failure to act by the Grantors or by their failure to comply with any of the Super Priority Lien Loan Documents, the First Lien Loan Documents or the Second Lien Loan Documents.

**8.8**     Reliance by Super Priority Lien Claimholders on Subordination Provisions.  Each of the First Lien Administrative Agent, on behalf of itself and the other First Lien Claimholders, and the Second Lien Administrative Agent, on behalf of itself and the other Second Lien Claimholders, acknowledges and agrees that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each Super Priority Lien Claimholders, whether its respective Super Priority Lien Obligations were created or acquired before or after the Amendment and Restatement Effective Date, to enter into the Super Priority Lien Loan Documents and to extend the Super Priority Lien Obligations, and each such Super Priority Lien Claimholder shall be deemed conclusively to have relied on such subordination provisions in acquiring and continuing to hold, or in continuing to hold, such Super Priority Lien Obligations.

**8.9**     Standstill.  Each of the First Lien Administrative Agent, on behalf of itself and the other First Lien Claimholders, and the Second Lien Administrative Agent, on behalf of itself and the other Second Lien Claimholders, agrees that, until the Discharge of Super Priority Lien Obligations shall have occurred, it shall not exercise any right or remedy under the First Lien Loan Documents (in the case of the First Lien Administrative Agent and the First Lien

Claimholders) or the Second Lien Loan Documents (in the case of the Second Lien Administrative Agent and the Second Lien Claimholders) against any Common Grantor that is not a debtor under the Specified Insolvency Proceedings.

SECTION 9.   Miscellaneous.

**9.1**     Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the Super Priority Lien Documents, the First Lien Loan Documents or the Second Lien Loan Documents, the provisions of this Agreement shall govern and control.  In the event of any conflict between the provisions of the DIP Orders and the provisions of  this Agreement, the Super Priority Lien Documents, the First Lien Loan Documents or the Second Lien Loan Documents, the provisions of the DIP Order shall govern and control.

**9.2**     Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and (x) the Super Priority Lien Claimholders may continue, at any time and without notice to the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder subject to the First Lien Loan Documents and the Second Lien Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of any Super Priority Lien Grantor constituting Super Priority Lien Obligations in reliance hereof and (y) the First Lien Claimholders may continue, at any time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of any First Lien/Second Lien Grantor constituting First Lien Obligations in reliance hereof. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to any Grantor shall include such Grantor as debtor and debtor-in-possession and any receiver or trustee for any Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate and payment has been made in full in cash of all other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate, (ii) with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 5.6 and Section 6.5 and (iii) with respect to the Super Priority Lien Collateral Agent, the Super Priority Lien Claimholders and the Super Priority Lien Obligations, the date of Discharge of Super Priority Lien Obligations, subject to the rights of the Super Priority Lien Claimholders under Section 5.6.

**9.3**    <u>Amendments; Waivers</u>.  No amendment, modification or waiver of any of the provisions of this Agreement by the Super Priority Lien Collateral Agent, the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights or obligations are adversely affected thereby.

**9.4**    <u>Information Concerning Financial Condition of Companies</u>.

(a)    The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of Companies and all endorsers and/or guarantors of the Super Priority Lien Obligations, the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Super Priority Lien Obligations, the First Lien Obligations or the Second Lien Obligations. The Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders shall have no duty to advise the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Super Priority Lien Collateral Agent or any of the Super Priority Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Lien Collateral Agent, any First Lien Claimholder, the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the Super Priority Lien Collateral Agent and the Super Priority Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.  The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Collateral Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which,

pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

(b)      The Grantors agree that any information provided to the Super Priority Lien Collateral Agent, the First Lien Collateral Agent, the Second Lien Collateral Agent, any Super Priority Lien Claimholder, any First Lien Claimholder or any Second Lien Claimholder may be shared by such Person with any Super Priority Lien Claimholder, any First Lien Claimholder, any Second Lien Claimholder, the Super Priority Lien Collateral Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent notwithstanding a request or demand by such Grantor that such information be kept confidential; provided, that such information shall otherwise be subject to the respective confidentiality provisions in the Super Priority Lien Credit Agreement, the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable.

**9.5**      Subrogation.  (x) The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and (y) the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby waive any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Super Priority Lien Obligations has occurred.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred.

**9.6**      Application of Payments.  (a)  All payments received by the Super Priority Lien Collateral Agent or the Super Priority Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the Super Priority Lien Obligations provided for in the Super Priority Lien Loan Documents. Each of (x) the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders and (y) the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the Super Priority Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the Super Priority Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

(b)      From and after the Discharge of Super Priority Lien Obligations, all payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Loan Documents. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**9.7**      SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)      ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE

OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK TO THE EXTENT PERMITTED BY APPLICABLE LAW. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NON-EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.8; AND (iv) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b)     EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**9.8**     Notices.  All notices to the Super Priority Lien Claimholders, the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Super Priority Lien Collateral Agent, the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall

be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.9     Further Assurances.  The Super Priority Lien Collateral Agent, on behalf of itself and the Super Priority Lien Claimholders under the Super Priority Lien Loan Documents, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Loan Documents, and each Grantor, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Super Priority Lien Collateral Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

9.10     APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5.1-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

9.11     Binding on Successors and Assigns.  This Agreement shall be binding upon the Super Priority Lien Collateral Agent, the Super Priority Lien Claimholders, the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders and their respective successors and assigns.

9.12     Specific Performance.  Each of the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement. The Super Priority Lien Collateral Agent, on behalf of itself and the Super Priority Lien Claimholders under its Super Priority Lien Loan Documents, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Loan Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any Super Priority Lien Collateral Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent, as the case may be.

9.13     Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

9.14     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection

herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

9.15    Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

9.16    No Third Party Beneficiaries.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the Super Priority Lien Collateral Agent, the Super Priority Lien Claimholders, First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent and the Second Lien Claimholders. No other Person shall have or be entitled to assert rights or benefits hereunder.

9.17    Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders. Nothing in this Agreement is intended to alter or affect the obligations of the Grantors, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

9.18    Additional Grantors.  The Grantors agree that, if any Subsidiary shall become a Grantor after the Effective Date, it will promptly cause such Subsidiary to acknowledge the terms hereof by executing and delivering an instrument in a form reasonably acceptable to the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent. Upon such execution and delivery, such Subsidiary will become a Grantor hereunder. The execution and delivery of such instrument shall not require the consent of any other party hereunder except to the extent to the extent obtained on or prior to such date, and will be acknowledged by the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

9.19    First Allied Repayment.  Notwithstanding the foregoing, until the First Allied payment, no obligations by any First Allied Entity pursuant to this Agreement shall be effective; *provided* that immediately upon the occurrence of the First Allied Repayment, the First Allied Entities shall automatically become bound by the terms of this Agreement without any action required on the part of any party, and the Borrower agrees to notify both the First Lien Collateral Agent and the Second Lien Collateral Agent in writing of the First Allied Repayment immediately upon the occurrence thereof.

9.20    Amendment and Restatement.  This Agreement amends and restates the Existing Intercreditor Agreement in its entirety, but does not constitute a novation of the Existing Intercreditor Agreement.  To the extent that the amendment and restatement intended to be effected hereby is ineffective for any reason, this Agreement shall constitute a separate agreement among the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent, and acknowledged by the Grantors acknowledging this

69

agreement, and the Existing Intercreditor Agreement shall continue in full force and effect, provided that in such event, in the event of a conflict between the provisions of this Agreement and the provisions of the Existing Intercreditor Agreement, as between the Super Priority Lien Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent and the Grantors acknowledging the terms hereof, the provisions of this Agreement shall govern and control.

      **9.21**   <u>Claimholders</u>.  The various limitations on the Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders set forth herein shall bind the Super Priority Lien Claimholders, the First Lien Claimholders and the Second Lien Claimholders, respectively, only with respect to their remedies and rights (including their rights to receive payment, including the proceeds of Collateral) under the Super Priority Lien Loan Documents (in the case of the Super Priority Lien Claimholders), the First Lien Loan Documents (in the case of the First Lien Claimholders) or the Second Lien Loan Documents (in the case of the Second Lien Claimholders).  The provisions hereof shall not prevent any Super Priority Lien Claimholder, First Lien Claimholder or Second Lien Claimholder from exercising its rights under the Super Priority Lien Loan Documents, First Lien Loan Documents or Second Lien Loan Documents, as the case may be, in accordance with the terms hereof and thereof because such Person is a claimholder of another type.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

> Barclays Bank PLC,
> as Super Priority Lien Collateral Agent and
> Super Priority Lien Administrative Agent
>
> By: _____
>         Name:
>         Title:

Notice Address:

Principal Office:

50 South Sixth Street, Suite 1290, Minneapolis, MN 55402
Attention: Meghan McCauley
Telecopier: (612) 217-5651
Telephone: (612) 217-5647
Electronic Mail: mmccauley@wilmingtontrust.com

BARCLAYS BANK PLC,
as First Lien Collateral Agent and First Lien
Administrative Agent


By: _____
    Name:
    Title:

Notice Address:

Principal Office:

745 7th Avenue, New York, NY 10019
Attention:     Noam Azachi
Telecopier:    212-526-5115
Telephone:    212-526-1957

with a copy to:

745 7th Avenue, New York, NY 10019
Attention:     Nina Guinchard
Telecopier:    212-526-5115
Telephone:    212-526-3713

WILMINGTON TRUST, NATIONAL
ASSOCIATION,
as Second Lien Collateral Agent and Second
Lien Administrative Agent


By: _____
      Name:
      Title:


<u>Notice Address</u>:

Principal Office:

Acknowledged and Agreed:

RCS CAPITAL CORPORATION

By: _____
               Name:
               Title:

**[GRANTORS]**

## **EXHIBIT 3**

**Initial DIP Budget**

*PRELIMINARY DRAFT - SUBJECT TO MATERIAL CHANGE*
*SUBJECT TO FRE408*

**RCS Capital**
**Weekly cash flow forecast - assuming 'pre-arranged' filing**
**($ in 000s)**

| Forecast Week Number | 1 Forecast 02/01 | 2 Forecast 02/08 | 3 Forecast 02/15 | 4 Forecast 02/22 | 5 Forecast 02/29 | 6 Forecast 03/07 | 7 Forecast 03/14 | 8 Forecast 03/21 | 9 Forecast 03/28 | 10 Forecast 04/04 | 11 Forecast 04/11 | 12 Forecast 04/18 | 13 Forecast 04/25 | 13 Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | | | | | | | | | | | | | | |
| **II. OPERATING ACTIVITY** | | | | | | | | | | | | | | |
| Operating inflows: | | | | | | | | | | | | | | |
| RCS Advisory Services receipts | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | | | | | 450 |
| Hatteras - overhead allocation | | | | | | | | | | | | | | - |
| Cetera - shared service interco | 1,000 | | | 1,300 | | | | 1,300 | | | | | 1,300 | 4,900 |
| Cetera - dividends | | | | | | | | | | | | | | - |
| **Total Operating inflows** | **1,050** | **50** | **50** | **1,350** | **50** | **50** | **50** | **1,350** | **50** | **-** | **-** | **-** | **1,300** | **5,350** |
| Operating outflows: | | | | | | | | | | | | | | |
| Trade payables | (100) | (3,200) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (8,800) |
| Insurance - D&O/E&O policies | (237) | | (72) | | | | (72) | | | | | | | (381) |
| Payroll & taxes | | (586) | | (471) | | (469) | | (441) | | (441) | | (441) | | (2,850) |
| Rent & occupancy costs | (170) | | | | (170) | | | | (170) | | | | (170) | (679) |
| RCS B/D contribution | | | | | | | | | | | | | | - |
| Docupace capital contribution | (1,000) | | | | | | | | | (1,000) | | | | (2,000) |
| Other | | | | | (87) | | | | (100) | (112) | | | (100) | (398) |
| **Total Operating outflows** | **(1,507)** | **(3,786)** | **(572)** | **(971)** | **(756)** | **(969)** | **(572)** | **(941)** | **(770)** | **(2,053)** | **(500)** | **(941)** | **(770)** | **(15,108)** |
| **Total Operating Cash Flow** | **(457)** | **(3,736)** | **(522)** | **379** | **(706)** | **(919)** | **(522)** | **409** | **(720)** | **(2,053)** | **(500)** | **(941)** | **530** | **(9,758)** |
| **III. NON-OPERATING ACTIVITY** | | | | | | | | | | | | | | |
| Severance payments | | (67) | | | | | | | | | | | | (67) |
| RCAP retention/bonus payments | | | | | | | | (965) | | (268) | | | (50) | (1,283) |
| ICH/VSR/Girard - hold back/retention payments | (1,200) | | | | | | | | | | | | | (1,200) |
| ARCP note amortization | | | | | | | | | | | | | | - |
| Tax refund receipts | | 1,600 | | | | 2,500 | | | | | | | | 4,100 |
| Hatteras sale proceeds | | | | | | | | | | | | | | - |
| Strat Cap sale proceeds | | | | | | | | | | | | | | - |
| **Net non-operating inflows/(outflows)** | **(1,200)** | **1,533** | **-** | **-** | **-** | **2,500** | **(965)** | **-** | **(268)** | **-** | **-** | **-** | **(50)** | **1,550** |
| **IV. RESTRUCTURING EXPENDITURES** | | | | | | | | | | | | | | |
| Restructuring professional fees | (250) | | | | | (3,420) | | | | (5,470) | | | (30) | (9,170) |
| First-day order payments | | | | | | | | | | | | | | - |
| DIP financing fees | (575) | | | | (849) | | | | | | | | | (1,424) |
| DIP interest | | | | | | (311) | | | | (622) | | | | (933) |
| Luxor settlement | | | | | | | | | | | | | | - |
| Advisor retention loans | | | | | | | | | | (40,000) | | | | (40,000) |
| BD capital contribution | | (10,000) | | | | | | | | | | | | (10,000) |
| **Total restructuring expenditures** | **(825)** | **(10,000)** | **-** | **-** | **(849)** | **(3,731)** | **-** | **-** | **-** | **(46,092)** | **-** | **-** | **(30)** | **(61,527)** |
| **Net Cash Flow** | **(2,482)** | **(12,203)** | **(522)** | **379** | **(1,555)** | **(2,150)** | **(1,487)** | **409** | **(988)** | **(48,145)** | **(500)** | **(941)** | **451** | **(69,736)** |
| **V. LIQUIDITY** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 7,872 | 30,390 | 18,187 | 17,665 | 18,044 | 91,489 | 89,338 | 87,851 | 88,260 | 87,272 | 39,127 | 38,627 | 37,686 | 7,872 |
| Net cash flow | (2,482) | (12,203) | (522) | 379 | (1,555) | (2,150) | (1,487) | 409 | (988) | (48,145) | (500) | (941) | 451 | (69,736) |
| DIP Draw | 25,000 | | | | 75,000 | | | | | | | | | 100,000 |
| **Ending Book Cash** | **30,390** | **18,187** | **17,665** | **18,044** | **91,489** | **89,338** | **87,851** | **88,260** | **87,272** | **39,127** | **38,627** | **37,686** | **38,136** | **38,136** |

RCS Capital Corp.
Summary of First Day Motion Disbursements

| Motion | Amount | Notes |
|---|---|---|
| **Wages and Benefits** | | |
| Accrued / Unpaid wages for Active Employees | $ 112,125 | Represents a week of accrued wages as payroll is paid one week in arrears |
| Accrued / Unpaid wages for Terminated Employees | 51,750 | |
| Severance | 77,050 | |
| PTO for Separated Employees | 145,000 | |
| PTO for Remaining Employees | 470,000 | Assumes $57K will be payable within DIP period.  Remaining balance will be treated consistent with existing company policy. |
| Unpaid ADP Fees | 4,600 | |
| Unpaid T&E | 46,000 | |
| Unpaid T&E Service Fee | 11,500 | |
| ARC 401(k) and FSA Plans (including adminsitration fees) and FSA | 50,000 | |
| | 968,025 | |
| | | |
| **Cash Management** | | |
| Taxes | 250,000 | |
| Insurance | 237,000 | Company initiated wire to pay last remaining $237k premium on D&O policy on 1/29 but as of 1/31 it was not confirmed ($237k figure listed in motion since pending): Assuming $237k payment made then the Company is current on all outstanding premiums for D&O and E&O (two $73k monthly payments left for E&O); any other insurance amounts outstanding are de minimis |
| **Total** | $   1,455,025 | |

## **EXHIBIT B**

**Tempke Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RCS CAPITAL CORPORATION, <u>et al.</u>, | Case No. 16-10223 (   ) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF CHRISTIAN TEMPKE IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) PURSUANT**
**TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AUTHORIZING THE**
**DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS**
**AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE**
**CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND (D)**
**GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;**
**(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY**
**RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

I, Christian Tempke, declare under penalty of perjury that:

        1.     I am a Vice President in the Restructuring Group of Lazard Frères & Co. LLC ("**Lazard**"), the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory, and asset management firm with is principal office located at 30 Rockefeller Plaza, New York, New York.  I have been one of the principal engagement personnel working on Lazard's engagement as the proposed investment banker of the above captioned debtors and debtors in possession (collectively, the "**Debtors**").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: RCS Capital Corporation (4716); American National Stock Transfer, LLC (3206); Braves Acquisition, LLC (6437); DirectVest, LLC (9461); J.P. Turner & Company Capital Management, LLC (7535); RCS Advisory Services, LLC (4319); RCS Capital Holdings, LLC (9238); Realty Capital Securities, LLC (0821); SBSI Insurance Agency of Texas, Inc. (9203); SK Research, LLC (4613); Trupoly, LLC (5836); and We R Crowdfunding, LLC (9785).  The Debtors' corporate headquarters and mailing address is located at 405 Park Avenue, 12th Floor, New York, NY 10022.

2.    I submit this declaration (the "**Declaration**") in support of the *Debtors'*
*Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,*
*364 and 507 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and*
*Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured*
*Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a*
*Final Hearing Pursuant to Bankruptcy Rules 4001(b) And 4001(c); And (III) Granting Related*
*Relief* (the "**DIP Motion**").[2]

3.    Except as otherwise indicated, all facts set forth in this Declaration are
based upon my personal knowledge of the Debtors' operations and finances gleaned during the
course of my engagement with the Debtors, my discussions with the Debtors' senior
management, other members of the Lazard Financial Institution Group and Restructuring Group
teams and the Debtors' restructuring advisor, Zolfo Cooper Management, LLC ("**Zolfo**
**Cooper**"), my review of relevant documents, or my opinion based upon experience.  I am
authorized to submit this Declaration.  If called upon to testify, I would testify to the facts set
forth herein.

4.    I have been employed at Lazard since 2007 and specialize in advising
public and private companies and creditor groups in complex financial restructurings, distressed
mergers and acquisitions and in raising capital for troubled businesses.  I have advised
companies and creditor groups in connection with numerous in-court and out-of-court
restructurings and recapitalizations, including Millennium Health, RadioShack, Chassix,
Momentive, Quiznos, OGX, Eastman Kodak Company, Spanish Broadcasting, Lehman
Brothers, iStar Financial, U.S. Concrete, Evraz Group, Plastech Engineered Products and

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

Wellman, among others.  I have a B.A. in economics from Northwestern University.  I hold a Series 79 Investment Banking Representative license and I am a member of the Turnaround Management Association.

5.      Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 150 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.  Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

6.      Since Lazard's engagement, Lazard has rendered investment banking services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations and improving their overall financial condition.  Additionally, Lazard has worked closely with the Debtors' management and other professionals retained by the Debtors for these chapter 11 cases and has become acquainted with the Debtors' capital structure, liquidity needs and business operations.

**The Debtors' Need for Financing**

7.      As described in detail in the First Day Declaration, the Debtors' financial position has deteriorated significantly over the last year. Most critically, the Debtors' liquidity was declining and its cash flow was increasingly insufficient to cover interest on its debt and amortization payments under the First Lien Credit Facility.

3

8.      The Debtors' access to sufficient working capital and liquidity through the Financing (as defined below) is crucial to the Debtors' ability to sustain market confidence in their businesses, protect the operational stability of the Debtors' core Independent Retail Advice business, preserve their going concern value, and successfully reorganize as contemplated by the Debtors' proposed chapter 11 plan filed contemporaneously herewith.    In consultation with Lazard and Zolfo Cooper, the Debtors have determined that, absent access to cash collateral and the DIP Facility (the "**Financing**"), they would not have adequate liquidity for the period necessary to effectuate a successful reorganization.    As discussed in the DIP Motion, the Participating Prepetition Lenders (as defined below), have committed to act as DIP Lenders to provide the necessary financing to be used by the Debtors to operate their businesses as debtors in possession.

9.      The Debtors need to obtain access to the Financing to permit the Debtors to, among other things, satisfy payroll obligations and other working capital and operational needs, and address potential adverse impacts on their businesses and operations that may result from the filing of these chapter 11 cases.  The availability of credit is crucial to the Debtors' ability to fund a critically needed retention program for their retail sales force (discussed in more detail below) and to assure their customers, employees, regulators, and independent financial advisors that they have adequate liquidity to sustain operations.

10.      In particular, the Debtors' broker-dealer subsidiaries, through which their core businesses are conducted, are subject to certain regulatory net capital requirements.  The Financing is required to ensure that those subsidiaries will remain in regulatory compliance for the duration of the chapter 11 cases which is critical to their ability to continue to operate.

11.     Moreover, in consultation with Lazard, Zolfo Cooper, and the Participating Prepetition Lenders (as defined below), the Debtors have determined, in their business judgment, to institute a program at the Debtors' broker-dealer subsidiaries through which retention loans will be provided to the independent financial advisors engaged in the Independent Retail Advice business.  Most of the Debtors' enterprise value is generated through the Independent Retail Advice business, and the maintenance and growth of that business depends upon the Debtors' ability to keep the current network of independent financial advisors largely intact.

12.     The Debtors believe that absent the retention program, the broker-dealer subsidiaries may experience significant attrition in the ranks of the financial advisor network, as advisors may be leery of maintaining their customers' securities business with subsidiaries of entities who are involved in protracted chapter 11 proceedings.  The liquidity provided by the Financing is essential to the Debtors' ability to institute the retention program.

13.     Without access to the Financing, the Debtors' businesses may be unable to maintain regulatory compliance or preserve their independent financial advisor network, and accordingly, may suffer substantially decreased revenues or be forced to suspend operations.

14.     Further, the DIP Facility is fully integrated into the consensual framework for the Debtors' expedited emergence from chapter 11 which was negotiated among the Debtors, certain of the First Lien Lenders and Second Lien Lenders (the "**Participating Prepetition Lenders**"), and the Debtors largest unsecured creditor, Luxor, and embodied in the Plan, RSA and the exhibits thereto.  The Debtors, in consultation with Lazard and their other advisors, have determined that additional liquidity will be needed to sustain operations post-emergence. Accordingly, the Plan provides that the DIP Facility will be repaid with the proceeds of the Exit

Facility upon emergence, and the Participating Prepetition Lenders have committed to backstop a new-money portion of the Exit Facility, ensuring the Debtors' continued access to adequate liquidity following consummation of the Plan.   Thus, the DIP Facility is an integral component of a comprehensive restructuring strategy developed by the Debtors in concert with their key stakeholders.

15.    In light of the foregoing and based upon meetings with the Debtors' management team and my review and analysis of relevant materials, I understand that the Debtors require access to the Financing to fund the costs and expenses of administering these chapter 11 cases and continue as a going concern.  The proposed DIP Facility and the use of cash collateral will help provide the Debtors with sufficient liquidity to meet management's forecasts of their ongoing day-to-day obligations, operational restructuring costs and the administrative costs of these chapter 11 cases, as well as working capital requirements and other operational expenses, all of which will help preserve the value of the Debtors' estates.  Without access to the Financing, the Debtors could suffer significant impairment to their business operations to the detriment of their stakeholders.

## Efforts to Obtain Post-Petition Financing

16.    On September 15, 2015, the Company engaged Lazard as investment banker, initially to assist the Company in exploring one or more potential transactions, including a significant junior capital raise.  Immediately following its engagement, Lazard commenced diligence review of the Company's financial projections and assisted management in developing a Confidential Information Memorandum ("**CIM**") and constructing an electronic data room.  Lazard held discussions with over twenty potential investors, ten of whom executed confidentiality agreements for the junior capital raise.  The CIM and other financial information

were provided to, and management meetings were held with, ten interested parties.  Ultimately, only two parties submitted final bids, which were in the form of offers to purchase the Debtors' and non-debtor affiliates' assets, neither of which was acceptable to the Company or the Participating Prepetition Lenders as both were insufficient to pay off the debt outstanding under First Lien Credit Facility.  Subsequently, the Company received a non-binding proposal from Luxor setting forth a potential equity investment in RCS Capital Corporation, but Luxor subsequently abandoned that proposal.

17.    In early December 2015 it became clear that the Debtors' attempts to raise junior capital or to sell their businesses would not be fruitful, therefore the Debtors shifted their focus to a balance sheet restructuring.  The Debtors expanded the scope of Lazard's engagement to include the negotiation and consummation of an out-of-court or in-court restructuring transaction and, with the assistance of Lazard, Zolfo Cooper, and Dechert LLP, as legal counsel, the Debtors began an extensive, good-faith negotiating process with the Participating Prepetition Lenders and Luxor.  The process included presentations to the Participating Prepetition Lenders regarding the Debtors' financial situation and estimates of the Debtors' anticipated cash needs during a chapter 11 filing and after emergence.

18.    Negotiations with the Participating Prepetition Lenders with respect to the terms of a potential restructuring continued for approximately eight weeks.  This effort involved protracted negotiations, responding to multiple rounds of diligence requests, in-depth discussions about the terms for DIP financing, the overall restructuring strategy, the advisor retention program and exit financing needs.  Due to the unique circumstances associated with the Debtors' businesses (*i.e.* that the core business is conducted at broker-dealer subsidiaries that are ineligible for chapter 11 relief and through independent financial advisors with transferrable businesses),

the Debtors stressed the need to prioritize consensus and operational stability over any one creditor constituency's ability to maximize its own recoveries. Through these negotiations, the Participating Prepetition Lenders worked collaboratively with the Debtors and made significant concessions to creditors more junior in the capital stack in negotiating a restructuring framework, including with respect to the DIP Facility to be provided by the Participating Prepetition Lenders.

19.     The Debtors and Lazard believe that the framework resulting from their extensive negotiations with the parties to the RSA represents the best currently available path to preserving the Debtors' going concern value for the benefit of their stakeholders. As discussed above, the Participating Prepetition Lenders agreement to act as DIP Lenders under the DIP Facility, which will then be satisfied with the proceeds of the Exit Facility provided by the Participating Prepetition Lenders, is a key component of the consensual, integrated restructuring strategy.

20.     Once the importance of the DIP Facility to the overall restructuring became apparent, and for other reasons as described below, the Debtors, in consultation with Lazard, decided to concentrate their efforts on improving the terms of the DIP Facility proposed by the Participating Prepetition Lenders. Extensive good-faith negotiations between the Debtors and the Participating Prepetition Lenders occurred over the weeks leading up to the Petition Date, where the Debtors were successful in improving certain key terms of the DIP Facility. Based on Lazard's extensive experience in restructurings and capital markets, I believe that the financial terms and fees of the proposed DIP Facility are well within the range of customary market terms for financing deals of this type.

21.     Obtaining post-petition financing from third party financing sources appeared significantly less likely and not practicable for a number of reasons:

22.     First, the DIP Facility is an integral part of the consensual restructuring plan, with the Participating Prepetition Lenders also providing a commitment to retire the DIP Facility with proceeds from a 4.5-year first-lien exit facility upon the Debtors' emergence from chapter 11, subject to meeting certain conditions prior to or at emergence. It is a significant benefit for the Debtors to have committed exit financing prior to a chapter 11 filing as it significantly reduces execution risk vis-à-vis the Debtors' emergence.

23.     Second, given the Debtors' need for immediate liquidity and stabilization, time was of the essence. To stabilize operations and the fragile advisor base, the Debtors believe that it was critical for Debtors' management to announce a resolution with respect to the Debtors' capital structure by year-end 2015.  The Participating Prepetition Lenders and their advisors were already familiar with the Debtors' business and willing to provide commitments and funding on an expedited timeline, along with an agreed resolution for the remainder of the capital structure, avoiding a long and drawn out diligence process with potential third party financing sources or investors.

24.     Third, I believe that it is highly likely that any third party lender would have required a priming security interest in the pre-petition lenders' collateral given the Debtors' "asset-lite" balance sheet and general lack of unencumbered assets that could be utilized in a financing. Without consensual priming of the Participating Prepetition Lenders' security interests, which consent did not appear to be forthcoming based on feedback from negotiations, a priming DIP facility could have given rise to a "priming fight".  Putting aside the significant risk that the Debtors would be able to win a "priming fight" and therefore be left without any DIP

financing (and without the needed liquidity to operate the business), the potential damage of a "priming fight" on the Debtors' business and already fragile advisor base could have been very difficult, if not impossible, to endure and would have been contrary to the overall objective of achieving a consensual restructuring to protect the business.

25.     Fourth, given the results of the junior capital process as outlined above, it appeared highly unlikely that a third-party financing source would be willing to provide post-petition financing on a junior or unsecured basis, let alone at terms superior to the DIP Facility as proposed by the Prepetition Participating Lenders.  Nonetheless, Lazard did contact three (3) additional sophisticated third-party financing sources with respect to post-petition financing that have extensive experience in extending and syndicating post-petition financing in these type of situations. None of the potential financing sources that were approached offered or agreed to provide post-petition financing on a junior or unsecured basis.

26.     Fifth, the Debtors did not have sufficient liquidity to pay the interest and amortization payments that became due on the First Lien Credit Facility and the Second Lien Credit Facility in December 2015.  The Debtors were able to obtain short-term forbearances from the Prepetition Secured Parties in order to continue negotiations with respect to a consensual restructuring. The Debtors' focus, given the existence of the default and limited forbearance, was ensuring that it reached a deal with its Prepetition Secured Lenders to ensure a well-funded, and soft landing, in to these chapter 11 cases.

27.     After having engaged in extensive arm's-length negotiations regarding the DIP Facility proposed as part of the consensual restructuring under the Plan and RSA, and having improved several terms of the DIP Facility as initially proposed, the Debtors have determined that the DIP Facility is the best source of financing currently available to the Debtors.

## The DIP Facility Should Be Approved

28.     Based on my experience and review of comparable DIP financing transactions, I believe that the financial terms of the DIP Facility are reasonable under the circumstances.  Furthermore, I believe the proposed adequate protection of the First Lien Lenders' and Second Lien Lenders' interests is reasonable under the circumstances and is similar to protections granted in many other bankruptcy cases to lenders providing debtor in possession financing.

29.     I believe, based on my experience and involvement in the negotiation of the DIP financing in this matter, that the negotiations with the Participating Prepetition Lenders were conducted at arm's length and in good faith.  The negotiating process was also successful, as the Debtors were able to improve upon the initial offers from the Participating Prepetition Lenders.

30.     In my view, the value of having agreed terms for a reorganization plan and stable and committed DIP and exit financing to reassure the Debtors' customer base, regulators, and network of independent financial advisors that operations will continue as normal, cannot be overstated.  Furthermore, I believe the fees and expenses in the proposed DIP Facility are reasonable under the circumstances, are on market terms and, on the whole, the Financing is the best available option available to the Debtors at this time.

31.     I also believe that, based on the Debtors' DIP budget and discussions with Zolfo Cooper and the Debtors' management, that the DIP Facility should allow the Debtors to effectuate the negotiated restructuring contemplated by the RSA by providing the Debtors with necessary liquidity to fund and continue operations during these chapter 11 cases and sends a

strong signal to employees, customers, independent financial advisors, regulators, and other parties with respect to the Debtors' continued viability.  If approved, the DIP Facility will provide capital to preserve the value of the Debtors' businesses and ensure there is sufficient liquidity to reorganize.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated:  January 31, 2016                    /s/ *Christian Tempke*

                                                        Christian Tempke
                                                        Vice President
                                                        Lazard Frères & Co. LLC

**<u>EXHIBIT C</u>**

**DIP Budget**

*PRELIMINARY DRAFT - SUBJECT TO MATERIAL CHANGE*
*SUBJECT TO FRE408*

**RCS Capital**
**Weekly cash flow forecast - assuming 'pre-arranged' filing**
**($ in 000s)**

| Forecast Week Number | 1 Forecast 02/01 | 2 Forecast 02/08 | 3 Forecast 02/15 | 4 Forecast 02/22 | 5 Forecast 02/29 | 6 Forecast 03/07 | 7 Forecast 03/14 | 8 Forecast 03/21 | 9 Forecast 03/28 | 10 Forecast 04/04 | 11 Forecast 04/11 | 12 Forecast 04/18 | 13 Forecast 04/25 | 13 Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **II. OPERATING ACTIVITY** | | | | | | | | | | | | | | |
| **Operating inflows:** | | | | | | | | | | | | | | |
| RCS Advisory Services receipts | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | | | | | 450 |
| Hatteras - overhead allocation | | | | | | | | | | | | | | - |
| Cetera - shared service interco | 1,000 | | | 1,300 | | | | 1,300 | | | | | 1,300 | 4,900 |
| Cetera - dividends | | | | | | | | | | | | | | - |
| **Total Operating inflows** | **1,050** | **50** | **50** | **1,350** | **50** | **50** | **50** | **1,350** | **50** | **-** | **-** | **-** | **1,300** | **5,350** |
| **Operating outflows:** | | | | | | | | | | | | | | |
| Trade payables | (100) | (3,200) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (8,800) |
| Insurance - D&O/E&O policies | (237) | | (72) | | | | (72) | | | | | | | (381) |
| Payroll & taxes | | (586) | | (471) | | (469) | | | (441) | (441) | | (441) | | (2,850) |
| Rent & occupancy costs | (170) | | | | (170) | | | (441) | | (170) | | | (170) | (679) |
| RCS B/D contribution | | | | | | | | | | | | | | - |
| Docupace capital contribution | (1,000) | | | | | | | | | | (1,000) | | | (2,000) |
| Other | | | | | (87) | | | | (100) | (112) | | | (100) | (398) |
| **Total Operating outflows** | **(1,507)** | **(3,786)** | **(572)** | **(971)** | **(756)** | **(969)** | **(572)** | **(941)** | **(770)** | **(2,053)** | **(500)** | **(941)** | **(770)** | **(15,108)** |
| **Total Operating Cash Flow** | **(457)** | **(3,736)** | **(522)** | **379** | **(706)** | **(919)** | **(522)** | **409** | **(720)** | **(2,053)** | **(500)** | **(941)** | **530** | **(9,758)** |
| **III. NON-OPERATING ACTIVITY** | | | | | | | | | | | | | | |
| Severance payments | | (67) | | | | | | | | | | | | (67) |
| RCAP retention/bonus payments | | | | | | | (965) | | | | | | (50) | (1,283) |
| ICH/VSR/Girard - hold back/retention payments | (1,200) | | | | | | | (268) | | | | | | (1,200) |
| ARCP note amortization | | | | | | | | | | | | | | - |
| Tax refund receipts | | 1,600 | | | | 2,500 | | | | | | | | 4,100 |
| Hatteras sale proceeds | | | | | | | | | | | | | | - |
| Strat Cap sale proceeds | | | | | | | | | | | | | | - |
| **Net non-operating inflows/(outflows)** | **(1,200)** | **1,533** | **-** | **-** | **-** | **2,500** | **(965)** | **-** | **(268)** | **-** | **-** | **-** | **(50)** | **1,550** |
| **IV. RESTRUCTURING EXPENDITURES** | | | | | | | | | | | | | | |
| Restructuring professional fees | (250) | | | | | (3,420) | | | | (5,470) | | | (30) | (9,170) |
| First-day order payments | | | | | | | | | | | | | | - |
| DIP financing fees | (575) | | | | (849) | | | | | | | | | (1,424) |
| DIP interest | | | | | | (311) | | | | (622) | | | | (933) |
| Luxor settlement | | | | | | | | | | | | | | - |
| Advisor retention loans | | | | | | | | | | (40,000) | | | | (40,000) |
| BD capital contribution | | (10,000) | | | | | | | | | | | | (10,000) |
| **Total restructuring expenditures** | **(825)** | **(10,000)** | **-** | **-** | **(849)** | **(3,731)** | **-** | **-** | **-** | **(46,092)** | **-** | **-** | **(30)** | **(61,527)** |
| **Net Cash Flow** | **(2,482)** | **(12,203)** | **(522)** | **379** | **(1,555)** | **(2,150)** | **(1,487)** | **409** | **(988)** | **(48,145)** | **(500)** | **(941)** | **451** | **(69,736)** |
| **V. LIQUIDITY** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 7,872 | 30,390 | 18,187 | 17,665 | 18,044 | 91,489 | 89,338 | 87,851 | 88,260 | 87,272 | 39,127 | 38,627 | 37,686 | 7,872 |
| Net cash flow | (2,482) | (12,203) | (522) | 379 | (1,555) | (2,150) | (1,487) | 409 | (988) | (48,145) | (500) | (941) | 451 | (69,736) |
| DIP Draw | 25,000 | | | | 75,000 | | | | | | | | | 100,000 |
| **Ending Book Cash** | **30,390** | **18,187** | **17,665** | **18,044** | **91,489** | **89,338** | **87,851** | **88,260** | **87,272** | **39,127** | **38,627** | **37,686** | **38,136** | **38,136** |

RCS Capital Corp.
Summary of First Day Motion Disbursements

| Motion | Amount | Notes |
|---|---|---|
| **Wages and Benefits** | | |
| Accrued / Unpaid wages for Active Employees | $  112,125 | Represents a week of accrued wages as payroll is paid one week in arrears |
| Accrued / Unpaid wages for Terminated Employees | 51,750 | |
| Severance | 77,050 | |
| PTO for Separated Employees | 145,000 | |
| PTO for Remaining Employees | 470,000 | Assumes $57K will be payable within DIP period.  Remaining balance will be treated consistent with existing company policy. |
| Unpaid ADP Fees | 4,600 | |
| Unpaid T&E | 46,000 | |
| Unpaid T&E Service Fee | 11,500 | |
| ARC 401(k) and FSA Plans (including adminsitration fees) and FSA | 50,000 | |
| | 968,025 | |
| | | |
| **Cash Management** | | |
| Taxes | 250,000 | |
| Insurance | 237,000 | Company initiated wire to pay last remaining $237k premium on D&O policy on 1/29 but as of 1/31 it was not confirmed ($237k figure listed in motion since pending); Assuming $237k payment made then the Company is current on all outstanding premiums for D&O and E&O (two $73k monthly payments left for E&O); any other insurance amounts outstanding are de minimis |
| **Total** | $   1,455,025 | |

# **EXHIBIT D**

## **Fee Letter**

**Barclays Bank PLC**
**745 7th Avenue**
**New York, NY 10019**

<u>**CONFIDENTIAL**</u>

[January 31], 2016

<u>**FEE LETTER**</u>

RCS Capital Corporation
405 Park Avenue
New York, NY 10022
Attention:[Brian D. Jones (bjones@rcsecurities.com)]
         [Jesse C. Galloway (jgalloway@rcsecurities.com)]

    *Re:   $100 million Senior Secured Super-Priority Debtor-in-Possession Term Loan Facility*

Ladies and Gentlemen:

        We refer to the commitment letter dated the date hereof (including the exhibits, schedules and annexes thereto, the "***Commitment Letter***") among BARCLAYS BANK PLC ("***we***" or "***us***"), and RCS CAPITAL CORPORATION, a Delaware corporation (the "***Borrower***" or "***you***"). Terms used but not defined in this letter agreement (this "***Fee Letter***") shall have the meanings assigned thereto in the Commitment Letter.

    1.    <u>Compensation</u>.

        (a)    <u>Fees</u>.   As consideration for our commitments and agreements under the Commitment Letter with respect to the DIP Credit Facility, you shall pay the following fees and amounts:

        (i)    <u>Fronting Fee</u>. A fronting fee (the "***DIP Facility Fronting Fee***") payable to us in an amount equal to .25% of the aggregate principal amount of our Commitment (determined as of the date hereof) in respect of the DIP Credit Facility. The DIP Facility Fronting Fee shall be payable in full on the Closing Date.

        (ii)    <u>Administration Fee</u>.  An annual administration fee (the "***DIP Facility Administration Fee***") payable to us in the amount of $75,000 *per annum*, due and payable in advance on the Closing Date and on each anniversary thereafter. The DIP Facility Administration Fee shall be in addition to reimbursement of our out-of-pocket expenses pursuant to the DIP Loan Documents.

        (b)    <u>Fees Nonrefundable</u>.  All fees hereunder, once paid, are nonrefundable and not creditable against any other fee payable in connection with any Debt Financing Letter or otherwise, including, without limitation, in the event that the Final DIP Order is not entered by the Bankruptcy Court. All fees payable hereunder shall be earned on the date hereof, regardless of when payable hereunder and such fees shall be payable in immediately available funds in U.S. dollars free and clear of

and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto.  Without limiting the foregoing, your obligation to pay fees hereunder, or to cause such fees to be paid, shall be absolute and unconditional and shall not be subject to reduction by way of setoff or counterclaim or otherwise.  We reserve the right to allocate, in whole or in part, to our affiliates or any assignees of all or a portion of our Commitment certain fees payable to us hereunder in such manner as we shall determine in our sole discretion.  The Borrower acknowledges that this Fee Letter is neither an expressed nor an implied commitment by us or any of their respective affiliates to act in any capacity with respect to the DIP Credit Facility or to purchase or place any loans in connection therewith, which commitment, if any, is only set forth in the Commitment Letter.

2.    _Confidentiality_.    This Fee Letter is exclusively for the information of the Board of Directors and senior management of the Borrower and may not be disclosed to any other person or entity except to the extent expressly permitted by Section 7 of the Commitment Letter.

3.    _Notices_.    Notice given pursuant to any of the provisions of this Fee Letter shall be in writing and shall be mailed or delivered (a) if to you, at the address set forth above and (b) if to us, at our offices, at [Barclays Bank PLC, 745 Seventh Avenue, New York, NY 10019, Attn: Bank Debt Management; email: nina.guinchard@barclays.com].

4.    _Counterparts_.    This Fee Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif")  will be effective as delivery of a manually executed counterpart hereof.

5.    _Assumption by Debtor-in-Possession_: Immediately upon the appointment of the DIP Borrower, you shall cause the DIP Borrower to execute this Fee Letter by executing its signature page attached hereto.  Notwithstanding any provision herein to the contrary, upon execution of this Fee Letter by the DIP Borrower as provided above, the DIP Borrower (and only the DIP Borrower) shall be entitled to your rights and benefits under this Fee Letter, and subject to your obligations hereunder and all references herein to the term "Borrower", "you" or "your" shall be deemed to be a reference to the DIP Borrower exclusively.

6.    _Assignment_.    Subject to Section 5 above, you may not assign any of your respective rights, or be relieved of any of your respective obligations, under this Fee Letter without our prior written consent, which may be given or withheld in our sole discretion (and any purported assignment without consent, at our sole option, shall be null and void).   Any and all obligations of, and services to be provided by, us hereunder may be performed and any and all of our rights hereunder may be exercised by or through any of our affiliates or branches.

7.    _Third Party Beneficiaries_.    This Fee Letter has been and is made solely for the benefit of you, us and our affiliates, and your, our and their respective successors and assigns, and nothing in this Fee Letter, express or implied, is intended to confer or does confer on any other person or entity any rights or reason under or by reason of this Fee Letter or your or our agreements contained herein.

8.    _Entire Agreement; Survival_.    The Debt Financing Letters incorporate the entire understanding of the parties and supersede all previous agreements relating to the subject matter hereof should they exist.  This Fee Letter shall survive the expiration or termination of the Commitment Letter, the execution and delivery of the DIP Loan Documents and the closing and funding of the DIP Credit Facility.

9.    <u>Choice of Law;  Jurisdiction; Waivers</u>.  The Debt Financing Letters, and any claim, controversy or dispute arising under or related to the Debt Financing Letters (whether based upon contract, tort or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York. To the fullest extent permitted by applicable law, you hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, to the exclusive jurisdiction of each federal or state court sitting in Manhattan, New York in respect of any claim, suit, action or proceeding arising out of or relating to the provisions of any Debt Financing Letter and irrevocably agree that all claims in respect of any such claim, suit, action or proceeding may be heard and determined in such court and that service of process therein may be made by certified mail, postage prepaid, to your address set forth above.  You and we hereby waive, to the fullest extent permitted by applicable law, any objection that you or we may now or hereafter have to the laying of venue of any such claim, suit, action or proceeding brought in the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, such federal or state court sitting in Manhattan, New York, and any claim that any such claim, suit, action or proceeding brought in the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, such federal or state court has been brought in an inconvenient forum.  You and we hereby waive, to the fullest extent permitted by applicable law, any right to trial by jury with respect to any claim, suit, action or proceeding (whether based upon contract, tort or otherwise) arising out of or relating to the Debt Financing Letters, any of the Transactions or any of the other transactions contemplated hereby or thereby.  The provisions of this <u>Section 9</u> are intended to be effective upon the execution of this Fee Letter without any further action by you, and the introduction of a true copy of this Fee Letter into evidence shall be conclusive and final evidence as to such matters.

10.    <u>Headings</u>.  The section headings in this Fee Letter have been inserted as a matter of convenience of reference, are not part of this Fee Letter and shall not affect the interpretation of this Fee Letter.

11.    <u>Amendment; Waiver</u>.  This Fee Letter may not be modified or amended except in a writing duly executed by you and us.  No waiver by any party of any breach of, or any provision of, this Fee Letter shall be deemed a waiver of any similar or any other breach or provision of this Fee Letter at the same or any prior or subsequent time.  To be effective, a waiver must be set forth in writing signed by the waiving party and must specifically refer to this Fee Letter and the breach or provision being waived.

*[Remainder of page intentionally blank]*

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement among you and us.

Very truly yours,

**BARCLAYS BANK PLC**

By: _____
    Name:
    Title:

Accepted and agreed to as of the
date first above written:
Accepted and agreed to as of the
date first above written:

**RCS CAPITAL CORPORATION**

By: _____
    Name:
    Title:

RCS Capital Corporation, as debtor and debtor-in-possession under the voluntary bankruptcy case filed under Chapter 11 of Title 11 of the United States Code by RCS Capital Corporation and its affiliates (in such capacity, the "DIP Borrower"), hereby assumes all obligations of the Borrower (as defined herein), effective upon the date on which the DIP Borrower affixes its signature hereto and acknowledges that all references herein to the term "Borrower", "you" or "your" shall be deemed a reference to the DIP Borrower exclusively.

**RCS CAPITAL CORPORATION,**
as Debtor and Debtor-in-Possession

By: _____
    Name:
    Title:

4

## **EXHIBIT E**

**Commitment Letter**

**Barclays Bank PLC**
**745 7th Avenue**
**New York, NY 10019**

[January 31], 2016

**RCS CAPITAL CORPORATION COMMITMENT LETTER**

RCS Capital Corporation
405 Park Avenue
New York, NY 10022
Attention: [Brian D. Jones (bjones@rcsecurities.com)]
         [Jesse C. Galloway (jgalloway@rcsecurities.com)]

***Re: $100 million Senior Secured Super-Priority Debtor-in-Possession Term Loan Facility***

Ladies and Gentlemen:

        You have advised Barclays Bank PLC ("***we***" or "***us***") that (i) RCS Capital Corporation, a Delaware corporation (the "***Borrower***" or "***you***") and certain of its affiliates are considering the filing of voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"), for jointly administered bankruptcy cases (the "***Bankruptcy Cases***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and (ii) in connection with the Bankruptcy Cases, the Borrower intends to incur a new $100.0 million senior secured super-priority debtor-in-possession term loan facility, $25.0 million of which shall be available upon the entry of the Interim DIP Order (as defined in Exhibit A hereto) net of the Interim Discount (as defined in Exhibit A hereto), the DIP Facility Fronting Fee (as defined in the Fee Letter (as defined below)) and the initial DIP Facility Administration Fee (as defined in the Fee Letter) and $75.0 million net of the Final Discount (as defined in Exhibit A hereto) of which shall be available upon the entry of the Final DIP Order (as defined in Exhibit A hereto) (the "***DIP Credit Facility***").

        The incurrence of the DIP Credit Facility, together with the payment of all related fees, commissions and expenses, are collectively referred to as the "***Transactions***."  You and the Guarantors (as defined in Exhibit A hereto) are collectively referred to herein as the "***Company***." As used in this Commitment Letter (as defined below) and the Fee Letter (as defined below), the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Capitalized terms used but not defined herein are used with the meanings assigned to them in <u>Exhibit A</u> hereto (the "***Term Sheet***").

        1.    <u>The Commitment</u>.

        We are pleased to inform you that we hereby commit, directly or through one or more of our affiliates, to provide $100,000,000[1] in respect of the DIP Credit Facility and to act as administrative agent and collateral agent in connection with the DIP Credit Facility.

---

[1] Number to represent the entire principal amount of the DIP Credit Facility.

The commitment described in this Section 1 is referred to herein as the "**Commitment**." Our Commitment and agreement set forth in the previous paragraph are on the terms and subject to the terms and conditions set forth in (i) this letter (including the exhibits, schedules and annexes hereto, collectively, this "**Commitment Letter**"), and (ii) the fee letter, dated the date hereof, between you and us (the "**Fee Letter**"). The Commitment Letter and the Fee Letter are collectively hereinafter referred to as the "**Debt Financing Letters**". Notwithstanding anything to the contrary in any Debt Financing Letter, the terms of this Commitment Letter are intended as an outline of certain of the material provisions of the DIP Credit Facility, but do not include all of the terms, covenants, representations, warranties, default clauses and other provisions that will be contained in the Loan Documents. Those matters that are not covered or made clear in the Debt Financing Letters are subject to mutual agreement of the parties hereto. No party hereto has been authorized by us to make any oral or written statements or representations that are inconsistent with the Debt Financing Letters.

2.    Titles and Roles.  You hereby agree that you hereby retain and will cause your affiliates to retain (i) us or one of our affiliates designated by us to act as sole book-runner, sole lead arranger and sole syndication agent and (ii) us to act as the sole administrative agent and sole collateral agent, in each case, for you and your affiliates in connection with the DIP Credit Facility and no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers shall be appointed, no other titles shall be awarded and no compensation (other than that expressly contemplated by the Debt Financing Letters) shall be paid in connection with the DIP Credit Facility, unless mutually agreed.

3.    Conditions Precedent.  The effectiveness of the DIP Credit Facility is subject to the conditions set forth in the Term Sheet under the heading "Conditions Precedent". The funding of the Interim DIP Amount is subject to the conditions set forth in the Term Sheet under the heading "Conditions Precedent" and the entry of the Interim DIP Order and execution of a back-to-back commitment letter between us and each respective committing lender (each, a "**Back-to-Back Commitment**", a form of which is attached hereto as Exhibit B and each committing lender thereunder, a "**Committing Lender**" and collectively, the "**Committing Lenders**") in form, substance and aggregate principal amount satisfactory to us in our sole discretion. The funding of the Final DIP Amount is subject to the conditions set forth in the Term Sheet under the heading "Conditions Precedent", the entry of the Final DIP Order and the full performance of each Back-to-Back Commitment.

Our commitment hereunder and our agreements to perform the services described herein are further subject to the following conditions: (i) your performance of all of your obligations hereunder and under the Fee Letter to pay fees and expenses; (ii) we shall have received executed Back-to-Back Commitments in form, substance and aggregate principal amount satisfactory to us in our sole discretion; and (iii) execution and delivery of the DIP Loan Documents, which shall be in form and substance reasonably satisfactory to us and each Committing Lender.

Notwithstanding anything to the contrary contained in this Commitment Letter or in the other Debt Financing Letter, our Commitment hereunder is further subject to (i) the approval by the Bankruptcy Court (pursuant to one or more orders in form and substance reasonably acceptable to us (such order or orders, the "**Approval Order**")) of the Debt Financing Letters and

the DIP Credit Facility, (ii) your compliance with your obligations under the Debt Financing Letters (including the Fee Letter), and (iii) satisfaction of the conditions precedent described in the Debt Financing Letters and the DIP Loan Documents.  For the avoidance of doubt, the Approval Order shall authorize the DIP Loan Parties and affiliates to enter into the obligations under the Debt Financing Letters and the DIP Loan Documents, including the payment of all fees, expenses and other liabilities and amounts payable thereunder and/or any indemnification obligations thereunder, and shall provide that all such amounts constitute superpriority administrative expense obligations of the DIP Loan Parties  under Sections 364(c)(1), 503(b) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Cases.

4.      Information.  You represent and warrant that:

(a)      all information and data other than the Projections (as defined below) and information of a general economic or industry-specific nature (the "*Information*") that has been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives is or will be, when furnished and taken as a whole, complete and correct in all material respects;

(b)      none of the Information shall, when furnished or on the Closing Date and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made;

(c)      you will use commercially reasonable efforts to obtain from Moody's Investor Service, Inc. ("*Moody's*") and Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("*S&P*"), within 60 days after the date on which the Bankruptcy Court enters the Approval Order, a credit rating for the DIP Facility;

(d)      all projections, budgets, estimates and other forward-looking information that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives (collectively, the "*Projections*") have been or will be prepared in good faith based upon assumptions believed by you in good faith to be reasonable at the time made and at the time the related Projections are made available to us (it being understood that any such Projections are subject to uncertainties and contingencies, some of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material).

You agree that, if at any time prior to the Closing Date you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information or Projections were then being furnished and such representations and warranties were then being made, you shall, at such time, supplement promptly such Information and/or Projections, as the case may be, in order that such representations and warranties will be correct in all material respects under those circumstances.

We (i) will be relying on Information, the Projections and data provided by or on behalf of you or any of your representatives or otherwise available from generally recognized public sources, without having independently verified the accuracy or completeness of the same, (ii) do not assume responsibility for the accuracy or completeness of any such Information, Projections

and data and (iii) will not make an appraisal of your assets or liabilities.  You shall (i) furnish us with all Information and data that we may reasonably request in connection with our activities on behalf of you and your affiliates and (ii) provide us full access, as reasonably requested, to your respective officers, directors, employees, representatives, agents and professional advisors.

       5.      <u>Fees and Expenses</u>.  As consideration for the Commitment and our other undertakings hereunder, you hereby agree to pay or cause to be paid to us the fees and reasonable and documented out-of-pocket expenses and other amounts set forth in the Debt Financing Letters.

       6.      <u>Indemnification and Waivers</u>.  As consideration for the Commitment and our other undertakings hereunder, you agree to the provisions with respect to indemnification, waivers and other matters contained in <u>Annex A</u> hereto, which is hereby incorporated by reference in this Commitment Letter.

       7.      <u>Confidentiality</u>.  This Commitment Letter is delivered to you on the understanding that neither the existence of this Commitment Letter or the Fee Letter nor any of their terms or substance will be disclosed by you, directly or indirectly, to any other person or entity except that this Commitment Letter and the Fee Letter may be disclosed by you (i) to your officers, directors, agents and advisors who are directly involved in the consideration of the DIP Credit Facility to the extent you notify such persons of their obligation to keep this Commitment Letter and the Fee Letter confidential, (ii) to the extent and to the parties necessary to obtain required approval from the Bankruptcy Court for the Debt Financing Letters and the DIP Credit Facility, (iii) to legal and financial advisers of any official committee appointed in the Bankruptcy Cases on a "professionals' eyes only" basis, (iv) to the extent required by governmental or regulatory authorities (including any self-regulatory organization having or claiming to have jurisdiction), law or legal process including any national securities exchange, federal securities law or in Bankruptcy Court filings and (v) to the Committing Lenders and their officers, directors, agents and advisors.  You may also disclose the aggregate amount of fees payable under the Fee Letter as part of a generic disclosure regarding sources and uses (but without disclosing any specific fees set forth therein) in connection with any customary disclosure regarding the DIP Credit Facility not prohibited by this <u>Section 7</u>.  In addition, the Term Sheet may be disclosed to Moody's and S&P in connection with the rating of the DIP Credit Facility.

       Notwithstanding anything herein to the contrary, you and we (and any of your and our respective employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by the Debt Financing Letters and all materials of any kind (including opinions or other tax analyses) that are provided to you or us relating to such tax treatment and tax structure, except that (i) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to any Debt Financing Letter, and (ii) neither you nor we shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws.  For this purpose, the tax treatment of the transactions contemplated by the Debt Financing Letters is the purported or claimed U.S. federal income tax treatment of such transactions and the tax

structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of such transactions.

8.  <u>Conflicts of Interest; Absence of Fiduciary Relationship</u>.  You acknowledge and agree that:

(a)      we, the Committing Lenders and/or our and their respective affiliates and subsidiaries (the "***Lender Group***"), in our and their respective capacities as principal or agent are involved in a wide range of commercial banking and investment banking activities globally (including investment advisory, asset management, research, securities issuance, trading, and brokerage) from which conflicting interests or duties may arise and, therefore, conflicts may arise between (i) our interests and duties hereunder and (ii) the duties or interests or other duties or interests of another member of the Lender Group,

(b)      we and any other member of the Lender Group may, at any time, (i) provide services to any other person, (ii) engage in any transaction (on our or its own account or otherwise) with respect to you or any member of the same group as you or (iii) act in relation to any matter for any other person whose interests may be adverse to you or any member of your group (a "***Third Party***"), and may retain for our or its own benefit any related remuneration or profit, notwithstanding that a conflict of interest exists or may arise and/or any member of the Lender Group is in possession or has come or comes into possession (whether before, during or after the consummation of the transactions contemplated hereunder) of information confidential to you; *provided* that such confidential information shall not be used by us or any other member of the Lender Group in performing services or providing advice to any Third Party.  You accept that permanent or *ad hoc* arrangements/information barriers may be used between and within our divisions or divisions of other members of the Lender Group for this purpose and that locating directors, officers or employees in separate workplaces is not necessary for such purpose,

(c)      information that is held elsewhere within us or the Lender Group, but of which none of the individual directors, officers or employees having primary responsibility for the consummation of the transactions contemplated by this Commitment Letter actually has knowledge (or can properly obtain knowledge without breach of internal procedures), shall not for any purpose be taken into account in determining our responsibilities to you hereunder,

(d)      neither we nor any other member of the Lender Group shall have any duty to disclose to you, or utilize for your benefit, any non-public information acquired in the course of providing services to any other person, engaging in any transaction (on our or its own account or otherwise) or otherwise carrying on our or its business,

(e)      (i) neither we nor any of our affiliates have assumed any advisory responsibility or any other obligation in favor of the Company or any of its affiliates except the obligations to you expressly provided for under the Debt Financing Letters, (ii) we and our affiliates, on the one hand, and the Company and its affiliates, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor does the Company or any of its affiliates rely on, any fiduciary duty on the part of us or any of our affiliates and (iii) we are (and are affiliated with) full service financial firms and as such may effect from time to time transactions for our own account or the account of customers, and hold

long or short positions in debt, equity-linked or equity securities or loans of companies that may be the subject of the transactions contemplated by this Commitment Letter (and, in particular, we and any other member of the Lender Group may at any time hold debt or equity securities for our or its own account in the Company or any of its affiliates).  With respect to any securities and/or financial instruments so held by us, any of our affiliates or any of our respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of such rights, in its sole discretion. You hereby waive and release, to the fullest extent permitted by law, any claims you have, or may have, with respect to (i) any breach or alleged breach of fiduciary duty (and agree that we shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors) and (ii) any conflict of interest arising from such transactions, activities, investments or holdings, or arising from our failure or the failure of any of our affiliates to bring such transactions, activities, investments or holdings to your attention, and

(f)    neither we nor any of our affiliates are advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated by the Debt Financing Letters, and neither we nor our affiliates shall have responsibility or liability to you with respect thereto. Any review by us, or on our behalf, of the Company, the Transactions, the other transactions contemplated by the Debt Financing Letters or other matters relating to such transactions will be performed solely for our benefit and shall not be on behalf of you or any of your affiliates.

9.    <u>Choice of Law; Jurisdiction; Waivers</u>.  The Debt Financing Letters, and any claim, controversy or dispute arising under or related to the Debt Financing Letters (whether based upon contract, tort or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York. To the fullest extent permitted by applicable law, you hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, to the exclusive jurisdiction of each federal or state court sitting in Manhattan, New York in respect of any claim, suit, action or proceeding arising out of or relating to the provisions of any Debt Financing Letter and/or the Back-to-Back Commitment and irrevocably agree that all claims in respect of any such claim, suit, action or proceeding may be heard and determined in such court and that service of process therein may be made by certified mail, postage prepaid, to your address set forth above. You and we hereby waive, to the fullest extent permitted by applicable law, any objection that you or we may now or hereafter have to the laying of venue of any such claim, suit, action or proceeding brought in the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, such federal or state court sitting in Manhattan, New York, and any claim that any such claim, suit, action or proceeding brought in the Bankruptcy Court or, if the Bankruptcy Court does not accept such jurisdiction, such federal or state court has been brought in an inconvenient forum.  You and we hereby waive, to the fullest extent permitted by applicable law, any right to trial by jury with respect to any claim, suit, action or proceeding (whether based upon contract, tort or otherwise) arising out of or relating to the Debt Financing Letters, the Back-to-Back Commitment, any of the Transactions or any of the other transactions contemplated hereby or thereby.  The provisions of this <u>Section 9</u> are intended to be effective upon the execution of this Commitment Letter

6

without any further action by you, and the introduction of a true copy of this Commitment Letter into evidence shall be conclusive and final evidence as to such matters.

10.    <u>Miscellaneous</u>.

(a)    This Commitment Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Delivery of an executed signature page of this Commitment Letter by facsimile, PDF or other electronic transmission will be effective as delivery of a manually executed counterpart hereof.

(b)    Subject to Section 13, you may not assign any of your rights, or be relieved of any of your obligations, under this Commitment Letter without our prior written consent, which may be given or withheld in our sole discretion (and any purported assignment without such consent, at our sole option, shall be null and void).  We may at any time and from time to time assign all or any portion of our Commitment hereunder; *provided* that no assignment of any part of our Commitment prior to the Closing Date will reduce or relieve us of our obligation to fund on the Closing Date such portion of the Commitment so assigned to the extent any such assignee fails to fund such portion of the Commitment on the Closing Date. Any and all obligations of, and services to be provided by, us hereunder (including the Commitment) may be performed, and any and all of our rights hereunder may be exercised, by or through any of our affiliates or branches and we reserve the right to allocate, in whole or in part, to our affiliates or branches certain fees payable to us in such manner as we and our affiliates may agree in our and their sole discretion.  You further acknowledge that, subject to <u>Section 7</u> hereof, we may share with any of our affiliates and assignees (including the Committing Lenders), and such affiliates and assignees (including the Committing Lenders) may share with us, any information relating to the Transactions, you and your affiliates, or any of the matters contemplated in the Debt Financing Letters.

(c)    This Commitment Letter has been and is made solely for the benefit of you, us and the indemnified persons (as defined in <u>Annex A</u> hereto) and your, our and their respective successors and assigns, and nothing in this Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or your and our agreements contained herein.

(d)    The Debt Financing Letters set forth the entire understanding of the parties hereto as to the scope of the Commitment and our obligations hereunder and thereunder.  The Debt Financing Letters supersede all prior understandings and proposals, whether written or oral, between us and you relating to any financing or the transactions contemplated hereby and thereby.

(e)    You agree that we or any of our affiliates may disclose information about the Transactions to market data collectors and similar service providers to the financing community.

(f)    We hereby notify you and, upon its becoming bound by the provisions hereof, each other Guarantor, that pursuant to the requirements of the USA PATRIOT Act

Improvement and Reauthorization Act, Pub. L. 109-177 (signed into law March 9, 2006) (as amended or reauthorized from time to time, the "***Patriot Act***"), we and each of our assignees (including the Committing Lenders) may be required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name, address, tax identification number and other information regarding the Borrower and the Guarantors that will allow us or such assignee (including the Committing Lenders) to identify the Borrower and the Guarantors in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective as to us and each of our assignees (including the Committing Lenders). You agree that we shall be permitted to share any or all such information with our assignees (including the Committing Lenders).

11.    <u>Amendment; Waiver</u>.  This Commitment Letter may not be modified or amended except in a writing duly executed by the parties hereto.  No waiver by any party of any breach of, or any provision of, this Commitment Letter shall be deemed a waiver of any similar or any other breach or provision of this Commitment Letter at the same or any prior or subsequent time.  To be effective, a waiver must be set forth in writing signed by the waiving party and must specifically refer to this Commitment Letter and the breach or provision being waived.

12.    <u>Surviving Provisions</u>.    Notwithstanding anything to the contrary in this Commitment Letter: (i) <u>Sections 5</u> to and including <u>14</u> hereof shall survive the expiration or termination of this Commitment Letter, regardless of whether the DIP Loan Documents have been executed and delivered or the Transactions consummated, and (ii) <u>Sections 2</u> and <u>4</u> to and including <u>11</u> hereof shall survive execution and delivery of the DIP Loan Documents and the consummation of the Transactions.

13.    <u>Assumption by Debtor-in-Possession</u>: Immediately upon the appointment of RCS Capital Corporation as debtor and debtor-in-possession by the Bankruptcy Court in respect of the Bankruptcy Cases (in such capacity, the "***DIP Borrower***"), the Borrower shall cause the DIP Borrower to execute this Commitment Letter by executing its signature page attached hereto. Notwithstanding any provision herein to the contrary, upon execution of this Commitment Letter by the DIP Borrower as provided above, the DIP Borrower (and only the DIP Borrower) shall be entitled to the rights and benefits of Borrower under this Commitment Letter and the Fee Letter, and subject to Borrower's obligations thereunder and all references herein to the term "Borrower", "you" or "your" shall be deemed to be a reference to the DIP Borrower exclusively.

14.    <u>Acceptance, Expiration and Termination</u>.  Please indicate your acceptance of the terms of the Debt Financing Letters by returning to us executed counterparts of the Debt Financing Letters not later than [10 a.m.], New York City time, on [February 1], 2016 (the "***Deadline***"); *provided* that <u>Sections 5</u> and <u>6</u> of this Commitment Letter and the Fee Letter shall be deemed effective only upon the Approval Order being entered into by the Bankruptcy Court. The Debt Financing Letters are conditioned upon your contemporaneous execution and delivery to us, and the contemporaneous receipt by us, of executed counterparts of each Debt Financing Letter on or prior to the Deadline. This Commitment Letter will expire in the event that you have not complied with the requirements of the two immediately preceding sentences by such relevant times as specified therein.    Thereafter, except with respect to any provision that expressly survives pursuant to <u>Section 12</u> hereof, this Commitment Letter (but not the Fee Letter) will terminate automatically on the earliest of (i) a material breach by you or a failure of a condition

under any Debt Financing Letter, (ii) [10:00 a.m.], New York City time, on [February 1], 2016 and (iii) [February 3], 2016 if the Approval Order has not been entered by such date.

*[Remainder of page intentionally blank]*

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BARCLAYS BANK PLC**

By: _____
    Name:
    Title:

Accepted and agreed to as of the
date first above written:

**RCS CAPITAL CORPORATION**


By:_____
    Name:
    Title:




RCS Capital Corporation, as debtor and debtor-in-possession under the voluntary bankruptcy case filed under Chapter 11 of Title 11 of the United States Code by RCS Capital Corporation and its affiliates (in such capacity, the "DIP Borrower"), hereby assumes all obligations of the Borrower (as defined herein), effective upon the date on which the DIP Borrower affixes its signature hereto and acknowledges that all references herein to the term "Borrower", "you" or "your" shall be deemed a reference to the DIP Borrower exclusively.



**RCS CAPITAL CORPORATION,**
as Debtor and Debtor-in-Possession


By:_____
    Name:
    Title:

## ANNEX A TO COMMITMENT LETTER

## INDEMNIFICATION AND WAIVER

*Except as otherwise defined in this Annex A, capitalized terms used but not defined herein have the meanings assigned to them elsewhere in this Commitment Letter.*

The Borrower ("*you*") hereby agrees (i) to indemnify and hold harmless Barclays Bank PLC (collectively, "*we*" or "*us*"), the DIP Agent, our assignees (including each Committing Lender) and each of our and their respective affiliates and subsidiaries and each of the respective officers, directors, partners, trustees, employees, affiliates, shareholders, advisors, agents, representatives, attorneys-in-fact, members, successors, assigns and controlling persons of each of the foregoing (each, an "*indemnified person*") from and against any and all losses, claims, damages and liabilities (collectively, "*Losses*") to which any such indemnified person, directly or indirectly, may become subject arising out of, relating to, resulting from or otherwise in connection with the Debt Financing Letters, the Back-to-Back Commitment, the DIP Credit Facility, the use of the proceeds therefrom, the Transactions, any of the other transactions contemplated by the Debt Financing Letters, or any action, claim, suit, litigation, investigation, inquiry or proceeding (each, a "*Claim*") directly or indirectly arising out of, relating to, resulting from or otherwise in connection with any of the foregoing (**IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PERSON**), regardless of whether any indemnified person is a named party thereto or whether such Claim is brought by you, any of your affiliates or a third party and (ii) to reimburse each indemnified person upon demand at any time and from time to time for all reasonable and documented out-of-pocket legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any Claim, directly or indirectly, arising out of, relating to, resulting from or otherwise in connection with any of the foregoing (including in connection with the enforcement of the indemnification obligations and waivers set forth in this Annex A); *provided*, *however*, that no indemnified person will be entitled to indemnity hereunder in respect of any Loss to the extent that it is found by a final, non-appealable judgment of a court of competent jurisdiction that such Loss resulted from the gross negligence or willful misconduct of such indemnified person. In addition, in no event will any indemnified person be liable for consequential, special, exemplary, punitive or indirect damages (including any loss of profits, business or anticipated savings), whether, directly or indirectly, as a result of any failure to fund all or any portion of the DIP Credit Facility or otherwise arising out of, relating to, resulting from or otherwise in connection with the DIP Credit Facility or arising out of, relating to, resulting from or otherwise in connection with any Claim or otherwise. In addition, no indemnified person will be liable for any damages arising from the use by unauthorized persons of Information or Projections sent through electronic, telecommunications or other information transmission systems that are intercepted or otherwise obtained by such persons except to the extent it is found by a final, non-appealable judgment of a court of competent jurisdiction that such damages resulted from the gross negligence or willful misconduct of such indemnified person.

You shall not settle or compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Claim in which any indemnified person is or could be a party and as to which indemnification or contribution could have been sought by such indemnified person hereunder whether or not such indemnified person is a party to any Debt Financing Letter, unless (i) such indemnified person and each other indemnified person from which such indemnified person could have sought indemnification or contribution have given their prior written consent, which may be given or withheld in their sole discretion or (ii) the settlement, compromise, consent or termination (A) includes an express unconditional release of all indemnified persons and their respective affiliates from all Losses, directly or indirectly, arising out of, relating to, resulting from or otherwise in connection with such Claim and (B) does not include any statement as to or any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any indemnified person.

If for any reason (other than the gross negligence or willful misconduct of an indemnified person as determined above) the foregoing indemnity is unavailable to an indemnified person or insufficient to hold an indemnified person harmless, then you to the fullest extent permitted by law, shall contribute to the amount paid or payable by such indemnified person as a result of such Losses in such proportion as is appropriate to reflect the relative benefits received by you, on the one hand, and by us, on the other hand, from the Transactions or, if allocation on that basis is not permitted under applicable law, in such proportion as is appropriate to reflect not only the relative benefits received by you, on the one hand, and us, on the other hand, but also the relative fault of you, on the one hand, and us, on the other hand, as well as any relevant equitable considerations. Notwithstanding the provisions hereof, the aggregate contribution of all indemnified persons to all Losses shall not exceed the amount of fees actually received by us pursuant to the Fee Letter. For the purposes of this paragraph, it is hereby further agreed that (i) the relative benefits to you, on the one hand, and us, on the other hand, with respect to the Transactions shall be deemed to be in the same proportion as (x) the total value paid or received or contemplated to be paid or received by you, your equityholders and/or your or their respective affiliates, as the case may be, in the Transactions, whether or not the Transactions are consummated, bears to (y) the fees actually paid to us under the Fee Letter and (ii) the relative fault of you, on the one hand, and us, on the other hand, with respect to the Transactions shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by you, any of your affiliates and/or any of your or their respective officers, directors, partners, trustees, employees, affiliates, shareholders, advisors, agents, representatives, attorneys-in-fact and controlling persons or by us, as well as your and our relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

In addition, you shall reimburse the indemnified persons for all reasonable and documented expenses (including fees and expenses of internal and external counsel), as incurred, in connection with investigating, preparing, defending or settling any Claim for which indemnification or contribution may be sought by the indemnified person, whether or not any indemnified person is a named party thereto or whether such Claim is brought by you, any of your affiliates or a third party.

The indemnity, contribution and expense reimbursement obligations set forth herein (i) shall be in addition to any liability you may have to any indemnified person at law, in equity or otherwise, (ii) shall survive the expiration or termination of the Debt Financing Letters (notwithstanding any other provision of any Debt Financing Letter or the DIP Loan Documents), (iii) shall apply to any modification, amendment, waiver or supplement of our and any of our affiliates' commitment and/or engagement, (iv) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of us or any other indemnified person and (v) shall be binding on any successor or assign of you and the successors or assigns to any substantial portion of your business and assets.