## **EXHIBIT 1**

Blackline

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RCS CAPITAL CORPORATION, *et. al.*[1] | Case No. 16-10223 (MFW) |
| Debtors. | Jointly Administered |

**<u>AMENDED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION FOR RCS CAPITAL CORPORATION AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

<div style="border:1px solid black; padding:10px;">

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

</div>

| | |
|---|---|
| **DECHERT LLP** | **YOUNG CONAWAY STARGATT & TAYLOR, LLP** |
| Michael J. Sage (admitted *pro hac vice)* | Robert S. Brady (No. 2847) |
| Shmuel Vasser (admitted *pro hac vice*) | Edmon L. Morton (No. 3856) |
| Stephen M. Wolpert (admitted *pro hac vice*) | Robert F. Poppiti, Jr. (No. 5052) |
| Andrew C. Harmeyer (admitted *pro hac vice*) | Ian J. Bambrick (No. 5455) |
| 1095 Avenue of the Americas | Rodney Square, 1000 North King Street |
| New York, NY 10036 | Wilmington, Delaware 19801 |
| Telephone: (212) 698-3500 | Telephone: (302) 571-6600 |
| Facsimile: (212) 698-3599 | Facsimile: (302) 571-1253 |

Dated:  February ~~5~~9, 2016

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: RCS Capital Corporation (4716); American National Stock Transfer, LLC (3206); Braves Acquisition, LLC (6437); DirectVest, LLC (9461); J.P. Turner & Company Capital Management, LLC (7535); Realty Capital Securities, LLC (0821); RCS Advisory Services, LLC (4319); RCS Capital Holdings, LLC (9238); SBSI Insurance Agency of Texas Inc. (9203); SK Research LLC (4613); Trupoly, LLC (5836); and We R Crowdfunding, LLC (9785).  The Debtors' corporate headquarters and mailing address is located at 405 Park Avenue, ~~14~~12th Floor, New York, NY 10022.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION .......................................................................................... 1
    1.1    General ................................................................................................. 1
    1.2    The Confirmation Hearing ................................................................... 6
    1.3    Administrative and Priority Claims ..................................................... 7
    1.4    Classification of Claims and Interests ................................................. 7
    1.5    Voting; Holders of Claims Entitled to Vote ....................................... 13
    1.6    Important Matters ................................................................................ 15

ARTICLE II. BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO
             THESE CHAPTER 11 CASES .................................................... 16
    2.1    The Debtors' Prepetition Businesses ................................................... 16
    2.2    Prepetition Capital Structure ............................................................... 22
    2.3    Events Leading to the Chapter 11 Cases ............................................. 30

ARTICLE III. DESCRIPTION OF THE DEBTORS' CHAPTER 11 CASES ................. 37
    3.1    Continuation of the Businesses after the Petition Date ....................... 37
    3.2    Case Administration ............................................................................ 43

ARTICLE IV. THE PLAN .............................................................................................. 44
    4.1    Overview of Chapter 11 ...................................................................... 44
    4.2    Overview of the Plan .......................................................................... 45
    4.3    Means for Implementation of the Plan ............................................... 64
    4.4    Executory Contracts and Unexpired Leases ....................................... 78
    4.5    Retention of Jurisdiction by the Bankruptcy Court ............................ 81
    4.6    Miscellaneous Provisions .................................................................... 84

ARTICLE V. CONDITIONS PRECEDENT .................................................................. 86
    5.1    Conditions Precedent to Confirmation ................................................ 86
    5.2    Conditions Precedent to the Effective Date ........................................ 86
    5.3    Effect of Failure of Conditions to Effective Date .............................. 88
    5.4    Waiver of Conditions .......................................................................... 88

ARTICLE VI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
             PLAN ......................................................................................... 89
    6.1    Modification and Amendments ........................................................... 89
    6.2    Effect of Confirmation on Modifications ........................................... 89
    6.3    Revocation, Withdrawal, or Non-Consummation of the Plan ............ 89
    6.4    Severability ......................................................................................... 90

ARTICLE VII. EFFECT OF CONFIRMATION ........................................................... 90
    7.1    Vesting of Assets ................................................................................ 90
    7.2    Settlement of Certain Intercreditor Issues .......................................... 91
    7.3    Discharge of Claims Against the Debtors and Termination of Interests .. 91
    7.4    Term of Injunctions or Stays .............................................................. 92
    7.5    Injunction Against Interference with the Plan .................................... 92
    7.6    Releases .............................................................................................. 92

| | | |
|---|---|---|
| 7.7 | Exculpation | 93 |
| 7.8 | Injunction | 94 |
| 7.9 | Worthless Stock Deduction Procedures | 95 |
| 7.10 | Setoff | 95 |
| 7.11 | Exemption from Certain Transfer Taxes | 95 |
| 7.12 | Issuance of New Securities and Plan-Related Documentation | 96 |

ARTICLE VIII. CONFIRMATION OF THE PLAN .................................................. 96
| | | |
|---|---|---|
| 8.1 | Confirmation Hearing | 96 |
| 8.2 | Confirmation | 97 |
| 8.3 | Consummation | 106 |

ARTICLE IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................. 106
| | | |
|---|---|---|
| 9.1 | Liquidation under Chapter 7 of the Bankruptcy Code | 106 |
| 9.2 | Alternative Plan(s) of Liquidation or Reorganization | 107 |

ARTICLE X. SUMMARY OF VOTING PROCEDURES .................................................. 107

ARTICLE XI. CERTAIN RISK FACTORS TO BE CONSIDERED .................................................. 108
| | | |
|---|---|---|
| 11.1 | Certain Bankruptcy Considerations | 108 |
| 11.2 | Actual recoveries may differ materially from the estimated recoveries set forth in this Disclosure Statement | 110 |
| 11.3 | Risks Relating to the Exit Facility, the New Second Lien Facility and the Reorganized Holdings Equity Interests | 111 |
| 11.4 | Risks Relating to Tax Consequences of the Plan | 113 |
| 11.5 | Risks Associated with the Business | 113 |
| 11.6 | Risks Related to the Creditor Trust | 114 |

ARTICLE XII. SECURITIES LAW MATTERS .................................................. 116
| | | |
|---|---|---|
| 12.1 | General | 116 |
| 12.2 | Issuance of Reorganized Holdings Equity Interests, New Warrants, Class A Units and Class B Units | 117 |
| 12.3 | Subsequent Transfers of Securities Issued Under the Plan | 118 |
| 12.4 | Shareholders' Agreement; New Warrant Agreements | 119 |

ARTICLE XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................................................. 120
| | | |
|---|---|---|
| 13.1 | Federal Income Tax Consequences to the Debtors | 121 |
| 13.2 | Federal Income Tax Consequences to U.S. Holders of Claims | ~~125~~126 |

ARTICLE XIV. RECOMMENDATION AND CONCLUSION .................................................. 138

## INDEX OF EXHIBITS

EXHIBIT 1          The Plan

EXHIBIT 2          Liquidation Analysis

EXHIBIT 3          Historical Financial Statements

EXHIBIT 4          Prepetition Organizational Chart

EXHIBIT 5          Financial Projections

EXHIBIT 6          Valuation Analysis

EXHIBIT 7          Terms of Insurance Policies

# ARTICLE I.

## INTRODUCTION

**1.1**    *General.*

RCS Capital Corporation ("**RCS Capital Corporation**" or "**Holdings**"); American National Stock Transfer, LLC; Braves Acquisition, LLC; DirectVest, LLC; J.P. Turner & Company Capital Management, LLC; Realty Capital Securities, LLC; RCS Advisory Services, LLC; RCS Capital Holdings, LLC; SBSI Insurance Agency of Texas, Inc.; SK Research, LLC; Trupoly, LLC; and We R Crowdfunding, LLC (collectively, the "**Debtors**"), as debtors and debtors-in-possession in chapter 11 cases pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), jointly administered under Case No. ~~16~~-16-10223 (MFW), submit this disclosure statement (this "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the *Joint Plan of Reorganization of RCS Capital Corporation and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* (the "**Plan**"), dated January 31, 2016.  A copy of the Plan is attached as **Exhibit 1** to this Disclosure Statement.

This Disclosure Statement is designed to provide holders of Claims in voting Classes with adequate information in order to make an informed decision about whether to vote to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Debtors' prepetition capital structure and business operations, important developments leading to the commencement of the chapter 11 cases, and important developments that have occurred during these chapter 11 cases.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the Plan, potential alternatives to the Plan, the manner in which distributions will be made under the Plan if the Plan is confirmed and becomes effective, and related matters.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

**THE DEBTORS, THE REQUIRED CONSENTING FIRST LIEN LENDERS, THE REQUIRED CONSENTING SECOND LIEN LENDERS, AND LUXOR SUPPORT CONFIRMATION OF THE PLAN.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2, 3 AND 5 VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES THE BEST AVAILABLE RECOVERY TO CREDITORS IN SUCH CLASSES.**

Except as otherwise provided herein, capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.  To the extent the Plan is inconsistent with this Disclosure Statement, the provisions of the Plan will control.

The Plan and this Disclosure Statement are the result of months of discussions followed by extensive and vigorous negotiations among the Company, its primary secured lenders and its largest unsecured creditor. The culmination of these negotiations was the entry into a restructuring support agreement (the "**Restructuring Support Agreement**" or "**RSA**"), upon which the Plan is premised, by and among the Company and the holders of approximately 92.5% of the principal amount of the First Lien Facility, holders of approximately 87.6% of the principal amount of the Second Lien Facility, and holders of over $135 million in unsecured claims, representing the overwhelming majority of the unsecured claims against the Debtors (collectively, the "**Supporting Creditors**"). The Debtors firmly believe the RSA—with the requisite support necessary to confirm a plan under 1126(c) of the Bankruptcy Code—puts the Debtors on firm footing to expeditiously prosecute these cases to conclusion.

As described in more detail below, the Plan provides for, among other things, (i) an injection of $150 million to $170 million dollars of incremental liquidity to fund, among other things, the Debtors' working capital needs and a critical retention program for the independent financial advisors, (ii) a deleveraging of the Debtors' balance sheet by over $200 million, including the conversion of $100 million of first and second lien secured debt into equity of Reorganized Holdings, (iii) the reduction in interest expense on an annual basis, (iv) recoveries for unsecured creditors through the establishment and funding of a creditor trust, and (v) the cancellation of all existing preferred and common equity securities in RCS Capital Corporation. As part of the global compromise embodied in the Restructuring Support Agreement and the Plan, the Prepetition Secured Parties agreed to provide additional value to unsecured creditors through a creditor trust that otherwise would be largely unavailable without such compromise. The key components of the Plan are as follows:

• Payment in full, in cash, of all Allowed Administrative Claims, Priority Tax Claims, statutory fees, Other Priority Claims and Other Secured Claims;

• The establishment and funding of a creditor trust (the "**Creditor Trust**") with the following: (i) ~~all~~ the Creditor Assets, consisting of $12 million in Cash and warrants to purchase up to 10% of the new equity issued by Reorganized Holdings, (ii) the Litigation Assets, consisting of certain claims and causes of action held by the Debtors, their respective estates, and certain of the ~~RCS~~ Debtors' subsidiaries; (iii) the right to prosecute the causes of action transferred to the Creditor Trust; and (iv) the right to prosecute, object to, settle, or otherwise resolve all General Unsecured Claims;

• Each holder of a Convertible Note Claim, Senior Unsecured Note Claim, or General Unsecured Claim will receive Class A Units in the Creditor Trust entitling it to receive its pro rata share of the Creditor Trust Assets available for distribution, which will be distributed in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan;

• The conversion of $50 million of the Claims under the First Lien Facility into 38.75% of the equity in Reorganized Holdings, with the remainder of the claims under the First Lien Facility receiving a pro rata share of a $500 million new second lien term facility;

2

&bull;     The conversion of $50 million of the Claims under the Second Lien Facility into 38.75% of the equity in Reorganized Holdings;

&bull;     The capping of the Second Lien Deficiency Claims at $105 million, with Second Lien Lenders agreeing to waive any distributions on account of the Second Lien Deficiency Claim from (a) the Creditor Assets and (b) the first $30 million in proceeds received by the Creditor Trust from the Litigation Assets, which shall be distributed in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan;

&bull;     Entry into a $100 million new secured superpriority debtor-in-possession facility provided by certain existing First Lien Lenders and Second Lien Lenders, which will, on the Effective Date, be repaid with proceeds from a new $150 million first lien term facility; and

&bull;     The cancellation of all existing Preferred Stock and existing common equity interests in RCS Capital Corporation.

The Company and each of the Supporting Creditors believe that the proposed restructuring under the Plan is extremely favorable for all creditors because it achieves a deleveraging of the Company's balance sheet through consensus with the overwhelming majority of the Company's creditors and eliminates potential deterioration of value that could otherwise result from a protracted and contentious bankruptcy case.  The significant support obtained by the Company pursuant to the Restructuring Support Agreement provides a fair and reasonable path for an expeditious consummation of the Plan and the preservation of the ongoing businesses.

**Additionally, as described in Section 7.6 herein, the Plan provides for certain releases of Claims against, among others, the Debtors, the Reorganized Debtors, the parties to the Restructuring Support Agreement, the Creditor Trust Administrator, the Creditor Trust Board, and each of their professionals, employees, officers and directors.**

On [&bull;], 2016 after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE

CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "**S.E.C.**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE S.E.C., ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE S.E.C., NOR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a) OF THE BANKRUPTCY CODE OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTIONS 1145(a)(1) AND (2) OF THE BANKRUPTCY CODE AND SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. ALTHOUGH THE DEBTORS WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT

WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE

SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN WILL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

All Exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, at (http://cases.primeclerk.com/rcscapital) (the "**Website**") not later than ten (10) days before the Voting Deadline (defined herein).  Copies of all Exhibits to the Plan also may be obtained, free of charge, from Prime Clerk LLC. ("**Prime Clerk**" or the "**Voting Agent**") by calling (855) 410-7357 (U.S. and Canada) or (646) 795-6963 (International), or by emailing rcsballots@primeclerk.com.

In addition, if you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent by calling (855) 410-7357 (U.S. and Canada) or (646) 795-6963 (International), or by emailing rcsballots@primeclerk.com.

**1.2**    *The Confirmation Hearing.*

In accordance with an order from the Bankruptcy Court approving this Disclosure Statement under section 1128 of the Bankruptcy Code, a hearing to be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at Courtroom #4 of the Bankruptcy Court, 824 Market Street N, Wilmington, Delaware 19801, on **[DATE] at [TIME] (Eastern Time)**, will be scheduled to consider confirmation of the Plan.  The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right, with the consent of the Required Consenting Lenders, to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **[DATE] at [TIME] (Eastern Time)**.  The hearing on confirmation of the Plan may be adjourned from time to time without further notice,

except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

**1.3**    ***Administrative and Priority Claims.***

In accordance with section 1123(a)(1) of the Bankruptcy Code, U.S. Trustee Fees, Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims have not been classified under the Plan.  Each of these Claims will be satisfied as detailed in Section 4.2 below.

**1.4**    ***Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, for all purposes, including voting, confirmation and Distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The following table specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.  A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class; provided, however, that any Claim classified in Class 6 shall not be classified in any other Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

| Class | Designation | Impairment | Recovery[2] and Treatment | Entitled to Vote |
|---|---|---|---|---|
| Class 1 | Priority Claims | No | 100%<br><br>The Debtors estimate that there will be up to approximately $[●]2 million of Allowed Priority Claims.<br><br>Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment, each holder of an Allowed Priority Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Priority Claim, Cash in the full amount of such Allowed Priority Claim on the Effective Date or, if later, the first Business Day after the date such Priority Claim becomes Allowed. | No (deemed to accept) |
| Class 2 | First Lien Claims | Yes | [●]90% to 100%<br><br>The First Lien Claims as of the Petition Date will be Allowed in the aggregate amount of $556.0 million.[3]<br><br>On the Effective Date, (i) in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of $50 million of the aggregate amount of Allowed First Lien Claims, each holder of an Allowed First Lien Claim shall receive its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests, and (ii) in exchange for and in full satisfaction, | Yes |

---

[2]  For a discussion of the estimated ranges of recovery rates, see Section 8.2(a)(3c), "Creditors' Estimated Recovery Rates," of this Disclosure Statement.

[3]  Notwithstanding the Allowed amount of the First Lien Claims, solely to the extent of their treatment under this Plan, the amount of the First Lien Claims will be deemed to be $550 million.   Agreement to this treatment under the Plan shall not be deemed a waiver or admission that the holders of First Lien Claims are in any way not entitled to the full value of their Claims for any other purpose.☼

| Class | Designation | Impairment | Recovery[2] and Treatment | Entitled to Vote |
|---|---|---|---|---|
| | | | settlement, release, and discharge of its Pro Rata share of $500 million of the aggregate amount of Allowed First Lien Claims, each holder of an Allowed First Lien Claim shall receive its Pro Rata share of the New Second Lien Facility. | |
| Class 3 | Second Lien Claims | Yes | [●]0% to 36% <br><br> The Second Lien Claims will be Allowed in the aggregate amount of $153.2 million, with $50 million of such Allowed Claims to be treated as Secured Second Lien Claims and $103.2 million to be treated as Second Lien Deficiency Claims. <br><br> On the Effective Date (i) in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of the aggregate Allowed Secured Second Lien Claims, each holder of an Allowed Second Lien Claim shall receive its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests, and (ii) in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of the aggregate Allowed Second Lien Deficiency Claims, each holder of an Allowed Second Lien Claim will receive its Pro Rata share of Class B Units, entitling the holders thereof to receive a share of the distributions of the Litigation Asset Proceeds allocated to the holders of Class B Units pursuant to the Creditor Trust Distribution Schedule. For the avoidance of doubt, holders of Allowed Second Lien Claims will waive all rights to and will not receive any distributions of Creditor Assets or | Yes |

| Class | Designation | Impairment | Recovery[2] and Treatment | Entitled to Vote |
|---|---|---|---|---|
| | | | the proceeds thereof from the Creditor Trust. | |
| Class 4 | Other Secured Claims | No | 100%<br><br>The Debtors estimate that ~~there will be approximately $[●] of~~ Other Secured Claims _will be de minimis_.<br><br>Unless a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, on the Effective Date, each Allowed Other Secured Claim shall be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Consenting Lenders, each holder of an Allowed Other Secured Claim shall receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim. | No (deemed to accept) |
| Class 5 | General Unsecured Claims | Yes | ~~[●]% - [●]%~~6%[4] | Yes |

[4]   The 6% projected recovery on account of General Unsecured Claims is based on (i) approximately $201.5 million in claims and (ii) $13 million (cash and new warrants) in assets available for distributions, without taking into account the value of litigation assets and costs of administration of the Creditors Trust.

10

| Class | Designation | Impairment | Recovery[2] and Treatment | Entitled to Vote |
|---|---|---|---|---|
| | | | On the Effective Date, each holder of an Allowed General Unsecured Claim, in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, shall be deemed to receive its Pro Rata share of Class A Units, entitling the holders thereof to receive a share of the Creditor Trust Assets allocated to holders of General Unsecured Claims in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan. Each holder of a General Unsecured Claim shall be permitted to reduce its Claim to $[●] and receive, in lieu of the Distribution provided to holders of Claims in Class 5, Distribution as if the Claim is a Class 6 Convenience Class Claim. | |
| Class 6 | Convenience Class | No | 100%<br><br>Each holder of an Allowed Convenience Class Claim will receive in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed Convenience Class Claim, payment in full in Cash from the Reorganized Debtors on or as soon as reasonably practicable after the Effective Date in an amount not to exceed $[●]. | No (deemed to accept) |
| Class 7 | Subordinated Claims | Yes | Each holder of a Subordinated Claim shall receive no Distribution. | No (deemed to reject) |
| Class 8 | Intercompany Claims | No | On the Effective Date, each Intercompany Claim shall be reinstated or extinguished in the discretion of the Debtors with the written consent of the Required | No (deemed to accept) |

| Class | Designation | Impairment | Recovery[2] and Treatment | Entitled to Vote |
|---|---|---|---|---|
| | | | Consenting Lenders. | |
| Class 9 | Intercompany Interests | No | On the Effective Date, each Class 9 Intercompany Interest will be Reinstated. | No (deemed to accept) |
| Class 10 | Holdings Equity Interests | Yes | All Holdings Equity Interests in Class 10 will be deemed cancelled as of the Effective Date. | No (deemed to reject) |

The table set forth above provides a brief summary of the classification and treatment of Claims and Interests and the estimated recovery distributable to the holders of such Claims and Interests under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on provisions of the Bankruptcy Code.  The information set forth in the table is for convenience of reference only.  Each holder of a Claim or Interest should refer to Sections 2, 3 and 4 of the Plan and the Liquidation Analysis annexed as **Exhibit 2** hereto (the "**Liquidation Analysis**") for a full understanding of the classification and treatment of Claims and Interests provided under the Plan.

THE ESTIMATES SET FORTH IN THE TABLE ABOVE MAY DIFFER FROM ACTUAL DISTRIBUTIONS BY REASON OF, AMONG OTHER THINGS, VARIATIONS IN THE ASSERTED OR ESTIMATED AMOUNTS OF ALLOWED CLAIMS AND THE EXISTENCE OF DISPUTED CLAIMS.  STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTORS BASED ON INFORMATION AS OF THE DATE HEREOF AND ARE NOT REPRESENTATIONS AS TO THE ACCURACY OF THESE AMOUNTS.  THE FINAL AMOUNTS OF ALLOWED CLAIMS MAY VARY SIGNIFICANTLY FROM THESE ESTIMATES.  FOR AN EXPLANATION OF THE BASIS FOR THE LIMITATIONS AND UNCERTAINTIES REGARDING THESE CALCULATIONS, SEE ARTICLE XI ("CERTAIN RISK FACTORS TO BE CONSIDERED"), BELOW.

**1.5    *Voting; Holders of Claims Entitled to Vote.***

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are Impaired and not deemed to have rejected a plan are entitled to vote to accept or reject a plan.  Generally, a claim or interest is Impaired under the Plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are Unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

12

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims held by non-insiders that cast ballots for acceptance or rejection of such plan (such vote, the "**Requisite Acceptances**"). **Your vote to accept or reject the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is Impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors, reserve the right to amend the Plan (subject to the prior written consent of the Required Consenting Lenders) and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more Impaired classes of Claims or Interests, so long as at least one Impaired class of Claims or Interests, excluding the votes of insiders, votes to accept the plan. Under that section of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan (a "**Ballot**"). This Disclosure Statement, the Exhibits attached hereto, and the Plan and related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan. If you believe that you are entitled to vote to accept or reject the Plan and you did not receive a Ballot, please consult with your counsel and/or contact the Voting Agent by telephone at (855) 410-7357 (U.S. and Canada) or (646) 795-6963 (International), or by emailing rcsballots@primeclerk.com, or at the address listed below.

Please complete, execute and return your Ballot(s) (a) in the provided postage prepaid envelope, (b) via electronic mail to rcsballots@primeclerk.com or (c) by first class mail, overnight courier or hand delivery to:

> RCS Balloting Processing Center
> c/o Prime Clerk LLC
> 830 3rd Avenue, 9th Floor
> New York, NY 10022

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

TO BE COUNTED, YOUR PROPERLY COMPLETED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN **[DATE], EASTERN TIME, ON [TIME] (the "Voting Deadline")** UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS WITH THE CONSENT OF THE REQUIRED CONSENTING LENDERS. YOUR BALLOT MAY BE SENT VIA THE PROVIDED POSTAGE PREPAID ENVELOPE, ELECTRONIC MAIL,

FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY, AS INSTRUCTED IN THE BALLOT.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto.  Accordingly, in voting on the Plan, please use only the Ballot(s) sent to you with this Disclosure Statement or provided by the Voting Agent.  If you require an additional Ballot, please contact the Voting Agent and request a replacement and/or supplemental Ballot.

The Debtors have fixed **[DATE]** (the "**Voting Record Date**") as the date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan.  Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of Impaired Claims has accepted the Plan.  The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

**THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST OPPORTUNITY TO MAXIMIZE VALUE FOR ALL OF THE DEBTORS' STAKEHOLDERS AND CONSTITUENTS AND STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**1.6**    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.

## ARTICLE II.

## BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO THESE CHAPTER 11 CASES

**2.1    *The Debtors' Prepetition Businesses.***

(a)    **Overview**.

RCS Capital Corporation (together with the other Debtors and RCS Capital Corporation's direct and indirect non-debtor subsidiaries (the "**Non-Debtor Subsidiaries**"), the "**Company**") is headquartered in New York, New York.  The Company is comprised of 58 entities, of which 12 are Debtors in these cases as of the Petition Date.  RCS Capital Corporation is the ultimate parent company to each of the other Debtors, as well as the Non-Debtor Subsidiaries.

RCS Capital Corporation is a public reporting company under Section 12(b) of the Securities Exchange Act of 1934 and its shares of Class A common stock, par value $0.001 per share, are publicly traded on the OTC Pink marketplace under the symbol "RCAPQ US."  The Company's controlling stockholder—RCAP Holdings , LLC ("**RCAP Holdings**")—is part of the American Realty Capital group of companies ("**ARC Group**") founded in 2007 by Nicholas S. Schorsch.

The Company provides integrated financial services, principally to retail investors.  Historically, the Company conducted its business through operating subsidiaries in six principal segments: (i) Independent Retail Advice; (ii) Wholesale Distribution; (iii) Investment Banking, Capital Markets, and Transaction Management Services; (iv) Investment Management; (v) Investment Research; and (vi) Corporate and Other.  As of the Petition Date, however, substantially all of the Company's business operations other than its Independent Retail Advice segment and a joint venture, Docupace Technologies, LLC ("**Docupace**"), were either sold or are in the process of winding down.

The Company's Wholesale Distribution, Investment Banking, Capital Markets, and Transaction Management Services (which includes the Company's transfer agent, Debtor American National Stock Transfer) divisions historically derived a majority of their revenue through the provision of services to ARC Group-affiliated investment programs. On the other hand, the Company's Independent Retail Advice segment has not historically, and does not currently, derive a significant or material portion of its revenue from products sponsored or advised by ARC Group-affiliated investment programs.

Through its Independent Retail Advice division, which operates under the marketing name Cetera Financial Group, the Company offers retail advice and investment programs offered by third party program sponsors through a nationwide network of approximately 9,100 independent, FINRA-registered financial advisors.[45]  The majority of those financial advisors are independent contractors who have registered for FINRA-licensing purposes with one of the Company's retail broker-dealer subsidiaries.  As of the Petition Date, the Company's Independent Retail Advice

---

[45]  This figure is as of December 31, 2015.

workforce also consisted of approximately 1,600 employees working out of over 34 locations throughout the United States.

On a consolidated basis, the Company generated approximately $1.775 billion in total revenues and $90.63 million in adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("**EBITDA**") from continuing operations (non-GAAP) during the nine months ended September 30, 2015, as compared to approximately $1.063 billion in total revenues and $131.738 million in adjusted EBITDA from continuing operations (non-GAAP) during the nine months ended September 30, 2014.

The Company's primary business segments, as well as the divestiture of its non-retail businesses, are discussed in further detail below.

### i.      Independent Retail Advice

The Company's independent retail advice ("**Independent Retail Advice**") platform is the second largest independent financial advisor network in the nation by number of advisors, as well as a leading provider of retail services to the investment programs of banks and credit unions, and is conducted through a network of independent channel regulated broker-dealers (which are ineligible to file for chapter 11) (the "**BDs**"),[56] certain subsidiaries that are acting as registered investment advisors to retail investors under the Investment Advisers Act of 1940 (the "**RIAs**"),[67] and certain of the BDs' direct and indirect holding companies (the "**BD HoldCos**," and collectively with certain affiliates including with the BDs and the RIAs, the "**Retail Firms**").[78]  As of December 31, 2015, these Retail Firms had approximately 9,100 financial advisors across the United States, serving approximately 2.5 million individual retail investor clients with approximately $220 billion assets under administration.

---

[56]  The BD entities are as follows: Cetera Advisor Networks LLC; Cetera Advisors LLC; Cetera Financial Specialists LLC; Cetera Investment Services LLC; First Allied Securities, Inc.; Girard Securities, Inc.; Investors Capital Corporation; Legend Equities Corporation; Summit Brokerage Services, Inc.; and VSR Financial Services, Inc.  Prior to the Petition Date, Debtor Realty Capital Securities, LLC (which was not part of the Independent Retail Advice Business) and Non-Debtor Subsidiaries Advisor Direct, Inc. and J.P. Turner & Company, LLC acted as regulated broker-dealers but withdrew their registrations prior to the commencement of the chapter 11 cases.

[67]  The RIAs are as follows: Cetera Advisors LLC; Cetera Advisors Networks LLC; Cetera Investment Advisors LLC; First Allied Advisory Services, Inc.; First Allied Asset Management, Inc.; First Allied Securities, Inc.; Girard Securities, Inc.; Investors Capital Corporation; J.P. Turner & Company Capital Management, LLC ("**J.P. Turner & Company Capital**"); Legend Advisory Corporation; Summit Financial Group, Inc.; Tower Square Investment Management LLC; and VSR Financial Services, Inc.  Debtor SK Research, LLC ("**SK Research**") was also a registered investment advisor prior to the Petition Date but withdrew its registration shortly after RCS Capital Corporation sold substantially all of SK Research's assets to its then-current management team on January 15, 2016, as discussed in further detail below.  Debtor J.P. Turner & Company Capital Management, LLC ("**J.P. Turner & Company Capital**") was a registered investment advisor prior to December 31, 2015. On that date, J.P. Turner & Company Capital filed a Form ADV-W with the SEC withdrawing its registration as an investment advisor.

[78]  The BD HoldCos are as follows: Braves Acquisition, LLC; Cetera Financial Group, Inc.; Cetera Financial Holdings, Inc.; Cetera Financial Specialists Services LLC; Chargers Acquisition, LLC; FAS Holdings, Inc.; First Allied Holdings, Inc.; Investors Capital Holdings, LLC; Legend Group Holdings, LLC; Summit Financial Services Group, Inc.; and VSR Group, LLC.

The Company's Independent Retail Advice segment constitutes its core business, *i.e.*, its largest and most profitable business, and is the central focus of the Debtors' business plan for post-emergence operations.

Each Retail Firm in the Independent Retail Advice segment was acquired by the Company in 2014 or the first quarter of 2015 and operates independently under its own brand and management, but with certain shared services with other Retail Firms.  A brief description of the Retail Firms is as follows:

> a.     Cetera Financial Holdings, Inc. ("**Cetera Holdings**").  Acquired by the Company in April 2014, BD HoldCo Cetera Holdings is a financial services holding company formed in 2010 which provides independent broker-dealer services and investment advisory services through four distinct independent broker-dealer platforms: Cetera Advisors, LLC, Cetera Advisor Networks, LLC, Cetera Investment Services, LLC, and Cetera Financial Specialists, LLC, each of which is a BD and non-debtor in these chapter 11 cases.  Cetera Advisors LLC and Cetera Advisor Networks LLC are also RIAs, as are Cetera Investment Advisers LLC and Tower Square Investment Management LLC, which are also non-debtors in these chapter 11 cases.  Cetera Holdings and its operating subsidiaries (collectively, "**Cetera Financial**") constitute the largest Retail Firm in the Independent Retail Advice segment.

> b.     First Allied Holdings Inc. ("**First Allied Holdings**").  BD HoldCo First Allied Holdings and its operating subsidiaries (collectively, "**First Allied**") provide independent broker-dealer services and advisory programs through registered broker-dealers and investment advisors under the brands "First Allied," "First Allied Asset Management," "First Allied Advisory Services," and "First Allied Retirement Services."  In addition, under the brand "The Legend Group," First Allied Holdings and certain of its subsidiaries provide 403(b) plans, which are retirement savings plans for employees of specific tax-exempt organizations, such as health care organizations, colleges, and universities.  First Allied Securities, Inc. and Legend Equities Corporation, both of which are indirect subsidiaries of First Allied Holdings, are BDs and non-debtors in these chapter 11 cases.  First Allied Securities, Inc. is also a RIA, as are sister companies First Allied Advisory, Inc., First Allied Asset Management Inc, and Legend Advisory Corporation, which are also non-debtors in these chapter 11 cases.

> c.     Investors Capital Holdings, LLC ("**ICH Holdings**").  BD HoldCo Investors Capital Holdings, LLC and its operating subsidiaries (collectively, "**ICH**") provide independent broker-dealer services and advisory programs through two registered broker-dealers and an investment advisor under the brand "Investors Capital."  Investors Capital Corporation and Advisor Direct, Inc., both of

which are direct subsidiaries of ICH Holdings, are BDs and are non-debtors in these chapter 11 cases. Investors Capital Corporation is also currently a RIA.

          d.     <u>Summit Financial Services Group, Inc.</u> ("**Summit Group, Inc.**"). Non-Debtor Subsidiary and BD HoldCo Summit Financial Services Group, Inc. and its direct and indirect subsidiaries (collectively, "**Summit Financial**") provide independent broker-dealer services and advisory programs through a registered broker-dealer and an investment adviser under the brand name "Summit Financial Services." Summit Brokerage Services, Inc., a direct of subsidiary of Summit Group, Inc., is a BD and a non-debtor in these chapter 11 cases. In addition, subsidiary Summit Financial Group, Inc. is a RIA and is also a non-debtor in these chapter 11 cases.

          e.     <u>J.P. Turner & Company, LLC and J.P. Turner & Company Capital</u> (together, "**J.P. Turner**"). Prior to the Petition Date, J.P. Turner was a retail broker-dealer and investment adviser which also offered a variety of other services, including investment banking and private placements. During the second quarter of 2015, however, the Company determined that it would be more effective if J.P. Turner no longer operated as a separate broker-dealer subsidiary and that it would no longer use the J.P. Turner brand. At the end of October 2015, the Company invited certain J.P. Turner financial advisors to join Summit Financial and advisors who were not invited to join Summit Financial at this time had their securities registrations terminated.

          f.     <u>VSR Financial Services, Inc.</u> ("**VSR Financial**"). Acquired in the first quarter of 2015, Non-Debtor Subsidiary VSR Financial is a BD, RIA, and member of FINRA, SIPC. VSR Financial's direct parent company, VSR Group, LLC, is a BD HoldCo.

          g.     <u>Girard Securities, Inc.</u> ("**Girard**"). Acquired in the first quarter of 2015, Non-Debtor Subsidiary Girard is a BD, RIA, and member of FINRA, SIPC. Girard's direct parent company, Chargers Acquisition, LLC, is a BD HoldCo and a non-debtor in these chapter 11 cases.

During the nine month period ended September 30, 2015, the Independent Retail Advice segment accounted for approximately 86.4% of the Company's total revenues and accounted for approximately 66.3% of total revenues for fiscal year 2014.

        ii.    **Wholesale Distribution**

Prior to the Petition Date, Debtor Realty Capital Securities, LLC ("**Realty Capital Securities**") engaged in wholesale distribution of non-traded REITs, BDCs, and other direct investment

programs sponsored, co-sponsored, advised, or sub-advised by ARC Group entities (which are non-debtors in these chapter 11 cases).

On November 12, 2015, the Massachusetts Securities Division filed an administrative complaint against Realty Capital Securities alleging that it violated the Massachusetts Uniform Securities Act and regulations thereunder by fraudulently casting shareholder proxy votes. Subsequently, on December 2, 2015, RCS Capital Corporation initiated the shutdown of Realty Capital Securities. On December 4, 2015, Realty Capital Securities withdrew from doing business in the Commonwealth of Massachusetts. Since the shutdown, (i) substantially all employees of Realty Capital Securities have been terminated, (ii) all distribution and selling group agreements with ARC Group and third-party broker-dealers have been terminated or cancelled, (iii) all sales and distribution of investment programs or securities have ceased, and (iv) Realty Capital Securities has filed its Form BD-W, thereby terminating its registration as a licensed broker-dealer. The wind down of Realty Capital Securities is substantially complete as of the Petition Date. The Company expects to complete the wind down of Realty Capital Securities in the coming weeks.

Prior to the Petition Date, non-debtor Strategic Capital Management Holdings, LLC ("**StratCap Holdings**") through its direct and indirect subsidiaries (collectively with StratCap Holdings, "**StratCap**") was a wholesale distributor of alternative investment programs, specifically two non-traded REITs, a non-traded BDC, and two public, non-traded limited liability companies. On December 3, 2015, RCS Capital Corporation signed a letter of intent to sell StratCap to its former owner, Validus Group Partners, Ltd., for a purchase price of $5.0 million, plus a working capital adjustment and the waiver of $20 million in "earn-out" obligations owed to the former owners, 50% of which was payable in cash and 50% payable in RCS stock. This transaction closed on January 29, 2016 for a total cash purchase price of approximately $8.8 million.

### iii.    Investment Banking, Capital Markets, and Transaction Management Services

Prior to the Petition Date, the Company provided investment banking strategic advisory (mergers and acquisition), stock exchange listing, and debt and equity capital markets advisory services through its investment banking division, RCS Capital, the investment banking marketing name of a division located within Debtor Realty Capital Securities. The Company, through Debtor RCS Advisory Services, LLC ("**RCS Advisory**"), also provided legal, investor relations, marketing, events coordination, and similar transaction management services to direct investment programs, primarily publicly registered non-traded REITs and BDCs, as well as open and closed-end mutual funds, sponsored, co-sponsored, or advised by non-debtor affiliate American Realty Capital. On December 2, 2015, RCS Capital Corporation initiated the shutdown of RCS Advisory concurrently with the shutdown of Realty Capital Securities described above, which process is substantially complete, but for the potential collection of certain investment banking tail fees.

In addition, prior to the Petition Date, Debtor American National Stock Transfer, LLC ("**ANST**") acted as registrar, provided record-keeping services, and executed the transfer, issuance, and cancellation of shares or other securities in connection with offerings conducted by issuers sponsored directly or indirectly by ARC Group. On January 8, 2016, the ARC Group (controlled by Nicholas Schorsch) delivered to the Company a purported notice of termination of

the omnibus transfer agency agreement pursuant to which ANST provided services to a majority of its clients. The Company and ANST subsequently delivered a notice disputing the validity of that termination; however, as of the Petition Date, ANST has not received payment in January for invoices sent to its ARC Group-affiliated clients, which represent the substantial majority of all ANST clients. These events caused a significant decline in cash receipts at ANST, while material cash outflows were still required to operate the business in the ordinary course. Largely due to these factors, RCS Capital Corporation has taken steps to shut down ~~of~~ ANST beginning on January 29, 2016 and expects to dissolve ANST pursuant to the Plan.

Finally, as of the Petition Date, RCS Capital Corporation owns a controlling financial interest in Non-Debtor Subsidiary Docupace, a provider of integrated, electronic processing technologies and systems for financial institutions and wealth management firms. The Debtors are continuing to evaluate strategic opportunities with respect to Docupace, including divesting ownership of its equity in this entity during the pendency of these chapter 11 cases. MPAP and Debtor RCS Capital Holdings, LLC ("**RCS Capital Holdings**")~~,~~ are party to that certain Amended and Restated Limited Liability Company Agreement (the "**LLC Agreement**") of Docupace, dated as of November 21, 2014. It is the position of MPAP that RCS Capital Holdings no longer has any rights as a member of Docupace (other than to receive distributions of income). RCS Capital Holdings rejects this contention and maintains that its rights as a member of Docupace remain unchanged. ~~Each of~~ MPAP and RCS have_each agreed that all rights are reserved with respect to that dispute.

## iv.    Investment Management

Prior to the Petition Date, the Company's investment management business was led by Hatteras Funds, LLC ("**Hatteras Funds**"), a boutique alternative investment specialist founded in 2003, which managed a family of registered investment company funds, including both open- and closed-end retail funds primarily focused on liquid alternatives. On January 5, 2016, RCS Capital Corporation sold 100% of the membership units of Hatteras Funds to Raleigh Acquisition, LLC, a special purpose vehicle controlled by the then-current management of Hatteras Funds, for $5.5 million and the assumption of RCS Capital Corporation's obligations under the asset purchase agreement for its initial acquisition of Hatteras Funds, including obligations relating to certain liquidated damages, deferred payments, and earn-out payments.

## v.    Investment Research

Prior to the Petition Date, SK Research provided due diligence on traditional and non-traditional investment products, as well as focused research, consulting, training, and education, to Cetera Financial Group. In addition, SK Research provided due diligence services in connection with direct investment programs, including direct investment programs sponsored, co-sponsored, or advised by non-debtor affiliate American Realty Capital, to other broker-dealers and registered investment advisers, as well as individual registered representatives and investment adviser representatives. On January 15, 2016, RCS Capital Corporation sold substantially all of SK Research's assets to its then-current management team for net proceeds, after adjustments, of approximately $1 million. The Company expects to dissolve the remaining entity, SK Research, pursuant to the Plan.

### vi.    Corporate and Other

On July 21, 2014, the Company announced that it was establishing a crowdfunding investment platform which it subsequently rebranded under the name, "DirectVest."  In connection with this initiative, the Company acquired substantially all the assets of Debtor Trupoly, LLC ("**Trupoly**"), a white-label investor relationship management portal, which was to be integrated into the Company's crowdfunding investment platform.  On November 10, 2015, RCS Capital Corporation sold substantially all of Trupoly's assets for an immaterial amount of cash and the assumption of liabilities.

In November 2015, the Company ceased operating its crowdfunding investment platform and completed the wind down of indirect subsidiary DirectVest LLC ("**DirectVest**"), which is a Debtor in these chapter 11 cases.  Both Trupoly and DirectVest are Dissolving Debtors and will be wound down pursuant to the Plan.

## 2.2    *Prepetition Capital Structure.*

### A.    Prepetition Funded Indebtedness

As of the Petition Date, the Debtors have funded debt facilities in place with a face amount of approximately $873.6 million, of which approximately $709.2 million is senior secured debt and $164.4 million is unsecured debt.  The below chart summarizes the Debtors' prepetition material indebtedness:

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| (i) $575.0 million Senior Secured First Lien Term Loan Facility (the "**First Lien Term Facility**") and (ii) $25.0 million Senior Secured First Lien Revolving Facility (the "**First Lien Revolving Facility**," and together with the First Lien Term Facility, the "**First Lien Credit Facility**") | First Lien Credit Agreement (as amended, restated, modified, or supplemented, and in effect on the date hereof, the "**First Lien Credit Agreement**"), dated as of April 29, 2014, among RCS Capital Corporation, as Borrower, RCAP Holdings, LLC, RCS Capital Management, LLC, and the Subsidiary Guarantors, as Guarantors, the lenders and other parties from time to time party thereto, and Barclays Bank PLC, as Administrative Agent and Collateral Agent (in such capacities, the "**First Lien Agent**") | $532.2 million under the First Lien Term Facility<br><br>$23.8 million under the First Lien Revolving Facility | First Lien Term Facility: April 29, 2019<br><br>First Lien Revolving Facility: Commitments Terminated Prepetition | First Lien Secured |
| $150.0 million Senior Secured Second Lien Term Loan Facility (the "**Second Lien Term Facility**," and together with the First Lien | Second Lien Credit Agreement (as amended, restated, modified, or supplemented, and in effect on the date hereof, the "**Second Lien Credit Agreement**"), dated as of April 29, 2014, among RCS Capital Corporation, as | $153.2 million | April 29, 2021 | Second Lien Secured |

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| Credit Facility, the "**Prepetition Secured Facilities**") | Borrower, RCAP Holdings, LLC, RCS Capital Management, LLC, and the Subsidiary Guarantors, as Guarantors, the lenders and other parties from time to time party thereto, and Wilmington Trust, National Association, as successor Administrative Agent and Collateral Agent to Bank of America, N.A. (in such capacities, the "**Second Lien Agent**") | | | |
| $120.0 million aggregate principal amount of 5.00% Convertible Senior Notes due 2021 (collectively, the "**Convertible Notes**") | Indenture (as amended, restated, modified, or supplemented, and in effect on the date hereof) (the "**Convertible Notes Indenture**"), dated as of April 29, 2014, among RCS Capital Corporation and Wilmington Savings Fund Society, FSB, as successor Indenture Trustee to Wilmington Trust, National Association (in such capacities, the "**Convertible Notes Indenture Trustee**") | $121 million | November 1, 2021 | Unsecured |
| $15.3 million Unsecured Promissory Note issued to ARC Properties Operating Partnership, L.P. (the "**ARC Note**") | Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of December 4, 2014, between RCS Capital Corporation and ARC Properties Operating Partnership, L.P. (together with VEREIT, Inc. f/k/a American Realty Capital Properties, Inc.,"**ARCP**") | $15.5 million | March 31, 2017 | Unsecured |
| $12 million Senior Unsecured Promissory Note issued to RCAP Holdings, LLC (the "**RCAP Note**") | Senior Unsecured Promissory Note dated as of November 9, 2015, among RCS Capital Corporation and RCAP Holdings, LLC | $12.4 million | November ~~11,~~1, 2021 | Unsecured |
| Notes issues to various Luxor entities for the aggregate principal amount of $15 million (collectively, the "**Senior Unsecured Notes**") | (i) Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Capital Partners, LP <br><br> (ii) Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Wavefront, LP | | November 1, 2021 | Unsecured |

22

| Debt Obligation | Agreement(s) | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| | (iii) Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Luxor Capital Partners Offshore Master Fund, LP | $15.5 million | | |
| | (iv) Senior Unsecured Promissory Note (as amended, restated, modified, or supplemented, and in effect on the date hereof), dated as of November 9, 2015, among RCS Capital Corporation and Thebes Offshore Master Fund, LP | | | |

### i.    Prepetition Secured Facilities

<u>First Lien and Second Lien Borrowings.</u>  On April 29, 2014, concurrently with the closing of the Company's acquisition (the "**Cetera Acquisition**") of the Cetera Financial Group legacy broker-dealers,[89] the Company, as Borrower, and non-debtor affiliate RCAP Holdings, non-debtor affiliate RCS Capital Management, LLC ("**RCS Capital Management**")[910]  and certain subsidiaries of RCS Capital Corporation, as Guarantors, incurred debt under the following bank facilities: (i) $575.0 million First Lien Term Facility, (ii) $25.0 million First Lien Revolving Facility, and (iii) $150.0 million Second Lien Term Facility.[1011]

The proceeds of the First Lien Term Facility and Second Lien Term Facility were used to pay a portion of the consideration paid by RCS Capital Corporation for the Cetera Financial acquisition, to refinance certain existing indebtedness, and to pay related fees and expenses. Prior to the Petition Date, the Company had generally used the proceeds of the First Lien

---

[89]  These broker-dealers are: (i) Cetera Advisors, LLC; (ii) Cetera Advisor Networks, LLC; (iii) Cetera Investment Services, LLC; and (iv) Cetera Financial Specialists, LLC.

[910] Non-debtor affiliate RCS Capital Management is part of ARC Group.

[1011]  Each capitalized term used but not defined in this section shall have the meaning ascribed to it in the First Lien Credit Agreement or Second Lien Credit Agreement, as applicable.

Revolving Facility for permitted capital expenditures, to meet ongoing working capital requirements, and for general corporate purposes.  On December 31, 2015, in connection with the failure to make payments required under each of the Prepetition Secured Facilities and entry by the Debtors into a forbearance agreement with lenders under each of the Prepetition Secured Facilities (the "**Prepetition Secured Lenders**") (as discussed further below), the First Lien Lenders' respective commitments to fund loans under the First Lien Revolving Facility were terminated in accordance with the terms of the First Lien Credit Agreement.

The First Lien Term Facility, as amended, bears interest at a rate per annum of LIBOR (floor of 100 basis points) plus 650 basis points and matures on April 29, 2019.  Outstanding Revolving Loans under the First Lien Revolving Facility, as amended, accrue interest at a rate per annum of LIBOR (floor of 100 basis points) plus 650 basis points or, alternatively, plus 625 basis points in the event that the Company's First Lien Leverage Ratio is less than or equal to 1.25x.  The First Lien Revolving Facility also includes a commitment fee of 50 basis points.  The Second Lien Term Facility, as amended, bears interest at a rate per annum of LIBOR (floor of 100 basis points) plus 1050 basis points and matures on April 29, 2021.

As of the Petition Date, the outstanding balances due on the First Lien Term Facility, First Lien Revolving Facility, and Second Lien Term Facility were $532.2 million, $23.8 million, and $153.2 million, respectively.[11][12]

Guaranty.  Each of the Prepetition Secured Facilities is guaranteed by all of the Debtors, except for Realty Capital Securities; We R Crowdfunding, LLC; DirectVest; and Trupoly (which are either immaterial subsidiaries or entities that are no longer operating or in the process of dissolution), as well as non-debtor affiliates RCAP Holdings and RCS Capital Management, and certain of the Non-Debtor Subsidiaries (other than the Broker-Dealer Non-Debtor Subsidiaries).

Collateral Securing Obligations Under Prepetition Secured Facilities.  RCS Capital Corporation, non-debtor affiliates RCAP Holdings and RCS Capital Management, and each of the Subsidiary Guarantors under the Prepetition Secured Facilities have granted the First Lien Collateral Agent and Second Lien Collateral Agent, in each instance for the benefit of the respective Secured Parties under the Prepetition Secured Facilities, a lien on and security interest in substantially all assets of the Debtors, including, but not limited to: (i) Accounts; (ii) Chattel Paper; (iii) all cash and Deposit Accounts; (iv) certain Commercial Tort Claims; (v) Documents; (vi) Equipment and Fixtures; (vii) General Intangibles; (viii) Goods; (ix) Instruments; (x) Intellectual Property; (xi) Inventory; (xii) Investment Property; (xiii) Letter-of-Credit Rights; (xiv) books and records pertaining to the foregoing; and (xv) Proceeds and products of any and all of the foregoing, all Supporting Obligations, and all collateral security guarantees given by any Person with respect to any of the foregoing, in each case subject to a carve-out for certain items of Excluded Collateral (collectively, the "**Article 9 Collateral**").

In addition to such liens on and security interests in the Article 9 Collateral, the obligations under the Prepetition Secured Facilities are secured by a pledge of certain debt and equity holdings, proceeds therefrom, and other rights related thereto, including 100% of the equity interests held by RCS Capital Corporation, non-debtor affiliates RCAP Holdings and RCS

---

[11][12]  Also as of the Petition Date, the Company has repaid approximately $50.3 million of the First Lien Term Facility as regularly scheduled principal repayments.

Capital Management, and certain of RCS Capital Corporation's U.S. subsidiaries (collectively with the Article 9 Collateral, the "**Prepetition Collateral**").

Relative Lien Priorities; Intercreditor Agreement.  Although the First Lien Collateral Agent and Second Lien Collateral Agent have identical collateral packages as described above, the relative rights, remedies, and lien priorities of the First Lien Lenders and Second Lien Lenders under the Prepetition Secured Facilities are governed by that certain Intercreditor Agreement (as amended, restated, modified, or supplemented, and together with any ancillary documents thereto, the "**Intercreditor Agreement**"), dated as of April 29, 2014, among the First Lien Collateral Agent, the Second Lien Collateral Agent, and each of the Grantors under the First Lien Collateral Agreement and Second Lien Collateral Agreement.[12][13]

Pursuant to the Intercreditor Agreement, the Second Lien Collateral Agent, on behalf of itself and the lenders under the Second Lien Term Facility (collectively, the "**Second Lien Lenders**"), has agreed, among other things as more fully set forth in the Intercreditor Agreement, that any lien on the Prepetition Collateral securing any of the First Lien Obligations is senior in all respects and prior to any lien on the Prepetition Collateral securing any of the Second Lien Obligations.

Amendments to Prepetition Secured Facilities.  On June 30, 2015, certain of the parties to the First Lien Credit Facility entered into Amendment No. 1 to the First Lien Credit Agreement and certain of the parties to the Second Lien Term Facility entered into Amendment No. 1 to the Second Lien Credit Agreement (together, the "**First Amendments**").  The First Amendments increased the interest rates on each of the Prepetition Secured Facilities by 100 basis points per annum and relaxed the restrictions pertaining to the required Secured Leverage Ratios (Secured Net Debt to Consolidated EBITDA, as defined and more particularly set forth in the First Lien Credit Agreement and Second Lien Credit Agreement, respectively) until December 31, 2016.

On November 8, 2015, certain of the parties to the First Lien Credit Facility entered into Amendment No. 2 to the First Lien Credit Agreement and certain of the parties to the Second Lien Term Facility entered into Amendment No. 2 to the Second Lien Credit Agreement (together, the "**Second Amendments**").  The Second Amendments permitted the Company to, among other things, incur certain additional subordinated indebtedness not exceeding $75.0 million upon satisfaction of certain conditions.   In addition, pursuant to the Second Amendments, the Fixed Charge Coverage Ratio and Secured Leverage Ratio financial covenants were not tested for Q3 2015.

### ii.    Convertible Notes

In connection with the Cetera Acquisition on April 29, 2014, RCS Capital Corporation issued $120.0 million aggregate principal amount of 5.00% Convertible Senior Notes due 2021 to affiliates of Luxor in a private placement pursuant to the Convertible Notes Indenture.   On January 31, 2016, Wilmington Savings Fund Society, FSB, was appointed successor trustee under the terms of the Convertible Notes Indenture.

---

[12][13]    As described below, the Intercreditor Agreement was amended in connection with entry into the DIP Facility.

The Convertible Notes bear interest at a rate of 5.00% per annum, payable on February 1, May 1, August 1, and November 1 of each year, and mature on November 1, 2021.

~~The~~As of the Petition Date, the outstanding balance due on the Convertible Notes is approximately $121 million.

Prior to the Petition Date, to the extent permitted by the terms of the Prepetition Secured Facilities, the Convertible Notes were convertible in $1,000 increments at the option of the holders thereof into shares of Class A common stock issued by RCS Capital Corporation, at a conversion price equal to $21.18 per share of Class A common stock, which conversion price was subject to anti-dilution adjustments upon the occurrence of certain events and transactions. The holders of Convertible Note Claims also had the right to require RCS Capital Corporation to repurchase the Convertible Notes for cash at a repurchase price equal to the principal amount outstanding plus accrued and unpaid interest on such notes upon the occurrence of certain events, including a change of control or delisting of the Class A common stock from a national securities exchange.

### iii.    Promissory Notes

ARC Note.   On December 31, 2014, RCS Capital Corporation paid $60.0 million in cash and issued a $15.3 million Unsecured Promissory Note to ARC Properties Operating Partnership, L.P. pursuant to the terms of a litigation settlement related to the termination of a previously announced agreement to purchase Cole Capital Partners LLC and Cole Capital Advisors, Inc. from ARCP, which was part of the ARC Group.~~13~~14   The ~~2014 Promissory~~ARC Note bears interest at a rate of 8.00% per annum and the principal amount of the note is due in three payments of approximately $7.7 million, $3.8 million, and $3.8 million on March 31, 2016, September 30, 2016, and March 31, 2017, respectively.

RCAP Note and Senior Unsecured Notes.   On November 9, 2015, RCS Capital Corporation issued five additional unsecured promissory notes: (i) the RCAP Note, a $12.0 million Senior Unsecured Promissory Note issued to RCAP Holdings, and (ii) the Senior Unsecured Notes issued to certain Luxor entities, including (a) a $6.080 million Senior Unsecured Promissory Note issued to Luxor Capital Partners, LP, (b) a $1.477 million Senior Unsecured Promissory Note issued to Luxor Wavefront, LP, (c) a $7.128 million Senior Unsecured Promissory Note issued to Luxor Capital Partners Offshore Master Fund, LP, and (d) a $315,000 Senior Unsecured Promissory Note issued to Thebes Offshore Master Fund, LP.

Each of the RCAP Note and the Senior Unsecured Notes bears interest at a rate of 12.00% per annum and matures on November 1, ~~2021.~~14~~2021.~~15   Prior to the Petition Date, the Senior Unsecured Notes were exchangeable into securities of RCS Capital Corporation issuable in a future financing from a third party resulting in net proceeds to RCS Capital Corporation or its subsidiaries of at least $175.0 million, subject to certain conditions.

---

~~13~~14   Mr. Schorsch was the Executive Chairman of ARCP (currently known as VEREIT, Inc.) at the time of the agreement between ARCP and the Company to purchase the Cole entities.

~~14~~15   Although RCS Capital Corporation may elect to pay interest in cash or in kind under the relevant terms for each of the RCAP Note and the Senior Unsecured Notes, it has been prohibited from paying cash interest on such notes under the Second Amendments to the Prepetition Secured Facilities.

Each of the Convertible Notes, the ARC Note, the RCAP Note and the Senior Unsecured Notes rank *pari passu* with one another and, as unsecured debt obligations, are effectively subordinate to the obligations under the Prepetition Secured Facilities with respect to the Prepetition Collateral.

## B.    Preferred Stock

As of the Petition Date, RCS Capital Corporation had issued the following classes of preferred stock:

### i.    Series A Preferred Stock

As of the Petition Date, RCS Capital Corporation's previously issued shares of Series A Preferred Stock are no longer outstanding.  On April 29, 2014, RCS Capital Corporation issued 14,657,980 shares of Series A Preferred Stock to affiliates of Luxor in a private placement. During the fourth quarter of 2014, however, the Company and the holders of the Series A Preferred Stock agreed to convert 3,073,553 shares of the Series A Preferred Stock into 5,405,601 shares of Class A common stock.  On December 19, 2014, RCS Capital Corporation exchanged the remaining 11,584,427 shares of the Series A Preferred Stock for 5,800,000 shares of Series B Preferred Stock and 4,400,000 shares of Series C Preferred Stock.

### ii.    Series B Preferred Stock

On December 19, 2014, RCS Capital Corporation issued 5,800,000 shares of Series B Preferred Stock to affiliates of Luxor.

If paid in cash, dividends on these shares of Series B Preferred Stock accrue quarterly at 11.00% per annum of the liquidation preference.  To the extent that a quarterly dividend is not paid in cash on its applicable dividend payment date, such dividend accrues at 12.50% per annum of the liquidation preference.  The initial liquidation preference for the shares of Series B Preferred Stock was $25.00 per share.  Any dividends that were not paid in cash on an applicable dividend payment date were automatically added to the aggregate liquidation preference on such applicable dividend payment date.
The holders of Series B Preferred Stock have no conversion rights.  The Series B Preferred Stock ranks *pari passu* with the Series C Preferred Stock issued by RCS Capital Corporation.

### iii.    Series C Preferred Stock

On December 19, 2014, RCS Capital Corporation issued 4,400,000 shares of Series C Preferred Stock to affiliates of Luxor.

If paid in cash, dividends on shares of Series C Preferred Stock accrue quarterly at 7.00% per annum of the liquidation preference.  To the extent that a quarterly dividend is not paid in cash on the applicable dividend payment date, such dividend accrues at 8.00% per annum of the liquidation preference.  The initial liquidation preference of shares of Series C Preferred Stock was $25.00 per share.  Any dividends that were not paid in cash on an applicable dividend payment date were automatically added to the aggregate liquidation preference on such applicable dividend payment date.

The Series C Preferred Stock ranks *pari passu* with the Series B Preferred Stock.[15][16]

### iv.    Series D Preferred Stock

On August 6, 2015, RCS Capital Corporation entered into separate Investment Agreements (together, the "**Investment Agreements**") with Apollo Management Holdings, L.P. ("**Apollo Management**") and affiliates of Luxor under which Apollo Management agreed to purchase 1,000,000 shares of Series D-1 Preferred Stock (the "**Series D-1 Preferred Stock**") for a purchase price of $25.0 million and the Luxor affiliates agreed to acquire 500,000 shares of Series D-2 Preferred Stock (the "**Series D-2 Preferred Stock**," and collectively with the Series D-1 Preferred Stock, the "**Series D Preferred Stock**") for a purchase price of $12.5 million. On November 9, 2015, ARC LLC purchased all of the outstanding shares of Series D-1 Preferred Stock from Apollo Management.

If paid in cash, dividends on shares of Series D Preferred Stock accrue quarterly at 11.00% per annum of the liquidation preference. To the extent a quarterly dividend is not paid in cash on the applicable dividend payment date, such dividend accrues at 12.50% per annum of the liquidation preference. The initial liquidation preference of shares of Series D Preferred Stock was $25.00 per share. Any dividends that were not paid in cash on an applicable dividend payment date were automatically added to the aggregate liquidation preference on such applicable dividend payment date.

The Series D-1 Preferred Stock and Series D-2 Preferred Stock rank *pari passu* with each other. In addition, the Series D Preferred Stock ranks *pari passu* with the Series B Preferred Stock and Series C Preferred Stock with respect to rights to the payment of dividends and the distribution of assets in the event of any liquidation, dissolution, or winding up of RCS Capital Corporation. The shares of Series D Preferred Stock generally have the right to vote on an as converted basis with the holders of the Class A common stock.[16][17]

## C.    Stockholders' Equity

As of the Petition Date, RCS Capital Corporation had the following classes of common stock and non-controlling interests:

---

[15][16]  Subject to certain limitations, the shares of Series C Preferred Stock are convertible at the option of the holders thereof (collectively, the "**Series C Preferred Holders**") into shares of Class A common stock at $13.00, which conversion price is subject to anti-dilution adjustments upon the occurrence of certain events and transactions. Shares of the Series C Preferred Stock have voting rights together with the common stock on an as-converted basis. In addition, under certain circumstances, RCS Capital Corporation may require the Series C Preferred Holders to convert their shares of Series C Preferred Stock into shares of Class A common stock at the same price set forth above. The shares of Series C Preferred Stock are also redeemable under certain circumstances.

[16][17]  Subject to certain limitations, the holders of the Series D Preferred Stock have the right, at their option, to convert some or all of their shares of Series D Preferred Stock into the number of shares of Class A common stock obtained by dividing the aggregate liquidation preference of such shares plus an amount equal to all accrued and unpaid dividends from the date immediately following the immediately preceding dividend payment date to the date of conversion by an initial conversion price of $5.00, which is adjustable upon the occurrence of certain events and transactions to prevent dilution.

### i. Class A Common Stock

As noted above, RCS Capital Corporation is a public reporting company under Section 12(b) of the Securities Exchange Act of 1934 and its shares of Class A common stock, par value $0.001 per share, are publicly traded on the OTC Pink marketplace under the symbol "RCAPQ US." The Class A common stock entitles holders to a portion of the voting rights of RCS Capital Corporation and economic rights, including rights to dividends, if any, and distributions upon liquidation.

As of November 13, 2015, there were 91,946,902 shares of Class A common stock outstanding.

### ii. Class B Common Stock

As of the Petition Date, RCAP Holdings owns the sole outstanding share of Class B common stock issued by RCS Capital Corporation, which entitles it, in any shareholder vote, to one vote more than 50% of the total outstanding voting power of RCS Capital Corporation. Holders of Class B common stock have no economic rights (including no rights to dividends or distributions upon liquidation).

### 2.3    *Events Leading to the Chapter 11 Cases.*

### A.    Significant Acquisitions and Related Debt Issuances to Fund Acquisitions

Beginning in early 2014 and through early 2015, the Company acquired 11 retail broker-dealer subsidiaries in a series of acquisitions with the intent to establish a presence in the retail advice independent broker-dealer channel and consolidate that sector. The Company's strategy focused on:

a. creating and expanding its financial advisor base;

b. consolidating the historically fractured and regionally-focused independent broker-dealer sector;

c. consolidating IT structures and technology across the Retail Firms to lay the groundwork for implementation of more advanced technology and productivity tools for financial advisors;

d. maintaining independent branding and cultures at the Retail Firms while simultaneously leveraging economies of scale through common shared services, back-office, and other support infrastructure;

e. expanding wholesale distribution and investment banking businesses to new sponsors of direct investment programs and other investment products;

f. establishing a "one-stop-shop" financial services institution (providing research, retail advice, wholesale distribution, and

29

transaction management services, including transfer agency and investment banking services) focused on the mass-affluent retail investor,[~~17~~18] which management believed was typically over-looked by "wire house" financial service companies;

g.     maintaining an "open architecture" retail advice platform, whereby financial advisors and their clients could choose their own menu of investment products rather than a limited selection of investment products favored by certain program sponsors; and

h.     diversifying its revenue streams to include more recurring revenue types, including asset management fees, subscription-based services, and recurring technology revenues.

These major acquisitions included:

| Date | Acquisition | Transaction Consideration |
|---|---|---|
| April 29, 2014 | Cetera Financial | $1.13 billion in cash. Substantially all of the acquisition was financed with the Prepetition Secured Facilities, the Convertible Notes, and issuance of Series A Preferred Stock. |
| June 11, 2014 | Summit Financial | $57.2 million, with $46.7 million paid in cash and $10.4 million through Class A common stock issuance. |
| June 12, 2014 | J.P. Turner | $32.7 million, consisting of: $12.8 million cash, $4.9 million of Class A common stock, and $15.1 million in contingent and deferred consideration.<br><br>On March 4, 2015, the parties amended the J.P. Turner purchase agreement to settle the remaining consideration. As part of this amendment, RCS Capital Corporation paid aggregate consideration of $9.1 million, consisting of $6.4 million in cash and $2.7 million worth of Class A common stock. RCS Capital Corporation also recorded new deferred consideration of $4.8 million, which was payable six months from the settlement date to be paid 50% in cash and 50% in shares of Class A common stock. As of the Petition Date, the Debtors have not paid this deferred consideration payable. |

---

[~~17~~18] "Mass affluent" investors are defined as individuals and households with $100,000 to $1,000,000 of investable assets.

| Date | Acquisition | Transaction Consideration |
|------|-------------|---------------------------|
| June 30, 2014 | Hatteras Funds | Aggregate initial purchase price of $40.0 million plus contingent consideration based on future operating income.  The Company has paid $30.0 million in cash to date.<br><br>As noted above, on January 5, 2016, RCS Capital Corporation sold 100% of the membership units of Hatteras Funds to Raleigh Acquisition, LLC, a special purpose vehicle controlled by the then-current management of Hatteras Funds, for $5.5 million and the assumption of RCS Capital Corporation's obligations under the relevant asset purchase agreement for its initial acquisition of Hatteras Funds, including obligations relating to certain liquidated damages, deferred payments, and earn-out payments. |
| June 30, 2014 | First Allied | In connection with the First Allied transaction, non-debtor RCAP Holdings contributed all of its equity interests in First Allied to the Company.  The effective cost to the Company for the First Allied acquisition was $271.2 million (including $32.0 million of First Allied indebtedness) and was paid substantially through Class A common stock issuances to non-debtor RCAP Holdings. |
| July 11, 2014 | ICH | $52.5 million, consisting of $8.4 million in cash and $44.1 million of Class A common stock. |
| July 21, 2014 | Trupoly | $2.9 million, consisting of $1.4 million in cash and issuance of $1.5 million in shares of Class A common stock.<br><br>On July 21, 2015, the Company paid 50% of the deferred consideration in shares of Class A common stock and the remainder in cash. |
| August 29, 2014 | StratCap | $77.5 million, consisting of $67.5 million in cash and $10.0 million of Class A common stock.  In addition, the Company paid approximately $10.0 million in cash on December 1, 2014 and is scheduled to pay earn-out payments in 2016 and 2017 based on the achievement of certain agreed-upon EBITDA performance targets, which pursuant to the relevant purchase agreement excludes StratCap's securities business.<br><br>As noted above, on December 3, 2015, RCS Capital Corporation signed a letter of intent to sell StratCap to its former owner, Validus Group Partners, Ltd., for a purchase price of $5.0 million, plus a working capital adjustment and the waiver of $20 million in "earn-out" obligations owed to the former owners, 50% of which was payable in cash and 50% payable in RCS stock.  This transaction closed on January 29, 2016 for a total cash purchase price of approximately $8.8 million. |
| November 21, 2014 | Docupace | $42.6 million, consisting of $26.3 million in cash (inclusive of $7.5 million of capital contributions) and issuance of $16.7 million in shares of Class A common stock. |
| March 11, 2015 | VSR Financial | $66.7 million aggregate consideration, subject to certain adjustments. The Company paid $26.8 million of the consideration in cash and |

| Date | Acquisition | Transaction Consideration |
|------|-------------|---------------------------|
| | | issued shares of Class A common stock with a total value of $26.8 million, with the outstanding balance due in deferred compensation of cash and further stock issuances. |
| March 18, 2015 | Girard | $27.8 million aggregate consideration, subject to certain adjustments, which is inclusive of the preliminary estimate of amounts payable on the first, second, and third anniversaries of the closing date and deferred compensation.  On the closing date, the Company paid $14.5 in cash and issued approximately $6.3 million worth of Class A common stock. |

The Company incurred approximately $1.1 billion in debt and preferred stock, and used in excess of $150 million of cash on hand to fund and finance the acquisitions described above. The Company's acquisition plan contemplated the achievement of certain synergies from higher strategic partner revenues, as well as cost synergies associated with back office management, technology efficiencies, renegotiation of clearing contracts, elimination of duplicative public company expense, and other factors.

During the course of 2014 and 2015, the Company experienced a delay in realizing the expected synergies.  Specifically, strategic partner revenue synergies were not realized in the amounts originally anticipated due to the effect of proposed regulations and overall market conditions, which negatively affected transaction volumes.  Cost synergies were not realized in the amounts and within the timeframe originally anticipated, as the Company lacked sufficient liquidity to make certain investments required to realize these synergies.

## B.      Decline in Financial Performance and Anticipated Liquidity Shortfall

Recently, a number of factors and events contributed to a decline in the Company's operating and financial performance, including, but not limited to:

a.      ARCP's accounting errors adversely affected the Company's ability to raise equity capital through its wholesale division on behalf of its investment program clients and, as a result, generate wholesale revenues.  In addition, the overhang created by the accounting errors at ARCP and the historical related-party links among the Company, Realty Capital Securities, and the ARC Group entities has negatively impacted the Debtors' reputation and business operations.

b.      On August 6, 2015, Apollo Management, agreed to acquire a 60% stake in AR Global Investments, LLC from AR Capital, LLC, an ARCP affiliate, in cash and stock valued at approximately $378 million. In a related deal, Apollo agreed to acquire the Debtors' wholesale distribution business for $25 million subject to certain purchase price adjustments.

c.     On November 8, 2015, however, Apollo Management terminated the agreement to acquire a 60% stake in AR Global Investments, LLC. In addition, Apollo Management and RCS announced that they mutually agreed to amend the previously announced sale of the Debtors' wholesale distribution business. Under the amended agreement, the Debtors agreed to sell the wholesale distribution business to Apollo for $6 million in cash, subject to certain purchase price adjustments. Ultimately, the announced sale to Apollo was not consummated.

d.     The marketplace viewed the termination of the sale transaction as negative for RCS Capital Corporation and its Class A common stock plunged approximately 46% on The New York Stock Exchange during trading on November 9, 2015, the day after the announcement of the Apollo transaction.

e.     On November 12, 2015, the Massachusetts Securities Division filed an administrative complaint against Debtor Realty Capital Securities alleging that it violated the Massachusetts Uniform Securities Act and regulations thereunder by fraudulently casting shareholder proxy votes in connection with the operation of its wholesale distribution business. Subsequently, on December 2, 2015, RCS Capital Corporation initiated the shutdown of Realty Capital Securities. On December 4, 2015, Realty Capital Securities withdrew from doing business in the Commonwealth of Massachusetts.

f.     Cetera Financial has been susceptible to the financial distress at parent RCS Capital Corporation and, more recently, has experienced a strain in its financial advisor network, including with respect to recruitment and retention of key personnel. Current industry headwinds including market volatility, recently announced proposed regulations by the Department of Labor affecting financial advisor's purported fiduciary duties to customers, and a continuing low interest rate environment have also impacted recent financial performance.

g.     In addition to the default notices described above, on or about January 14, 2016, the Debtors received a notice of default from VEREIT, Inc. under the $15.3 million unsecured note.

h.     As described in further detail in the immediately following paragraph, on January 5, 2015, The New York Stock Exchange delisted the Company's Class A common stock. That decision became permanent on January 21, 2016 with The New York Stock Exchange's filing of a Form 25 with the U.S. Securities and Exchange Commission.

33

In addition, on January 4, 2016, trading in shares of RCS Capital Corporation's Class A common stock was suspended. The next day, on January 5, 2016, The New York Stock Exchange (NYSE) notified RCS Capital Corporation that it had determined to commence proceedings to delist the Class A common stock. Effective that same day, the Class A common stock was delisted from The New York Stock Exchange (NYSE) and commenced trading on the OTC Pink marketplace under the symbol "RCAP." Subsequently, on February 1, 2015, the OTC ~~ticket~~ticker symbol was changed to "RCAPQ US."

As a result of the foregoing, the Company had been operating under severe liquidity constraints prior to the Petition Date and did not have sufficient projected short-term liquidity to service its amortization and interest payment obligations under the Prepetition Secured Facilities. On December 31, 2015, the Company failed to make a $14.4 million amortization payment under the First Lien Credit Facility and $5.1 million in combined interest payments under the Prepetition Secured Facilities. Given these liquidity constraints, the Company's existing capital structure was no longer sustainable based on $60 million of first-lien amortization and approximately $60 million of cash interest payments.

## C.    Retention of Professional Advisors and Evaluation of Strategic Alternatives

In the third quarter of 2015, recognizing the need to address anticipated liquidity shortfalls and potentially restructure the Company's balance sheet, the Executive Committee of the Board of Directors of RCS Capital Corporation authorized the Company to begin engaging advisors to assist in evaluating strategic alternatives. On September 15, 2015, the Company engaged Lazard Frères & Co. ("**Lazard**") as investment banker to assist the Company in exploring one or more potential transactions, including a significant junior capital raise.[18][19] Subsequently, on November 23, 2015, the Company engaged Zolfo Cooper Management, LLC ("**Zolfo Cooper**") to provide certain management and advisory services relating to cash management, assessment and implementation of strategic alternatives, and restructuring of certain non-core businesses. Dechert LLP ("**Dechert**") has been acting as the Company's outside legal counsel since November 24, 2014.

Immediately following its engagement, Lazard commenced diligence review of the Company's financial projections and assisted management in developing a Confidential Information Memorandum ("**CIM**") and constructing an electronic data room. Lazard held discussions with over 25 potential investors, ten of whom executed confidentiality agreements for the junior capital raise. The CIM and other financial information were provided to, and management meetings were held with, 10 interested parties. Initial indications of interest were due on October 14, 2015 and final bids on November 24, which deadline was subsequently extended to December 4, 2015.

Only two parties submitted final bids, neither of which was sufficient to pay off the debt outstanding under First Lien Credit Facility, let alone provide recoveries to more junior creditors. Subsequently, the Company received a non-binding proposal from Luxor setting forth

---

[18][19]    The Company subsequently expanded the scope of Lazard's engagement to include the negotiation and consummation of any Financing Event or Restructuring Transaction, each as defined in that certain engagement letter, dated as of November 24, 2015, between RCS Capital Corporation and Lazard.

a potential equity investment in RCS Capital Corporation, but Luxor subsequently abandoned that proposal after reviewing the November actual results.

During this same period, the Company, with the assistance of its advisors, began negotiating with certain of the Company's lenders under its First Lien Credit Facility (collectively, the "**First Lien Lenders**"), certain of the Second Lien Lenders, and Luxor and certain of its affiliates on the terms of a balance sheet restructuring.

### D.    Forbearance Agreement and Restructuring Support Agreement

As of December 31, 2015, the Company entered into separate forbearance agreements with requisite numbers of its First Lien Lenders, Second Lien Lenders, and Convertible Noteholders, as well as certain affiliates of Luxor Group with respect to their respective holdings of the Senior Unsecured Notes.  Pursuant to these agreements, the aforementioned lenders agreed to forebear from exercising rights or remedies with respect to then-existing events of default until January 29, 2016, which permitted the Company to, among other things, forgo a $14.4 million amortization payment under the First Lien Credit Facility and approximately $5.1 million in combined interest payments under the Prepetition Secured Facilities, all of which was payable on December 31, 2015.  In addition, the requisite majorities of First and Second Lien Lenders agreed to permit the Company to retain the net cash proceeds from the sale of Hatteras Funds instead of prepaying such lenders as would have otherwise been required under the respective terms of the First Lien and Second Lien Credit Agreements.

Subsequently, on January 29, 2016, after extensive and arm's-length negotiations over more than eight weeks, the Debtors, certain of the Non-Debtor Subsidiaries, certain of the Prepetition Secured Lenders, and Luxor reached an agreement on the terms of a restructuring to be implemented through these chapter 11 cases, which was formalized by the RSA.

The RSA is supported by holders of (i) approximately 92.5% of the principal face dollar amount of the outstanding loans under the First Lien Credit Facility (representing 86% of the number of holders of First Lien Claims), (ii) approximately 87.6% in principal face dollar amount of the outstanding loans under the Second Lien Term Facility (representing 74.6% of the number of holders of Second Lien Claims), and (iii) over $135 million in unsecured claims, representing the overwhelming majority of the Debtors' unsecured debt.  Thus, the parties to the RSA meet the requisite thresholds for acceptance of a plan of reorganization under section 1126(c) of the Bankruptcy Code.

The RSA contemplates, among other things, that as long as the RSA remains in effect, the Debtors and the other RSA Parties each agree to support and take all reasonable actions necessary to implement the restructuring transaction (the "**Restructuring Transaction**") contemplated in the RSA and the term sheet attached thereto (the "**Plan Term Sheet**") pursuant to the pre-arranged Plan.

# ARTICLE III.

## DESCRIPTION OF THE DEBTORS' CHAPTER 11 CASES

**3.1** *Continuation of the Businesses after the Petition Date.*

    (a)        **General Case Background**.

On January 31, 2016, each of the Debtors filed voluntary petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code. Pursuant to an order of the Bankruptcy Court dated February 2, 2016, the Chapter 11 Cases are being jointly administered for procedural purposes under Case Number 16-10223. The Honorable Mary F. Walrath is presiding over the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.

    (b)        **Employment and Compensation of Professionals**.

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, the Debtors, subject to Bankruptcy Court approval, retained:

- Dechert as bankruptcy counsel;

- Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as Delaware local counsel;

- Zolfo Cooper as restructuring advisor;

- Lazard as investment banker; and

- Prime Clerk as claims and noticing agent and administrative advisor.

On February 2, 2016, the Bankruptcy Court entered an order approving the retention of Prime Clerk. On [DATE], the Bankruptcy Court entered orders approving the retention of Dechert, Young Conaway, Zolfo Cooper, and Lazard. On [DATE], the Debtors filed with the Bankruptcy Court a motion seeking an order authorizing the Debtors to employ and retain professionals utilized in the ordinary course of business to assist the Debtors in their day-to-day business operations [ECF No. ●] (the "**Ordinary Course Professionals Motion**"). On [DATE], the Bankruptcy Court entered an order approving the Ordinary Course Professionals Motion.

    (c)        **Customary "First Day" Orders**.

To minimize the possible disruption to the Debtors upon the filing of these Chapter 11 Cases, among other reasons, on the Petition Date, the Debtors filed the following motions with the Bankruptcy Court:

a.      Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;

b.      Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Prime Clerk LLC as Clams and Noticing Agent, *Nunc Pro Tunc* to the Petition Date;

c.      Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;

d.      Debtors' Motion for an Order, Pursuant To Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums, and (B) Continuation of Insurance Premium Financing Programs; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;

e.      Motion of Debtors for Entry of an Order Approving (I) the Debtors' Continued Maintenance of Their Existing Bank Accounts and Use of Their Cash Management System, (II) the Payment of Certain Obligations Related Thereto, (III) the Continuation of Intercompany Transactions, (IV) Administrative Expense Status for Postpetition Intercompany Claims, (V) the Debtors' Continued Use of Existing Business Forms, and (VI) Granting the Debtors a Waiver of the Requirements Contained in Section 345(b) of the Bankruptcy Code on an Interim Basis;

f.      Motion of Debtors for an Order Authorizing (I) the Payment of Prepetition Wages and Salaries, (II) the Payment and Honoring of Prepetition Employee Policies and Benefits, and (III) the Continuation of Workers' Compensation Policies;

g.      Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief;

37

h.  Debtors' Motion for an Order Granting the Debtors Leave to File Joint Plan of Reorganization for RCS Capital Corporation and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code Without Concurrent Filing of an Accompanying Disclosure Statement; and

i.  Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Certain Equity Securities and (II) Establishing a Record Date for Notice for Trading in Claims Against the Debtors' Estates.

On February 2, 2016 and February 3, 2016, the Bankruptcy Court entered orders granting the relief requested in each of these motions (certain of which on an interim basis), with certain modifications.  On [DATE], the Bankruptcy Court entered final orders granting the relief previously approved on an interim basis.

(d)  **Appointment of Committee**.

Pursuant to section 1102(a)(1) of the Bankruptcy Code, on [DATE], the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") [ECF No. [●]].  The Committee retained [●] as its legal advisor and [●] as its financial advisor.  The current members of the Committee are:

(e)  **Debtor in Possession Financing**.

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking an order authorizing the Debtors to, among other things, obtain postpetition debtor in possession financing, grant adequate protection to the prepetition lenders and use cash collateral [ECF No. 18] (the "**DIP Motion**").  Pursuant to the DIP Motion, the Debtors sought, among other things, authorization for RCS Capital Corporation, as borrower, to obtain senior secured priming and superpriority postpetition debtor in possession financing, and for each of the other Debtors and certain Non-Debtor Subsidiaries (collectively, the "**DIP Obligors**") to unconditionally guaranty, jointly and severally, RCS Capital Corporation's obligations in connection with such postpetition debtor in possession financing.  On February 3, 2016, the Bankruptcy Court entered an order granting the DIP Motion and approving the Debtors' entry into the DIP Facility on an interim basis.  On February 3, 2016, the Bankruptcy Court entered the interim DIP Order [ECF No. 87] authorizing the relief requested in the DIP Motion on an interim basis, including authorizing the Debtors to immediately obtain $25 million of the $100 million in financing available under the DIP Facility.  On [DATE], the Bankruptcy Court entered an order granting the DIP Motion and approving the Debtors' entry into the DIP Facility on a final basis.

Key terms of the DIP Facility were negotiated in concert with, and attached as an exhibit to, the RSA.  As set forth in more detail therein and in the DIP Motion, the DIP Facility consists of a senior secured priming and superpriority debtor in possession term loan credit facility made available to RCS Capital Corporation in an original principal amount of $100 million.  The DIP Facility is being provided through commitments by certain of the First Lien Lenders and Second Lien Lenders.  Barclays Bank PLC serves as DIP Agent, collateral agent, sole lead arranger, sole

bookrunner, and sole syndication agent under the DIP Facility. All amounts outstanding under the DIP Facility bear interest at rates specified therein.

Obligations under the DIP Facility are secured by, among other things, perfected first priority security interests in and liens granted by the DIP Obligors on all owned or after-acquired assets and property of the DIP Obligors (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, commercial tort claims, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to customary exceptions and excluding assets of deferred compensation plans for financial advisors of retail brokerage entities (the "**DIP Collateral**"), excluding the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the final order approving the DIP Facility, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of the Avoidance Actions, provided that the security interest and lien on any such proceeds of Avoidance Actions required to be contributed to the Creditor Trust pursuant to the Plan (as described below) shall be released upon such contribution).

As a condition of the DIP Facility, the Debtors are operating their businesses pursuant to an agreed-upon budget (subject to certain enumerated variances), the terms of which are set forth in the definitive documents governing the DIP Facility. The budget contemplates that the proceeds of the DIP Facility will be used to (i) provide working capital to the Debtors; (ii) fund interest, discount, fees and other payments contemplated in respect of the DIP Facility and provide adequate protection to the First Lien Lenders, First Lien Agent, Second Lien Lenders and Second Lien Agent in exchange for the use of Prepetition Collateral and the priming of their liens; (iii) fund advisor retention loans for certain key members of management and advisors of Cetera Financial Group up to an aggregate amount of $50 million; (iv) provide funding to each BD (other than J.P. Turner & Company, LLC) to support compliance with these entities' net capital and other regulatory requirements (the "**BD Capital Contributions**"); and (v) to provide funding to subsidiaries that are not debtors in the Bankruptcy Cases. The funding of the Cetera retention loans and the BD Capital Contributions under the DIP Facility is designed to allow the Debtors to prevent significant advisor attrition and protect and preserve the Company's retail investment services businesses, where the material value of the Debtors' businesses resides.

In addition, the Debtors must maintain compliance with covenants regarding, without limitation, disposition of cash collateral and proceeds of the DIP Facility, incurrence of additional liens senior to *pari passu* with the liens under the DIP Facility, and provision of detailed financial deliverables. The DIP Facility incorporates customary events of default for debtor in possession facilities.

A final hearing on the DIP Motion was held on February [24], 2016 and an order approving the DIP Motion on a final basis was entered on February [●], 2016.

(f)        **Restructuring Support Agreement**

After over two months of extensive, good faith negotiations, on January 29, 2016, the Debtors, the Non-Debtor Subsidiaries, the First Lien Agent, the Second Lien Agent, Luxor and

First Lien Lenders representing approximately 92.5% of the First Lien Claims in Class 2 and Second Lien Lenders representing approximately 87.6% of the Second Lien Claims in Class 3, entered into the RSA. Pursuant to the RSA, Luxor and the First Lien Lenders and Second Lien Lenders party thereto agreed to support the confirmation of a plan of reorganization consistent with the terms of the RSA and the Plan Term Sheet attached thereto. The Plan proposed by the Debtors is consistent with the RSA and Plan Term Sheet and is supported by the parties to the RSA.

The RSA contains customary terms, including an agreement among the Debtors, the First Lien Lenders and Second Lien Lenders party thereto, and Luxor to support a plan of reorganization that is consistent with the RSA and an agreement by the parties to negotiate in good faith regarding necessary documentation (including, but not limited to, (i) this Disclosure Statement and any motion seeking the approval hereof, (ii) the order approving the Disclosure Statement, (iii) the Confirmation Order, (iv) the ballots for voting on the Plan, (v) the motion to approve the form of the ballots and any solicitation of the Plan, (vi) any documentation relating to the DIP Facility, the Exit Facility, the New Second Lien Facility and (vii) any documentation relating to exit financing, post-emergence organizational documents, equity holder-related agreements or other related documents to be executed on or before the Effective Date), and to refrain from supporting any plans of reorganization other than the Plan. In addition, the First Lien Lenders' and Second Lien Lenders' agreement to provide the Debtors with the DIP Facility and the consensual use of cash collateral is an integral part of the RSA.

The RSA also requires the Company to timely comply with, among other things, each of the following milestones (the "**Milestones**"), which may be extended with the prior written consent of the Majority RSA Lenders (as defined in the RSA):[1920]

> (i)      obtain entry of a final order approving the entry by the Debtors into the DIP Facility within thirty-five (35) days of the Petition Date;

> (ii)     obtain entry of an order approving the assumption by the Debtors of the RSA (the "**RSA Assumption Order**") within thirty-five (35) days of the Petition Date;

> (iii)    obtain entry of an order approving this Disclosure Statement within forty (40) days of the Petition Date;

> (iv)    the commencement of prepackaged chapter 11 cases by certain of the Non-Debtor Subsidiaries that are not RIAs by March 25, 2016 and the completion of solicitation of votes with respect to the Prepackaged Plan for such cases on or before March 15, 2016;

---

[1920]    In addition to the Milestones set forth above, the RSA required the commencement of these Chapter 11 Cases by no later than January 31, 2016, the filing of the Plan and DIP Motion on the Petition Date, entry of the Interim DIP Order by no later than two Business Days following the Petition Date, and the filing of this Disclosure Statement and a motion seeking approval of this Disclosure Statement by no later than five days after the Petition Date. Each of these Milestones was either met or extended with the consent of the Majority RSA Lenders.[1]

(v)    obtain entry of an order confirming the Plan and Prepackaged Plan on or before May 1, 2016; and

(vi)    cause the Effective Date of the Plan and Prepackaged Plan to occur on or before May 15, 2016;

Failure to comply with the Milestones set forth in the RSA may result in a "Supporting Party Termination Event" pursuant to which the Required Consenting Lenders may exercise their rights to terminate the RSA.

A hearing on the Debtor's motion to assume the RSA was held on February [24,] 2016, and the RSA Assumption Order was entered on [DATE].

(g)    **Protection of Tax Attributes**.

On January 31, 2016, the Debtors filed the ~~Motion Regarding Chapter 11 First Day Motions Motion for Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Certain Equity Securities and (II) Establishing a Record Date for Notice for Trading in Claims Against the Debtors' Estates~~*Motion Regarding Chapter 11 First Day Motions Motion for Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Certain Equity Securities and (II) Establishing a Record Date for Notice for Trading in Claims Against the Debtors' Estates* [ECF No. 11] (the "**WSD Procedures Motion**").  The purpose of the WSD Procedures Motion was to preserve the flexibility to implement a balance sheet restructuring that maximizes the value of the Debtors' tax attributes by closely monitoring certain transfers of the equity securities of Holdings and claims of worthlessness with respect to the equity securities of Holdings.  On February 3, 2016, the Bankruptcy Court entered an interim order establishing notification and hearing procedures for transfers of equity securities.  A hearing to consider the relief requested in the WSD Procedures Motion on a final basis is scheduled for February 24, 2016.

(h)    **Potential Claims against RCAP Holdings, LLC and Certain Other Claims**.

The Debtors believe that they and/or certain of their subsidiaries have claims against RCAP Holdings, LLC, its partners and officers, and certain former officers and directors of the Debtor, based on certain transactions and business activities it caused the Debtors to enter into for the benefit of RCAP Holdings, LLC, its partners and officers, and certain former officers and directors of the Debtor at the Debtor's expense. These claims, among other claims and causes of action, will be transferred to and vested in the Creditor Trust and pursued by the Creditor Trust Administrator following the Effective Date.  A list disclosing the Claims and Causes of Action transferred to and that may be brought by the Creditor Trust shall be included as part of the Plan Supplement.  In accordance with the Plan, the net proceeds of these claims will be distributed to holders of Class A Units and Class B Units in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan.

**3.2    *Case Administration*.**

(a)    **Exclusivity**.

Under the Bankruptcy Code, debtors have the exclusive right to file a plan or plans for an initial period of 120 days from the date on which the debtor filed its bankruptcy petition. If debtors file a plan within this exclusive period, then the debtors have the exclusive right for 180 days from the Petition Date to solicit acceptances of their plan. During these exclusive periods, no other party in interest may file a competing plan. A court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive filing period expires on May 30, 2016, and the Debtors' initial exclusive solicitation period expires on July 29, 2016.

(b)      **Schedules and Establishment of Bar Date**.

On [DATE], the Debtors filed their schedules and statements of financial affairs (collectively, the "**Schedules**"), which are available for viewing at the Website.

By order of the Bankruptcy Court dated [DATE] [ECF No. [●]] (the "**Bar Date Order**"), and pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court established (a) [DATE] at [TIME] (Eastern Time) (the "**General Bar Date**") as the deadline by which all persons and entities, other than governmental entities (as such term is defined in the Bankruptcy Code), must file proofs of Claim with respect to Claims arising before the Petition Date (including proofs of Claim with respect to Claims for the value of any goods (not services) received by any of the Debtors in the ordinary course of business within 20 days before the Petition Date pursuant to section 503(b)(9) of the Bankruptcy Code ("**503(b)(9) Claims**")) against the Debtors' estates. The Bar Date Order also established the later of (i) the General Bar Date, or (ii) [TIME] (Eastern Time) on the date that is thirty (30) days after entry of an order (which may be the order confirming the Plan) approving the rejection of an executory contract or unexpired lease as the deadline for filing proofs of Claims based on rejection of such contracts or leases (the "**Rejection Bar Date**"). In accordance with the Bar Date Order, written notice of the General Bar Date and the Rejection Bar Date was mailed to all known claimants.

Pursuant to Rule 3003(c)(2) of the Bankruptcy Rules, any creditor whose applicable claim was not scheduled, or was scheduled as disputed, contingent, or unliquidated, and who failed to file a proof of claim on or before the applicable bar date, will not be treated as a creditor with respect to the Plan or receive a distribution under the Plan.

(c)      **Claims**.

The Debtors have estimated the approximate amount of Allowed Claims and have set forth such estimates in the table set forth in Article I above.

THESE ESTIMATES ARE PRELIMINARY AND TENTATIVE GIVEN THE LIMITED REVIEW AND ANALYSIS UNDERTAKEN BY THE DEBTORS TO DATE. THESE AMOUNTS REPRESENT ESTIMATES BY THE DEBTORS BASED ON CURRENT INFORMATION ONLY. THE DEBTORS MAKE NO REPRESENTATION AS TO THE EXTENT THESE ESTIMATES ULTIMATELY PROVE ACCURATE IN LIGHT OF ACTUAL CLAIMS AND THE RESOLUTION OF CLAIMS DISPUTES. FOR INFORMATION REGARDING THE LIMITATIONS OF AND UNCERTAINTIES

RELATING TO THESE ESTIMATES, SEE ARTICLE XI BELOW ("CERTAIN RISK FACTORS TO BE CONSIDERED").

## ARTICLE IV.

## THE PLAN[2021]

**4.1     *Overview of Chapter 11.***

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the Debtors as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor.

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization or liquidation of the debtor and that are required or permitted by the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims is "Impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of the chapter 11 cases until such time as the court has approved a disclosure statement as containing adequate information.  Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are Impaired and not deemed to have rejected the Plan.

**4.2     *Overview of the Plan.***

General.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.  YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

---

[2021]  This summary is qualified in its entirety by the Plan.  To the extent that any provision of this summary is inconsistent with the Plan, the Plan will control.

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. The Plan separates the various Claims (other than those that do not need to be classified) into eight (8) separate Classes and classifies the Interests into two (2) Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan, and describes other provisions of the Plan. Only holders of Allowed Claims — Claims that are not disputed, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Section 1.4 of the Plan. Until a Disputed Claim becomes Allowed, no distribution of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim will be made.

The Debtors believe that they and the other parties appointed pursuant to the Plan will be able to perform their respective obligations under the Plan. Also, the Debtors believe that the Plan provides for equitable treatment for the holders of Claims and Interests.

The Confirmation Date will be the date on which the Bankruptcy Court enters the Confirmation Order. The Effective Date will be a day, as determined by the Debtors with the consent of the First Lien Agent, Second Lien Agent and the Required Consenting Lenders that is the Business Day on or after all conditions to substantial consummation of the Plan have been satisfied or waived in whole or in part by the Debtors, the First Lien Agent, Second Lien Agent and the Required Consenting Lenders, as applicable.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. Except as otherwise provided in the Plan or the Confirmation Order, all consideration necessary for the Reorganized Debtors to make Cash payments pursuant to the Plan will be obtained from the existing Cash balances of the Debtors and new loans to be made to the Debtors upon emergence.

All Claims and Interests, except General Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims (if any) (the "**Unclassified Claims**"), are placed in the Classes described below and set forth in Section 3 of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, the holders of the Unclassified Claims are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

Purpose and Effects of the Plan.

The overall purpose of the Plan is to restructure the Debtors' Estates in a manner designed to efficiently maximize recovery to stakeholders. The Debtors have sought to achieve this purpose through a debt for equity restructuring of the Debtors' balance sheet.

Time for Filing Administrative Claims and Professional Fee Claims.

### 1.    General Administrative Claims.

Except as otherwise provided in Section 2 of the Plan, unless it has previously filed a claim with the Bankruptcy Court, the holder of a General Administrative Claim, other than the holder of:

> (1)    a General Administrative Claim (i) that has been Allowed by a Final Order or under the Plan on or before the Effective Date or (ii) for an expense or liability incurred and payable in the ordinary course of business by a Debtor;
>
> (2)    any Cure Claim related to amounts due and payable in the ordinary course of business and pursuant to ordinary trade terms;
>
> (3)    a General Administrative Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or legal fees in connection with such indemnification or contribution claims pursuant to (A) any Debtor's operating agreement, certificate of incorporation, by-laws, or similar organizational document or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;²¹²²
>
> (4)    an Administrative Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; or
>
> (5)    a 503(b)(9) Claim (which shall be subject to their own Claims Bar Date)

will be required to file with the Bankruptcy Court and serve requests for payment of General Administrative Claims pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than thirty (30) days after the Effective Date (the "**General Administrative Claims Bar Date**").  Such requests for payment of General Administrative Claims will need to include at a minimum:  (A) the name of the applicable Debtor that is purported to be liable for the General Administrative Claim, and if the General Administrative Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (B) the name of the holder of the General Administrative Claim; (C) the amount of the General Administrative Claim; (D) the basis of the General Administrative Claim; and (E) supporting documentation for the General Administrative Claim. **HOLDERS OF GENERAL ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO**

---

²¹²²    As of the date hereof, the Debtors are not aware of any Administrative Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or legal fees in connection with such indemnification or contribution claims as set forth in this Section 4.2(c)(1)(4) of the Disclosure Statement.

**NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH GENERAL ADMINISTRATIVE CLAIMS BY SUCH DATE WILL BE FOREVER BARRED, ESTOPPED AND ENJOINED FROM ASSERTING SUCH GENERAL ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY AND SUCH GENERAL ADMINISTRATIVE CLAIMS WILL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.** Objections to requests for payment of General Administrative Claims, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than one hundred twenty (120) days after the Effective Date.

For the avoidance of doubt, Administrative Claims related to breach of contract, tort or any other Claim not related to amount due and payable in the ordinary course of business and pursuant to ordinary trade terms held by any party, including, parties to any Executory Contract or Unexpired Lease that is not rejected by the Debtors, or any trade creditor or customer, must be filed by the General Administrative Claims Bar Date set forth in Section 5.13 of the Plan.

### 2.    Professional Fee Claims.

The Plan provides that holders of Professional Fee Claims[22][23] shall file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred from and after the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court. **ANY PERSON THAT FAILS TO FILE SUCH APPLICATION ON OR BEFORE SUCH DATE WILL BE FOREVER BARRED FROM ASSERTING SUCH PROFESSIONAL FEE CLAIM AGAINST THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR PROPERTY AND THE HOLDER THEREOF WILL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET OR RECOVER SUCH CLAIM.**

Objections to Professional Fee Claims, if any, will be required to be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) days after the Effective Date or on such other date as established by the Bankruptcy Court.

Description and Treatment of Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, U.S. Trustee Fees, Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims are not classified under the Plan. To confirm the Plan, the Unclassified Claims must be paid in full or in a manner otherwise agreeable to the holders of those Claims.

### 3.    U.S. Trustee Fees.

On or before the Effective Date, the Debtors will pay all U.S. Trustee Fees in full in Cash. Any U.S. Trustee Fees due after the Effective Date will be paid by the Reorganized Debtors in the ordinary course until the earlier of the entry of a final decree closing the

---

[22][23]    As set forth in the Plan, the fees and expenses incurred by professionals and advisors to the DIP Agent, the First Lien Agent, the Second Lien Agent, the Required Consenting Lenders, and Luxor do not constitute "Professional Fee Claims."

applicable Chapter 11 Case, or a Bankruptcy Court order converting or dismissing the applicable Chapter 11 Case. Any deadline for filing Administrative Claims or Professional Fee Claims will not apply to claims for U.S. Trustee Fees.

### 4. General Administrative Claims.

Except to the extent that a holder of an Allowed General Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to less favorable or equal, but different, treatment, each holder of an Allowed Administrative Claim will be paid, in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed General Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable, the latest of (i) the Effective Date, (ii) the first Business Day after such General Administrative Claim becomes Allowed by a Final Order of the Bankruptcy Court or (iii) the date such General Administrative Claim becomes due and payable after such General Administrative Claim becomes Allowed by a Final Order of the Bankruptcy Court; provided, however, that Allowed General Administrative Claims incurred in the ordinary course of business may be paid in full in the ordinary course of business, at the option of the Reorganized Debtors, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

### 5. Professional Fee Claims.

Allowed Professional Fee Claims will be paid in full in Cash by the Reorganized Debtors either (a) within five (5) Business Days of the date such Professional Fee Claim is approved by a Final Order issued by the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon by such holder of an Allowed Professional Fee Claim and the Reorganized Debtors. Professionals will not be required to seek Bankruptcy Court approval of any fees and expenses incurred after the Effective Date in connection with the Debtors, Reorganized Debtors or the Chapter 11 Cases. Failure to file a final fee application by the deadline set forth above will result in the relevant Professional Fee Claim being forever barred and disallowed. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the requesting party no later than sixty-five (65) days after the Effective Date or such other date as established by the Bankruptcy Court.

### 6. Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, in exchange for and in full satisfaction, settlement, release, and discharge of its Allowed Priority Tax Claim, at the election of the Debtors with the consent of the Required Consenting Lenders, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the (a) Effective Date or (b) fifteenth (15th) Business Day after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the date of assessment of such Allowed Priority

47

~~Tax Claim~~Petition Date.  The Reorganized Debtors will have the right to prepay an Allowed Priority Tax Claim at any time under this option.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

No holder of an Allowed Priority Tax Claim will be entitled to receive any payment on account of any penalty not representing compensation of an actual pecuniary loss arising with respect to or in connection with such Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be deemed disallowed and expunged.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, or their property.

### 7.     DIP Claims.

All DIP Claims will be Allowed in full in the amount of the DIP Obligations outstanding on the Effective Date.  Except as otherwise agreed to by the Debtors, the DIP Agent, the "Required Lenders" under, and as defined in, the DIP Credit Agreement and the Required Consenting Lenders, on the Effective Date, each holder of an Allowed DIP Claim shall be paid in Cash in full from the proceeds of the Exit Facility in accordance with the DIP Credit Agreement and the Exit Credit Documents.

Description of Classification and Treatment of Claims and Interests Pursuant to the Plan.

This Section summarizes the treatment of each of the Classes of Claims against and Interests in the Debtors under the Plan.  **For a more detailed description of the treatment of each Class of Claims and Interests, please refer to Section 3 of the Plan.**

### 8.     Class 1: Other Priority Claims.

Class 1 comprises the Other Priority Claims against the Debtors.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date or the fifteenth (15th) Business Day after the date such Other Priority Claim becomes Allowed.

Class 1 is Unimpaired.  Each holder of an Allowed Other Priority Claim in Class 1 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

9.      **Class 2: First Lien Claims.**

Class 2 comprises the First Lien Claims against the Debtors.  The First Lien Claims will be Allowed in the aggregate amount of $556.0 million. [2324]  On the Effective Date, (i) in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of $50 million of the aggregate amount of Allowed First Lien Claims, each holder of an Allowed First Lien Claim will receive its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests, and (ii) in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of $500 million of the aggregate amount of Allowed First Lien Claims, each holder of an Allowed First Lien Claim will receive its Pro Rata share of the New Second Lien Facility.

Class 2 is Impaired.  Each holder of an Allowed First Lien Claim in Class 2 is entitled to vote to accept or reject the Plan.

10.      **Class 3: Second Lien Claims.**

Class 3 comprises the Second Lien Claims against the Debtors.  The Second Lien Claims will be allowed in the aggregate amount of $153.2 million, with $50 million of such Allowed Claims to be treated as Secured Second Lien Claims and $103.2 million to be treated as Second Lien Deficiency Claims. On the Effective Date:

      (i)      in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of the aggregate Allowed Secured Second Lien Claims, each holder of an Allowed Second Lien Claim shall receive its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests, and

      (ii)      in exchange for and in full satisfaction, settlement, release, and discharge of its Pro Rata share of the aggregate Allowed Second Lien Deficiency Claims, each holder of an Allowed Second Lien Claim will receive its Pro Rata share of Class B Units, entitling the holders thereof to receive a share of the distributions of the Litigation Asset Proceeds allocated to the holders of Class B Units pursuant to the Creditor Trust Distribution Schedule.  For the avoidance of doubt, holders of Allowed Second Lien Claims will waive all rights to and shall not receive any distributions of Creditor Assets or the proceeds thereof from the Creditor Trust.

Class 3 is Impaired.  Each holder of an Allowed Second Lien Claim in Class 3 is entitled to vote to accept or reject the Plan.

---

[2324]    Notwithstanding the Allowed amount of the First Lien Claims, solely to the extent of their treatment under the Plan, the amount of the First Lien Claims will be deemed to be $550 million. Agreement to this treatment under the Plan shall not be deemed a waiver or admission that the holders of First Lien Claims are in any way not fully entitled to the full value of their Claims.

11.      **Class 4: Other Secured Claims**

Class 4 comprises the Other Secured Claims against the Debtors.  Unless a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, on the Effective Date, each Allowed Other Secured Claim will be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Consenting Lenders, each holder of an Allowed Other Secured Claim will receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim.

Class 4 is Unimpaired.  Each holder of an Allowed Other Secured Claim in Class 4 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

12.      **Class 5: General Unsecured Claims.**

Class 5 comprises the Allowed General Unsecured Claims against the Debtors.

On the Effective Date, each holder of an Allowed General Unsecured Claim, in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, shall receive its Pro Rata share of Class A Units, entitling the holders thereof to receive a share of the Creditor Trust Assets allocated to holders of General Unsecured Claims in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan. Each holder of a General Unsecured Claim shall be permitted to reduce its Claim to $[●] and receive, in lieu of the Distribution provided to holders of Claims in Class 5, Distribution as if the Claim is a Class 6 Convenience Class Claim. Creditor Trust Assets include (i) $12 million in Cash, (ii) New Warrants and (iii) certain non-released Causes of Action.

Class 5 is Impaired.  Each holder of an Allowed General Unsecured Claim in Class 5 is entitled to vote to accept or reject the Plan.

13.      **Class 6: Convenience Class Claims.**

Class 6 comprises the Convenience Class Claims against the Debtors.  Each holder of an Allowed Convenience Class Claim will receive in exchange for and in full satisfaction, settlement, release, and discharge of such Allowed Convenience Class Claim, payment in full in Cash from the Reorganized Debtors on or as soon as reasonably practicable after the Effective Date in an amount not to exceed $[●].

Class 6 is Unimpaired.  Each holder of an Allowed Convenience Class Claim in Class 6 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

14. **Class 7:  Subordinated Claims.**

Class 7 comprises the Subordinated Claims against the Debtors.  Each holder of a Subordinated Claim shall receive no Distribution.

Class 7 is Impaired.  Each holder of a Subordinated Claim in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

15. **Class 8: Intercompany Claims.**

Class 8 comprises the prepetition Intercompany Claims.  On the Effective Date, each Intercompany Claim will be reinstated or extinguished in the discretion of the Debtors with the written consent of the Required Consenting Lenders.

As Debtors or Affiliates of the Debtors, each holder of an Intercompany Claim in Class 8 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

16. **Class 9: Intercompany Interests.**

Class 9 comprises the Intercompany Interests.  On the Effective Date, each Class 9 Intercompany Interest will be Reinstated.

Class 9 is Unimpaired.  Each holder of an Allowed Intercompany Interest in Class 9 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

17. **Class 10: Holdings Equity Interests.**

Class 10 comprises the Equity Interests in Holdings.  Each holder of a Holdings Equity Interest will receive no Distribution on account of such Equity Interest.  All Holdings Equity Interests will be deemed cancelled as of the Effective Date.

Class10 is Impaired.  Each holder of a prepetition Holdings Equity Interest in Class 10 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Distributions.

18. **Distribution Record Date.**

On the Distribution Record Date,[2425] the transfer ledgers for holders of Claims or Interests maintained by the Debtors will be closed, and there will be no further changes in the record holders of such Claims or Interests for purposes of Distributions hereunder.  The Debtors, the Reorganized Debtors, the First Lien Agent, the Second Lien Agent, and the Convertible Notes Indenture Trustee will have no obligation to recognize any transfer of any such Claims or Interests occurring after the Distribution Record Date and will be entitled instead to recognize

---

[2425]   The "**Distribution Record Date**" means the date to be agreed among the Debtors and the Required Consenting Lenders that is no later than two (2) Business Days before the Effective Date; provided, however, that the Distribution Record Date will not apply to any publicly traded securities.

and deal for all purposes under the Plan with only those record holders listed on the transfer ledgers as of the Distribution Record Date.

### 19.    Date of Distributions.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### 20.    No Recourse.

No holder of a Claim will have recourse to the Reorganized Debtors (or any property of the Reorganized Debtors) or the Creditor Trust (or any of the Creditor Trust Assets), other than with regard to the enforcement of rights or Distributions under the Plan, and the transactions contemplated thereby and by the Definitive Documents.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Section 7 of the Plan.

### 21.    Disputed Identity of Claim Holder.

If any dispute arises as to the identity of a holder of an Allowed Claim entitled to receive any Distribution, the Reorganized Debtors or the Creditor Trust Administrator, as applicable, may, in lieu of making such Distribution to such Person, make such Distribution into a segregated account until the disposition thereof will be determined by an order of the Bankruptcy Court or by written agreement among the interested parties.

### 22.    Release of Liens.

Except as otherwise provided in the Plan, the Definitive Documents, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of any Debtor's Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtors and their successors and assigns.  As of the Effective Date, the Reorganized Debtors will be authorized to execute and file on behalf of all applicable creditors who have had their liens released and discharged pursuant to the foregoing such Uniform Commercial Code termination statements, mortgage or deed of trust releases or such other forms, releases or terminations as may be necessary or appropriate to implement the Plan.

### 23.    Disbursing Agents.

All Distributions under the Plan to holders of Allowed General Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims and Allowed Other Secured Claims will be made by the applicable Reorganized Debtor, or their designees, as Disbursing Agent.  The DIP Agent and/or such other entity as it may designate will be the Disbursing Agent for the holders of Allowed DIP Claims.  The First Lien Agent and/or such other entity as it may

designate will be the Disbursing Agent for the holders of Allowed First Lien Claims.   The Second Lien Agent and/or such other entity as it may designate will be the Disbursing Agent for the holders of Allowed Second Lien Claims, solely with respect to the Distribution of Reorganized Holdings Equity Interests pursuant to Section 4.3 of the Plan.   Distributions to holders of Allowed Second Lien Deficiency Claims and Allowed General Unsecured Claims as beneficiaries of the Creditor Trust will be made by the Creditor Trust Administrator as Disbursing Agent subject to, as applicable, the terms of the Creditor Trust Agreement and Sections 4.3, 4.5, 5.17, and 6.11 of the Plan.

Each Disbursing Agent will be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make Distributions consistent with the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Except as provided otherwise in the Plan or ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses (including without limitation, reasonable attorneys' fees and expenses) incurred by any Disbursing Agent other than the Creditor Trust Administrator will be paid in Cash by Reorganized Holdings.

The DIP Agent, as Disbursing Agent, will administer Distributions to the holders of Allowed DIP Claims in accordance with the Plan and the DIP Credit Agreement.   Upon delivery to the DIP Agent of the Cash to be distributed on account of DIP Claims pursuant to Section 2.5 of the Plan, the Reorganized Debtors will be released of all liability with respect to the delivery of such Distributions.

The First Lien Agent, as Disbursing Agent, will administer Distributions to the holders of Allowed First Lien Claims in accordance with the Plan and the First Lien Credit Agreement. The issuance and Distribution of the Reorganized Holdings Equity Interests to the First Lien Agent and the execution of the New Second Lien Facility by the Reorganized Debtors and each of the parties thereto will be deemed Distributions to the respective holders of Allowed First Lien Claims.   Upon completion of the acts in the immediately preceding sentence, the Reorganized Debtors will be released of all liability with respect to the delivery of such Distributions.

The Second Lien Agent, as Disbursing Agent, will administer Distributions to the holders of Allowed Secured Second Lien Claims in accordance with the Plan and the Second Lien Credit Agreement, solely with respect to the to the Distribution of Reorganized Holdings Equity Interests pursuant to Section 4.3 of the Plan.   The issuance and Distribution of the Reorganized Holdings Equity Interests to the Second Lien Agent will be deemed Distributions to the respective holders of Allowed Secured Second Lien Claims.   Upon delivery of the Reorganized Holdings Equity Interests to the Second Lien Agent in accordance with the Plan, the Reorganized Debtors will be released of all liability with respect to the delivery of Distributions of Reorganized Holdings Equity Interests pursuant to Section 4.3 of the Plan.

The Creditor Trust Administrator, as Disbursing Agent, will distribute the Class A Units to holders of Allowed General; Unsecured Claims and Class B Units to the holders of Allowed Second Lien Deficiency Claims, subject to, as applicable, the terms of the Creditor Trust Agreement and Sections 4.3, 4.5, 5.17, and 6.11 of the Plan. Upon completion of the transfers pursuant to Sections 5.17(d) of the Plan, the Reorganized Debtors will be released of all liability with respect to the delivery of Distributions to the beneficiaries of the Creditor Trust.

The DIP Agent, the First Lien Agent, Second Lien Agent, and the Creditor Trust Administrator will be exculpated by all Persons from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon it as Disbursing Agent under the Plan or any order of the Bankruptcy Court pursuant to or in furtherance of the Plan. No holder of a Claim or an Interest or other party in interest will have or pursue any Claim or Cause of Action against the DIP Agent, the First Lien Agent, the Second Lien Agent, the Creditor Trust Administrator or any of their respective Representatives and advisors for making payments in accordance with the Plan or for implementing provisions of the Plan in its capacity as Disbursing Agent. The foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.

## 24.    Surrender of Securities or Instruments.

As a condition to receiving any Distribution or release under the Plan, if requested by the Debtors or the Reorganized Debtors, as applicable, each holder of a certificated instrument or note (other than the First Lien Agent, the Second Lien Agent, the Convertible Notes Indenture Trustee or any First Lien Lender or Second Lien Lender, or holder of a Convertible Note Claim, each in its capacity as such) will be required to surrender such instrument or note held by it to the Reorganized Debtors and execute such documents and instruments as the Debtors or the Reorganized Debtors require to effectuate and further evidence the terms and conditions of the Plan. Any holder of such instrument or note that fails to (i) surrender such instrument or note or execute such documents and instruments as the Debtors require, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors and furnish a bond in form, substance, and amount reasonably satisfactory to the Reorganized Debtors before the first anniversary of the Effective Date, will be deemed to have forfeited all rights, Claims or releases and may not participate in any Distribution or release hereunder. Any Distribution so forfeited will become property of the Reorganized Debtors.

## 25.    Delivery of Distributions; Unclaimed Property.

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made by the applicable Disbursing Agent, which shall transmit such Distribution to the holders of Allowed Claims at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any Distribution to any holder is returned as undeliverable, the Disbursing Agent may, but will not be required to, make efforts to determine the current address of such holder, but no

Distribution to such holder will be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such Distribution will be made to such holder without interest.

The applicable Disbursing Agent will hold all Unclaimed Property for the benefit of the holders of Claims entitled thereto under the terms of the Plan.  At the end of six (6) months following the relevant date on which a Distribution was made, the holders of Allowed Claims theretofore entitled to Unclaimed Property held pursuant to Section 6.9(b) of the Plan will be deemed to have forfeited such property, whereupon (i) with respect to all Unclaimed Property for Allowed Claims other than Allowed General Unsecured Claims all right, title and interest in and to such property will immediately and irrevocably revest in the Reorganized Debtors without the need for any further notice to, or action of, the Bankruptcy Court or any other party (including such holders), such holders will cease to be entitled to such Unclaimed Property and any such Unclaimed Property that is Cash will be property of the Reorganized Debtors, free and clear of any restrictions thereon, and the Disbursing Agent will transfer such property to Reorganized Holdings, and (ii) with respect to all Unclaimed Property for Allowed General Unsecured Claims, all right, title and interest in and to such property will immediately and irrevocably revest in the Creditor Trust without the need for any further notice to, or action of, the Bankruptcy Court or any other party, including such holders, such holders will cease to be entitled thereto, any such Unclaimed Property that is Cash shall be property of the Creditor Trust, free and clear of any restrictions thereon.  Any non-Cash consideration not distributed on account of an Allowed Claim (other than an Allowed General Unsecured Claim) as provided in the Plan will be cancelled.

### 26.    Distributions on Account of Allowed Claims Only.

Notwithstanding anything to the contrary in the Plan, no Distribution will be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

### 27.    Distributions to Creditor Trust Beneficiaries.

*Establishment of the CT Disputed Claims Reserve.* On or as soon as practicable after the Effective Date, the Creditor Trust Administrator will establish the CT Disputed Claims Reserve in accordance with the Creditor Trust Agreement.  The Creditor Trust Administrator will set aside and reserve in the CT Disputed Claims Reserve, for the benefit of each holder of a Disputed General Unsecured Claim, the number of Class A Units, together with an amount of Creditor Trust Assets corresponding thereto, equal to the Distribution from the Creditor Trust to which the holder of such Disputed General Unsecured Claim would be entitled if such Disputed General Unsecured Claim were an Allowed General Unsecured Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) an amount mutually agreed between the Creditor Trust Administrator and the holder of such Disputed General Unsecured Claim, or (iii) if no agreement has been reached and no Estimation Order has been entered with respect to such Disputed Claim, the greater of (A) the amount listed in the Schedules and (B) the amount set forth in a proof of claim or application for payment filed with the Bankruptcy Court, or pursuant to an order of the Bankruptcy Court entered in the Chapter 11 Cases, in each case with respect to such Disputed General Unsecured Claim.  The difference between (y) the amount so reserved for each such Disputed General

Unsecured Claim and (z) the amount of federal, state and local taxes paid by the Creditor Trust Administrator with respect to such Disputed General Unsecured Claim will constitute the maximum Distribution amount to which the holder of such Disputed General Unsecured Claim may ultimately become entitled from the Creditor Trust if such holder's Claim (or a portion thereof) becomes an Allowed General Unsecured Claim.

*Manner of Distributions to Holders of Trust Units*. Subject to the terms of the Creditor Trust Agreement and the Creditor Trust Assets Distribution Schedule, Distributions to holders of Trust Units shall be made by the Creditor Trust Administrator as follows:

(1)     As soon as practicable after the Effective Date, the Creditor Trust Administrator will distribute the Cash constituting Distributable Creditor Assets, Pro Rata to the holders of Class A Units (including Class A Units held in the CT Disputed Claims Reserve);

(2)     The Creditor Trust Administrator may, in its discretion at the direction of the Creditor Trust Board, either (i) at any time or from time to time, distribute the New Warrants constituting Distributable Creditor Assets Pro Rata to the holders of Class A Units (including Class A Units held in the CT Disputed Claims Reserve), or (ii) retain the New Warrants and make a distribution of the New Warrant Proceeds Pro Rata to the holders of Class A Units (including Class A Units held in the CT Disputed Claims Reserve) as soon as practicable after the receipt thereof in accordance with the terms of the Creditor Trust Agreement;

(3)     The Creditor Trust Administrator will distribute the Distributable Litigation Asset Proceeds Pro Rata to the holders of Class A Trust Units and Pro Rata to the holders of Class B Trust Units, respectively, subject to and in accordance with the Creditor Trust Assets Distribution Schedule, at such time or times as determined by the Creditor Trust Administrator.

*Distributions from Creditor Trust on Disputed General Unsecured Claims*. No Distributions will be made from the Creditor Trust with respect to a Disputed General Unsecured Claim until the resolution of such Claim by agreement between the holder of the Claim and the Creditor Trust Administrator or a Final Order. On or as soon as reasonably practicable after the next Distribution date after a Disputed General Unsecured Claim becomes an Allowed Claim, the Creditor Trust Administrator will distribute from the CT Disputed Claims Reserve to the holder thereof, the number of Class A Units, together with all Creditor Trust Assets distributed in respect thereof from and after the Effective Date, that would have been distributed to such holder in respect of such Claim had such Claim been an Allowed General Unsecured Claim, in the amount in which it is ultimately Allowed.

*Distributions to Trust Units from Disallowed Disputed General Unsecured Claims*. To the extent all or a portion of a Disputed General Unsecured Claim becomes disallowed or is reclassified, any Creditor Trust Assets previously reserved for such portion of such Disputed General Unsecured Claim will become Distributable Assets. Any Unclaimed Property distributed to holders of Allowed General Unsecured Claims from the Creditor Trust will revert to the Creditor Trust and be deemed to be Distributable Assets at the end of one (1) year

following the date on which such Unclaimed Property was initially distributed, and the holders of Allowed General Unsecured Claims theretofore entitled to such Unclaimed Property will be deemed to have forfeited such property to the Creditor Trust.

*Remaining Creditor Trust Assets in CT Disputed Claims Reserve.*  To the extent the Creditor Trust Administrator determines, at any time, that any portion of the Class A Units in the CT Disputed Claims Reserve, and the Creditor Trust Assets distributed in respect thereof, are not necessary for the satisfaction of Disputed General Unsecured Claims, the Creditor Trust Administrator will cancel such Class A Units, and shall distribute the Creditor Trust Assets distributed in respect thereof to the holders of Class A Units then outstanding, subject to the discretion of the Creditor Trust Administrator to retain such Class A Units and Creditor Trust Assets in the CT Disputed Claims Reserve for the satisfaction of other Disputed General Unsecured Claims.  Once all Disputed General Unsecured Claims have been resolved, any assets remaining in the CT Disputed Claims Reserve will be distributed to the holders of Class A Units then outstanding, and any remaining Class A Units held in the CT Disputed Claims Reserve shall be cancelled.

## 28.     Manner of Payment under the Plan.

Any Cash payment to be made under the Plan may be made by a check, wire transfer, or such other commercially reasonable manner as the payor will determine in its sole discretion, or as otherwise required or provided in applicable agreements.  Except as otherwise specified therein, Cash payments made pursuant to the Plan will be in U.S. currency; provided, however, that Cash payments to foreign holders of Allowed Claims may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 29.     Calculation of Distribution Amounts of Reorganized Holdings Equity Interests and New Warrants.

No fractional shares of Reorganized Holdings Equity Interests or New Warrants will be issued or distributed under the Plan.  Each Person entitled to receive a Reorganized Holdings Equity Interest or New Warrants will receive the total number of whole shares of Reorganized Holdings Equity Interests and New Warrants to which such Person is entitled.  Whenever any Distribution to a particular Person would otherwise call for Distribution of a fraction of a share of Reorganized Holdings Equity Interests or of a New Warrant, such number of shares or New Warrants to be distributed will be rounded down to the nearest whole number.

## 30.     Withholding and Reporting Requirements.

In connection with the Plan and all Distributions thereunder, any Person making Distributions under the Plan, including the Reorganized Debtors, will, to the extent applicable, as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under the Plan will be subject to any such withholding and reporting requirements. Any such amounts withheld shall be treated for purposes of the Plan as a Distribution. Any such amounts withheld shall be treated for purposes of the Plan as a Distribution. The Debtors and the Reorganized Debtors will be authorized to take all actions necessary or appropriate to comply with such

withholding and reporting requirements. All Persons holding Claims will be required to provide any information necessary to affect information reporting and the withholding of such taxes. Notwithstanding any other provisions of the Plan to the contrary, (a) each holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distributions, and (b) no Distribution will be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Any Cash and/or other consideration or property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an Unclaimed Property pursuant to Section 6.9(b) of the Plan. Any Person issuing any instruments or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or distributing Person for payment of, or compliance with, any such tax obligations. A failure to comply with a request to comply with reporting requirements for a period of one hundred eighty (180) days from the date of notice will result in an automatic disallowance of the Claim(s) held by the Person failing to comply. Any Cash not distributed on account of a Claim as provided in the Plan will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan. Any non-Cash consideration not distributed on account of a Claim as provided in the Plan will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

## 31.    Setoffs and Recoupment.

The Debtors, the Reorganized Debtors, and the Creditor Trust Administrator may, but will not be required to, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution will be made), any claims of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Creditor Trust (due to its rights in the Litigation Assets) may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Creditor Trust of any such claim the Debtors, Reorganized Debtors, or the Creditor Trust may have against the holder of such Claim. Nothing in the Plan will be deemed to expand rights to setoff or recoup under applicable non-bankruptcy law. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be deemed to waive and will have no right of setoff or recoupment against the holders of Allowed DIP Claims, Allowed First Lien Claims, or Allowed Second Lien Claims.

## 32.    Distributions After Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date, without any post-Effective Date interest thereon.

## 33.    Allocation of Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution will be

allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 34.   Postpetition Interest on Claims.

Except to the extent expressly contemplated in the Plan, no holder of an Allowed Claim will receive in respect of such Claim any Distribution in excess of the Allowed principal amount of such Claim.   Except for any First Lien Claims and Other Secured Claims on which postpetition interest is allowed under section 506 of the Bankruptcy Code or is otherwise authorized to be paid pursuant to Final Order of the Bankruptcy Court, interest will not accrue on or after the Petition Date.

### 35.   Minimum Distributions.

No Disbursing Agent will be obligated to make a Distribution of less than $100.00 on account of an Allowed Claim to any holder of a Claim.   Any holder of an Allowed Claim entitled to an aggregate Distribution of less than $100.00 will have its Claim for such Distribution discharged and will be forever barred from asserting any such Claim against the Debtors, their Estates, the Reorganized Debtors, the Creditor Trust, or their respective property.   Any Cash not distributed in accordance with the terms of Section 6.19 of the Plan will be the property of the Reorganized Debtors or the Creditor Trust, as applicable, free of any restrictions thereon.

Procedures for Resolving Disputed, Contingent, and Unliquidated Claims.

### 36.   Claims Administration

The Creditor Trust Administrator shall be responsible for and shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all General Unsecured Claims that were not otherwise resolved prior to the Effective Date.   The Reorganized Debtors shall be responsible for and shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than General Unsecured Claims, including without limitation all General Administrative Claims, Professional Fee Claims, Priority Tax Claims and Other Secured Claims. The Creditor Trust Administrator shall be entitled to compensation for its activities relating to Claims administration under this Section solely as provided in the Creditor Trust Agreement, and the Reorganized Debtors shall have no obligation to provide any funding or compensation for such Claims administration.

### 37.   Objections to Claims.

Any objections to Claims shall be served and filed on or before the later of (i) one year after the Effective Date, or (ii) such other date as may be fixed by the Bankruptcy Court, after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.   All Claims held by (i) any of the Excluded Parties and (ii) any creditor against which an adversary proceeding has been commenced by the Debtors, the Reorganized Debtors, the Committee, or the Creditor Trust (whether or not such adversary proceeding is related to such Claims) shall be deemed Disputed Claims.

38.      **Payments and Distributions with Respect to Disputed Claims.**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.    Notwithstanding any authority to the contrary, an objection to a Claim or Interest will be deemed properly served on the holder of the Claim or Interest if the Reorganized Debtors or the Creditor Trust Administrator, as the case may be, effect service in any of the following manners: (i) in accordance with Bankruptcy Rule 3007, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first-class mail, postage prepaid, on the signatory on the proof of claim filed such holder or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is Filed or if the Debtors and the Creditor Trust Administrator have been notified in writing of a change of address), or (iii) by first-class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

39.      **Estimation of Claims.**

On request of a party in interest, the Bankruptcy Court may estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law by issuing an Estimation Order, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.   In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim pursuant to an Estimation Order, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.   If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors or the Creditor Trust Administrator may pursue supplementary proceedings to object to the allowance of such Claim.   All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

40.      **Preservation of Rights to Pursue and Settle Claims.**

Except with respect to the Company Released Causes of Action, the applicable Reorganized Debtors (with respect to the Retained Causes of Action and any Causes of Action arising after the Petition Date) and the Creditor Trust (with respect to the Litigation Assets), in accordance with section 1123(b) of the Bankruptcy Code, will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that they each may respectively hold against any Person without the approval of the Bankruptcy Court and the Reorganized Debtors' and the Creditor Trust's rights to commence, prosecute, or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date, subject

to the terms of Section 7.2 of the Plan, the Confirmation Order and any contract, instrument, release, indenture, or other agreement entered into in connection therewith.  Except as otherwise provided in the Plan, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan.  On and after the Effective Date, the Reorganized Debtors (with respect to the Retained Causes of Action and any Causes of Action arising after the Petition Date) and the Creditor Trust (with respect to the Litigation Assets) will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Reorganized Debtors, or the Creditor Trust Administrator, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person on or before the Effective Date (including the Company Released Causes of Action and otherwise), the Debtors, the Reorganized Debtors, and the Creditor Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors (with respect to the Retained Causes of Action and any Causes of Action arising after the Petition Date) and the Creditor Trust (with respect to the Litigation Assets) expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of the Confirmation, or effectiveness of the Plan.

Notwithstanding anything contained in Section 7.5(a) or (b) of the Plan, the Reorganized Debtors shall be prohibited from commencing or prosecuting any Retained Cause of Action other than the RCAP Holdings Setoff Cause of Action against any Retained Cause of Action Party other than for setoff or defensive purposes in any suit or action commenced against any Reorganized Debtor by any Retained Cause of Action Party.

## 41.    Disallowed Claims.

All Claims held by Persons against whom or which a proceeding asserting an Avoidance Action has been commenced (whether before or after the Effective Date) will be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code.  Claims that are deemed disallowed pursuant to Section 7.7 of the Plan will continue to be disallowed for all purposes until the Avoidance Action against such Person has been settled or resolved by Final Order and any sums due from such Person have been paid to the appropriate party.

### 42.    Post-Effective Date Claims and Amendments to Claims.

On or after the Effective Date, (i) a Claim, other than an Unsecured Claim, may not be filed or amended without prior approval by the Bankruptcy Court or prior written authorization from the Reorganized Debtors, and (ii) an Unsecured Claim may not be filed or amended without prior approval of the Bankruptcy Court or prior written authorization of the Creditor Trust Administrator.  Any such new or amended Claim filed without prior written authorization or Bankruptcy Court approval will be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.  Any Claims filed after the applicable Claims Bar Date, including, without limitation, any bar date established under the Plan or the Confirmation Order, will be deemed disallowed and expunged in their entirety without further notice to or action, order, or approval of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors, or the Creditor Trust Administrator unless the person or entity wishing to file such untimely Claim has received Bankruptcy Court authority to do so.

**4.3**    *Means for Implementation of the Plan.*

(a)    <u>**Restructuring Transactions**</u>.

On or as of the Effective Date, the Distributions provided for under the Plan will be effectuated pursuant to the following transactions:

1.    the Debtors will transfer the Creditor Trust Assets to the Creditor Trust pursuant to Sections 5.17(b) and (c) of the Plan free and clear of all liens, Claims, encumbrances and Interests, and the Creditor Trust Assets will vest in the Creditor Trust as of the Effective Date;

2.    pursuant to Section 5.17(a) of the Plan, the Debtors will issue and the Creditor Trust Administrator will distribute (i) the Class A Units to holders of Allowed General Unsecured Claims, and (ii) the Class B Units to holders of the Allowed Second Lien Deficiency Claims;

3.    all Holdings Equity Interests will be cancelled, discharged, and of no further force or effect and any right of any holder of Holdings Equity Interests in respect thereof, including any Claim related thereto, will be deemed cancelled, discharged and of no force or effect,

4.    subject to Section 5.1(b) of the Plan, Reorganized Holdings shall issue (i) 38.75% of the Reorganized Holdings Equity Interests Pro Rata to the holders of Allowed First Lien Claims (ii) 38.75% of the Reorganized Holdings Equity Interests Pro Rata to the holders of Allowed Second Lien Claims, (iii) 13.5% of the Reorganized Holdings Equity Interests to the parties entitled to the Exit Base Discount pursuant to Section 5.14 of the Plan, (iv) 4.0% of the Reorganized Holdings Equity Interests to the parties entitled to the Backstop Exit Discount and (v) 5.0% of the Reorganized

Holdings Equity Interest will be held in reserve to be distributed in accordance with the Management Incentive Plan as determined by the new board of Reorganized Holdings;

5. Reorganized Holdings will issue the New Warrants in accordance with the terms and conditions of the New Warrant Agreement;

6. each certificate representing share(s) of Reorganized Holdings Equity Interests will bear a legend indicating that the Reorganized Holdings Equity Interests are subject to the terms and conditions of the New Corporate Governance Documents and/or the Shareholders' Agreement, as applicable;

7. subject to Section 5.1(b) of the Plan, (i) Reorganized Holdings will continue to own, directly or indirectly, the Interests in its remaining subsidiaries other than the Dissolving Debtors, and (ii) except as otherwise provided therein (including, but not limited to, as provided in Section 5.2 of the Plan), the property of each Debtor's Estate will vest in the applicable Reorganized Debtor free and clear of all liens, Claims, encumbrances and Interests;

8. the Reorganized Debtors will incur the obligations under the Exit Credit Documents and the New Second Lien Credit Documents; and

9. the releases, exculpations and injunctions provided for in the Plan, which are an essential element of Debtors' restructuring transactions, will become effective.

In addition to, or instead of the foregoing transactions, the Debtors or the Reorganized Debtors, subject to the prior written consent of the Required Consenting Lenders, and to the extent set forth in the RSA or Plan, Luxor, may cause any of the Debtors or the Reorganized Debtors to engage in additional corporate restructuring transactions necessary or appropriate for the purposes of implementing the Plan, including, without limitation, converting corporate entities into limited liability companies, forming new entities within the corporate organizational structure of the Debtors or Reorganized Debtors, cancelling the existing equity at another of the Debtor entities and issuing new equity therefrom, consolidating, reorganizing, restructuring, merging, dissolving, liquidating or transferring assets between or among the Debtors and the Reorganized Debtors, including Reorganized Holdings. The actions to effect these transactions may include (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable Persons may agree; (b) on terms consistent with the terms of the Plan and having such other terms to which the applicable Persons may agree, the execution and delivery of appropriate instruments of transfer, conversion, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation; (c) pursuant to applicable state law, the filing of appropriate certificates or articles of merger, consolidation, conversion, dissolution, or change in corporate

form; and (d) the taking of all other actions that the applicable Persons determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns.

The Effective Date will occur, and the Transactions contemplated by Section 5 of the Plan will be consummated, simultaneously with and subject to the occurrence of (i) the "Effective Date" and consummation of the restructuring transactions contemplated by the Prepackaged Plan and (ii) the RIA Release.

(b)    **Transfer of Assets and Dissolution of Dissolving Debtors**.

Except as otherwise provided in the Plan, all assets, other than Creditor Trust Assets, of each of the Dissolving Debtors will be transferred to Reorganized Holdings free and clear of all Liens, Claims, mortgages, options, rights, encumbrances and interests of any kind or nature whatsoever and will vest in Reorganized Holdings as of the Effective Date. Subject to the Restructuring Transactions, as soon as practicable after the transfer of assets pursuant to the immediately preceding sentence, each of the Dissolving Debtors will be dissolved upon the filing of appropriate certificates of dissolution with the appropriate governmental authorities under applicable law, and all agreements, instruments, and other documents evidencing any equity Interest in any of the Dissolving Debtors, and any right of any holder of such equity Interest in respect thereof, including any Claim related thereto, will be deemed cancelled, discharged and of no force or effect.

(c)    **Corporate Governance**.

On the Effective Date, Reorganized Holdings will adopt the New Corporate Governance Documents in form and substance acceptable to the Required Consenting Lenders. The certificates of incorporation and bylaws or other organizational documents of the subsidiaries of Reorganized Holdings, as of the Effective Date, will be amended and restated or otherwise modified to be consistent in substance with the New Corporate Governance Documents and otherwise reasonably acceptable to the Required Consenting Lenders.

(d)    **Shareholders' Agreement; New Warrant Agreement**.

The Required Consenting Lenders, in their reasonable discretion, may determine to set forth certain rights and obligations concerning the Reorganized Holdings Equity Interests in the Shareholders' Agreement (which, for the avoidance of doubt, might be a limited company liability agreement), in lieu of providing such rights and obligations in the New Corporate Governance Documents, in which case such Shareholders' Agreement, if any, will become effective as of the Effective Date and be binding on all holders of Reorganized Holdings Equity Interests; provided that each recipient of Reorganized Holdings Equity Interests must sign the Shareholders' Agreement prior to receiving any Reorganized Holdings Equity Interests. The New Corporate Governance Documents and/or the Shareholders' Agreement will provide that the holders of Reorganized Holdings Equity Interests shall be subject to confidentiality obligations, restrictions against transfer to competitors, and restrictions against transfer that would result in the Company becoming subject to reporting requirements of section 12 or 15 of

the Securities Exchange Act of 1934, as amended. Each holder of Reorganized Holdings Equity Interests will be deemed to be bound to the terms of the Shareholders' Agreement from and after the Effective Date even if not a signatory thereto. To the extent that within six (6) months of the Effective Date, any Reorganized Holdings Equity Interests are not distributed pursuant to the Plan as a result of such holder failing to sign the Shareholders' Agreement, such Reorganized Holdings Equity Interests will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

As a condition to the issuance of the New Warrants, each party entitled to a Distribution of New Warrants under the Plan shall take any and all actions necessary to be bound by the New Warrant Agreement. The New Warrant Agreement shall provide that the holders of New Warrants shall be subject to confidentiality obligations, restrictions against transfer to competitors, and restrictions against transfer that would result in the Company becoming subject to the reporting requirements of sections 12 or 15 of the Securities Exchange Act of 1934, as amended.

(e)        **Corporate Action**.

Upon the Effective Date, all matters provided for in the Plan that would otherwise require approval of the members, managers, stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) adoption or assumption, as applicable, of any Executory Contracts or Unexpired Leases, (ii) selection of the managers, directors and officers, as appropriate, for the Reorganized Debtors, (iii) the Distribution of the Reorganized Holdings Equity Interests and the New Warrants, and (iv) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date) will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to the applicable general corporation or other applicable law of the states in which the Debtors and the Reorganized Debtors are organized, including, without limitation, Section 303 of the Delaware General Corporation Law, without any requirement of further action by the members, managers, stockholders or directors of the Debtors or the Reorganized Debtors.

On or (as applicable) prior to the Effective Date, the appropriate officers of each respective Debtor or Reorganized Debtor (including, any vice-president, president, chief executive officer, treasurer or chief financial officer of any of the foregoing), as applicable, will be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the applicable Debtor or Reorganized Debtor, including (i) the organizational documents of the applicable Reorganized Debtor, which will include, to the extent required by section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, and (ii) any and all other agreements, documents, securities and instruments relating to the foregoing. The secretary or assistant secretary of the appropriate Debtor or Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions. The authorizations and approvals contemplated by Section 5.5 of the Plan will be effective notwithstanding any requirements under nonbankruptcy law.

(f)      **Continued Corporate Existence of Reorganized Debtors**.

Except as provided for in the Plan (including with respect to the Debtors' right or obligation to cause any of the Debtors to engage in additional corporate restructuring transactions necessary or appropriate for the purposes of implementing the Plan pursuant to Section 5.1 of the Plan), each of the Reorganized Debtors will continue to exist after the Effective Date with all powers of a corporation or other legal entity, as applicable, under the applicable state laws and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law.  The Reorganized Debtors, as applicable, may pay fees and expenses of their professionals incurred after the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

Except as provided in Section 7.1 of the Plan with respect to General Unsecured Claims, the Reorganized Debtors will be responsible for all claims administration with respect to all Claims for which final Distributions are not made on the Effective Date.  Except as otherwise set forth in the Plan, all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Other Secured Claims (if paid in Cash) against any Debtor will be paid by the Reorganized Debtor that is the successor to the Debtor that is the obligor with respect to such Allowed Claim.

(g)      **Payment of Certain Fees and Expenses**.

Notwithstanding any provision in the Plan to the contrary, on the Effective Date or as soon thereafter as agreed to by the Debtors and the Required Consenting Lenders, the Debtors or the Reorganized Debtors, as applicable, will promptly pay in full in Cash, to the extent not already paid during the course of the Chapter 11 Cases as required by the RSA and DIP Order, (i) the reasonable fees and out-of-pocket expenses incurred by the First Lien Agent, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses of Shearman & Sterling LLP and Richards, Layton & Finger, PA, (ii) the reasonable fees and out-of-pocket expenses incurred by the Required Consenting First Lien Lenders, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses of Jones Day, Houlihan Lokey, Inc. and Morris, Nichols, Arsht & Tunnell LLP, (iii) the reasonable fees and out-of-pocket expenses incurred by the Second Lien Agent, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses of Covington & Burling LLP and Fox Rothschild LLP, (iv) the reasonable fees and out-of-pocket expenses incurred by the Required Consenting Second Lien Lenders, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses of Davis Polk & Wardwell LLP, GLC Advisors & Co., LLC and Landis Rath & Cobb LLP, (v) the reasonable fees and out-of-pocket expenses incurred by Luxor, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses of Kramer Levin Naftalis & Frankel LLP and local Delaware counsel, and (vi) the reasonable fees and out-of-pocket expenses incurred by the Convertible Notes Indenture Trustee, and each of the foregoing parties' respective Affiliates, in each case, (i) in connection with the preparation, negotiation, and documentation evidencing and relating to the restructuring of the Debtors pursuant to the Plan, and (ii) without the need of such parties to file fee applications with the Bankruptcy Court; provided that each party and its counsel will provide the Debtors' counsel with summary invoices (redacted for any potentially privileged material) (or such other documentation as the Debtors may reasonably request) for which it seeks payment on a monthly basis and provided that the Debtors have no objection to such fees, such fees will be paid within five (5) Business Days of receipt of such invoices. To the extent that the Debtors object to any of the fees and expenses of the parties listed in (i)-(v) above, the Debtors will not be required to pay any disputed portion of such fees and expenses until a resolution of such objection is agreed to by the Debtors and such party, balance paid or an order of the Bankruptcy Court upon a motion by such party.

(h)        **Cancellation of Agreements and Securities**.

Except (i) for purposes of evidencing a right to a Distribution under the Plan, (ii) with respect to Executory Contracts or Unexpired Leases assumed by the Debtors, or (iii) as otherwise provided in the Plan, all the agreements and other documents evidencing the Claims, Interests or rights of any holder of an Impaired Claim or prepetition Interest under the Plan will be cancelled on the Effective Date; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, any such Convertible Notes Indenture or intercreditor agreement or document that governs the rights of the holder of a Claim, including the First Lien Credit Agreement, the Second Lien Credit Agreement, the Intercreditor Agreement and the Convertible Notes Indenture, will continue in effect solely for the purposes of (a) with respect to the First Lien Credit Agreement and the Second Lien Credit Agreement, any obligations thereunder governing the relationship between (i) the First Lien Agent and the First Lien Lenders and (ii) the Second Lien Agent and the Second Lien Lenders (including, but not limited to those provisions relating to the rights of the First Lien Agent or Second Lien Agent to expense reimbursement, indemnification and similar amounts) or that may survive termination or maturity of the First Lien Facility or Second Lien Facility in accordance with the terms thereof, and (b) with respect to the Convertible Notes Indenture, any obligations governing the relationship between the Convertible Notes Indenture Trustee and the holders of Convertible Note Claims (including but not limited to those provisions relating to the Convertible Notes Indenture Trustee's rights to expense reimbursement, indemnification and similar amounts) or that may survive termination or maturity of the Convertible Notes Indenture, and with respect to all of the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Convertible Notes Indenture, (x) allowing holders of the First Lien Claims, Second Lien Claims, and Convertible Note Claims, respectively to receive Distributions under the Plan, (y) allowing the First Lien Agent, the Second Lien Agent, and the Convertible Notes Indenture Trustee, respectively to make Distributions under the Plan to the extent provided in the Plan, and (z) allowing the First Lien Agent, the Second Lien Agent, and Convertible Notes Indenture Trustee to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Convertible Notes Indenture, respectively, and the Plan, including, without limitation, through the exercise of any charging lien; provided further, however, that the preceding proviso will not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, except to the extent set forth in or provided for under the Plan.  On and after the Effective Date, all duties and responsibilities of the First Lien Agent, the Second Lien Agent, and the Convertible Notes Indenture Trustee with respect to the Debtors under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Convertible Notes Indenture, respectively, will be discharged except to the extent required in order to effectuate the Plan. Notwithstanding the foregoing, the Plan will not impair or alter the rights of the DIP Secured Parties, the First Lien Secured Parties or the Second Lien Secured Parties with respect to any liens or security interests they hold in property of Non-Debtor Guarantors.

(i)      **Directors and Officers of the Reorganized Debtors**.

On the Effective Date, the term of each member of the current board of directors of each Debtor will automatically expire.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial officers of each of the Reorganized Debtors will consist of the officers of such Debtor immediately prior to the

Effective Date and the initial board of directors of each of the Reorganized Debtors will consist of Holdings' Chief Executive Officer, three (3) members selected by the Required Consenting First Lien Lenders and three (3) members selected by the Required Consenting Second Lien Lenders; provided, however, that one (1) of the members selected by the Required Consenting Second Lien Lenders shall be subject to the consent of the Required Consenting First Lien Lenders. The identities of the initial directors and the nature and amount of compensation for any member of the new board who is an "insider" under section 101(31) of the Bankruptcy Code will be disclosed in the Plan Supplement.

(j)      **Obligations to Insure and Indemnify Prepetition and Postpetition Directors, Officers and Employees**.

Any and all directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan. Each insurance carrier under such policies will continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date. The Reorganized Debtors will obtain insurance policies for run-off coverage for directors and officers liability, errors and omissions liability, employment practices liability, and fiduciary liability with respect to the Debtors' directors and officers on the terms attached hereto as **Exhibit 7**.

The obligations of each Debtor or Reorganized Debtor to indemnify any Released Party who is serving or served as one of its directors, officers or employees on or as of the Petition Date by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

(k)      **Sources of Consideration for Plan Distributions**.

Except as otherwise provided in the Plan or the Confirmation Order, all funds necessary to make Distributions pursuant to the Plan will be obtained from the Cash balances of the Debtors or the Reorganized Debtors on the Effective Date or such subsequent dates on which Distributions are payable and loan proceeds from the Exit Facility.

(l)      **Limited Substantive Consolidation for Voting and Distribution**.

The Debtors will be substantively consolidated for the limited purposes of voting on the Plan and Distributions provided for under the Plan as provided therein. The Debtors will not be substantively consolidated for any other purpose. The Plan will serve as, and will be deemed to be, to the extent necessary, a motion for the substantive consolidation to the extent provided for in the Plan. Consolidation pursuant to Section 5.12 of the Plan will not affect: (i) the legal and

corporate structures of the Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and Unexpired Leases that have been or will be assumed by the Debtors or (b) pursuant to the Plan (including with respect to Reinstated Claims); (iii) Intercompany Interests; (iv) distributions from any insurance policies or proceeds of such policies; or (v) the revesting of assets in the separate Reorganized Debtors. In addition, such consolidation will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

In the event that the Bankruptcy Court does not order limited substantive consolidation of the Debtors, then except as specifically set forth in the Plan: (1) nothing in the Plan or this Disclosure Statement will constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor; (2) Claims against multiple Debtors will be treated as separate Claims with respect to each Debtor's Estate for all purposes (including distributions and voting), and such Claims will be administered as provided in the Plan; and (3) the Debtors will not be required to re-solicit votes with respect to the Plan, nor will the failure of the Bankruptcy Court to approve limited substantive consolidation of the Debtors alter the distributions set forth in the Plan; provided that a holder's (a) vote to accept or reject the Plan; (b) presumed acceptance of the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (c) deemed rejection of the Plan pursuant to section 1126(g) may be deemed a vote to accept or reject an applicable subplan (as the case may be) to the extent that such subplan does not provide such holder with less favorable treatment than such holder would have received if the Bankruptcy Court had ordered limited substantive consolidation as set forth therein.

(m)        **Solicitation of Debtors**.

Notwithstanding anything to the contrary in the Plan, each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of an Intercompany Claim or Intercompany Interest will not be solicited for voting purposes, and such Debtor will be deemed to have voted to accept or reject the Plan, as the case may be.

(n)        **Exit Facility.**

On the Effective Date, the Reorganized Debtors will enter into the Exit Credit Agreement, a copy of which will be filed as part of the Plan Supplement, and make distributions to each Exit Facility Lender and Backstop Party in accordance with the procedures in the Exit Credit Documents. The Confirmation Order will provide for approval of the Exit Facility (including the transactions contemplated thereby) and authorization for the Reorganized Debtors to enter into and execute the Exit Credit Documents, distribute the Exit Backstop Discount, and distribute the Exit Base Discount without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.

The proceeds of the Exit Facility will be used to (i) repay (or be deemed to repay) in full all amounts outstanding under the DIP Facility substantially concurrently with the funding of the loans under the Exit Facility; (ii) fund distributions under the Plan, including the funding of the Creditor Trust, to the extent necessary; (iii) pay all Allowed General Administrative Claims,

Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Convenience Class Claims; and (iv) provide sufficient working capital to the Reorganized Debtors and their subsidiaries.

(o)    **New Second Lien Facility.**

On the Effective Date, the Reorganized Debtors will enter into the New Second Lien Credit Agreement, a copy of which will be filed as part of the Plan Supplement.  The Confirmation Order will provide for approval of the New Second Lien Facility (including the transactions contemplated thereby) and authorization for the Reorganized Debtors to enter into and execute the New Second Lien Credit Documents without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.

(p)    **Creditor Trust.**

*Establishment of Creditor Trust*.  On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, will execute the Creditor Trust Agreement and take all other necessary steps to establish the Creditor Trust and issue the Class A Units to holders of Allowed General Unsecured Claims, and the Class B Units to holders of the Allowed Second Lien Deficiency Claims.  In the event of any conflict between the terms of the Plan and the terms of the Creditor Trust Agreement, the terms of the Creditor Trust Agreement will govern.  Any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Litigation Assets shall be transferred to the Creditor Trust and shall vest in the Creditor Trust Administrator and its representatives.  The Debtors or the Reorganized Debtors, as the case may be, and the Creditor Trust Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges.  The Confirmation Order shall provide that the Creditor Trust Administrator's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates.

*Purpose of the Creditor Trust*.  The Creditor Trust shall be established for the sole purpose of making distributions of Cash constituting Distributable Creditor Assets; making distributions of New Warrants or New Warrant Proceeds; prosecuting the Litigation Assets and making distributions of Distributable Litigation Asset Proceeds received in respect thereof; and reconciling (and, if appropriate, objecting to or settling) General Unsecured Claims, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

*Funding Expenses of the Creditor Trust*.  The Creditor Trust Administrator may, in its discretion, establish and fund the Creditor Trust Administrative Expense Reserve in accordance with the Creditor Trust Agreement for purposes of funding the Creditor Trust Costs and the Creditor Trust Liabilities.  After the transfer of the Creditor Trust Assets to the Creditor Trust, none of the Debtors or Reorganized Debtors will have any further obligation to provide any funding with respect to the Creditor Trust.

*Transfer of Assets*.  As of the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, the Non-RCS Affiliates, and the Registered Investment Advisors will assign

and transfer to the Creditor Trust all of their rights, title and interest in and to the Creditor Trust Assets and the RIA Causes of Action, as applicable, for the benefit of the holders of Allowed General Unsecured Claims (whether Allowed on or after the Effective Date) and, except with respect to the Creditor Assets, the holders of Allowed Second Lien Deficiency Claims.  Each such transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and will be free and clear of any liens, claims and encumbrances, and no other entity, including the Debtors or Reorganized Debtors (other than as provided for in the Creditor Trust Distribution Schedule), will have any interest, legal, beneficial, or otherwise, in the Creditor Trust or the Creditor Trust Assets upon their assignment and transfer to the Creditor Trust (other than as provided in the Plan or in the Creditor Trust Agreement).  To the extent that any Creditor Trust Assets cannot be transferred to the Creditor Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Creditor Trust Assets will be deemed to have been retained by the Reorganized Debtors and the Creditor Trust Administrator will be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Creditor Trust Assets on behalf of the Reorganized Debtors.  Notwithstanding the foregoing, all net proceeds of such Creditor Trust Assets will be transferred to the Creditor Trust to be distributed in accordance with the Plan.

*Trust Implementation.*  On the Effective Date, the Creditor Trust shall be established and become effective for the benefit of the holders of Class A Units and Class B Units.  The Creditor Trust shall be governed by the Creditor Trust Agreement and administered by the Creditor Trust Administrator at the direction of the Creditor Trust Board.  All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Creditor Trust Administrator, and holders of Allowed Second Lien Deficiency Claims, and Allowed General Unsecured Claims) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Creditor Trust.

*Appointment of the Creditor Trust Administrator.*  The operations of the Creditor Trust will be conducted by the Creditor Trust Administrator, who will be acceptable to Luxor and the Debtors, identified prior to the approval of the Disclosure Statement, and approved in connection with confirmation of the Plan.  In the event the Creditor Trust Administrator dies, is terminated, or resigns for any reason, a successor will be designated by the Creditor Trust Board.

*Retention of Professionals by the Creditor Trust Administrator.* The Creditor Trust Administrator may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Creditor Trust Administrator on such terms as the Creditor Trust Administrator deems appropriate, without Bankruptcy Court approval, subject to the prior approval of the Creditor Trust Board, and provided that any liabilities or obligations incurred in connection with such retentions shall be Creditor Trust Costs satisfied from the Creditor Trust Assets.

*Fiduciary Duties; Exculpation and Indemnification.* The Creditor Trust Board and the Creditor Trust Administrator will each act in a fiduciary capacity on behalf of the Creditor Trust and all holders of Creditor Trust Units. The Creditor Trust Agreement will provide that the Creditor Trust Board and the Creditor Trust Administrator will each be indemnified and

exculpated by the Creditor Trust, except for gross negligence and willful misconduct. The Creditor Trust will obtain customary insurance for the benefit of the Creditor Trust Board and the Creditor Trust Administrator.

*Compensation of the Creditor Trust Administrator.* The terms of the Creditor Trust Administrator's employment, including the Creditor Trust Administrator's duties and compensation, to the extent not set forth in the Plan, will be as determined by the Creditor Trust Board. The compensation of the Creditor Trust Administrator will be reasonable and customary, and will constitute a Creditor Trust Cost to be paid from the Creditor Trust Assets.

*The Creditor Trust Board.*

The Creditor Trust Administrator will take direction from the "Creditor Trust Board," which shall initially consist of one (1) trustee selected by Luxor, one (1) trustee selected by the Convertible Notes Indenture Trustee, one (1) trustee selected by the Committee, if appointed in the Chapter 11 Cases, and if an official committee is not appointed, then by Luxor.  The identity of the individuals serving (or if applicable to be nominated to serve) on the Creditor Trust Board will be set forth in the Plan Supplement.  Any vacancy on the Creditor Trust Board shall be filled as provided in the Creditor Trust Agreement.

Any fees and expenses of individuals serving on the Creditor Trust Board shall be Creditor Trust Costs.

In all circumstances, the Creditor Trust Board shall act in the best interests of all holders of Trust Units and in furtherance of the purpose of the Creditor Trust.

*Litigation; Responsibilities of Creditor Trust Administrator.*  In furtherance of and consistent with the purpose of the Creditor Trust and the Plan, the Creditor Trust Administrator, upon direction by the Creditor Trust Board and in the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Assets, make timely distributions, and not unduly prolong the duration of the Creditor Trust.  The Creditor Trust Administrator shall have the power to (i) prosecute for the benefit of the Creditor Trust all Litigation Assets (whether such Litigation Assets are brought in the name of the Creditor Trust or otherwise) and (ii) otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Creditor Trust Administrator pursuant to the Plan.  The liquidation of the Creditor Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all Litigation Assets.  The Creditor Trust Administrator, upon direction by the Creditor Trust Board, shall have the absolute right to pursue or not to pursue any and all Litigation Assets as it determines is in the best interests of the holders of Trust Units, and consistent with the purposes of the Creditor Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence.  The Creditor Trust Administrator may incur any reasonable and necessary expenses in liquidating and converting the Creditor Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Creditor Trust Agreement.  Any and all proceeds generated from the Creditor Trust Assets shall be the property of the Creditor Trust.

73

*Cooperation of Reorganized Debtors*. The Reorganized Debtors will (i) cooperate with the Creditor Trust with respect to the transfer to the Creditor Trust of the Litigation Assets and the channeling to the Creditor Trust of all General Unsecured Claims, including by providing copies of all books and records of the Reorganized Debtors in connection therewith, and (ii) will reasonably cooperate with the Creditor Trust as reasonably requested regarding the Litigation Assets, including by providing documentation, access to employees for interviews and testimony and/or other evidence. Such cooperation will be without charge to the Creditor Trust, except that the Creditor Trust will reimburse the Reorganized Debtors for their reasonable out-of-pocket expenses.

*Registry of Beneficial Interests*. Trust Units will be issued in registered form, without certificates, on the books and records of the registrar for the Trust Units. The Creditor Trust Administrator will serve as the initial registrar. Trust Units will be deemed issued under Section 1145 of the Bankruptcy Code and will be freely transferable, except that affiliates of the Creditor Trust will be subject to restrictions on transfer under applicable securities law. The Creditor Trust Agreement will contain customary limitations such that the Creditor Trust will not become subject to the reporting requirements of the Securities Exchange Act of 1934 or the provisions of the Investment Company Act of 1940.

*Investment Powers*. The rights and powers of the Creditor Trust Administrator to invest the Creditor Trust Assets, the proceeds thereof, or any income earned by the Creditor Trust shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 6.11 of the Plan) only in Cash and Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; provided, however, that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and (b) the Creditor Trust Administrator may expend the assets of the Creditor Trust (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Creditor Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Creditor Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Creditor Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Creditor Trust Agreement.

*Valuation of Assets*. As soon as reasonably practicable after the creation of the Creditor Trust, the Creditor Trust Administrator will make a good faith determination of the value of the assets transferred to the Creditor Trust, and the Creditor Trust Administrator will apprise the holders of Trust Units of such valuation. The valuation will be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Creditor Trust Administrator, and the holders of the Trust Units) for all federal income tax purposes.

*Tax Treatment; Reporting Duties*.

Creditor Trust Assets Treated as Owned by Creditors. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Reorganized Debtors, the

Creditor Trust Administrator, and the beneficiaries of the Creditor Trust) will treat the transfer of the Creditor Trust Assets to the Creditor Trust for the benefit of the beneficiaries of the Creditor Trust, whether their Claims are Allowed on or after the Effective Date, as (a) a transfer of the Creditor Trust Assets directly to those holders of Allowed Claims receiving Trust Units (other than to the extent allocable to Disputed Claims), followed by (b) the transfer by such Persons to the Creditor Trust of the Creditor Trust Assets in exchange for beneficial interests in the Creditor Trust (and in respect of the Creditor Trust Assets allocable to the CT Disputed Claims Reserve, as a transfer by the relevant Debtors to the CT Disputed Claims Reserve). Accordingly, those holders of Allowed Claims receiving Trust Units will be treated for federal income tax purposes as the grantors and owners of their respective shares of the Creditor Trust Assets (other than Creditor Trust Assets that are allocable to the CT Disputed Claims Reserve or, to the extent set forth in the Creditor Trust Agreement, in respect of the interest retained by Reorganized Holdings in accordance with the Creditor Trust Distribution Schedule). The foregoing treatment also will apply, to the extent permitted by applicable law, for state and local income tax purposes.

*Tax Reporting*.

The Creditor Trust Administrator will file returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 11.9(a)(ii) of the Plan.

Allocations of Creditor Trust taxable income among the holders of the Creditor Trust Units will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Creditor Trust had distributed all of its other assets (valued at their tax book value) to the holders of the Creditor Trust Units, in each case up to the tax book value of the assets treated as contributed by such holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Creditor Trust. Similarly, taxable loss of the Creditor Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Creditor Trust Assets. The tax book value of the Creditor Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, and applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.

The Creditor Trust Administrator will be responsible for payments, out of the Trust Assets, of any taxes imposed on the Creditor Trust or its assets.

The Creditor Trust Administrator may request an expedited determination of taxes of the Creditor Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

The Creditor Trust shall (i) treat the CT Disputed Claims Reserve as a "disputed

ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election, (ii) file such tax returns and pay such taxes as may be required consistent with such treatment, and (iii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

*Dissolution*.  The Creditor Trust Administrator, the Creditor Trust Board, and the Creditor Trust will be discharged or dissolved, as the case may be, at such time as (i) the Creditor Trust Administrator, at the direction of the Creditor Trust Board, determines that the pursuit of additional Litigation Assets is not likely to yield sufficient additional Litigation Asset Proceeds to justify further pursuit of such claims and (ii) all distributions of assets, including New Warrants, New Warrant Proceeds, and Litigation Asset Proceeds required to be made by the Creditor Trust under the Plan and the Creditor Trust Agreement have been made, but in no event will the Creditor Trust be dissolved later than five (5) years from the Effective Date unless, on or prior to the date that is ninety (90) days prior to such fifth (5th) anniversary (and, in the event of further extension, at least (90) days prior to the end of the preceding extension), the Bankruptcy Court, upon motion determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Creditor Trust Assets.

*Net Creditor Trust Recovery*.  Notwithstanding anything contained in the Plan to the contrary, in the event that a defendant in a litigation brought by the Creditor Trust Administrator for and on behalf of the Creditor Trust (i) is required by a Final Order to make payment to the Creditor Trust (the "**Judgment Amount**") and (ii) is permitted by a Final Order to setoff under sections 553, 555, 556, 559, 560, and 561 of the Bankruptcy Code or applicable non-bankruptcy law against the Judgment Amount (a "**Valid Setoff**"), (y) such defendant will be obligated to pay only the excess, if any, of the amount of the Judgment Amount over the Valid Setoff and (z) none of the Creditor Trust or the holders or beneficiaries of the Creditor Trust Units will be entitled to assert a claim against the Debtors or the Reorganized Debtors with respect to the Valid Setoff.

(q)      **Management Incentive Plan**

On the Effective Date, 5.0% of the Reorganized Holdings Equity Interests will be reserved for distribution to members of management of Reorganized RCS in accordance with the Management Incentive Plan, the terms of which shall be developed by the Board of Reorganized RCS.  Any Reorganized Holdings Equity Interests provided to management in excess of the reserved 5.0% will dilute all holders of Reorganized Holdings Equity Interests pro rata.

(r)      **Retention Program**

On the Effective Date, Reorganized RCS will adopt the Retention Program.  Consistent with industry practice, retention loans will be provided under the Retention Program to the independent financial advisors engaged in the Independent Retail Advice business in a proactive

effort to keep the Debtors' network of financial advisors intact.  Most of the Debtors' enterprise value is generated through the Independent Retail Advice business, and the maintenance and growth of that business depends upon its financial advisor network.

(s)    **Indemnity**

As set forth in the Indemnification Agreement, Reorganized Holdings and its subsidiaries who are guarantors under the DIP Facility will indemnify the Indemnified Parties in connection with certain actions taken by the First Lien Agent and the Second Lien Agent (in their capacities as such) prior to the Effective Date in order to implement the restructuring of the Debtors and the restructuring of the Non-Debtor Guarantors and the other transactions contemplated by the Plan and the Restructuring Support Agreement.  The indemnity set forth in the Indemnification Agreement (including, without limitation, any rights and Claims thereunder) (i) is in addition to, and not in lieu of, all other rights of the Indemnified Parties under the First Lien Credit Agreement, the Second Lien Credit Agreement, each Loan Document (as defined in the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable), the Restructuring Support Agreement, the RSA Assumption Order, the DIP Facility, DIP Order, the Plan, the Prepackaged Plan, the Confirmation Order or an order confirming the Prepackaged Plan, including all rights to assert a General Administrative Claim in the Chapter 11 Cases or the chapter 11 cases of the Non-RCS Affiliates and (ii) shall not be released, discharged or dischargeable by the Plan, the Prepackaged Plan, the Confirmation Order or any order confirming the Prepackaged Plan.

(t)    **D&O Tail Policy**.

The Reorganized Debtors shall maintain one or more insurance policies reasonably acceptable to the Required Consenting Lenders that provides run-off coverage for prepetition directors and officers of the Debtors on the terms set forth on **Exhibit 7** hereto.

**4.4    *Executory Contracts and Unexpired Leases.***

(a)    **Debtors' Executory Contracts and Unexpired Leases**.

Pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code, all Executory Contracts and Unexpired Leases will be deemed assumed as of the Effective Date, other than any Executory Contract or Unexpired Lease that: (i) has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date; (ii) as to which a motion for approval of the rejection of such Executory Contract or Unexpired Lease has been filed and served prior to the Confirmation Date and remains pending before the Bankruptcy Court on such date; or (iii) that is specifically designated as an Executory Contract or Unexpired Lease to be rejected on the "**Schedule of Rejected Executory Contracts and Unexpired Leases**" to be included in the Plan Supplement, which will be in form and substance acceptable to the Debtors and the Required Consenting Lenders; provided, however, notwithstanding anything to the contrary in the Plan, that the Debtors shall have the right, on or prior to the Effective Date, with the prior written consent of the Required Consenting Lenders, to amend the Schedule of Rejected Executory Contracts and Unexpired Leases to delete any Executory Contract or Unexpired Lease therefrom or add any Executory

Contract or Unexpired Lease thereto, in which event such Executory Contract or Unexpired Lease will be deemed to be, respectively, assumed or rejected.  The Debtors will provide notice of any amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to such contracts that are affected thereby.  The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases will not constitute an admission by the Debtors that such document is an Executory Contract or an Unexpired Lease or that the Debtors have any liability thereunder.

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to Section 8.1 of the Plan; and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases assumed pursuant to Section 8.1 of the Plan.

(b)        **Cure of Defaults**.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to Section 8.1 of the Plan, the Debtors will, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, not later than twenty-one (21) days before the Confirmation Hearing, File and serve a pleading with the Bankruptcy Court listing the amounts of any Cure Claims for each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan.  The counterparties to such Executory Contracts and Unexpired Leases to be assumed will have until seven (7) days prior to the Confirmation Hearing to object to the amounts of the Cure Claims listed by the applicable Debtor seeking assumption or assumption and assignment.  If there are any objections filed, the Bankruptcy Court may hold a hearing, which may be the Confirmation Hearing, to determine such Cure Claim amounts or other issues pertaining to the assumption or assumption and assignment of such Executory Contract or Unexpired Lease.  Until the Effective Date, the Debtors, subject to the prior written consent of the Required Consenting Lenders, will retain the right to reject any of the Executory Contracts or Unexpired Leases, including such contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults.  Any party that fails to object to the applicable Cure Claims for each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan shall be forever barred, estopped and enjoined from disputing the Cure Claim and/or from asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the pleading filed by the Debtors.

The Reorganized Debtors will be responsible for the payment of any Cure Claims due under section 365 of the Bankruptcy Code with respect to the Executory Contracts and Unexpired Leases assumed by the Debtors.  Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contracts and Unexpired Leases assumed by the Debtors, any Cure Claims with respect to the Executory Contracts and Unexpired Leases assumed by the Debtors shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the amount of the Cure Claim in Cash on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute

relating to such Cure Amount has been resolved (either consensually or through judicial decision).

In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Claim; (ii) the ability of the applicable Reorganized Debtor or third party to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned under the Plan; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption and assumption and assignment, as applicable. To the extent a Cure Dispute relates solely to the Cure Claim, the applicable Debtor may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Reorganized Debtors). To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable Executory Contract or Unexpired Lease after such determination.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such executory contract or unexpired lease. Any proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to, or action of, the Bankruptcy Court or any other party.

(c)        **Bar Date for Rejection Claims and Turnover of Security**.

Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection (which may be the Confirmation Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 8.2(a) of the Plan, or pursuant to an order of the Bankruptcy Court). All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code may be objected to in accordance with the provisions of Section 7.2 of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. All such Claims not filed within such time shall be (i) forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, the Creditor Trust, and their property, (ii) not permitted to vote to accept or reject the Plan, and (iii) not permitted to participate in any Distribution in the Chapter 11 Cases on account of such Claims, and such Claim shall be deemed fully satisfied, released, settled, and compromised, and be subject to the permanent injunction set forth in Section 10.7 of the Plan, notwithstanding anything in the Schedule of Rejected Contracts and Unexpired Leases or a proof of claim to the contrary.

Any counterparty to a rejected Executory Contract or Unexpired Lease holding any security for any of the Debtors' obligations thereunder (including but not limited to any security deposits, escrow funds, reserves, receivables or letter of credit proceeds) must, within five (5) days after filing any Claim arising out of the rejection, or such other time as agreed to by the Reorganized Debtors: (i) return to the Reorganized Debtors all security; or (ii) File a motion seeking authorization to setoff and/or exercise other rights to apply the security toward satisfaction of the counterparty's Claim, to which motion the Reorganized Debtors shall have thirty (30) days to object.

(d)      **Restrictions on Assignment Void**.

Any Executory Contract or Unexpired Lease assumed or assumed and assigned will remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision. Any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease, terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

No sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto will have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

(e)      **Workers' Compensation and Insurance Programs**.

(i) All applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) all of the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs and plans regarding or relating to workers' compensation, workers' compensation insurance, and all other forms of insurance are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

**4.5    *Retention of Jurisdiction by the Bankruptcy Court.***

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases and all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan for, among other things, the following purposes:

- to determine any motion, adversary proceeding, application, contested matter, other litigated matter, and any other matters, and grant or deny any applications involving a Debtor or the Creditor Trust that may be pending on or commenced after the Confirmation Date;

- to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

- to allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

- to resolve any matters related to (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable in any manner, including, to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Claims arising from the rejection or cure of such agreements and cure Claims arising from the assumption of such agreements pursuant to section 365 of the Bankruptcy Code; (b) any matter relating to the terms and conditions of any such Executory Contract or Unexpired Lease as assumed or assumed and assigned, or the obligation of any party to perform thereunder, and any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date any Executory Contracts or Unexpired Leases to the Schedule of Rejected Executory Contracts and Unexpired Leases; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- to resolve disputes as to the ownership of any Claim or Interest;

- to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

- to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

- to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

81

- to hear and determine any matters relating to the Creditor Trust, including to hear and determine any actions brought by the Creditor Trust Administrator, including any adversary proceeding, action or other dispute relating to the Litigation Assets, the Creditor Assets, or the Distributions to be made by the Creditor Trust under the Plan;

- to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

- to determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, release, indenture, or other document governing or relating to any of the foregoing;

- to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

- to resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, Exculpations, and other provisions contained in Section 10 of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions, including to adjudicate any and all claims or Causes of Action (i) against any Person granted a release under Section 10.5 of the Plan or exculpation pursuant to Section 10.6 of the Plan, (ii) relating to the Debtors, the Plan, the Distributions, the Reorganized Holdings Equity Interests, the Chapter 11 Cases, the transactions contemplated by the Plan to effectuate the Plan, or any contract, instrument, release, agreement or document executed and delivered in connection with such transactions and the Plan, and (iii)

brought by the Debtors (or any successor thereto) or any holder of a Claim or an Interest;

- to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

- to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

- to enter a final decree closing any or all of the Chapter 11 Cases;

- to enforce, clarify or modify all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

- to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or under the RSA, Intercreditor Agreement, First Lien Credit Agreement and related documents, Second Lien Credit Agreement and related documents, and the Convertible Notes Indenture and related documents, in each case, except for cases, controversies, suits, disputes or Causes of Action between or among holders of Claims under the First Lien Credit Agreement, Second Lien Credit Agreement or Convertible Notes Indenture and related documents and not involving any Debtor; and

- to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors, the Reorganized Debtors, the Creditor Trust, or the Creditor Trust Administrator pursuant to the Confirmation Order, any other order of the Bankruptcy Court, the Bankruptcy Code, or any other federal statute or legal theory.

**4.6**    ***Miscellaneous Provisions.***

(a)        **<u>Entire Agreement</u>**.

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan on the Effective Date.

(b)  **Governing Law**.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit in the Plan or the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.  To the extent a rule of law or procedure is supplied by federal bankruptcy law, the Bankruptcy Code, the Bankruptcy Rules, and the decisions and standards of the United States Supreme Court, the United States Court of Appeals for the Third Circuit, the United States District Court for the District of Delaware, and the Bankruptcy Court, as applicable, will govern and control.

(c)  **Time**.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

(d)  **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

(e)  **Reservation of Rights**.

Except as expressly set forth in the Plan, the Plan will have no force or effect until the Bankruptcy Court has entered the Confirmation Order and the Effective Date has occurred. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtors, the First Lien Agent, the Second Lien Agent Luxor, or the Required Consenting Lenders with respect to the holders of Claims or Interests prior to the Effective Date.

(f)  **Binding Effect**.

The Plan shall be binding on and inure to the benefit of the Debtors, the holders of Claims and Interests, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors or the Creditor Trust, and all other parties in interest in the Chapter 11 Cases.  The rights, benefits, and obligations of any entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each entity.

(g)  **Plan Supplement and Additional Documents**.

On or before the Voting Deadline, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan which such agreements and documents will be in

form and substance reasonably acceptable to the Required Consenting Lenders, the First Lien Agent, the Second Lien Agent and Luxor in accordance with the terms of the RSA; provided, however that notwithstanding anything to the contrary in the Plan, the Shareholders' Agreement will be in form and substance acceptable to the Required Consenting Lenders in their respective good faith discretion and the Creditor Trust Agreement and the Warrant Agreement shall be in form and substance acceptable to Luxor in its good faith discretion.  The Debtors and all holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest will, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. Except as otherwise provided in the Plan, all documents included in the Plan Supplement will be filed with the Office of the Clerk of the Bankruptcy Court at least five (5) Business Days before the deadline to submit votes to accept or reject the Plan.  The Debtors, with the consent of the Required Consenting Lenders and Luxor, to the extent provided for in the RSA, reserve their rights to amend the Plan Supplement from time to time and to file any such amendments with the Bankruptcy Court.

## ARTICLE V.

## CONDITIONS PRECEDENT

**5.1**    *Conditions Precedent to Confirmation.*

Confirmation of the Plan is subject to the satisfaction or waiver of the following conditions precedent:

- Entry of the RSA Assumption Order;

- the Bankruptcy Court will have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") on or before the date that is forty (40) days from the Petition Date;

- each of the proposed Confirmation Order, the Disclosure Statement Order, the RSA Assumption Order, and the DIP Order will be in form and substance acceptable to the Debtors, the DIP Agent, the DIP Lenders, the First Lien Agent, the Second Lien Agent, the Required Consenting Lenders and Luxor to the extent set forth in the RSA; and

- each of the Non-RCS Affiliates will have filed chapter 11 petitions with the Bankruptcy Court on or before March 25, 2016.

**5.2**    *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan, and the consummation of the Plan, is subject to the satisfaction or waiver in whole or in part by the Debtors, the First Lien Agent, the Second Lien Agent, the Required Consenting Lenders, and, as set forth in the RSA, Luxor of the following conditions precedent:

- the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders, and to the extent set forth in the RSA, the First Lien Agent, the Second Lien Agent, and Luxor, and the Confirmation Order is a Final Order;

- all conditions precedent to the effectiveness of, and the initial borrowings under the Exit Facility are be satisfied or waived, in each case in accordance with the terms and conditions of the Exit Credit Documents, and the "Closing Date" under the Exit Credit Documents have occurred;

- all conditions precedent to the effectiveness of the New Second Lien Facility have been satisfied or waived, in each case in accordance with the terms and conditions of the New Second Lien Credit Documents, and the "Closing Date" under the New Second Lien Credit Documents has occurred;

- the Reorganized Holdings Equity Interests have been issued and delivered, as applicable, and all conditions precedent to the consummation of the transactions contemplated therein have been waived or satisfied in accordance with the terms thereof and the closing of the transactions contemplated by such agreements have occurred;

- the New Warrants have been issued and delivered, as applicable, and all conditions precedent to the consummation of the transactions contemplated therein have been waived or satisfied in accordance with the terms thereof and the closing of the transactions contemplated by such agreements will have occurred;

- the Debtors have entered into the Creditor Trust Agreement establishing the Creditor Trust, and the Debtors, the Non-RCS Affiliates, and the Registered Investment Advisors, as applicable, shall have transferred and assigned the Creditor Trust Assets to the Creditor Trust;

- the Debtors have received all regulatory approvals (including, without limitation, from Financial Industry Regulatory Authority and the Securities Exchange Commission) necessary to continue operating substantially in the ordinary course of business from and after the Effective Date, if any;

- (i) the Bankruptcy Court has entered an order confirming the Prepackaged Plan, which order shall be acceptable to the Debtors, the Non-RCS Affiliates, the First Lien Agent, Second Lien Agent, Required Consenting Lenders and Luxor to the extent set forth in the RSA, and is a Final Order and (ii) the "Effective Date" of such Prepackaged Plan has occurred or is occurring simultaneously with the Effective Date of the Plan;

- the RIA Release has occurred;

- all Definitive Documents, including, but not limited to, the New Corporate Governance Documents and the Plan Supplement, unless a different approval standard is specified in the Plan, are in form and substance reasonably acceptable to the Debtors and the Required Consenting Lenders, and to the extent set forth in the RSA, the First Lien Agent, the Second Lien Agent, and Luxor, and are deemed to be valid, binding and enforceable in accordance with their terms;

- all documents and agreements necessary to implement the Plan have (a) been tendered for delivery, and (b) been effected or executed by all Persons party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth therein, and all conditions precedent to the effectiveness of such documents and agreements will have been satisfied or waived pursuant to the terms of such documents and agreements; and

- the RSA is in full force and effect.

**5.3** *Effect of Failure of Conditions to Effective Date.*

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 9.4 of the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section 9.3 of the Plan, the Plan will be null and void in all respects.

**5.4** *Waiver of Conditions.*

Each of the conditions set forth in Sections 9.1 and 9.2 of the Plan may be waived in whole or in part by the Debtors with the prior written consent of the First Lien Agent, the Second Lien Agent, and the Majority Consenting Lenders, without any notice to other parties in interest or the Bankruptcy Court and without a hearing; provided, however that, notwithstanding anything herein to the contrary, the waiver of conditions set forth in Section 9.2(a), (e), (f), and (j) of the Plan (to the extent applicable to Luxor) shall also require the consent of Luxor.

## ARTICLE VI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**6.1** *Modification and Amendments.*

Prior to the Confirmation Date, the Plan, including exhibits thereto and the Plan Supplement, may be amended, modified, or supplemented by the Debtors, subject to the prior written consent of the Required Consenting Lenders, the First Lien Agent, and the Second Lien

Agent in accordance with the RSA, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by the Plan or law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.

Subject to the prior written consent of the Required Consenting Lenders, the First Lien Agent and the Second Lien Agent, and Luxor, each to the extent provided for in the RSA and Plan, unless terminated by its terms, the Plan may be amended, modified or supplemented at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as amended, modified or supplemented, satisfies the requirements of section 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such amendment, modification or supplement. Any holder of a Claim that has accepted the Plan prior to any amendment, modification or supplement will be deemed to have accepted the Plan, as amended, modified or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such holder's Claim. Prior to the Effective Date, the Debtors, with the consent of the Required Consenting Lenders and Luxor, to the extent provided in the RSA, which shall not be unreasonably withheld, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court. After the Effective Date, the Debtors, and the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**6.2     *Effect of Confirmation on Modifications.***

Entry of a Confirmation Order will result in all modifications or amendments to the Plan occurring after the solicitation thereof being approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**6.3     *Revocation, Withdrawal, or Non-Consummation of the Plan.***

The Debtors reserve the right to revoke or withdraw the Plan unless terminated by its terms, and subject to the prior written consent of the Required Consenting Lenders and Luxor, to the extent provided in the RSA, at any time prior to the Confirmation Date and to file other plans of reorganization; provided, however, that any such revocation or withdrawal of the Plan would constitute a Supporting Party Termination Event under Section 6(a) of the RSA, which could result in the termination of the RSA. If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence, or if the Confirmation Order is not entered or consummation of the Plan does not occur, then (i) the Plan will be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in

any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or any other Person.

**6.4     *Severability.***

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the reasonable consent of the Debtors, the First Lien Agent, the Second Lien Agent the Required Consenting Lenders, and Luxor, each as provided in the RSA; and (3) nonseverable and mutually dependent.

<div align="center">

**ARTICLE VII.**

**<u>EFFECT OF CONFIRMATION</u>**

</div>

**7.1     *Vesting of Assets.***

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates (including, all Retained Causes of Action which may be asserted by or on behalf of the Debtors but excluding the Creditor Trust Assets) will be vested in the Reorganized Debtors and (ii) all Creditor Trust Assets shall be vested in the Creditor Trust, in each case free and clear of all Claims, liens, encumbrances, charges, and other interests.  After the Effective Date, the Reorganized Debtors will not have any liability to holders of Claims or Interests other than as expressly provided for in the Plan.  As of the Effective Date, each of the Reorganized Debtors will be deemed to have incurred the Exit Facility Obligations and the New Second Lien Facility Obligations pursuant to the Exit Credit Agreement and the New Second Lien Credit Agreement, respectively.  As of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

**7.2     *Settlement of Certain Intercreditor Issues.***

To the extent applicable, pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the

Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against any Released Party, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**7.3**     *Discharge of Claims Against the Debtors and Termination of Interests.*

*Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date and in consideration of the rights afforded in the Plan and the payments and Distributions to be made hereunder, each holder (as well as any trustees and agents on behalf of each holder) of a Claim against the Debtors or an Interest in the Debtors will be deemed upon receipt of its respective distributions provided for in the Plan to have forever waived, released and discharged such Claim or Interest.  On the Effective Date, all holders of such Claims and Interests will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or Interest against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, the Creditor Trust Board, or any of their assets or properties based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest.*

*Except as otherwise provided in the Plan or in the Confirmation Order, all Persons who have held, now hold or may hold Claims against any of the Debtors or Interests in any of the Debtors and all other parties in interest, along with their respective present and former Representatives, are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim or Interest against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, or the Creditor Trust Board (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, or the Creditor Trust Board with respect to such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, or the Creditor Trust Board, or against the property or interests in property of the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, or the Creditor Trust Board with respect to such Claim or Interest; or (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due from the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust Administrator, or the Creditor Trust Board, with respect to such Claim or Interest.  Such injunction will extend to any successors of the Debtors, their Estates, the Reorganized Debtors, the Released Parties, the Creditor Trust, the Creditor Trust*

*Administrator, the Creditor Trust Board and their respective properties and interest in properties.*

**7.4**     *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the closing of the respective Chapter 11 Cases.

**7.5**     *Injunction Against Interference with the Plan.*

*Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.*

**7.6**     *Releases.*

*Without limiting any other applicable provisions of, or releases contained in, the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, including the Distributions to be made hereunder, the Debtors and the Reorganized Debtors, on behalf of themselves and their Affiliates, the Estates and their respective Representatives, successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Causes of Action that they have, or had against any Released Party (the "Company Released Causes of Action") except with respect to any obligations arising under the Plan, the Definitive Documents that by their terms survive the Effective Date and any applicable orders of the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases; provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.*

*As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim (solely in its capacity as such) (i) whose Claim is Unimpaired by the Plan, (ii) has not voted to reject the Plan, or (iii) has voted to reject the Plan but has not checked the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, (provided that the each of the parties to the RSA are and shall be deemed to elect to grant the releases provided in the Plan if the RSA has not terminated in accordance with its terms), will be deemed to forever release, waive and discharge all Causes of Action in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, the RSA and the Term Sheets, the First Lien Facility, the Second Lien Facility or the Convertible Notes Indenture that such Person has, had or may have against any Released Party or their representatives or any employees, agents or partners of the Debtors (which release will be in addition to the discharge of Claims*

*provided in the Plan and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under the Plan, the New Term Loan Agreement, or any of the Definitive Documents that by their terms survive the Effective Date, or any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Causes of Action relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.*

*Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases in Sections 10.5(a) and (b) of the Plan, which includes, by reference, each of the related provisions and definitions contained therein and, further, will constitute the Bankruptcy Court's finding that such releases are (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing a good faith settlement and compromise of the Claims released therein, (ii) in the best interests of the Debtors and all holders of Claims, (iii) fair, equitable, and reasonable, (iv) approved after due notice and opportunity for hearing, and (v) a bar to any of the releasing parties asserting any Claim released by the releasing parties against any of the Debtors or the other Released Parties or their respective property.*

*Each Person to which Sections 10.5(a) and/or (b)of the Plan apply will be deemed to have granted the releases set forth in those Sections notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of the release.*

**7.7    Exculpation.**

*From and after the Effective Date, the Exculpated Parties, will neither have nor incur any liability to any entity, and no holder of a Claim or Interest, no other party in interest and none of their respective Representatives, will have any right of action against any Exculpated Party, for any act taken or omitted to be taken in connection with, related to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, any transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that*

*would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.*

**7.8    *Injunction.***

*Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Debtors' Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Creditor Trust Administrator, the Creditor Trust, the Creditor Trust Board, the Creditor Trust Assets, the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Creditor Trust Administrator, the Creditor Trust, the Creditor Trust Board, the Creditor Trust Assets, or the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Creditor Trust Administrator, the Creditor Trust, the Creditor Trust Board, the Creditor Trust Assets, or the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.  For the avoidance of doubt, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities discharged pursuant to Section 10.3 of the Plan, released pursuant to Section 10.5 of the Plan, or exculpated pursuant to Section 10.6 of the Plan.*

**7.9    *Worthless Stock Deduction Procedures***

Unless otherwise ordered by the Bankruptcy Court or consented to by the Reorganized Debtors, and notwithstanding anything to the contrary contained in any order entered by the Bankruptcy Court as contemplated by the WSD Procedures Motion, on and after the Effective Date, each "50% Shareholder" (as such term is defined in WSD Procedures Motion) shall be required to file upon the Court, and serve upon counsel to the Debtors, an advance written declaration (the Declaration of Intent to Claim a Worthless Security Deduction, in the form of

Schedule E of Exhibit 1 attached to the WSD Procedures Motion), before (i) filing any federal or state tax return, (ii) filing any amendment to such a return, or (iii) distributing any K-1 or other information statement, if any, to its partners or members, in each case claiming or reflecting any deduction for worthlessness or abandonment of a Holdings Equity Interest, for a tax year ending on or before the Effective Date.  For the avoidance of doubt, Section 13.5 of the Plan shall not be construed to enjoin any "50% Shareholder" from taking or causing to be taken any such action with respect to a tax year ending after the Effective Date.

To the extent any 50% Shareholder is a partnership or other pass-through entity for federal or state income tax purposes, prior to filing any federal or state tax return, or any amendment to such a return, then unless otherwise ordered by the Bankruptcy Court, each partner or other owner of such 50% Shareholder will be required to file upon the Court, and serve upon counsel to the Debtors, an advance written declaration (the Declaration of Intent to Claim a Worthless Security Deduction), before filing a tax return claiming or otherwise reflecting any deduction for worthlessness of a Holdings Equity Interest for a tax year ending on or before the Effective Date.  For the avoidance of doubt, Section 13.5 of the Plan will not be construed to enjoin any partner or owner of such 50% Shareholder from taking or causing to be taken any such action with respect to a tax year ending after the Effective Date.

**7.10**  *Setoff.*

Notwithstanding anything herein, in no event will any holder of a Claim be entitled to setoff or recoup any Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Creditor Trust, as applicable, unless such holder obtains an order from the Bankruptcy Court authorizing such setoff by motion Filed on or before the Confirmation Date, and notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**7.11**  *Exemption from Certain Transfer Taxes.*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange (or deemed issuance, transfer or exchange) of a security, including the issuance of the Reorganized Holdings Equity Interests and the New Warrants, (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest, including pursuant to the Exit Facility or the New Second Lien Facility, (c) the making or assignment of any lease or sublease, (d) the assignment and transfer of the Creditor Trust Asset to the Creditor Trust as provided in the Plan, or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property), including the restructuring transactions contemplated by the Plan, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes ~~(including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders)~~**,** or other similar taxes, and the appropriate state or local government officials or agents will, and will be directed to, forgo the

collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments (including, without limitation, any transfers or assignments for collateral purposes) of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date will be deemed to have been in furtherance of or in connection with the Plan.

**7.12**  *Issuance of New Securities and Plan-Related Documentation.*

The issuance under the Plan of (i) the Reorganized Holdings Equity Interests to the holders of Allowed First Lien Claims, Allowed Second Lien Claims, the Backstop Parties, and the parties entitled to receive the Exit Base Discount and Exit Backstop Discount and (ii) the New Warrants to the Creditor Trust and the subsequent distribution of the New Warrants from the Creditor Trust to the holders of Class A Units,  if the Creditor Trust Administrator at the direction of the Creditor Trust Board determines to make such distribution, and any subsequent sales, resales, transfers or other Distributions of such Reorganized Holdings Equity Interests or New Warrants (including Reorganized Holdings Equity Interests issuable upon exercise of any New Warrants) will be exempt from any federal or state securities law registration requirements (and all rules and regulations promulgated thereunder) to the fullest extent permitted by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law.

Upon the Effective Date, all documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, and any other agreements or documents related to or entered into in connection with same, will become, and will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

## ARTICLE VIII.

## CONFIRMATION OF THE PLAN

**8.1**  *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, hold a hearing on confirmation of a plan.  The Bankruptcy Court has established May [●], 2016 at [TIME] (Eastern Time) as the date and time of the Confirmation Hearing.  The Confirmation Hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount

of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon: (i) the Chambers of the Honorable Mary F. Walrath, United States Bankruptcy Judge, 824 Market Street N, Wilmington, Delaware 19801; (ii) counsel to the Debtors, Dechert LLP, 1095 Avenue of the Americas, New York, New York  10036, Attn: Michael J. Sage, Shmuel Vasser, Stephen M. Wolpert and Andrew C. Harmeyer; (iii) Andy Vara, United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Linda Casey; (iv) counsel to the Official Committee of Unsecured Creditors (if appointed), [●], (v) counsel to the First Lien Agent, Shearman & Sterling LLP, 599 Lexington Avenue New York, NY 10022, Attn: Joel Moss, (vi) counsel to the Second Lien Agent, Covington & Burling LLP, The New York Times Building 620 Eighth Avenue New York, NY 10018 Attn: Ronald Hewitt, (vii) counsel to the Required Consenting First Lien Lenders, Jones Day LLP, 222 East 41st Street, New York, New York  10017, Attn: Scott Greenberg and Stacey L. Corr-Irvine, (viii) counsel to the Required Consenting Second Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Timothy Graulich (ix) counsel to Luxor, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Rachel Ringer, and (x) all other parties who have filed a notice of appearance and request for service of documents.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**8.2**   *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

Confirmation Requirements.

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each Impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not Impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of certain types of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims, regular installment payments in cash (i) of a total value, as of the effective date, equal to the allowed amount of such claim, (ii) over a period not exceeding five (5) years after the petition date, or (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122 of the Bankruptcy Code);

- if a class of claims is Impaired, at least one (1) Impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class;

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan; and

- all fees payable to the applicable United States Trustee's office, pursuant to section 1930 of title 28, have been paid or the plan provides for payment of such fees on the effective date of the plan.

97

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied at the time of confirmation with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

(a)    ~~1.~~  **Acceptance**.

A class is "Impaired" under a plan unless, with respect to each claim or interest of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim or interest.  A class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Classes 2, 3 and 5 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 1, 4, 6, 8 and 9 are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 7 and 10 are Impaired and not receiving any property under the Plan, and thus are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right, with the consent of the Required Consenting Lenders and subject to the RSA, to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit, Schedule, or Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 7 and 10 which are deemed to reject the Plan and will set forth such arguments in a brief in support of confirmation filed in advance of the Confirmation Hearing.

(b)    ~~2.~~  **Feasibility; Valuation and Financial Projections**.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in

the Plan.   If the Plan is confirmed, the Allowed Claims that may be paid in full in Cash are the General Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims (if any), Priority Claims and Other Secured Claims.  The Debtors have estimated the total amount of such payments and expect sufficient liquidity from Cash on hand to fund these payments.

In addition, annexed as **Exhibit 5** hereto are the Financial Projections (the "**Financial Projections**"), which were prepared by the Debtors, with the assistance of its advisers, and detail, among other things, the financial feasibility of the Plan and the Reorganized Debtors' ability to service their obligations, including under the Exit Facility or New Second Lien Facility.   The Financial Projections indicate it is expected that the Reorganized Holdings' Adjusted EBITDA will be approximately $[●]68 million in 2016, $[●]90 million in 2017, $[●]120 million in 2018, $[●]152 million in 2019, and $[●]168 million in 2020 which earnings will be used, among other things, to service the Exit Facility and New Second Lien Facility.  Please see Article XI, "Certain Risk Factors to be Considered," for a discussion of some of the risks that could affect the Debtors' ability to pay its post-Effective Date indebtedness, including its ability to achieve its projected financial results as further described in the risk factor set forth in Section 11.3(a) of this Disclosure Statement.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on or prior to May 16, 2016.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.   THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW IN ARTICLE XI.   IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.   Those assumptions considered to be significant are described in notes to the Financial Projections.  The Financial Projections have not been examined or compiled by independent accountants.    The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic recession underway both in the United States and abroad.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results

and the variations may be material.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

In addition, in connection with the Plan, Lazard performed an analysis of the estimated value of the Reorganized Debtors on a going-concern basis, attached hereto as **Exhibit 6** (the "**Valuation Analysis**").

Specifically, in preparing the Valuation Analysis, Lazard, among other things: (i) reviewed certain recent publicly available financial results of the Debtors; (ii) reviewed the Financial Projections; and (iii) discussed with certain senior executives the current operations and prospects of the Debtors and Non-Debtor Affiliates, as well as key assumptions related to the Financial Projections.

THE VALUATION ANALYSIS SET FORTH IN EXHIBIT 6 IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION ANALYSIS WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS AND THE NONDEBTOR AFFILIATES CONTINUE AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATE SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

(c)    3.  **Creditors' Estimated Recovery Rates**.

CREDITORS' ESTIMATED RECOVERY RATES SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED ON A HYPOTHETICAL ANALYSIS OF THE DEBTORS' FINANCIAL PROJECTIONS AND THE VALUATION ANALYSIS, WHICH ASSUMES THAT THE REORGANIZED DEBTORS CONTINUE AS OPERATING BUSINESSES.  THE ESTIMATED RECOVERY RATES SET FORTH IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO CONSTITUTE A VALUATION OF THE DEBTORS OR AN APPRAISAL OF THE DEBTORS' ASSETS OR CLAIMS, AND THE ESTIMATED RECOVERY RATES SET FORTH HEREIN DO NOT REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE

REORGANIZED DEBTORS, THEIR SECURITIES OR ASSETS OR CLAIMS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATED RECOVERY RATES SET FORTH IN THE DISCLOSURE STATEMENT.

The Debtors have been advised by their financial advisor, Zolfo Cooper with respect to the estimated ranges of recovery rates.  Zolfo Cooper assisted by estimating the range of value available for distribution to holders of Allowed Claims pursuant to the Plan.  The estimated ranges of recovery rates for purposes of the Plan is based on the Financial Projections provided by the Debtors' management for the years 2016 through 2019, and the Valuation Analysis, and takes into consideration the variability depending on the business strategy ultimately pursued.

Based on the Financial Projections and the Valuation Analysis subject to the disclaimers herein and solely for purposes of the Plan, Zolfo Cooper estimates that the ranges recovery rates for creditors under the Plan are as presented in this Disclosure Statement.

THE ESTIMATED RECOVERIES WERE DERIVED FROM ANALYSIS PERFORMED BY ZOLFO COOPER ON THE BASIS OF INFORMATION AVAILABLE TO ZOLFO COOPER AS OF THE PETITION DATE.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT ZOLFO COOPER'S CONCLUSIONS, NEITHER ZOLFO COOPER NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE ESTIMATE.

The estimated recoveries and the Valuation Analysis assume that the Financial Projections were reasonably prepared by management of the Debtors in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors, and assume the Reorganized Debtors will achieve their Financial Projections in all material respects.  If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively.  In conducting its analysis, Zolfo Cooper: (a) reviewed certain historical financial information of the Debtors; (b) reviewed certain internal financial and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team of the Debtors and third-party advisors; (d) reviewed certain publicly available financial data for public companies that Zolfo Cooper deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate; and (g) the Valuation Analysis.  Zolfo Cooper assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as third parties and publicly available information.

In addition, Zolfo Cooper did not independently verify the Financial Projections or the Valuation Analysis in connection with preparing any analysis, and no independent appraisals of the Debtors were sought or obtained in connection herewith.  The ranges of recovery estimates were developed solely for purposes of confirmation of the Plan, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

The estimated recovery ranges do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Zolfo Cooper and the Debtors' other advisors have not been asked to and do not express any view as to what the value of the Reorganized Debtors' securities would be on issuance at any time.  The estimated recovery ranges do not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY THE DEBTORS, LAZARD, OR ZOLFO COOPER.   THE PREPARATION OF RECOVERY RATES ESTIMATES INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, ZOLFO COOPER, LAZARD, AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY THE DEBTORS, LAZARD, ZOLFO COOPER AND ANY OTHER ADVISOR ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

(d)   4.  **Standards Applicable to Releases.**

Article 10.5 of the Plan provides for releases of certain claims against non-Debtors in consideration of services provided to the Estates and valuable compromises made by the Released Parties.  The non-Debtor released parties are, collectively and individually, (a) the employees of the Debtors (other than directors and officers) who are employed as of the Petition Date and do not voluntarily relinquish their positions as of a date prior to the Effective Date without the consent of the Company (b) the officers and directors of the Debtors who are employed or serving in such capacity as of the Effective Date, (c) officers and directors of the Debtors who are employed or serving in such capacity at any time following the Petition Date and terminated without cause prior to the Effective Date, (d) (i) Barclays Bank PLC, as the First Lien Agent, and (ii) the First Lien Lenders, (e) (i) Bank of America, N.A., as former Second Lien Agent, (ii) Wilmington Trust, National Association as successor Second Lien Agent, and (iii) the Second Lien Lenders, (f) Luxor and its officers, directors, agents, and principals, including in their capacity as officers and/or directors of the Debtors (to the extent employed as officers or directors as of the Petition Date), (g) the Convertible Notes Indenture Trustee, (h) the DIP Agent and DIP Secured Parties, (i) the Committee and its members (solely in their capacities as such), and (j) Representatives of each of the parties listed in clauses (a) through (j); provided, however, that Released Parties shall not include Excluded Parties and parties subject to Non-Released Causes of Action.  As set forth in the Plan, the releases are given by each holder of a Claim (solely in its capacity as such) that is (i) Unimpaired by the Plan, (ii) have not voted to reject the Plan, or (iii) have voted to reject the Plan but have not checked the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan.  The released claims are limited to those Causes of Action that relate to a Debtor, the Chapter 11

Cases, the Estates, the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, the First Lien Facility, the Second Lien Facility or the Convertible Notes Indenture.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has provided significant value to the Debtors, aided in the reorganization process, and facilitated the Debtors' ability to propose and pursue confirmation of the Plan.  Specifically, in an effort to ensure the Debtors' reorganization can be completed in a consensual, expeditious and timely manner and in a way that minimizes the impact of these Chapter 11 Cases on the Debtors' businesses, the First Lien Lenders were willing to agree to substantial compromises to their recoveries in order to facilitate recoveries for more junior creditors.  Further, as DIP Lenders and Exit Facility Lenders, the vast majority of the First Lien Lenders and Second Lien Lenders are contributing new money to the Debtors to fund these Chapter 11 Cases and meet the Debtor's liquidity needs post-emergence.  The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.  Finally, each of the non-debtor Released Parties will continue to play a substantial role in formulating, negotiating, and consummating the Plan and in the transactions contemplated thereunder. Absent the support and participation of the Released Parties, the Debtors could not have filed for chapter 11 protection with a path to reorganization and emergence. Accordingly, the Debtors contend that the circumstances of the Chapter 11 Cases satisfy the requirements for such releases.

(e)    ~~5.~~        **Best Interests Test**.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See the Liquidation Analysis annexed as **Exhibit 2** hereto, which demonstrates that the Plan satisfies the "best interests" test.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case.  The gross amount of Cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the Cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation.  Any remaining net Cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

As further described in **Exhibit 2**, underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and

contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a chapter 7 liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated under chapter 7. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

**The Debtors have determined, as discussed in the Liquidation Analysis attached as Exhibit 2 hereto, that confirmation of the Plan will provide each holder of Claims and Interests with a recovery that is not less than it would receive pursuant to a liquidation of the applicable Debtor under chapter 7 of the Bankruptcy Code.** See the Liquidation Analysis annexed as Exhibit 2 hereto for a further discussion of how the Plan satisfies the "best interests" test.

(f) ~~6.~~ **Classification of Claims and Interests**.

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

**8.3** ~~(a)~~ *Cramdown.*

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted the Plan. The "cramdown" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cramdown" provisions, upon the request of a plan proponent, the bankruptcy court will confirm a plan despite the lack of acceptance by all Impaired classes if the bankruptcy court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting Impaired class, (ii) the plan is fair and equitable with respect to each non-accepting Impaired class, and (iii) at least one Impaired class has accepted the plan. These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan that has been rejected by a senior class of Impaired claims or interests unless holders of such senior Impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class identically, the Plan has been structured so as to satisfy the "no unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of

secured or unsecured claims or interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation, notwithstanding non-acceptance by an Impaired class, if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.  Case law surrounding section 1129(b) of the Bankruptcy Code requires that no class senior to a non-accepting Impaired class receives more than payment in full on its claims.  This will not occur here.  Although the Intercompany Interests are preserved, this is done for administrative convenience only for the purpose of preserving the Debtors' corporate structure.

The Debtors intend to seek "cramdown" of the Plan on Classes 7 and 10, which are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no Plan distributions, and against any other Impaired Class which does not accept the Plan.

**8.4**    ~~8.3~~ *Consummation.*

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.  For a more detailed discussion of the conditions precedent to Plan consummation and the consequences of the failure to meet such conditions, see Section 9 of the Plan.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## ARTICLE IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors believe that much of the success reached by the parties to the RSA in their negotiations and their long-standing efforts to reach consensual resolutions could very well be squandered.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

**9.1**    *Liquidation under Chapter 7 of the Bankruptcy Code.*

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VIII of this Disclosure Statement.  The Debtors believe that such a liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis described in Article VIII herein and attached as **Exhibit 2** to this Disclosure Statement.

**9.2**    *Alternative Plan(s) of Liquidation or Reorganization.*

The Debtors believe that failure to confirm the Plan would lead inevitably to more expensive and protracted Chapter 11 Cases.  In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process with the First Lien Agent, the Second Lien Agent, the Required Consenting Lenders and Luxor.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries to Classes 2, 3, and 5 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns. Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

Further, as noted above, in an effort to ensure a consensual and efficient chapter 11 process that limits damage to the Debtors' businesses, the Debtors' secured creditors are making significant concessions to provide holders of General Unsecured Claims with recoveries to which  holders of such Claims may not otherwise be entitled  The First Lien Lenders and Second Lien Lenders may be unwilling to make similar concessions in the context of an alternative chapter 11 plan, and, further, may be unwilling to provide the Debtors' with access to post-chapter 11 financing in the form of the Exit Facility if an alternative plan was proposed.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES AND ADDITIONAL ADMINISTRATIVE EXPENSES ASSOCIATED WITH LITIGATION. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## ARTICLE X.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all Exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 2, 3 and 5, which are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed [DATE] as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than [TIME] (Eastern Time) on [DATE], unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at [TIME] (Eastern Time) on such extended date. Notwithstanding the foregoing, each holder of a Claim in Classes 2, 3 and 5 may revoke or amend such holder's Ballot in the event the Debtors modify the Allowed amount of such holder's Claim under the Plan.

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a Claim, each holder of a Claim within a Class of Claims entitled to vote to accept or reject the Plan will be entitled to vote the amount of such

Claim as set forth on the Schedules or, if such holder has timely filed a proof of claim, the amount of such Claim as set forth in such proof of claim.

If a Claim is listed on the Schedules as contingent, unliquidated, disputed, undetermined in amount, or in an amount equal to zero dollars and a proof of claim was not (i) filed by the Bar Date for the filing of proofs of claim, or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, such Claim is disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c), unless the Debtors consent in writing. If a Claim for which a proof of claim has been timely filed is, by its terms, unknown, undetermined, contingent, unliquidated, or disputed, or if the Claim is deemed disputed under the Plan, such Claim is temporarily allowed at $1.00 solely for purposes of satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, and not for purposes of allowance or distribution.

To the extent any inconsistency exists between the voting procedures summarized above and the voting procedures set forth in the order approving the Disclosure Statement, the voting procedures set forth in such order shall control.

## ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**11.1**   *Certain Bankruptcy Considerations.*

(a)      **General**.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, the probability and the magnitude of the potentially adverse effects described herein would be increased.

(b)      **Failure to Receive Requisite Acceptances**.

Classes 2, 3 and 5 are the only Classes that are entitled to vote to accept or reject the Plan. If the Requisite Acceptances for at least one Impaired Class are not received, the Debtors may seek to obtain acceptances to an alternative plan of reorganization, which alternate plan may not have broad based support, or seek liquidation for one or more of the Debtors. There can be no assurance that the terms of any such alternative restructuring arrangement or liquidation would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan. As

noted above, the creditor parties to the RSA have committed to vote in favor of the Plan. Therefore, absent the termination of the RSA, the Debtors expect to receive the Requisite Acceptances for the Classes 2 and 3. In addition, if a liquidation or protracted reorganization were to occur, further administrative expenses would cause a substantial erosion of the value of the Debtors' assets. Additional Claims may also arise by reason of a liquidation or protracted reorganization.

(c)        **Failure to Confirm the Plan**.

Certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Debtors have not satisfied the confirmation requirements with respect to the Plan. Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. The Debtors believe that the Plan satisfies all of the requirements for confirmation of a plan under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied. If the Bankruptcy Court determines that the requirements for confirmation have not been satisfied, the Debtors have reserved the right to amend the Plan in such a manner so as to satisfy the requirements of the Bankruptcy Code.

(d)        **Failure to Consummate the Plan**.

There can be no assurance that even if the Plan is confirmed, the other conditions to consummation will be satisfied or waived. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can also be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in Section 9 of the Plan and those described in section 5.2 above have not occurred and have not been waived, the Confirmation Order will be vacated, in which event, no Plan distributions will be made. Were this to occur, the Debtors may seek to obtain acceptances to an alternative plan of reorganization, which alternate plan may not have broad based support, or seek liquidation for one or more of the Debtors. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan. In addition, if a liquidation or protracted reorganization were to occur, further administrative expenses would cause a substantial erosion of the value of the Debtors' assets. Additional Claims may also arise by reason of a liquidation or protracted reorganization.

(e)        **Termination of the Restructuring Support Agreement**.

The RSA contains a number of termination events, upon the occurrence of which certain parties to the RSA may terminate such agreement. If the RSA is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the RSA. Such termination may result in the loss of support for the Plan, which could adversely affect the Debtors' ability to confirm and consummate the Plan. If, as a result, a liquidation or protracted reorganization were to occur, further administrative expenses would cause a substantial erosion of the value of the Debtors' assets. Additional Claims may also arise by reason of a liquidation or protracted reorganization.

(f)        **Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is "substantially similar" to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**11.2** ***Actual recoveries may differ materially from the estimated recoveries set forth in this Disclosure Statement.***

The recoveries listed in this Disclosure Statement are estimates based on assumptions made by the Debtors. Such recoveries are dependent on a variety of factors, including the factors described below.

(a)      **Allowance of Unsecured Claims May Substantially Dilute the Recovery to Holders of Other Unsecured Claims under the Plan**.

The Debtors currently are in the process of reviewing, analyzing and reconciling the scheduled and filed Claims. The aggregate amount of Claims that will ultimately be Allowed is not determinable at present, and the Debtors expect that the claims resolution process will not be completed until after the Effective Date. The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis are based on the Debtors' estimates of Allowed Claims. However, there can be no assurance that the Debtors' estimates will prove accurate. If estimates of the Claims are inaccurate, it may materially adversely affect the Reorganized Debtors' financial condition.

Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated Plan distributions set forth herein.

(b)      **Litigation Risks**.

There is, or may be in the future, certain litigation that could result in a material judgment against the Reorganized Debtors and/or their assets. Such litigation and any judgment in connection therewith could have a material negative effect on the Reorganized Debtors and their respective values, assets, and future operations.

**11.3** ***Risks Relating to the Exit Facility, the New Second Lien Facility and the Reorganized Holdings Equity Interests***

(a)      **Variances From Financial Projections**.

The Financial Projections included as **Exhibit 5** to this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors and which may not materialize, particularly given the current difficult economic environment. These assumptions may or may not prove accurate.

(b)        **Obligations Under the Exit Facility and New Second Lien Facility**.

The obligations of the Exit Facility Parties under the Exit Facility Credit Agreement and the New Second Lien Facility Parties under the New Second Lien Credit Agreement will be secured by a first lien and a second lien, respectively, on substantially all assets of the Debtors, including (i) accounts, (ii) equipment, goods, inventory, and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and letter of credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property collateral, (viii) certain commercial torts claims, (ix) general intangibles, (x) money and deposit accounts, (xi) supporting obligations, (xii) books and records relating to the foregoing, (xiii) other personal property; and (xiv) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable from time to time with respect to any of the foregoing.  The Debtors have also pledged 100% of the equity interests they hold in each domestic subsidiary to the First Lien Agent and Second Lien Agent.  If there is a default under the Exit Facility or New Second Lien Facility, and payment on any obligation thereunder is accelerated, the lenders under the Exit Facility or New Second Lien Facility, respectively, would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the Exit Facility and New Second Lien Facility, as applicable.  As a result, the assets of the Reorganized Debtors would not be available for distribution to any Holder of Reorganized Holdings Equity Interests.

(c)        **Uncertain Trading Value**.

The Debtors have no present intention to register the Reorganized Holdings Equity Interests under the Securities Act, nor to apply to list the Reorganized Holdings Equity Interests on any national securities exchange.  There can be no assurance as to the liquidity of any market that may develop for the Reorganized Holdings Equity Interests.  The Reorganized Debtors will not be required to file periodic reports with the SEC or otherwise provide any other financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.  Furthermore, the lack of liquidity may adversely affect the price at which Reorganized Holdings Equity Interests may be sold, if at all.   The valuation of the Reorganized Debtors is not intended to represent the trading value of the Reorganized Holdings Equity Interests in public or private markets.  Such trading value may or may not be consistent with the Valuation Analysis described herein.

(d)        **Restrictions on Transfer**.

Holders of Reorganized Holdings Equity Interests who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  These Persons will be permitted to transfer or sell such securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) following a holding period, the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  The Reorganized Debtors have no current plans to register at a later date, post-emergence, any of

110

their securities under the Securities Act or under equivalent state securities laws such that the recipients of the Reorganized Holdings Equity Interests would be able to resell their securities pursuant to an effective registration statement.  Moreover, the Reorganized Debtors do not currently nor in the future intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of Reorganized Holdings Equity Interests to avail themselves of Rule 144 following the applicable holding period.

In addition, the Shareholders' Agreement and/or the New Corporate Governance Documents will contain certain restrictions on transfers, including with respect to compliance with applicable securities laws, and transfers the result of which would require the Company to become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").  All certificates for shares of Reorganized Holdings Equity Interests will conspicuously bear legends with respect to the restrictions on transfer in respect thereof.

For additional information regarding restrictions on resale of the Reorganized Holdings Equity Interests, see Article XII ("**Securities Law Matters**") below.

(e)        **The Equity Value of Reorganized Holdings May Never Equal or Exceed the Strike Price Under the New Warrants**.

The equity value of Reorganized Holdings may never equal or exceed the strike price ~~of $[   ] million, subject to certain adjustments,~~ under the New Warrants.

(f)        **Future Issuances and Dilution**.

In the future, the Company may grant equity securities to its employees, consultants and directors under certain stock option and incentive plans.  Furthermore, the Company may issue equity securities in connection with future investments, acquisitions or capital raising transactions.  Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership of the Reorganized Holdings Equity Interests, including Reorganized Holdings Equity Interests issued pursuant to the Plan.

**11.4    *Risks Relating to Tax Consequences of the Plan.***

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.   In addition, the alternate structures under consideration for consummating the Plan could have materially different tax consequences to the Debtors or a creditor.  The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.   In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  **Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.**

For additional information regarding the federal income tax consequences of the Plan, see Article XIII ("Certain United States Federal Income Tax Consequences of the Plan"), below.

**11.5**   *Risks Associated with the Business.*

    (a)           **General Business Risks**.

The Debtors' business is subject to a variety of business risks.  The Debtors compete with many others in the market for investment services which may result in lower prices for their services, reduced operating margins and an inability to maintain or increase their market share.

    (b)           **Growth of the Business and Customer Retention**.

The Company's ability to remain competitive and sustain and grow profitable operations is dependent on the willingness of both existing and new customers to use the Company's investment services.  Many of the Company's existing customer relationships are terminable at will, as customers are free to move their customers' accounts to competing broker-dealers on short notice.  Although the Company's core retail investment services businesses are conducted by BDs and RIAs that will not be debtors in chapter 11 cases, their mere association with the Debtors carries significant risks, as customers may be reluctant to maintain securities business with subsidiaries of bankrupt entities or entities emerging from bankruptcy.  If a significant number of customers were to terminate or materially change their relationships with the Company, or if the Company cannot attract new customers, the Debtors could have significantly decreased revenue, which would harm their business, operating results and financial condition.

    (c)           **Independent Financial Advisors**.

The Company's investment services are provided through a network of independent financial advisors, most of which are independent contractors.  The independent financial advisors maintain customer relationships and have unique expertise in meeting the needs of their customers.   The Company's operations and future success are dependent upon the retention of a substantial portion of its network of independent financial advisors.  Although the Company intends to implement the Retention Program, there is a significant risk of attrition of many independent financial advisors, as such advisors may be concerned that their customers will be reluctant to do business with an advisor associated with a bankrupt entity or an entity emerging from bankruptcy.  In addition, a number of high-producing independent financial advisors are entitled to deferred compensation payments.  In the event that these payments are not made, there is an increased risk of attrition of those advisors.  If a significant number of investment advisors, or certain high-producing advisors, were to terminate their relationships with the Company, the Debtors could have significantly decreased revenue, which would harm their business, operating results and financial condition.

    (d)           **Key Employees**.

The Company's operations and future success are also dependent upon the expertise of certain key employees.  The loss of services of any of these individuals for any reason or inability to attract suitable replacements would have a material adverse effect on the financial condition of the Debtors' business and operations.

**11.6**    *Risks Related to the Creditor Trust*

(a)          **Control Over the Creditor Trust**.

The Creditor Trust will be managed by the Creditor Trust Administrator under the direction of the Creditor Trust Board.  The Creditor Trust Administrator and the members of the Creditor Trust Board will be appointed initially as provided under the Plan and thereafter may be removed and replaced, and any vacancies may be filled, in accordance with the Creditor Trust Agreement, which will generally pose the authority for these purposes in the Creditor Trust Board.  Holders of Trust Units will not have any voting rights under the Creditor Trust Agreement.  In particular, the holders of Trust Units will have no power to remove and/or replace the Creditor Trust Administrator or members of the Creditor Trust Board, even if a majority of the holders of Trust Units would otherwise wish to do so.

(b)          **Information with Respect to the Creditor Trust**.

The Trust Units will not be registered with the Securities and Exchange Commission, and the Creditor Trust will have no obligation to file public reports with the Commission.  Also, the Creditor Trust Agreement will not require the Creditor Trust Administrator to provide periodic reports to the holders of Trust Units.  Thus, while the Creditor Trust will file reports with the Bankruptcy Court as required by law, and the Creditor Trust Administrator may in its discretion provide reports to holders of Trust Units, the information available to holders of Trust Units concerning the operations of the Creditor Trust is likely to be limited.

(c)          **Absence of a Market for the Trust Units**.

The Plan provides that the Trust Units will be freely tradable to the extent permitted under applicable securities laws.  However, the Creditor Trust is prohibited from facilitating a market in the Trust Units.  The ownership of the Trust Units, at least initially, will be highly concentrated and trading in the Trust Units will be limited so as to prevent the Creditor Trust from having to register the Trust Units under the Securities Exchange Act of 1934.  Thus, there is no assurance that a market for the Trust Units will develop, that holders of the Trust Units will otherwise be able to dispose of them or of the price that a holder may receive for the Trust Units if it desires and is able to sell them.

(d)          **Uncertainty in the Value of the Litigation Assets**

The Creditor Trust Assets include the Litigation Assets, which consist of claims and causes of action that the Debtors believe that they have or may have against third parties and which will be transferred to the Creditor Trust on or about the Effective Date.  Holders of Class A Units will share in any recoveries realized by the Creditor Trust on the Litigation Assets, in

addition to receiving a portion of the Cash contributed to the Creditor Trust by the Debtors at or about the Effective Date and the New Warrants, if distributed by the Creditor Trust, and New Warrant Proceeds, if any are realized by the Creditor Trust.  Holders of Class B Units will also share in any recoveries realized by the Creditor Trust on the Litigation Assets, but only if distributions with respect to the Litigation Assets exceed $30 million, and will receive no other distributions from the Creditor Trust.  While the Debtors believe that there is merit to the litigation claims and causes that will be transferred to the Creditor Trust, the defendants against whom these claims and causes of action will be asserted can be expected to raise various defenses.  There can therefore be is no assurance that the Creditor Trust will be successful in prosecuting the litigations asserting these claims and causes of action, or of the amount of the recoveries, if any, that the Creditor Trust will realize and that will be available for distribution to holders of Trust Units.  Also, even if the Creditor Trust is successful in realizing value from the Litigation Assets, litigation activity can be prolonged, and there can be no assurance as to the time frame during which distributions in respect of the Litigation Assets will be made.  Accordingly, the Debtors expressly disclaim any estimate of the value of the Litigation Assets, or the amount of distributions, if any, that will in the future be made on account of these assets, and no such estimate is being provided.

(e)        **The New Warrants**.

The Reorganized Debtors will be issuing to the Creditor Trust New Warrants to acquire 10% of the Reorganized Holdings Equity Interests (pro forma for the exercise of the New Warrants).  The Creditor Trust Board can elect to hold the New Warrants in the Creditor Trust or to distribute the New Warrants pro rata to the holders of the Class A Units, in its discretion.  If the Creditor Trust Board determines not to distribute the New Warrants, holders of the Class A Units will not be able to realize any value on the New Warrants, unless and until there is a monetization event that generates New Warrant Proceeds available for distribution to the holders of the Class A Warrants.  Even if the Creditor Trust were to distribute the New Warrants to the holders of the Class A Units, the value that the holders of the Class A Units could realize from the New Warrants, whether through exercise or disposition, is uncertain.  One reason for this is the likely absence of a public market for the Reorganized Holdings Equity Interests, at least initially, which will make the New Warrants difficult to value.  If the Creditor Trust does not distribute the New Warrants, the Creditor Trust Board will have sole discretion whether to hold the New Warrants, exercise the New Warrants, dispose of the New Warrants to a third party for cash proceeds or await a business combination or similar transaction in which the New Warrants will be "in the money." There is no assurance that any such transaction will materialize during the period when the New Warrants are exercisable, or of the amount of New Warrant Proceeds that the Creditor Trust may realize, and have available for distribution following any such transaction.

Holders of Class B Units will have no interest in the New Warrants and will receive no distributions of, or on account of, the New Warrants.

(f)        **Expenses of the Creditor Trust**.

The Debtors will have no obligation, and have no intention, to make contributions to the Creditor Trust, other than the contribution of Creditor Trust Assets to be made on or about the Effective Date.  A portion of the Cash included in the Creditor Trust Assets will be set aside to fund the expenses of the Creditor Trust, including the expenses of litigation expected to be incurred in connection with the Litigation Assets, and will therefore not be distributed to the holders of Class A Units.  If the Cash that is initially set aside for expenses is insufficient to fund the expenses of the Creditor Trust in later periods, particularly with respect to the litigation which could be prolonged and costly, the Creditor Trust could take various steps to raise additional funds.  These steps may include borrowing against the Creditor Trust Assets or selling certain Creditor Trust Assets, including some or all of the New Warrants, if the New Warrants continue to be held by the Creditor Trust, or interests in the Litigation Assets.  Alternatively, the Creditor Trust could utilize New Warrant Proceeds or recoveries realized from certain of the Litigation Assets for these purposes, rather than distributing  these proceeds to holders of the Trust Units.  These determinations will be made in the sole discretion of the Creditor Trust Board.

## ARTICLE XII.

## SECURITIES LAW MATTERS

**12.1**    *General.*

The Plan provides for Reorganized Holdings to issue Reorganized Holdings Equity Interests to (i) the First Lien Lenders on account of the Allowed First Lien Claims pursuant to Section 4.2 of the Plan, (ii) Second Lien Lenders on account of the Allowed Second Lien Claims pursuant to Section 4.3 of the Plan, and (iii) the Exit Facility Lenders and Backstop Parties pursuant to Section 5.15 of the Plan.

The Plan also provides for the issuance of New Warrants to the Creditor Trust for the benefit of the holders of Class A Units, and for the issuance by the Creditor Trust of (i) Class A Units to the holders of Allowed General Unsecured Claims and (ii) Class B Units to the holders of Allowed Second Lien Claims.

The Debtors believe that the Reorganized Holdings Equity Interests, the New Warrants, the Class A Units and Class B Units constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws.

THE ISSUANCE OF REORGANIZED HOLDINGS EQUITY INTERESTS, THE NEW WARRANTS, THE CLASS A UNITS AND THE CLASS B UNITS UNDER THE PLAN RAISES CERTAIN SECURITIES LAW ISSUES UNDER THE BANKRUPTCY CODE AND FEDERAL AND STATE SECURITIES LAWS WHICH ARE DISCUSSED IN THIS ARTICLE.  THE INFORMATION CONTAINED IN THIS ARTICLE SHOULD NOT BE CONSIDERED APPLICABLE TO ALL SITUATIONS OR ALL CREDITORS RECEIVING

HOLDINGS REORGANIZED EQUITY INTERESTS UNDER THE PLAN. CREDITORS SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE FACTS AND CIRCUMSTANCES WITH RESPECT TO THE TRANSFER OF SUCH INTERESTS OR WARRANTS IN EACH PARTICULAR CASE.

**12.2    *Issuance of Reorganized Holdings Equity Interests, New Warrants, Class A Units and Class B Units.***

The Debtors believe that the offer and sale of the Reorganized Holdings Equity Interests, the New Warrants, Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants, the Class A Units and the Class B Units pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code, other than Persons deemed "underwriters," as discussed below. Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property. The Debtors believe that the offer and sale of the Reorganized Holdings Equity Interests, the New Warrants, Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants, the Class A Units and the Class B Units in exchange for the Claims described above satisfy the requirements of section 1145 (a) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.

The exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) provides that, with specified exemptions and except with respect to "ordinary trading transactions" of an entity that is not an "issuer," an entity is an "underwriter" if the entity:

- purchases a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- offers to sell securities offered under a plan for the holders of such securities ("distributors");

- offers to buy securities under a plan from the holders of such securities, if the offer to buy is with a view to distributing such securities and (b) made under a distribution agreement; and

- who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly controlling, controlled by or under common control with the issuer.

## 12.3   *Subsequent Transfers of Securities Issued Under the Plan.*

Securities Law Restrictions.

Securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering pursuant to section 1145(c) of the Bankruptcy Code.  In general, the Debtors further believe that resales of and subsequent transactions in the Reorganized Holdings Equity Interests, New Warrants, Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants, Class A Units and Class B Units will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to  such securities.  For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.   A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

In addition, for any "affiliate" of an issuer deemed to be an underwriter, Rule 144 under the Securities Act provides a safe-harbor from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities. Rule 144 allows a Holder of unrestricted securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of shares of such unrestricted securities that does not exceed the greater of 1% of the number of outstanding securities of the issuer or the average weekly trading volume in the securities of the issuer during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.  However, the Reorganized Debtors do not intend to make publicly available the requisite information regarding the Reorganized Debtors and the Creditor Trust does not intend to make such information available regarding the Creditor Trust, and, as a result, after the holding period, Rule 144 will not be available for resales of Reorganized Holdings Equity Interests, New Warrants, Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants, Class A Units and Class B Units by Persons deemed to be underwriters or otherwise.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter." In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Reorganized Holdings Equity Interests, New Warrants, Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants, Class A Units and Class B Units.

In addition, holders of Class A Units and Class B Units who are deemed to be "controlling persons" of the Creditor Trust may be subject to restrictions on resale of their Trust Units applicable to "affiliates" under Rule 144.

**Accordingly, the Debtors recommend that potential recipients of Reorganized Holdings Equity Interests, New Warrants, Class A Units and Class B units consult their own counsel concerning how they may freely trade such securities in compliance with the federal and state securities laws or an exemption therefrom.**

### 12.4   *Shareholders' Agreement; New Warrant Agreements.*

The Required Consenting Lenders, in their reasonable discretion, may determine to set forth certain rights and obligations concerning the Reorganized Holdings Equity Interests in the Shareholders' Agreement (which, for the avoidance of doubt, might be a limited liability company agreement), in lieu of providing such rights and obligations in the New Corporate Governance Documents, in which case such Shareholders' Agreement, if any, will become effective as of the Effective Date and be binding on all holders of Reorganized Holdings Equity Interests; provided that each recipient of Reorganized Holdings Equity Interests must sign the Shareholders' Agreement prior to receiving any Reorganized Holdings Equity Interests. Each holder of Reorganized Holdings Equity Interests will be deemed to be bound to the terms of the Shareholders' Agreement from and after the Effective Date even if not a signatory thereto. To the extent that within six (6) months of the Effective Date, any Reorganized Holdings Equity Interests are not distributed pursuant to the Plan as a result of such holder failing to sign the Shareholders' Agreement, such Reorganized Holdings Equity Interests will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

The Shareholders' Agreement contains certain restrictions on transfers, including with respect to compliance with applicable securities laws, and prohibitions on transfers the result of which would require the Company to become subject to the reporting requirements of the Exchange Act. All book-entry forms or certificates for shares of Reorganized Holdings Equity Interests will conspicuously bear legends with respect to the restrictions on transfer in respect thereof, including under applicable securities laws.

The Creditor Trust, as the holder of the New Warrants, will execute the New Warrant Agreement at or prior to the time of the issuance of the New Warrants under the Plan to the Creditor Trust.  The New Warrant Agreement may contain certain restrictions on transfer of the New Warrants similar to those contained in the Shareholders' Agreement with respect to the Reorganized Holdings Equity Interests.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE REORGANIZED HOLDINGS EQUITY INTERESTS, NEW WARRANTS, CLASS A UNITS, CLASS B UNITS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH RECIPIENT OF REORGANIZED HOLDINGS EQUITY INTERESTS, NEW WARRANTS, CLASS A UNITS AND CLASS B UNITS TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISOR WITH RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE REORGANIZED HOLDINGS EQUITY INTERESTS, NEW WARRANTS, CLASS A UNITS OR CLASS B UNITS.

## ARTICLE XIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to U.S. holders and non-U.S. holders (as defined below) of certain Claims.  The analysis contained herein is based upon the Tax Code, the Treasury Regulations promulgated and proposed thereunder (the "**Regulations**"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "**IRS**") as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences discussed below.  The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  This summary does not generally address state, local gift, estate or non-U.S. tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, partnerships and other pass-through entities, and investors in pass-through entities).  Accordingly, the following summary of certain federal income tax consequences is for informational purposes

only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.

For purposes of this discussion, a "U.S. holder" is a beneficial owner of a Claim that is, for U.S. federal income tax purposes:

> an individual who is a citizen or resident of the United States;

> a corporation, or other business entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state of the United States or the District of Columbia;

> an estate, if its income is subject to U.S. federal income taxation regardless of its source; or

> a trust, if (1) a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons (within the meaning of the Tax Code) have the authority to control all of its substantial decisions or (2) the trust has a valid election in effect under applicable Regulations to be treated as a U.S. person.

For purposes of this discussion, a "non-U.S. holder" is a beneficial owner of Claims that is neither a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) nor a U.S. holder.

If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership will generally depend on the status of the partner and on the activities of the partnership. Partners of partnerships holding Claims are encouraged to consult their independent tax advisors regarding the tax consequences to them of this Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW.  NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED WITH RESPECT THERETO.   THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.    THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

### 13.1    *Federal Income Tax Consequences to the Debtors.*

The Debtors are Holdings, various corporate subsidiaries and entities disregarded as separate from Holdings or its subsidiaries for United States federal income tax purposes. Holdings is the common parent of an affiliated group of corporations that files a consolidated tax return for federal income tax purposes (the "**RCS Group,**" which also includes for purposes of this discussion, as the context may require, any similar group after the Effective Date of which RCS Capital Corporation is a member).    As discussed below, in connection with the implementation of the Plan, the amount of the RCS Group's currently existing net operating loss ("**NOL**") carryforwards and certain other attributes may be reduced or eliminated.  In addition, the RCS Group's subsequent utilization of any NOL carryforwards remaining, and possibly certain other tax attributes, may be restricted following the consummation of the Plan.  The determination of whether any of the RCS Group's NOL carryforwards (or other tax attributes) will be limited as a result of the consummation of the Plan is complex and depends on many different factors, including the precise nature of the transactions effectuated to consummate the Plan.

Except to the extent described below, and assuming the Restructuring Transactions take place as provided for above in Section 4.3(a)(1) through 4.3(a)(9) (and not including any different or additional transactions requiring the consent of the Required Consenting Lenders as described in Secton 4.3(a) (second paragraph)), the Debtors do not expect to recognize any income, gain or loss on the Plan transactions.

### (a)    **Cancellation of Indebtedness and Reduction of Tax Attributes.**

Generally, gross income for United States federal income tax purposes includes the amount of any cancellation of debt ("**COD**") income.  The amount of the COD income generally equals the amount by which the adjusted issue price of the indebtedness discharged exceeds the sum of (i) the amount of cash paid, (ii) the issue price of any new debt issued, and (iii) the fair market value of any other consideration given in exchange for such indebtedness, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction).

COD income is excluded from gross income of a debtor in a case under chapter 11 of the Bankruptcy Code if the discharge of indebtedness is granted by the bankruptcy court or pursuant to a plan of reorganization approved by the bankruptcy court. Instead the debtor must reduce certain tax attributes by the amount of excluded COD income in the manner prescribed by section 108(b) of the Tax Code.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryovers; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital losses and capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined.  A debtor with COD income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  If a debtor with excluded COD income is a member of a consolidated group, the Regulations address the application of the rules for the reduction of tax attributes.  If the debtor is a member of a consolidated group and is

121

required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member.  If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax.

The RCS Group expects that it will realize significant COD income as a result of the consummation of the Plan.  The extent of such COD income and resulting tax attribute reduction will depend, in part, on the value of the Reorganized Holdings Equity Interests that are distributed to holders of Claims and the precise nature of the transactions effectuated to consummate the Plan.

     (b)    **Section 382.**

Under Section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally is subject to an annual limitation (a "**Section 382 Limitation**").  Typically, consummation of a chapter 11 plan of reorganization results in an ownership change.  The section 382 limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized.

The Debtors estimate that their U.S. federal income tax NOL carryforwards are approximately $325 million as of December 31, 2015 (some of which the Debtors believe are subject to a~~a~~one or more pre-existing Section 382 ~~Limitation~~Limitations as a result of prior ownership changes), and they believe they have incurred additional NOLs since then.  Subject to the Restructuring Transactions and the discussion above regarding reduction of tax attributes for COD income, the Debtors expect that when Reorganized Holdings Equity Interests are issued to creditors pursuant to the Plan, the RCS Group may be able to carry forward NOLs, which, unless an exception applies, would be subject to certain limitations under Section 382 of the Tax Code.  The discussion below summarizes certain of the aforementioned limitations that could apply under such circumstances.

          1.    **General Section 382 Limitation.**

In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 2.65% for an ownership change occurring in February 2016).

          2.    **Built-In Gains and Losses.**

If a loss corporation (or consolidated group) has a net unrealized built-in loss immediately before an ownership change (taking into account most assets and items of "built-in"

income and deductions), then generally built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses and will be subject to the same annual limitation as the NOL carryforwards. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain immediately before the ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. Thus, a consolidated group can be considered to have both a net unrealized built-in loss and a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

The determination of whether the RCS Group will, as a whole, be in a net unrealized built-in gain or loss position immediately before the Effective Date is complex and depends on many different factors.  Whether the RCS Group will, as a whole, be in a net unrealized built-in gain position or loss position on the Effective Date also depends upon the precise nature of the transactions effectuated to implement of the Plan.

### 3. Chapter 11 Exceptions.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in a chapter 11 proceeding receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in the relevant chapter 11 proceeding) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the Tax Code, a qualified creditor is a holder of a Claim that (i) was held by such holder since the date that is 18 months before the date on which the debtor first filed its petition with the bankruptcy court or (ii) arose in the ordinary course of business and is held by the person who at all times held the beneficial interest in such claim. In determining whether the 382(l)(5) Exception applies, certain holders of Claims that would own a de minimis amount of the reorganized debtor's stock pursuant to the debtor's plan are presumed to have held their Claims since the origination of such claims. In general, this de minimis rule applies to holders of Claims who would own directly or indirectly less than 5% of the total fair market value of the debtor's stock pursuant to the plan.

Under the 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three (3) year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the

debtor undergoes another ownership change within two years after consummation, then the debtor's pre-change losses effectively would be eliminated in their entirety for all periods after the second ownership change. In addition, under the Regulations, the use of NOLs may be eliminated upon consummation of the plan of reorganization, despite the 382(l)(5) Exception, if the debtor does not carry on more than an insignificant amount of an active trade or business during and subsequent to the bankruptcy proceeding. The requirement of carrying on more than an insignificant amount of an active trade or business may be met even though all trade or business activities temporarily cease for a period of time to address business exigencies.

Where the 382(l)(5) Exception is not applicable to a corporate debtor in a chapter 11 proceeding (either because the debtor does not qualify for it or the debtor elects not to utilize the 382(l)(5) Exception), a second special rule under section 382(l)(6) of the Tax Code will apply with respect to the calculation of the section 382 limitation (the "**382(l)(6) Exception**"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally determines the fair market value of its stock as the lesser of (1) the value of its stock immediately after the ownership change or (2) the gross value of its assets before the ownership change. This generally has the effect of taking into account the increase in value resulting from any surrender or cancellation of creditors' Claims in the chapter 11 proceeding, but not taking into account any cash or other property contributed to a debtor or exchanged for stock of a debtor. This differs from the general rule under section 382 that requires the fair market value of a corporation that undergoes an ownership change to be determined immediately before the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its pre-change losses (although the debtor corporation would be subject to the general rule under section 382 imposing an annual limitation on the use of its NOLs following such subsequent ownership change). In addition, if the 382(l)(5) Exception is inapplicable, section 382(c) of the Tax Code provides that the debtor must continue the business enterprise of the debtor for two (2) years following the ownership change or its NOLs will be reduced to zero (0) as of the date of the ownership change.

It is not clear whether the Debtors will satisfy the requirements for the 382(l)(5) Exception or, if they do, if they will avail themselves of its provisions.

### 4. Alternative Minimum Tax.

The Tax Code provides that, for any taxable year, a corporation's federal income tax liability equals the greater of (i) the regular tax computed at the regular corporate tax rate (generally 35%) on taxable income and (ii) the alternative minimum tax ("**AMT**") computed at a lower tax rate (20%) but on a broader income base (alternative minimum taxable income ("**AMTI**")).  For purposes of computing a corporation's regular federal income tax liability, all of the income recognized in a taxable year may be offset by available NOLs and other tax carryovers (to the extent permitted under, *inter alia*, sections 382 and 383 of the Tax Code).  By contrast, for purposes of computing AMTI, NOLs (as determined for AMT purposes) and other tax carryovers generally are taken into account, but typically do not offset more than 90% of the pre-NOL AMTI.  Thus, a corporation that is currently profitable for AMT purposes generally

will be required to pay federal income tax at an effective rate of at least 2% of its pre-NOL AMTI (10% of the 20% AMT tax rate).

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT.  Any unused credit may be carried forward indefinitely.

### 13.2 *Federal Income Tax Consequences to U.S. Holders of Claims*

(a) **In General.**

Generally, in the event of a taxable exchange as described below, a U.S. holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim.

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the U.S. holder, the nature of the Claim in the U.S. holder's hands, the purpose and circumstances of its acquisition, the U.S. holder's holding period of the Claim, and the extent to which the U.S. holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  If the Claim is a capital asset in the U.S. holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the U.S. holder has held such Claim for more than one year.  There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

(b) **Allocation of Consideration to Accrued Interest.**

A portion of the consideration received by a U.S. holder in satisfaction of a Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest.  If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the U.S. holder as interest income, except to the extent the U.S. holder has previously reported such interest as income.  A U.S. holder will generally recognize a loss to the extent that any accrued interest was previously included in the U.S. holder's gross income and is not paid in full.

Pursuant to the Plan, all Plan distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for United States federal income tax purposes.

In the event that a portion of the consideration received by a U.S. holder of a Claim represents accrued but unpaid interest, such consideration would not be included in the "amount realized" by such holder in exchange for its Claim.

(c)    **Market Discount.**

A U.S. holder that acquires a debt instrument with market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the U.S. holder.  In general, a debt instrument is considered to have been acquired with market discount if it is acquired other than on original issue and if the U.S. holder's adjusted tax basis in such instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with "original issue discount" ("**OID**"), its adjusted issue price, in each case, by at least a de minimis amount (equal to the product of 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, and the number of remaining whole years to maturity). To the extent that the debt instruments that were acquired with market discount are exchanged for other property in a corporate reorganization within the meaning of Section 368 of the Tax Code, any market discount that accrued on such debt instruments (i.e., up to the time of the exchange) but was not recognized by the U.S. holder is carried over to the property received and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

(d)    **Treatment of ~~First Lien Claim~~ U.S. Holders of First Lien Claims.**

Pursuant to the Plan and in satisfaction of their Claims, each of the U.S. holders of the Allowed First Lien Claims would receive its Pro Rata Share of (i) 38.75% of the Reorganized Holdings Equity Interests, and (ii) the New Second Lien Facility (the "**Exchange**").  Depending upon the precise nature of the transactions effectuated to consummate of the Plan, it is possible that, if each of the debt underlying the First Lien Claims and New Second Lien Facility Credit Agreement is treated as a "security" for United States federal income tax purposes, the Exchange would be treated as a "recapitalization" (or, possibly, some other type of partially tax-free reorganization) and the U.S. holders of the First Lien Claims would generally not recognize any gain or loss on the Exchange. Alternatively, if only the debt underlying the First Lien Claims is treated as a "security" for United States federal income tax purposes, gain (but not loss) would be recognized, but only to the extent of the fair market value of the New Second Lien Facility received.  Finally, if the debt underlying the First Lien Claims is not treated as a "security" for United States federal income tax purposes, the Exchange would be a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Regulations and has not been clearly defined by judicial decisions or IRS administrative guidance. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average of ten years or more constitute securities. It has not yet been determined whether the debt underlying the First Lien Claims or the New Second Lien Facility will be treated as a "security" for United States federal income tax purposes.  Therefore, it is possible the Exchange may be a partially or fully taxable, or tax-free, exchange.  No ruling has been or will be applied for or obtained from the IRS with respect to this issue and no opinion of counsel has been or will be requested or obtained with respect thereto.  In addition, if the Exchange were

deemed to be a contribution of property to a corporation governed by Section 351 of the Tax Code, U.S. holders of the First Lien Claims generally would not recognize loss, and would only recognize gain to the extent of the fair market value of the New Second Lien Facility received.

If the Exchange is fully taxable, a U.S. holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim.  Any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued with respect to its Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.

A U.S. holder's amount realized generally will depend on whether the New Second Lien Facility or the debt underlying the First Lien Claims being exchanged are deemed to be "traded on an established market" within the meaning of section 1273 of the Tax Code.  The New Second Lien Facility or the debt underlying the First Lien Claims will be treated as traded on an established market only if the debt is traded on an established market during the 31-day period ending 15 days after the exchange date.  Pursuant to applicable Regulations, an "established market" need not be a formal market.  The New Second Lien Facility or the debt underlying the First Lien Claims will be considered traded on established market if (i) there is a price for an executed purchase or sale of the New Second Lien Facility or the debt underlying the First Lien Claims, as applicable, that is reasonably available within a reasonable period of time after the sale; (ii) there is at least one price quote for the New Second Lien Facility or the debt underlying the First Lien Claims, as applicable from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Second Lien Facility or the debt underlying the First Lien Claims, as applicable (a "**Firm Quote**"); or (iii) there is at least one price quote for the New Second Lien Facility or the debt underlying the First Lien Claims, as applicable, other than a Firm Quote, available from at least one such broker, dealer, or pricing service. Where the principal amount of a debt instrument underlying a First Lien Claim does not exceed $100 million on the date of the Exchange, the debt underlying the First Lien Claims will not be deemed to be traded on an established market on such date. With respect to the debt underlying the First Lien Claims, price quotes for each date beginning on the pricing date are available on Bloomberg Finance.

If neither the New Second Lien Facility nor the debt underlying the First Lien Claims being exchanged are deemed to be traded on an established market, then a U.S. holder's amount realized would generally be equal to the sum of the stated principal amount of the New Second Lien Facility and the fair market value of the Reorganized Holdings Equity Interests ("**New Equity FMV**") issued to such U.S. holder in the Exchange.  A U.S. holder's basis in the New Second Lien Facility, and the issue price of such loan for purposes of determining the amount of any OID thereupon (discussed below), would generally be the stated principal amount of such loan, and a U.S. holder's basis in the Reorganized Holdings Equity Interests would generally be an amount equal to the New Equity FMV.  However, the tax consequences to a U.S. holder could be materially different if either the New Second Lien Facility or the First Lien Claims being exchanged therefor are deemed to be traded on an established market.

If the debt underlying the First Lien Claims is deemed to be traded on an established market, but the New Second Lien Facility is not, then (i) the U.S. holder's aggregate amount realized in the Exchange generally would be an amount equal to the fair market value of the First Lien Claims ("**Old Debt FMV**"), (ii) a U.S. holder's basis in, and the issue price of, the New Second Lien Facility would be an amount equal to the Old Debt FMV minus the New Equity FMV and (iii) a U.S. holder's basis in the Reorganized Holdings Equity Interests would be the New Equity FMV. If the New Second Lien Facility is deemed to be traded on an established market for these purposes (regardless of whether the debt underlying the First Lien Claims is also treated as such), then (i) the U.S. holder's aggregate amount realized in the Exchange generally would be an amount equal to the sum of the New Equity FMV and the fair market value of the New Second Lien Facility (the "**New Loan FMV**"), (ii) a U.S. holder's basis in, and the issue price of, the New Second Lien Facility would be an amount equal to the New Loan FMV and (iii) a U.S. holder's basis in the Reorganized Holdings Equity Interests would be the New Equity FMV.

The treatment of the Exchange is subject to the discussions above regarding allocation of consideration to accrued interest, and market discount. The treatment of the Exchange is not free from doubt and depends on the application of complex rules to facts that are not clearly addressed by such rules. U.S. holders should consult with their tax advisors regarding the tax consequences of the Exchange with respect to their particular circumstances.

(e)    **Treatment of** ~~Second Lien Claim~~ **U.S. Holders** of Second Lien Claims.

Pursuant to the Plan and in satisfaction of their Claims, each U.S. holder of the Allowed Second Lien Claims would receive its Pro Rata Share of: (i) 38.75% of the Reorganized Holdings Equity Interests and (ii) the Class B Trust Interests (entitling the U.S. holders to receive a share of the distributions of the Litigation Asset Proceeds allocated to the U.S. holders of Class B Trust Interests pursuant to the Creditor Trust Distribution Schedule) (the "**Second Lien Exchange**"). Depending upon the precise nature of the transactions effectuated to consummate the Plan, it is possible that, if the debt underlying the Second Lien Claims is treated as a "security" for United States federal income tax purposes, the Second Lien Exchange would be treated as a "recapitalization" (or, possibly, some other type of partially tax-free reorganization) and the U.S. holders of the Second Lien Claims would generally recognize gain (but not loss), but only to the extent of the fair market value of the assets represented by the Class B Trust Interests ("**Class B Trust FMV**") received.

It has not yet been determined whether the debt underlying the Second Lien Claims will be treated as a "security" for United States federal income tax purposes. Therefore, it is possible the Second Lien Exchange may be a partially or fully taxable exchange. No ruling has been or will be applied for or obtained from the IRS with respect to this issue and no opinion of counsel has been or will be requested or obtained with respect thereto. In addition, if the Second Lien Exchange were deemed to be a contribution of property to a corporation governed by Section 351 of the Tax Code, U.S. holders of the Second Lien Claims generally would not recognize loss, and would only recognize gain to the extent of the ~~fair market value of the~~ Class B Trust ~~Interests~~FMV received.

If the Second Lien Exchange is fully taxable, a U.S. holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim.  Any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued with respect to its Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.  A U.S. holder's ability to claim and/or utilize a loss may be limited.  U.S. holders are urged to consult their own tax advisors concerning their ability to claim and/or utilize a loss.

A U.S. holder's amount realized generally will equal the sum of the New Equity FMV and the ~~fair market value of the Class B Trust Interests (~~"Class B Trust FMV~~")~~ issued to such U.S. holder in the Second Lien Exchange.  A U.S. holder's basis in the Reorganized Holdings Equity Interests generally would equal the New Equity FMV, and a U.S. holder's basis in the Class B Trust Interests generally would equal the Class B Trust FMV.

The treatment of one Second Lien Exchange is subject to the discussions above regarding allocation of consideration to accrued interest, and market discount.  The treatment of the Second Lien Exchange is not free from doubt and depends on the application of complex rules to facts that are not clearly addressed by such rules.  U.S. holders should consult with their tax advisors regarding the tax consequences of the Second Lien Exchange with respect to their particular circumstances.

(f)     **Treatment of General Unsecured Claim U.S. Holders.**

As described above, each U.S. holder of a General Unsecured Claim (including Convertible Note Claims) will receive such U.S. holder's pro rata share of the Class A Trust Interests (entitling it to receive its share of the Trust Assets allocated to U.S. holders of General Unsecured Claims in accordance with the Creditor Trust Distribution Schedule and Section 6.11 of the Plan).   General Unsecured Claim U.S. holders generally will recognize gain or loss equal to the difference between the "amount realized" by such U.S. holders in exchange for their Claims and such U.S. holders adjusted tax basis in their Claims.  The "amount realized" will equal the fair market value of the assets represented by the Class A Trust Interests received, as determined pursuant to the Plan.  The treatment of an exchange by a U.S. holder of a General Unsecured Claim is subject to the discussions above regarding allocations of consideration to accrued interest, and market discount.

(g)     **Ownership and Disposition of the New Second Lien Facility by U.S. Holders.**

*Stated Interest*.  The stated interest on the New Second Lien Facility generally will be taxable as ordinary interest income in accordance with the U.S. holder's regular method of accounting at the time such payments are accrued or received.

*Original Issue Discount*.  The amount of OID with respect to the New Second Lien Facility will be equal to the excess of the "stated redemption price at maturity" of the debt (i.e., generally, the face amount of the New Second Lien Facility) over its "issue price" as described above.  PIK interest on the New Second Lien Facility will be considered OID.

For United States federal income tax purposes, each U.S. holder (regardless of its accounting method) generally must include in gross income a portion of any OID in each taxable year during which the New Second Lien Facility is held in an amount equal to any such OID that accrues during such period, determined using a constant yield to maturity basis. This means that each U.S. holder may be required to include amounts in gross income without a corresponding receipt of cash attributable to such income. A U.S. holder's tax basis in the New Second Lien Facility will be increased by the amount of OID includible in the U.S. holder's gross income as it accrues.

*Acquisition Premium or Amortizable Bond Premium on the New Second Lien Facility*. If a U.S. holder's initial tax basis in the New Second Lien Facility is greater than its issue price and less than or equal to its stated redemption price at maturity, the New Second Lien Facility will be considered to have been issued to such U.S. holder at an "acquisition premium." Under the acquisition premium rules, the amount of OID that a U.S. holder must include in income with respect to the New Second Lien Facility for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. If a U.S. holder's initial tax basis in its share of the New Second Lien Facility is greater than its stated redemption price at maturity, a U.S. holder will be considered to have acquired the New Second Lien Facility with "amortizable bond premium" and a U.S. holder will not be required to include any OID in income. A U.S. holder generally may elect to amortize the premium over the remaining term of the New Second Lien Facility on a constant yield method as an offset to interest when includible in income under a U.S. holder's regular accounting method. If a U.S. holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss a U.S. holder would otherwise recognize on disposition of the New Second Lien Facility.

*Sale or Other Disposition of the New Second Lien Facility*. When a U.S. holder sells or otherwise disposes of its share of the New Second Lien Facility in a taxable transaction, the U.S. holder will generally recognize gain or loss for United States federal income tax purposes in an amount equal to the difference, if any, between (1) the amount realized on the disposition, less any amount attributable to accrued interest, which will be taxable as such; and (2) the U.S. holder's adjusted tax basis in the New Second Lien Facility. The U.S. holder's adjusted tax basis in the New Second Lien Facility generally equals the issue price of such U.S. holder's share of the New Second Lien Facility increased by any accrued OID or market discount with respect to the New Second Lien Facility and decreased by payments on the New Second Lien Facility other than payments of "qualified stated interest." Such gain or loss will generally be capital gain or loss.

U.S. holders should consult with their tax advisors regarding the tax consequences of the ownership and disposition of the New Second Lien Facility with respect to their particular circumstances.

(h)    **Ownership and Disposition of the Reorganized Holdings Equity Interests by U.S. Holders.**

*Distributions*. A distribution paid in respect of the Reorganized Holdings Equity Interests generally will constitute a dividend for United States federal income tax purposes to the extent the distribution is paid out of current or accumulated earnings and profits, as determined under

United States federal income tax principles.  The gross amount of any such dividend to a U.S. holder will be included in the income of the U.S. holder, as ordinary dividend income.  In general, distributions in excess of current or accumulated earnings and profits will not be taxable to a U.S. holder to the extent that such distributions to the U.S. holder do not exceed the U.S. holder's adjusted tax basis in the Reorganized Holdings Equity Interests with respect to which the distribution is paid, but rather will reduce the U.S. holder's adjusted tax basis in such Reorganized Holdings Equity Interests (but not below zero). To the extent that distributions exceed current and accumulated earnings and profits as well as the U.S. holder's adjusted tax basis in the Reorganized Holdings Equity Interests, such distributions generally will be taxable as capital gain realized in respect of the Reorganized Holdings Equity Interests.

Under current United States federal income tax law, dividends paid to certain non-corporate U.S. holders, including individuals, generally will constitute qualified dividend income currently eligible for preferential rates of United States federal income tax, with a maximum rate of twenty percent (currently 20%), provided certain conditions and requirements are satisfied, such as minimum holding period requirements. U.S. holders that are corporations may be eligible for a partial dividends-received deduction with respect to dividend distributions that are paid in respect of the Reorganized Holdings Equity Interests, subject to certain conditions and requirements, such as minimum holding period requirements. The earnings and profits of Reorganized Holdings generally will be increased by the amount of COD income realized by Holdings pursuant to the Plan to the extent that such COD income does not reduce basis in assets of the RCS Group.

*Sale or Other Disposition of Reorganized Holdings Equity Interests*. In general, a U.S. holder will recognize gain or loss upon the sale or other taxable disposition of the Reorganized Holdings Equity Interests in an amount equal to the difference between the sum of the fair market value of any property and the amount of cash received in such disposition and such U.S. holder's adjusted tax basis in the Reorganized Holdings Equity Interests at the time of the disposition. Such gain or loss will generally be capital gain or loss.

U.S. holders should consult with their tax advisors regarding the tax consequences of the ownership and disposition of the Reorganized Holdings Equity Interests with respect to their particular circumstances.

(i)    **Ownership and Disposition of the New Warrants by U.S. Holders.**

Generally speaking, a U.S. holder who receives the New Warrants will recognize capital gain or loss upon the sale, exchange, redemption or other taxable disposition of the New Warrants equal to the difference between the amount realized and the U.S. holder's basis in the New Warrants. Upon exercise of the New Warrants, a U.S. holder exercising the New Warrants through a cash exercise should generally recognize no gain or loss on the exercise.  However, the exercise of New Warrants through a cashless exercise may be treated as a taxable exchange of the New Warrants causing the exercising U.S. holder to recognize taxable gain.  The holding period of a U.S. holder in Reorganized Holdings Equity Interests obtained through exercise of the New Warrants generally will begin on the date of exercise.

If a holder sells the warrants or they expire unexercised such holder would recognize capital gain, or loss, upon the date of the sale or the expiration of the warrants, reflecting the amount by which the consideration allowed, or the fair market value of the warrants exceeds, or is less than, such holder's tax basis in the warrants.

(j)      **Ownership and Disposition of the Class A Trust Interests and Class B Trust Interests.**

For further information on the tax treatment of the ownership and disposition of the Class A Trust Interests and Class B Trust Interests, see Section 4.3(p) (Creditor Trust).

(k)      **Medicare Tax.**

Certain U.S. holders that are individuals, estates or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets and income generated by certain capital assets such as interest and dividends generally for taxable years beginning after December 31, 2013. U.S. holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their exchange and the receipt, ownership and disposition of any consideration to be received under the Plan.

(l)      **Information Reporting and Backup Withholding.**

In general, a U.S. holder (other than certain exempt holders) will be subject to information reporting requirements with respect to (i) payments made in connection with the Plan, (ii) payments of principal, premium, and interest (including OID) paid in respect of, and the proceeds from a sale, redemption or other disposition before maturity of, the New Second Lien Facility, (iii) dividends and other taxable distributions paid in respect of, and the proceeds from a sale or other disposition of, the Reorganized Holdings Equity Interests, (iv) payments and distributions to the holders of Class A Trust Interests and Class B Trust Interests, and (v) proceeds from a sale or other disposition of the New Warrants.  In addition, such a U.S. holder may be subject to backup withholding (currently at a rate of 28%) on such payments if the U.S. holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its United States federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.  Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

(m)      **Bad Debt and/or Worthless Securities Deduction.**

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165 of the Tax Code. The rules governing the

character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 13.3 Federal Income Tax Consequences to non-U.S. Holders of Claims

(a)     **In General.**

Subject to the discussions below regarding accrued and unpaid interest, backup withholding and FATCA, a non-U.S. holder generally will not be subject to U.S. federal income or withholding taxes with respect to any gain recognized on (i) the exchange of Allowed First Lien Claims for its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests and the New Second Lien Facility, (ii) the exchange of Second Lien Claims for its Pro Rata Share of 38.75% of the Reorganized Holdings Equity Interests and the Class B Trust Interests, or (iii) the exchange of General Unsecured Claims for its Pro Rata Share of the Class A Trust Interests unless:

•        the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such non-U.S. holder maintains or, in the case of an individual, a fixed base in the U.S.), in which case the gain will be subject to tax as discussed below under "—(f) Income Effectively Connected with a U.S. Trade or Business;"

•        the non-U.S. holder is an individual present in the United States for 183 days or more during the taxable year of the exchange and certain other conditions are met, in which case the gain generally will be subject to tax at a rate of 30%; or

•        in the case of holders of Convertible Note Claims (or other options, warrants and equity interests) the non-U.S. holder meets certain ownership requirements and the Holdings had been a "United States real property holding corporation" (a "**USRPHC**"), for U.S. federal income tax purposes at any time during the five-year period ending on the date of the exchange or, if shorter, the non-U.S. holder's holding period with respect to its Claims. If Holdings was a USRPHC, such gain would be subject to tax at generally applicable U.S. federal income tax rates. In addition, a non-U.S. holder would be subject to U.S. withholding tax at a rate of 15% on the gross amount paid to such non-U.S. holder in respect of Convertible Note Claims (or other options, warrants and equity interests). Holdings will be classified as a USRPHC if the fair market value of its "United States real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

(b)     **Accrued and Unpaid Interest**.

A portion of the consideration received by a non-U.S. holder in satisfaction of a Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest as discussed alone with respect to U.S. holders in "—(b) Allocation

of Consideration to Accrued Interest." To the extent an amount is treated as interest, it will be subject to tax in the same manner as interest as described below under "—(c) Ownership and Disposition of the New Second Lien Facility by non-U.S. Holders."

(c)      **Ownership and Disposition of the New Second Lien Facility by non-U.S. Holders**.

*Interest and OID.* Stated interest on, and OID accrued with respect to, the New Second Lien Facility constitute income from U.S. sources. Except as discussed below under "—(g) FATCA" and/or "—(h) Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to U.S. federal income or withholding tax on any amount treated as interest (including OID), if the interest is not effectively connected with a U.S. trade or business (or, if required by an applicable income tax treaty, is not attributable to a U.S. permanent establishment or, in the case of an individual, a fixed base), provided that the non-U.S. holder:

•      does not actually or constructively own 10% or more of the total combined voting power of all classes of the Reorganized Holdings Equity Interests entitled to vote;

•      is not a controlled foreign corporation that is related to Reorganized Holdings (directly or indirectly) through stock ownership;

•      is not a bank receiving interest on a loan entered into in the ordinary course of its trade or business; and

•      certifies to its non-U.S. status on a properly completed and executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable.

If a non-U.S. holder cannot satisfy the requirements described above, payments treated as interest made to the non-U.S. holder will be subject to a 30% U.S. federal withholding tax, unless the non-U.S. holder establishes its eligibility for a reduced rate of withholding, or is able to claim a valid exemption, under an applicable income tax treaty generally by providing a properly completed and executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, upon which the non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. A non-U.S. holder that is eligible for a reduced rate of U.S. withholding tax under a tax treaty may also obtain a refund of any amounts withheld in excess of that rate by filing a timely refund claim with the IRS. For purposes of providing a properly completed and executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, special procedures are provided under applicable Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

Interest paid to a non-U.S. holder that is effectively connected with its conduct of a trade or business within the United States will not be subject to U.S. federal income or withholding tax, as described above, generally if the non-U.S. holder provides a properly completed and executed IRS Form W-8ECI. Instead, such interest payment generally will be subject to U.S.

federal income tax as further discussed below under "—(f) Income Effectively Connected with a U.S. Trade or Business."

*Sale or Other Disposition.*  Except as discussed below under "—(g) FATCA" and/or "—(h) Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to U.S. federal income or withholding tax with respect to any gain recognized on the sale, redemption or other disposition of its share of the New Second Lien Facility in a taxable transaction unless:

> • the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such non-U.S. holder maintains or, in the case of an individual, a fixed base in the U.S.), in which case the gain will be subject to tax as discussed below under "—(f) Income Effectively Connected with a U.S. Trade or Business;" or

> • the non-U.S. holder is an individual present in the United States for 183 days or more during the taxable year of the sale, redemption or other disposition and certain other conditions are met, in which case the gain generally will be subject to tax at a rate of 30%.

(d)      **Ownership and Disposition of the Reorganized Holdings Equity Interests by non-U.S. Holders.**

*Distributions*.  In general, any distribution paid in respect of the Reorganized Holdings Equity Interests to a non-U.S. holder that constitutes a dividend for U.S. federal income tax purposes will be subject to a 30% U.S. federal withholding tax, unless the non-U.S. holder establishes its eligibility for a reduced rate of withholding under an applicable income tax treaty generally by providing an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, upon which the non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. A distribution paid in respect of the Reorganized Holdings Equity Interests will generally constitute a dividend for U.S. federal income tax purposes to the extent the distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  Any distribution not constituting a dividend will be treated first as reducing the adjusted basis in the non-U.S. holder's Reorganized Holdings Equity Interests and thereafter as gain from the sale or exchange of Reorganized Holdings Equity Interests.

Dividends paid to a non-U.S. holder that are effectively connected with its conduct of a trade or business within the United States will not be subject to U.S. federal income or withholding tax, as described above, generally if the non-U.S. holder provides a properly completed and executed IRS Form W-8ECI. Instead, such dividends generally will be subject to U.S. federal income tax as further discussed below under "—(f) Income Effectively Connected with a U.S. Trade or Business."

*Sale or Other Disposition of Reorganized Holdings Equity Interests*. Except as discussed below under "—(g) FATCA" and/or "—(h) Backup Withholding and Information Reporting,"

135

non-U.S. holders will generally not be subject to U.S. federal income or withholding tax on gain recognized on the sale, exchange, redemption or other taxable disposition of Reorganized Holdings Equity Interests unless certain exceptions apply, as described above under "—(a) In General."

(e)    **Ownership and Disposition of the New Warrants by non-U.S. Holders**.

Except as discussed below under "—(g) FATCA" and/or "—(h) Backup Withholding and Information Reporting," non-U.S. holders generally will not be subject to U.S. federal income or withholding tax on gain recognized on the sale, exchange, redemption or other taxable disposition of New Warrants unless certain exceptions apply, as discussed above under "—(a) In General."

(f)    **Income Effectively Connected with a U.S. Trade or Business**.

If a non-U.S. holder is or was engaged in a trade or business in the United States and interest, dividends or gain with respect to the Claims, New Second Lien Facility, Warrants, Class A Trust Interests, Class B Trust Interests, or Reorganized Holdings Equity Interests is or was effectively connected with the conduct of the non-U.S. holder's trade or business, or, where a U.S. income tax treaty applies, the non-U.S. holder maintains a U.S. permanent establishment (or, in the case of an individual, a fixed base) to which the interest, dividends or gain is attributable, the non-U.S. holder generally will be subject to U.S. federal income tax on a net income basis on such interest, dividends or gain in the same manner as a U.S. holder, as described above under "13.2 Federal Income Tax Consequences to U.S. Holders of Claims." In addition, if a non-U.S. holder is a corporation, the non-U.S. holder may be subject to a U.S. branch profits tax with respect to its effectively connected earnings and profits attributable to such interest, dividends or gain at a rate of 30%, unless a lower rate applies to the non-U.S. holder under an applicable income tax treaty. Such interest or dividends will generally be exempt from U.S. federal withholding tax if the non-U.S. holder claims the exemption by providing a properly completed and executed IRS Form W-8ECI to the payer on or before the relevant payment date.

(g)    **FATCA**.

In addition, Sections 1471 to 1474 of the Tax Code ("FATCA") generally impose withholding of 30% on certain payments to certain foreign entities (including financial intermediaries), unless various U.S. information reporting, diligence, and certain other requirements have been satisfied. Such payments will ultimately include U.S. source interest and dividends, as well as gross proceeds (including principal payments) from the sale or other disposition of debt or equity securities that can produce, respectively U.S. source interest or dividends. FATCA withholding generally applies to payments of dividends and interest made after June 30, 2014, and payments of gross proceeds made after December 31, 2018. If withholding is required under FATCA on payments made to a holder, the holder likely will not be entitled to receive any additional amounts with respect to any amounts withheld. Foreign holders should consult their tax advisors regarding the possible implications of this legislation to their particular circumstances.

(h)     **Backup Withholding and Information Reporting**.

A non-U.S. holder not subject to U.S. federal income tax may nonetheless be subject to backup withholding and information reporting with respect to interest paid on the Claims or New Second Lien Facility, or dividends paid on the Reorganized Holdings Equity Interests and with respect to amounts realized on the disposition of the Claims, New Second Lien Facility, Warrants, Class A Trust Interests, Class B Trust Interests, or Reorganized Holdings Equity Interests unless the non-U.S. holder provides the withholding agent with the applicable IRS Form W-8.   Non-U.S. holders should consult their independent tax advisors as to their qualifications for an exemption from backup withholding and the procedure for obtaining such an exemption.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.   ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE XIV.

## RECOMMENDATION AND CONCLUSION

Chapter 11 of the Bankruptcy Code provides that, unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of Impaired Claims against the Debtors in each Class of Impaired Claims must accept the Plan by the Requisite Acceptances set forth in the Bankruptcy Code.

The Debtors recommend that all holders of Claims entitled to do so, vote to accept the Plan.  The boards of directors of each of the Debtors (collectively, the "**Company Boards**"), the Debtors' officers have reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' creditors, such as liquidation of the Debtors under chapter 7 of the Bankruptcy Code.   The Debtors determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of these Debtors' estates for stakeholders, and such recovery will exceed any recovery under a hypothetical chapter 7.   For all of these reasons, the Debtors' officers and boards of directors support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims.    Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims.   Further, concessions the Debtors' secured creditors are willing to make to provide recoveries to junior creditors may not be available in an alternative plan structure.   The Debtors urge the holders of Impaired Claims in Classes 2 , 3 and 5 who are entitled to vote on the Plan, to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than [●] (Eastern Time) on [●].   Please be reminded that the Voting Agent must have original signatures on all Ballots; and that the Voting Agent will not accept Ballots delivered by email or facsimile.

[Signature Page follows.]

Dated: February 5,9, 2016
       New York, New York

                        Respectfully submitted,

                        RCS CAPITAL CORPORATION, on behalf of
                        itself and its affiliated Debtors

                     By:   */s/ David Orlofsky*
                           David Orlofsky
                           Chief Restructuring Officer

DECHERT LLP

1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

*Proposed Attorneys for the Debtors and
Debtors in Possession*

*[Signature Page to Disclosure Statement]*

21907099